IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHERYL BUTLER, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| JENNIFER P. COLLINS, | § | |
| STEVEN C. CURRALL, ROY R. | § | |
| ANDERSON, ANTHONY COLANGELO, | § | |
| JULIE PATTERSON FORRESTER, | § | CIVIL ACTION NO. 3:18-CV-37 |
| ELIZABETH G. THORNBURG, | § | |
| SAMANTHA THOMAS, RHONDA ICE | § | |
| ADAMS, HAROLD STANLEY, PAUL J. | § | |
| WARD, AND SOUTHERN METHODIST | § | |
| UNIVERSITY | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Plaintiff, Cheryl Butler (referred to herein as "Plaintiff" or "Professor Butler") in the above-referenced matter, complaining of and about Defendants, Jennifer P. Collins, (referred to herein as "Ms. Collins" or "Dean Collins"), Steven C. Currall (referred to herein as "Mr. Currall" or "Provost Currall"), Roy R. Anderson (referred to herein as "Mr. Anderson" or "Professor Anderson"), Anthony Colangelo (referred to herein as "Mr. Colangelo" or "Professor Colangelo"), Mary Spector (referred to herein as "Ms. Spector" or "Dean Spector"), Julia P. Forrester (referred to herein as "Ms. Forrester" "Julie Forrester" or "Associate Provost Forrester"), Elizabeth G. Thornburg (referred to herein as "Ms. Thornburg" or "Dean Thornburg"), Samantha Thomas (referred to herein as "Ms. Thomas"), Rhonda Ice Adams (referred to herein as "Ms. Adams"), Harold W. Stanley (referred to herein as "Mr. Stanley" or "Provost Stanley"),  Paul J. Ward (referred to as "Mr. Ward"), and SOUTHERN METHODIST

1

UNIVERSITY (referred to herein as "SMU" or "SMU Dedman School of Law" or "the law school") (collectively referred to herein as "Defendants"), and for cause of action files this Second Amended Complaint, showing the Court the following:

## I.    PARTIES

1.    Plaintiff Cheryl Butler is a former Assistant Professor of Law at Southern Methodist University ("SMU") Dedman School of Law.  Plaintiff is a resident of Texas.

2.    Defendant Jennifer M. Collins is a Professor of Law at SMU Dedman School of Law.  Ms. Collins is an attorney and a member of the District of Columbia Bar.  Ms. Collins is a resident of Texas whose mailing address is 6531 Northport Dr. Dallas, Texas 75230.  Ms. Collins is sued in both her official and individual capacity.

3.    Defendant Steven C. Currall is the Provost and Vice President for Academic Affairs at SMU. Mr. Currall is a resident of Texas whose mailing address is 3202 Drexel Dr. Dallas, Texas 75205.  Mr. Currall is sued in both his official and individual capacity.

4.    Defendant Roy R. Anderson is the Vinson & Elkins Distinguished Teaching Fellow and Professor of Law at SMU Dedman School of Law.  At the time of the events giving rise to Plaintiff's claims, Mr. Anderson was the Chair for Plaintiff's Tenure & Promotion Committee. Mr. Anderson is an attorney and a member of the Texas Bar. Mr. Anderson resident of Texas whose mailing address is 8259 Santa Clara Dr. Dallas, Texas 75218.  Mr. Anderson is sued in both his official and individual capacity.

5.    Defendant Anthony Colangelo is the Gerald J. Ford Research Fellow and Professor of Law at SMU Dedman School of Law. At the time of the events giving rise to Plaintiff's claims, Mr. Colangelo was a member of Plaintiff's Tenure and Promotion Committee. Mr. Colangelo is an attorney and a member of the Texas Bar.  Mr. Colangelo is resident of Texas whose mailing address is 3429 Mockingbird Ln. Dallas, Texas 75205.  Mr. Colangelo is sued in both his official and individual capacity.

6.    Defendant Julia Patterson Forrester is the Associate Provost and Professor of Law at SMU. At the time of the events giving rise to Plaintiff's claims, Ms. Forrester was the Dean *ad interim* of the SMU Dedman School of Law and, initially a member of Plaintiff's Tenure and Promotion Committee.  Ms. Forrester is an attorney and a member of the Texas Bar.  Ms.

Forrester is a resident of Texas whose mailing address is 3908 Amherst Ave. Dallas, Texas 75225.  Ms. Forrester is sued in both her official and individual capacity.

7.      Defendant Elizabeth G. Thornburg is the Altshuler Distinguished Teaching Professor and Richard R. Lee Endowed Professor of Law at SMU.  At the time of the events giving rise to Plaintiff's claims, Ms. Thornburg was the Associate Dean of Faculty at the SMU Dedman School of Law and, initially, a member of Plaintiff's Tenure and Promotion Committee. Ms. Thornburg is an attorney and a member of the Texas Bar.  Ms. Thornburg is a resident of Texas whose mailing address is 8088 Park Ln. Apt. 615, Dallas, Texas 75231.   Ms. Thornburg is sued in both her official and individual capacity.

8.      Defendant Samantha Thomas is the Executive Director of Access and Equity, and Title IX Coordinator of the Office of Institutional Access and Equity at SMU.  Ms. Thomas is also an Executive Assistant to the President of SMU. Ms. Thomas is a resident of Texas whose mailing address is 3902 Altona Drive Dallas, Texas 75233-3402.  Ms. Thomas is sued in both her official and individual capacity.

9.      Defendant Rhonda Ice Adams is a Senior Human Resources Specialist, Benefits and the Family and Medical Leave Act (FMLA) Coordinator at SMU.  Ms. Adams is a resident of Texas whose mailing address is 1820 Arrow Lane Garland, Texas 75042-8313. Ms. Adams is sued in both her official and individual capacity.

10.     Defendant Harold W. Stanley is the Vice President for Executive Affairs and Guerin-Pettus Distinguished Professor in American Politics at SMU.  At the time of the events giving rise to Plaintiff's claims, Mr. Stanley was the Provost *ad interim* at SMU and was later promoted to Vice President of Executive Affairs.  Mr. Stanley is a resident of Texas whose mailing address is 5520 Winton Street Dallas, Texas 75206-5352.  Mr. Stanley is sued in both his official and individual capacity.

11.     Defendant Paul J. Ward is the Vice President for Legal Affairs, General Counsel, and Secretary of the Board of Trustees of SMU.  Mr. Ward is an attorney and a member of the Texas Bar.  Mr. Ward is a resident of Texas whose mailing address is 4030 Moler St. Dallas, Texas 75211.  Mr. Ward is sued in both his official and individual capacity.

12.     Defendant Southern Methodist University (SMU) is an educational institution organized and existing under the laws of the State of Texas and conducting business at various

3

branches throughout Texas and the United States, including this division of the Northern District of Texas, and may be served with process through its registered agent, Paul J. Ward, Perkins Admin. Bldg., 6425 Boaz, Dallas, Texas 75275.  At all times relevant hereto, Defendant, SMU, was acting through its agents, servants, and employees, who were acting within the scope of their authority, course of employment, and under the direct control of Defendant.

## II.      JURISDICTION AND VENUE

13.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, as Plaintiff's causes of action arise under federal statutes: (a) Title VII of the Civil Rights Act of 1964 (as amended) (which is codified in 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a)) (hereinafter referred to as "Title VII"); (b) the Age Discrimination in Employment Act of 1967 (as amended by the Civil Rights Act of 1991) (which is codified in 29 U.S.C. § 621 et seq.) (hereinafter referred to as the "ADEA"); (c) the Americans with Disabilities Act of 1990, as amended ("ADA/ADAAA") and 29 USC § 2601 *et seq.*, and the Family Medical Leave Act ("FMLA"). (d)  Family Medical Leave Act; and the Civil Rights Act of 1866, as amended, 42 U.S. C. § 1981 (hereinafter referred to as "§ 1981").

14.      Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's similar state claims that arise under the Texas Commission on Human Rights Act, which is codified in Chapter 21 of the Texas Labor Code, Texas Labor Code § 21.001 et seq. (hereinafter referred to as the "TCHRA") and common law principles of breach of contract, defamation, and negligence retention, supervision and training, because these claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

15.      Venue is proper in the Northern District of Texas - Dallas Division pursuant to 28 U.S.C. § 1391(a) because this is the judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

## III.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.      On March 2, 2017, Plaintiff filed a Charge of Discrimination (Charge No. 460-2017-01925) with the U.S. Equal Employment Opportunity Commission (hereinafter referred to as the "EEOC") against Defendant SMU for race, sex, and disability discrimination, as well as retaliation and FMLA interference and retaliation.  This Charge of Discrimination was filed for

discrimination and retaliation.  (See Exhibit 1, which is attached hereto and incorporated by reference).

17.     Subsequently, the EEOC issued Plaintiff's Notice of Right to Sue, dated December 19, 2017.  (See Exhibit 2, which is attached hereto and incorporated by reference). Plaintiff filed this lawsuit within ninety (90) days of receiving the Right to Sue notice. Therefore, this lawsuit is timely filed.

## IV.     FACTS

18.     Plaintiff, an African American attorney, graduated *cum laude* from Harvard University, where she was awarded the Ellen A. Barr Award for Character and Academic Excellence and the Elizabeth Cary Agassiz Award for Academic Distinction. She received *magna cum laude* honors for coursework in the dual major of American History and African-American Studies.

19.     Plaintiff then received her Juris Doctor degree from New York University School of Law, where she was honored as a Root-Tilden-Kerr Scholar and a Junior Fellow with the Center for International Legal Studies.

### A.   Plaintiff's Employment Contract with SMU & Tenure Track Appointment

20.     On or about August 2011, Plaintiff commenced her appointment as a "tenure track" Assistant Professor of Law at the SMU Dedman School of Law.

21.     Professor Butler's employment contract with SMU was based on several documents and guidelines which set forth the terms and conditions of her employment, including but not limited to, the SMU University Policies and Procedures General ("University Bylaws") and the SMU Dedman School of Law's Policies and Procedures ("law school Bylaws").

22.     Professor Butler's employment contract was also based in part upon her "appointment letter" which discusses some of the terms of her status as a" tenure track" professor.

23.     Plaintiff's appointment letter provided that SMU would assign her to teach three (3) courses during her first three (3) years of employment, including a seminar course chosen by Plaintiff.  In the fourth year of employment, a fourth course would be added to Plaintiff's teaching load.  Plaintiff's Contract also required that she publish legal scholarship and provide service to the university and the profession.

24.     After a probationary period, an Assistant Professor of Law on tenure track may apply for tenure and promotion to the rank of Associate Professor.  A tenure track law professor at SMU customarily is considered for Tenure and Promotion in the Fall Semester of her fifth year of employment.

25.     SMU may delay consideration an Assistant Professor's candidacy for tenure and promotion for various reasons including, but not limited to, FMLA leave or unpaid leave to provide the candidate with extra time beyond the probationary period to meet the tenure standards.

26.     If SMU approves an application for tenure and promotion, the professor receives tenure. Tenure is an indefinite appointment that generally is only terminated for cause.  If SMU denies an assistant professor's application for tenure and promotion, the university provides one terminal year of employment.

27.     At all times during her employment, Plaintiff performed all her contractual duties. And, Plaintiff did not receive any written or verbal reprimands or other disciplinary action prior to applying for tenure or promotion at SMU.

**Plaintiff's Third Year Review: She is "On Track for Tenure & Promotion."**

28.     As a prerequisite for applying for tenure and promotion, Assistant Professors at the law school must undergo a third-year performance review known as "Contract Renewal" and or "Third Year Review." At SMU, the standard for Contract Renewal is that the candidate's scholarship, teaching, and service must be "on track for tenure and promotion."

29.     Upon her Third-Year performance review, Professor Butler's first Tenure Committee recommended Contract Renewal, finding that she was "on track for tenure and promotion."

30.     In support of her application for Contract Renewal, several faculty members, including Tenure Advisory Chair Joe Norton, visited Professor Butler's Torts class and told her that she met the tenure standard for teaching.

31.     As part of her Third Year Review, Plaintiff's Tenure Advisory Committee submitted a report to the faculty, referred to as a Tenure Committee Letter or Report.  In its report, the Committee concluded that Plaintiff met the standard of "on track for tenure and promotion."

32.     In its report, the Tenure Committee also noted Plaintiff's reputation for collegiality and leadership, citing as an example, her care for colleague, Professor Sarah Tran, who later that month died from cancer.

33.     Prior to recommending her for contract renewal, the tenure committee assessed Professor Butler's teaching evaluations by students and faculty.   The Tenure Committee observed that Professor Butler always received outstanding teaching evaluations in her Civil Rights and Employment Discrimination courses but received outstanding teaching evaluations in Torts in some, but not all, semesters.   Based on this record, the Tenure Committee concluded that Professor Butler "was on track for tenure and promotion" and recommended her for contract renewal.

### Defendants Further Indicated Plaintiff was "On Track" for Tenure and Promotion

34.     Before and after Professor Butler's Contract Renewal, SMU made other representations that Professor Butler was "on track for tenure and promotion."

35.     On or about February 2014 (shortly before Contract Renewal), former Provost Paul Ludden appointed Professor Butler to serve on SMU's Law School Dean Search Committee.  Then-Provost Ludden appointed Professor Butler to serve with the SMU Board of Trustees on SMU's Law School Dean Search Committee because "she represented the future of the Dedman School of Law."    Plaintiff was the only non-tenured faculty member and only African American to serve on the committee.  Plaintiff served on the faculty with members of the tenured law faculty, deans and administrators from throughout the university, and members of the SMU Board of Trustees.

36.     Several members of the Board of Trustees commended Professor Butler for her leadership, dedication, and collegiality while in service with them on the Dean Search Committee.

37.     Each year, members of the law faculty are required to submit a Personal Assessment listing their achievements and accomplishments.  Based on the Personal Assessment, as well as other performance indicators such as publications and student teaching evaluations, the Dean and Provost recommend salary raises, pay bonuses, and competitive summer research grants. Each year, Professor Butler was awarded a salary increase and bonus.  Further, each year

7

before her application for tenure and promotion, Professor Butler was awarded the maximum summer research grant of at least $20,000.

38.     In Fall 2014, subsequent to her Contract Renewal in Spring 2014, Associate Dean Beth Thornburg, a member of the Tenure Advisory Committee, visited Professor Butler's Torts class.  Professor Thornburg reported to Professor Butler and to the Tenure Advisory Committee that Professor Butler that she observed excellent teaching in that class.

39.      Subsequently, Professor Butler's teaching evaluations for Torts for the Fall 2014 semester overall were "excellent" and very favorable.  Tenure Chair Joe Norton wrote to Professor Butler to congratulate her on her outstanding teaching evaluations in all of her courses that semester.

40.     In Fall 2015, weeks before she was scheduled to apply for Tenure and Promotion, Plaintiff's Tenure Advisory Chair, Professor Joe Norton, sent her two important emails.  In one, Professor Norton told Professor Butler that she had met all of the standards for tenure and promotion and that "she was a good person."

41.     In another email, Professor Norton told her and the other two members of her Tenure Advisory Committee, Associate Dean of Faculty Beth Thornburg and Professor George Martinez, that Professor Butler met the standard for teaching as set forth in the SMU Bylaws. Particularly, he advised the Committee on how he wanted them to outline the grounds in which Plaintiff met the standard for teaching.

42.     With the support of Tenure Chair Joe Norton, and encouragement from other faculty members, Plaintiff prepared her application for tenure and promotion in October 2015,

43.     Prior to applying for tenure and promotion, Plaintiff did not receive any due process notice reprimand or disciplinary action for misconduct.

### Plaintiff's Record of Legal Scholarship Met the Tenure Standard

44.     It was common knowledge that the University subjected African American women to a heightened standard for tenure and promotion.   And, despite these increased standards, Plaintiff still met the standard required for tenure, as noted by her original tenure chair, Joe Norton, and her second chair Roy Anderson (who would later replace Joe Norton).

45.     On or about Spring 2013, in the second year of her appointment, Professor Joe Norton, Professor Butler's tenure chair, told Professor Butler in writing that, SMU, she had to

8

publish at least six major articles in "flagship" journals at law schools "ranked equal or higher than SMU Law" based on the U.S. News & World Report Law School Rankings.

46.     Professor Norton and other law faculty members voting on Professor Butler's application for tenure and promotion told her that presentations of her research at universities was expected and acknowledged as further indicia of "outstanding" and or "high quality" legal scholarship and teaching.

47.     During her tenure probationary period, Professor Butler authored EIGHT academic articles published in leading law journals – including: *The Racial Roots of Human Trafficking,* 62 UCLA LAW REVIEW 1464 (2015); *Bridge Over Troubled Water: Safe Harbor Laws for Prostituted Minors,* 93 NORTH CAROLINA LAW REVIEW 1281 (2015); *A Critical Race Feminist Perspective on Prostitution and Sex Trafficking*, 27 YALE JOURNAL OF LAW & FEMINISM 95 (2015); *The Story Behind a Letter In Support of Professor Derrick Bell: A Symposium in Honor of Professor Derrick Bell: Continuing Professor Bell's Legacy of Race Law Scholarship and Social Justice Advocacy,* 75 UNIVERSITY OF PITTSBURGH LAW REVIEW 729 (2015)(co-authored); *Making the Grade: The United States' TIP Report Card & The Fight Against Child Sex Trafficking*, 67 SMU LAW REVIEW 341 (2014); *Kids For Sale: Does America Recognize Her Own Sexually Exploited Minors as Victims of Human Trafficking?* 44 SETON HALL LAW REVIEW 833 (2014); *Blackness as Delinquency*, 90 WASHINGTON UNIVERSITY LAW REVIEW 1335 (2013); *Sex Slavery in the Lone Star State: Does the Texas Human Trafficking Legislation of 2011 Protect Sexually Exploited Minors?* 45 AKRON LAW REVIEW 843 (2012).

48.     Plaintiff gave lectures and presentations of her research at the leading law schools across the nation including Yale Law School, UCLA Law School, Tulane Law School, University of North Carolina School of Law, Vanderbilt Law School, University of Houston Law Center, Texas A&M School of Law, Gonzaga Law School, and Wisconsin Law School.

49.     Several "outside" reviewers – legal scholars and experts at other top schools – gave Professor Butler's legal scholarship favorable reviews.

50.     Based on her reputation as a legal scholar, Professor Butler was selected and did serve as a manuscript reviewer for COLUMBIA UNIVERSITY PRESS in "Gender & the Law."

**Plaintiff's Record for Teaching Met the Tenure Standard**

51.     Despite SMU's higher teaching standards imposed upon Black female tenure candidates, Plaintiff's Teaching record equaled or exceeded the record of similarly situated white male candidates awarded tenure and promotion at the Dedman School of Law.

52.     According to SMU Policy 6.2, the term "teaching" describes the "total range of duties customarily performed by a full-time faculty member.  Those duties include such activities as classroom teaching, research, directing research, counseling students, curriculum oversight, committee work, and administrative responsibilities."

53.     White professors with the same or inferior evaluations in teaching, as compared to Plaintiff, have been awarded tenure and promotion.

54.     As part of her Third Year Review, several professors visited Professor Butler's Torts class and provided favorable teaching reviews.   Upon information and belief, these professors included, but are limited to, Associate Dean Nathan Cortez, Torts Professor Tom Mayo, Professor Jeff Kahn, Professor Bill Bridge, and Professor Jessica Dixon Weaver.

55.     Based in part on these favorable reviews, Plaintiff's Tenure Advisory Committee recommended that the law faculty renew Plaintiff's application for Contract Renewal. SMU law faculty voted to renew Plaintiff's contract and allow her to proceed as a Tenure Track candidate.

56.     However, after Professor Butler filed a formal complaint of FMLA discrimination with the Office of Institutional Equity in Fall 2015, the University assigned a new Tenure Advisory Committee.

57.     The new Tenure Advisory Committee Chair, Professor Roy Anderson told Plaintiff that she was a talented, gifted and qualified teacher.  Professor Anderson told Plaintiff that in her Employment Discrimination and Civil Rights Courses "she was outstanding."  He said in those classes "everyone can see all of your gifts and talents."

58.     Notably, Plaintiff was ill during the evaluation/tenure process.

59.     Professor Anderson further told Plaintiff that, given that she was obviously sick with some sort of respiratory illness during the only month that he had to assess her teaching, it was not fair to him or his Tenure Advisory Committee for SMU to require that assess her teaching while ill.

60.     Professor Anderson visited Professor Butler's Torts class, but not her other courses. He also told Professor Butler that there were some things that she could improve her

teaching in the Torts class, although he was not completely sure if the issues were related to an illness. He said that Professor Butler just needed a short period with a senior colleague who could help her make a few adjustments.

61.     The Tenure Chair, Professor Anderson, added that he already saw evidence of Professor Butler's capacity as an excellent and qualified teacher vis-à-vis her consistently and unanimously outstanding student Teaching evaluations in THREE courses (podium lecture courses and writing seminars) at the law school.  In his words, Professor Butler had "so many gifts and talents" as a law professor and "it is obvious that so many students adore you." Therefore, he was confident that with extra time, and or, if she were not sick with upper respiratory problems, he was certain that would personally observe "outstanding" teaching in all her classes.  He said that Professor Butler only had to make a few minor adjustments and if given more time, he could show her what to change to be an even better teacher.

62.     Professor Anderson conveyed to Plaintiff that, even if he thought that it was discriminatory to evaluate a candidate in such a short period of time and or while the candidacy appeared disabled, he would follow orders and proceed with doing so. Particularly, Professor Anderson warned that, regardless of his personal thoughts on this matter, he was "an employee of the University" and had to what Dean Collins and the "central administration" told him to do.

63.     Therefore, Professor Anderson and other members of the faculty, including Professors Weaver and Kofele-Kafe, told Professor Butler that she had a contractual right to delay her Tenure evaluation period so that the new committee could evaluate her while she was not ill. Professor Anderson advised Plaintiff to seek an extension in her tenure probationary period of one semester or a year.  The extra time would give him a fair opportunity to assess her teaching in the Torts class.

64.     Even though SMU did not defer Plaintiff's tenure evaluation due to illness, Plaintiff continued to receive favorable teaching evaluations from members of the SMU law faculty. For example, Dean Collins visited Plaintiff's Torts class.  Plaintiff then met with Dean Collins in her office to discuss the assessment.  Dean Collins told Plaintiff that "she was an outstanding teacher."

11

65.     Likewise, the Professors who visited class in Fall 2015 with Dean Collins, including Professors Bill Bridge and Nathan Cortez, also told Professor Butler that she had done a great job teaching that day.

66.     In Fall 2015, during the formal tenure advisory period, Plaintiff also received an Outstanding peer review from a professor affiliated with SMU's Center for Teaching Excellence. The Center allows teachers to request that a seasoned professor in the university to visit classes and provide an assessment.  As stated, Professor Butler's assessment was outstanding.

## Reputation: A Dedicated and Sought-After Professor; a Caring Colleague & Campus Leader

67.     Even in those semesters in which her Torts teaching evaluations were mixed, Professor Butler always received unanimously strong marks for the portion of the evaluation that asks students to assess the professor's interest, motivation, care, and dedication to teaching.

68.     Plaintiff received these high marks for dedication in part because she was known to spend lots of time and energy tutoring and otherwise meeting with her First Year Students to help them with Torts and otherwise counsel them about the pressures of law school.

69.     Plaintiff was known to hold her review sessions (which are not required of professors) even when she and or family members were seriously ill.  For example, in Spring 2014, Plaintiff notified Dean Collins and other faculty that Plaintiff's husband was in the hospital for several days in Houston.  Professor Butler promised to hold her review session and office hours despite the medical emergency.

70.     In another example, in December 2015, after Plaintiff was finally granted FMLA leave for asthma, Plaintiff still agreed to travel to the Dallas campus from Houston to hold a review session.  During the same FMLA leave, Plaintiff graded her own exams instead of allowing SMU to provide Pass Fail grades.

71.     For these efforts, Plaintiff developed a reputation at the law school as an outstanding and sought-after teacher.  For example, in her graduation speech before the law faculty and University President, the Class of 2014 Valedictorian recognized Professor Butler as one of the "best" and "sought after professors at the law school."

72.     In support of her application for tenure and promotion, several of Professor Butler's former students and SMU alumni wrote letters of support attesting to her skill as a teacher and mentor and her dedication to and affinity toward her students.

73.     In all of her courses, Professor Butler was known to hold unlimited office hours to assist any First Year Torts students who needed help.  Her review sessions gained notoriety because so many students would come to her weekly Office Hours that they would crowd on the couch and on the floor or in standing room only. The students seem to enjoy crowding into the tight and intimidate setting of the Office to engage and debate Tort law with their Professor.

74.     In addition to her award for Directed Research, Professor Butler received several awards and recognition from SMU Law student organizations for outstanding teaching and leadership on the SMU campus.

75.     For her teaching and support in supporting women professors and students on campus, the SMU Women in Law Association celebrated Professor Butler with their Leadership Award in Spring 2015.

76.     Professor's reputation as a sought-after teacher is also evidenced by the fact that her Upper level courses were among the most popular and sought-after at the law school.  Some tenure track law professors taught semester courses for which only five or six students would register.  In contrast, Professor Butler's courses would often fill up within the first hour of registration and would often require a "waiting list" or a barrage of emails from students requesting assistance with admission to the course.

77.     The law school administration often asked Plaintiff to extend the registration in the class beyond capacity.  The extended registration created a heavier teaching load for Professor Butler.

78.     In addition to a reputation as an outstanding teacher in the Upper level courses, Professor Butler also demonstrated her love and care for teaching by developing a reputation as an advocate for students and mentoring several minority and female students.

79.     Professor Butler's reputation as a caring and dedicated teacher was also developed in response to the numerous review sessions and extended office hours that she held for her students.  She was known for allowing a crowd of students to sit in large groups on the

floor outside of her office.  She would join them on the floor or in the chair and talk about Torts. Her rule is that she would not leave until the last question was answered.

80.     Plaintiff was known to hold her review sessions (which are not required of professors) even when she and or family members were seriously ill.  For example, in Spring 2014, Plaintiff notified Dean Collins and other faculty that Plaintiff's husband was in the hospital for several days in Houston.  Professor Butler promised to hold her review session and office hours despite the medical emergency.

81.     In another example, in December 2015, after Plaintiff was finally granted FMLA leave for asthma, Plaintiff still agreed to traveled to the Dallas campus from Houston to hold a review session.  During the same FMLA leave, Plaintiff graded her own exams instead of allowing SMU to provide Pass Fail grades.

82.     Plaintiff's reputation as an outstanding and caring professor was also based on her efforts to help her fellow tenure track colleague, Professor Sarah Tran, to continue teaching while she fought cancer.

83.     Former Professor Tran's battle with cancer gained national attention in 2013-2014. It was public knowledge at the law school that Professor Butler served formally as the liaison between the University and Professor Tran's family and led efforts for the University to support Professor Tran and her family.

84.      Professor Butler communicated Professor Tran's medical status to the University, stayed by Professor Tran's side while she taught classes via Skype from her hospital bed; assisted Professor Tran in the grading of her seminar papers and worked with the University to help assess Professor Tran's ability to keep teaching as she began to lose her fight with cancer.

### Outstanding Student Evaluations in Torts (Except During Major FMLA Events)

85.     Plaintiff's student teaching evaluations in her Torts courses were outstanding for half of the semesters she taught them.

86.     During the remainder of her Tenure Evaluation period, Plaintiff received less than outstanding evaluations in her Torts class, she experienced an FMLA-qualifying event or other major hardship (death or hospitalization of a family member or colleague) and the University had notice.

14

87.     In those semesters when Plaintiff battled severe bronchitis and asthma, or she sought FMLA protection to care for a family member, her Torts evaluations received mixed reviews from students.

88.     Plaintiff taught her courses even though SMU failed or refused to provide FMLA leave or any other medical accommodation for Plaintiff.

89.     For example, in Fall 2015, the semester in which Professor Anderson's Tenure Advisory Committee observed Plaintiff's Tort's teaching, Plaintiff conducted student evaluations in Torts twice.  In late October, Plaintiff received outstanding evaluations from approximately 90 out of 97 students.

90.     Three weeks later, Professor Butler administered teaching evaluations, and the evaluations were substantially different with half of the class continuing to indicate that Plaintiff was an outstanding professor and half expressing criticism.  During the three-week interim, Plaintiff notified the university that she was suffering from severe asthma attacks and or some ailment that caused wheezing, incessant cough, trouble breathing and repeated visits to the hospital.

91.     Plaintiff also asked the University to delay her tenure evaluation to a later semester when she was not having trouble breathing while teaching.

92.     The University denied Plaintiff's request to delay her teaching evaluation and proceeded to evaluate her.  The University also credited the negative teaching evaluations that she received from students.

93.     Notwithstanding her FMLA events, Plaintiff's overall record of Student Teaching Evaluations – Outstanding Evaluations in three courses, Outstanding Evaluations in Directed Research, and mixed evaluations in a remaining course – met the standard for "high quality" teaching.

94.     Professor Butler often received strong teaching evaluations notwithstanding illness. For example, in Fall 2015, the semester in which Professor Anderson's Tenure Advisory Committee observed Plaintiff's Tort's teaching, Plaintiff conducted student evaluations in Torts twice.  In late October, Plaintiff received outstanding evaluations from approximately 90 out of 97 students.

15

95. Three weeks later, Professor Butler administered teaching evaluations. Three weeks later, the evaluations were substantially different with half of the class continuing to indicate that Plaintiff was an outstanding professor and half expressing criticism. Professor Weaver opined that, from her impressions from reading the evaluations and talking to students that praise vs. criticism was drawn among race and gendered lines, with the majority of favorable reviews coming from White females and Nonwhite racial minorities.

96. During the three-week interim, Plaintiff notified the university that she was suffering from asthma and or some ailment that caused wheezing, incessant cough, trouble breathing and repeated visits to the hospital.

97. During the interim, Plaintiff also asked the University to delay her tenure evaluation to a later semester when she was not having trouble breathing while teaching.

98. The University denied Plaintiff's request to delay her teaching evaluation and proceeded to evaluate her. The University also credited the negative teaching evaluations that she received from students.

**Outstanding / Excellent Teaching of SMU Students Outside of the Law Classroom**

99. According to Tenure Chair Joe Norton, Professor Butler met SMU's broad standard for excellent teaching through teaching activities beyond her classroom.

100. As stated above, this contractual definition of "teaching" is expressly stated in SMU Policy 6.2, which defines the term "teaching" the "total range of duties customarily performed by a full-time faculty member. Those duties include such activities as classroom teaching, research, directing research, counseling students, curriculum oversight, committee work, and administrative responsibilities."

101. Plaintiff taught her courses even though SMU failed or refused to provide FMLA leave or any other medical accommodation for Plaintiff.

102. Notwithstanding her FMLA events, Plaintiff's overall record of Student Teaching Evaluations – Outstanding Evaluations in three courses, Outstanding Evaluations in Directed Research, and mixed evaluations in a remaining course – met the standard for "high quality" teaching.

103.     In addition to meeting SMU's teaching standard in the classroom, Plaintiff also demonstrated other traditional indicia of "teaching of high quality" by presenting her scholarship at the most prestigious law schools in the nation including, but not limited to, Harvard, Yale, University of Pennsylvania, UCLA, Vanderbilt, UNC, and Tulane.

104.     Eager to grow professionally and further develop her teaching skills, Plaintiff attended every teacher development event at SMU or across the country that her schedule allowed.

105.     At defendants' request, Plaintiff served, along with professors and administrators across campus, on the Planning Committee for the Inaugural Women's Initiative Fellowship Program of the George W. Bush Presidential Center, Bush Institute.

106.     At the request of Provost Linda Eads, Plaintiff served on SMU Women's Studies Certificate Program, Advisory Committee.  As part of the program, Professor Butler lectured to international scholars and lawyers on issues related to civil rights, human rights and constitutional law.

107.     Professor Butler represented SMU as the only or one of the few Black professors to organize and lecture in the Bush Institute Program. Professor Butler received outstanding evaluations of her lectures from the participants. As a result, Provost Linda Eads wrote a letter to Dean Attanasio reporting on Professor Butler's outstanding teaching reviews in the program.

108.     Plaintiff served as the official Faculty Advisor to the Black Law Students Association and unofficially as an advisor of Women in Law.

109.     When SMU appointed former Associate Dean of Students Martin Camp as an inaugural Faculty Director of SMU's new residential college system in 2014, Dean Camp invited Plaintiff to work with him as an Faculty Affiliate at Crum Commons.

110.     In her capacity as a Faculty Affiliate, Plaintiff assisted the Dean of Students with events for students in the college. The events included purely social events aimed at providing institutional support; guest speaker events with law professors and attorneys aimed at recruiting the students to law school and speaker events aimed at addressing pressing legal and public policy issues.

111.     SMU administrators, professors, and student frequently invited Plaintiff to lecture as a panelist for SMU-sponsored events and programs.

112.     Plaintiff supported students on campus by accepting invitations to lecture at events organized by campus groups including The Federalist Society, The American Constitutional Society, The Employment Law Association, Older Wiser Law Students ("OWLS"), The Black Law Students Association, The Gay and Lesbian Students Association, and Women in Law.

113.     SMU Law Professor Jenia Turner recommended Plaintiff to SMU Gerald Turner to serve on the SMU President's Commission on the Status of Women.  Professor Butler served on the Commission for several years and assumed leadership positions.

114.     In 2014, Professor Butler's dedication and skill as a teacher, administrator, and campus leader was also indicated by her service on the Dean Search Committee.  SMU appointed Professor Butler to Dean Search Committee with members of the tenured law faculty, the SMU Board of Trustees and leading administrators across the University.  Several law professors and Trustees wrote that she served with distinction.

115.     Professor Butler served full time on the Committee even though she was supposed to be on a semester leave of absence from all teaching duties, including this type of committee work.  In this capacity, Plaintiff interviewed law professor candidates from across the nation and chaired meetings with the Junior Faculty (recently tenured or nontenured) to understand and covey to the Search Committee their criteria for a new dean (one of which was that the new dean must change the culture of discrimination at the law school).

116.     During her tenure on the Dean Search Committee in Fall 2014, Professor Butler's father suddenly.  During this same week, Dean candidate Jennifer Collins was interviewing for the deanship.  As evidence of her dedication, Professor Butler continued her work on the Search Committee while she planned her father's funeral.

117.     At SMU's request and or invitation, Plaintiff also served as a judge for the annual Moot Court Competition.

118.     Plaintiff also met another traditional criteria and indicia of excellent teaching identified in the SMU Law School Bylaws – writing and advocacy to impact legislation. Professor Butler worked with members of Congress to research, advocate on civil rights issues.

**Plaintiff' Met the Tenure Standard for Service**

119.    Plaintiff met SMU's discriminatory standard for Service by serving on several professional committees.  Plaintiff formerly represented SMU as Secretary (2014) and Treasurer (2013) of the AALS Civil Rights Section.  Plaintiff represented SMU as a member of the AALS Minority Section.

120.    Plaintiff also upheld her commitments to service to the legal profession and the community.  Plaintiff was active member of the American Bar Association.

121.    Several teaching activities are also considered indicia of "service" even though the SMU Bylaws define then as "teaching."  For example, SMU Law Professor Jenia Turner recommended Plaintiff to SMU Gerald Turner to serve on the SMU President's Commission on the Status of Women.

122.    In 2014, SMU appointed Professor Butler to Dean Search Committee.

123.    During her tenure probationary period, Professor Butler also served as an active member of several civic and advocacy organizations including, e.g., Top Ladies of Distinction, Inc. where she served as the National Parliamentarian and former Executive Director.

**B.  SMU Faculty Warn of Tenure Discrimination Systemically & in Plaintiff's Case**

124.    Notwithstanding her record of achievement and reputation as an engaged and supportive colleague, the law faculty voted in January 2016 to recommend that SMU deny Professor Butler's application for Tenure and Promotion.  Immediately, several faculty members baulked, informing Professor Butler that the adverse recommendation was part of a scheme to humiliate and retaliate against her for filing several internal complaints of discrimination, most notably an FMLA claim against Associate Law Dean Beth Thornburg and a Title IX complaint with the SMU Office of Institutional Equity.

125.    SMU and Defendants denied Plaintiff's application for tenure and promotion after subjecting her to racially discriminatory tenure standards and a discriminatory tenure process.  Defendants also denied Plaintiff's application for tenure and promotion in retaliation for complaints about discrimination based on race, disability, and FMLA.

126.    Yet, as SMU faculty members admit on tape, even before the law faculty recommended the denial of tenure, several colleagues had already warned Professor Butler that, in addition to targeting her, or in the alternative, SMU has a history, pattern and practice of

19

applying discriminatory tenure standards generally and specifically toward African American female candidates.  Therefore, her tenure denial was part of this systemic problem of tenure discrimination.

127.    Particularly, in meetings of the SMU Faculty Senate, SMU faculty complained that the SMU Bylaws require teaching and scholarship of "outstanding" or "high quality" but fail to define these terms or provide consistent guidance on how candidates for tenure and promotion can meet these standards. SMU faculty also have complained that the question of whether a candidate's teaching or scholarship is "outstanding" or "of high quality" subjectively judged and evaluated by faculty and administrators on a case by case basis, and thereby, discriminatory basis.

128.    For years, Professor Butler has expressed similar concerns with her tenure committee, Associate Dean Nathan Cortez and then-Interim Dean Julie Forrester.  In response, these colleagues told her that plaintiff was not the first law faculty to raise this issue and that SMU reserved the right to apply different standards to different candidates.

129.    During Professor Butler's tenure evaluation process, several faculty members repeatedly warned her that SMU was subjecting her to racially discriminatory tenure standards and a discriminatory tenure process based on race, disability, and FMLA qualification. Notably, even members of Professor Butler's Tenure Advisory Committee are on record admitting that SMU was discriminating against her (and against the committee members) by subjecting her to a discriminatory tenure standard and or process.  The evidence shows that Plaintiff's first Tenure Chair, Professor Joe Norton made such warning via email and that the second Tenure Chair, Professor Roy Anderson and Tenure Advisory Committee member, Dean Mary Spector, expressly made such admissions on tape.

130.    Professor Weaver told Professor Butler that a group of faculty members, including, but not limited to, Professor Julie Forrester and Professor and former dean Paul Rogers routinely sabotaged current or prospective Black female law professors.

131.    Professor Weaver and Professor Butler complained that when Professor Weaver was a candidate for Contract Renewal, SMU discriminated by abruptly raising the standards for legal scholarship to sabotage her efforts toward contract renewal.

132.     Professor Weaver complained of several instances in which Dean Collins and other SMU administrators raised the requirements for scholarly publications when the candidate for tenure or promotion is a Black woman but lowers the standards for White male counterparts.

133.     Similarly, Professor Kofele-Kale, the first African-American Professor awarded tenure at SMU Law, told Professor Butler that SMU has a pattern and practice of raising the tenure standards for minority candidates as pretext for discrimination.  For example, Professor Kofele-Kale told Professor Butler that when he applied for tenure and promotion, then-Dean Paul Rogers discriminated against him based on race when Mr. Rogers recommended that SMU deny Professor Kofele-Kale's application and that the "racial controversy" prompted a "sit-in" by the SMU's Black law students and national media attention.  His tenure case received national media attention via the New York Times.

134.     Professor Ndiva Kofele-Kale, who is Black and was a member of Tenure Committee for Professor W. Keith Robinson who went up for tenure at the same time as Professor Butler, told Professor Butler that Defendants did not require that male candidates meet the standard for scholarship that SMU imposed upon Professor Butler and that the two male candidates did not meet that standard.

135.     In Spring 2014, one semester before Professor Butler submitted her application for tenure, Professor Weaver, who just one semester prior had just become the first African American female to receive tenure at the law school, complained to Dean Collins and other defendants that SMU discriminated based race by applying less stringent tenure standards for White male candidates.  Professor Weaver insisted that Professor Butler join her in that protest, and Professor Butler joined the protest.  SMU did not take prompt remedial action and change its pattern of discrimination.

136.     For example, Professor Weaver asked Professor Butler to protest SMU's attempts to lower the standards by allowing Professor Chris Jenks to apply for Contract Renewal without allowing the faculty to review his poor student teaching evaluations.

### Defendants Subject Plaintiff to Discriminatory Standards for Scholarship

137.     On information and belief, Plaintiff's Tenure Advisory Committee did not dispute that she met the tenure standards for Scholarship.

138.    Nevertheless, as several law professors have admitted, from the commencement of her employment, SMU subjected Plaintiff to discriminatory tenure standards for legal scholarship.  These discriminatory tenure standards in Scholarship caused stress and extra time that undermined Plaintiff's time commitment to Teaching.

139.    Plaintiff was assigned a Tenure Advisory Committee Chair on or about Spring 2013, during the second year of her employment contract. The other original members of the Tenure Advisory Committee included Professor Forrester and Professor George Martinez.  When Professor Forrester resigned from the committee to take on responsibility as Interim Dean, Associate Dean Beth Thornburg replaced her on the committee.

140.    Shortly after his appointment as Tenure Chair, Professor Joe Norton wrote Plaintiff a letter indicated that the late assignment of a Tenure Committee placed Plaintiff at a disadvantage.  Professor Norton explained to Plaintiff that a Tenure Committee normally is appointed, or should be appointed, at an earlier stage in the candidate's probationary appointment to provide guidance and supervision in the candidate's efforts toward meeting the standards for tenure and promotion.

141.    Yet, Professor Norton subjected Plaintiff to discrimination. Professor Norton imposed higher tenure standards for scholarship to "protect" Plaintiff from colleagues "who had never voted to give a Black woman tenure as a law professor at SMU."  Professor Norton advised that some colleagues naturally would be skeptical of a Black woman's legal scholarship and other qualifications.

142.    Specifically, Professor Norton told Plaintiff in writing that, to apply for tenure and promotion, she should publish at least six major law review articles.  He advised Professor Butler that she should publish the articles in "flagship" law review publications instead of "specialty journals" (*e.g.*, Harvard Law Review, not Harvard Journal of Women & the Law).  The article should be published by law school ranked at or above the ranking for SMU Dedman School of Law.  Only articles published during the tenure track period would count; and, co-authored pieces would not count.  Additionally, articles published in the SMU Law Review counted, but were not preferred.

143.    However, the two male tenure track professors, David O. Taylor and Keith Robinson were not subjected to this same stringent standard.   For example, in January 2016,

22

Professor Robinson when submitted his application for tenure and promotion, his publication record did not meet the standard imposed upon Plaintiff. Similarly, in January 2016, Professor Taylor when submitted his application for tenure and promotion, his publication record did not meet the standard imposed upon Plaintiff.

144.    Plaintiff expressed concerns to Professor Norton, Interim Dean Forrester, Dean Collins, and other colleagues.  Notwithstanding her complaints, Plaintiff maintained a rapporteur and collegial relationship with Professor Norton.

145.    Plaintiff also told Professor Norton, Interim Dean Forrester, and Dean Collins that SMU discriminated in its tenure standards in other ways. For example, Plaintiff expressed concern that SMU had failed to Award Seminar in area of research as provided to male candidates and all other candidates. Plaintiff's Contract provided that all tenure track law professors will be allowed to teach a seminar course in the area in which they research and publish scholarship.  The law school's failure to provide this benefit made Plaintiff's teaching load more difficult.

146.    Professor Norton responded via email, advising that Plaintiff with respect to the standard for legal scholarship must publish six major articles.  The articles must be published in the most prestigious flagship law review journals at top law schools and must be substantial in length.  He discouraged co-authored articles as meeting the standards.

147.    Plaintiff expressed concerns with Professor Norton and other faculty members that this standard seemed more stringent than other tenure chairs had imposed on the two male candidates for tenure and promotion at the law school.  Professor Norton advised Plaintiff that "she should follow this formula and reach for a higher mark "because the law faculty had never granted tenure to a Black woman" and to "beat the naysayers she should do more if necessary."

148.    On several occasions, Plaintiff shared her concerns about inconsistent tenure standards with Professor Josh Tate. And, Professor Tate told Plaintiff that the inconsistent application of tenure standards was not only a problem at the law school, but at other schools within the university.  Therefore, the SMU Faculty Senate and other committees had taken up the task of requiring that schools within the university apply the standards consistently.

149.    Even though Professors Weaver and Butler complained about this discrimination, the University and the law deans outright refused to change its policies.

23

150.     Professor Weaver testified that the standards for tenure and promotion would change depending on the race and gender of the candidate.  SMU would raise the standards when Black women such as herself applied for promotion and would lower the standards when the candidate was a white male.

151.     On several occasions between Summer 2015 and Spring 2016, Plaintiff wrote to Dean Collins notifying her that SMU had subjected Plaintiff to discriminatory tenure standards in part by requiring that she write six or more major articles but requiring that white and or male candidates meet a lower standard.

152.     When Plaintiff sent Dean Collins a copy of the written proof that she requested, Dean Collins refused to acknowledge discrimination.

153.     In Spring 2015, Professor Butler complained to Dean Collins and Associate Dean Beth Thornburg that, in her case, SMU was discriminating against her by requiring more stringent tenure requirements with respect to legal scholarship.

154.     Professor Weaver then confirmed that the same Dean denied tenure and promotion to Professor Butler, who was required to publish at least six articles and published eight articles.  But thereafter, told the white male candidate that he only had to publish at least four articles.

155.     Professor Weaver expressed, on tape, frustration that SMU would promote or promise to promote a White male professor who had substantially fewer law review publications than Professor Butler.  Speaking of SMU, Professor Weaver stated: *"You are going to deny Cheryl tenure with eight articles and then let this buster slide through with three or four? Okay, and he had presented [his scholarship] in like two places. He had been to two places to present his work [while Cheryl had been to over ten]. Two. Two."*

156.     In several phone conversations, Professor Weaver told Professor Butler that SMU's tenure standards for scholarship varied depending on the race and gender of the candidate and she and Professor Butler had been subjected to such discriminatory standards. For example, after the faculty voted to deny Professor Butler's application for tenure and promotion, Professor Weaver told Professor Butler: "They seem to be ratched down the number of articles that you have to write as opposed to rationing them down.  It's very ironic . . . 'cause they only ratched up the standards when I was coming up for tenure.   You know what I mean?_That's bullshit.

Professor Butler: Right. Professor Weaver: That's what they tried to pull on me and it didn't work . . . And it ended up affecting you . . . as you went up [for tenure] . . . You know what I mean?  So, I don't think it was coincidental.  But, at the end of the day, it was a total opposite conversation [for white male candidates] to the conversation that was going on during my contract renewal."

### Defendants Subject Plaintiff to Racially Discriminatory Teaching Standards

157.    In addition to discriminatory tenure standards for research and scholarship, Defendants also subjected Plaintiff to intentional discrimination with respect to teaching.

158.    Furthermore, after the faculty voted to recommend the denial of Plaintiff's application based on teaching, several faculty members objected, telling Professor Butler that the denial of tenure based on teaching is pretext for discrimination.

159.    As explained above, Plaintiff's teaching record met SMU's tenure standards, namely that teaching "must be outstanding or as high quality."

160.    While SMU Policy 6.2 states that "Faculty with administrative responsibility may, when such administrative duties demand significant time, receive additional release time from teaching."   However, SMU requested that Plaintiff take on increasing administrative responsibility without reducing her teaching schedule accordingly.

161.    SMU otherwise imposed additional, discriminatory and more difficult standards for teaching that it imposed on similarly situated White and male candidates for tenure and promotion.

162.    SMU also deprived Plaintiff of the contractual right to teach a seminar in her area of legal scholarship but afforded this right to similarly situated White male candidates for tenure. SMU contracted to allow Plaintiff to teach a seminar based on her research agenda on Human Trafficking.  Instead, a few weeks before Professor Butler began her job, SMU reversed course and required that she teach Critical Race Theory/Civil Rights because SMU had abruptly terminated the full-time Black law professor who taught this course.

163.    The failure to provide Plaintiff with the Contractual right to teach a Human Trafficking Seminar, particularly during the first three years of the Tenure Probationary Period was discriminatory and disadvantaged Plaintiff. SMU allows new professors to teach a seminar in the area in which they are researching to make both their research and teaching obligations

easier and to support of the candidate's efforts to meet the tenure standards for scholarship and teaching.   Depriving Plaintiff of this contractual right made her teaching and research load heavier and more difficult as compared to the White and or Male tenure candidates.

164.    Plaintiff diplomatically told Dean Attanasio that these changes had a discriminatory effect. Plaintiff had to scramble to prepare a new course and, therefore had less time than other new professors for class prep for her first semester of teaching.   Plaintiff later told Dean Attanasio that this last-minute switching of courses discriminated against her with respect to class prep for Fall 2011.

165.    In an exchange of emails with Dean Collins and Dean Thornburg, Plaintiff revisited the complaint about the Human Trafficking Course at the end of Spring 2015. Dean Thornburg finally offered her the opportunity to teach such a course.   However, this last-minute offer did not cure the disadvantage that Plaintiff suffered.   By Spring 2015, the Tenure Probationary Period was practically over – Plaintiff was scheduled to apply for tenure and promotion the following semester.

166.    In addition to failing to allow Plaintiff to develop a Human Trafficking Course during the Tenure Probationary Period. In Spring 2015, Professor Butler complained to Dean Collins and Associate Dean Thornburg that SMU and former Interim Dean Forrester had discriminated by not considering Professor Butler as a candidate for Director of Co-Director of SMU's Human Trafficking Clinic even though she was qualified. Professor Butler also complained that SMU had not allowed her to teach a seminar on human trafficking but offered this opportunity to White female candidates for the clinic directorship.

167.    When Professor Butler complained to Interim Dean Forrester in 2014 about this matter, Dean Forrester told Plaintiff to "stop complaining about discrimination because you to do not want people not to like you.  This could hurt your tenure bid.

168.    Likewise, Professor Weaver also explains on tape that Interim Dean Forrester and Dean Collins discriminated against Professor Weaver by failing to consider Professor Weaver for a Clinic or Center Chair position that carried an increase in salary.

169.    Professor Weaver further explained to Professor Butler on tape that when she complained to faculty and administrators, SMU failed to take prompt remedial action.  Instead, Dean Forrester chastised Professor Weaver for her repeated complaints about discrimination in

hiring.  Professor Weaver also opined that, in response, Dean Forrester marked Professor Weaver for retaliation by trying to sabotage the first major stage in Professor Weaver's tenure evaluation process, the Third Year Review.

170.    Furthermore, during her appointment, SMU required that Plaintiff teach a heavier teaching load than similarly situated White candidates. While SMU only required that Professor David O. Taylor, a similarly situated White male candidate for tenure, teach four distinct courses during their tenure-track probationary period, SMU required that Plaintiff teach five distinct courses. The *five* distinct courses included: Torts I; Torts II, Employment Discrimination Survey (a lecture course); Employment Discrimination Edited Writing Seminar and Civil Rights - Critical Race Theory Edited Writing Seminar.

171.    SMU further imposed a heavier teaching load by allowing and or requiring that Professor Butler accept enrollment of 20+ students in her Writing Seminars while similarly situated White professors enrolled as little as five or six students. Therefore, Plaintiff had to supervise research and writing for over three times the number of students.

172.    SMU also subjected Plaintiff to discriminatory teaching standards by refusing to provide her with a contractual semester leave of absence, free of teaching responsibilities as promised in her contract.  Particularly, SMU requested that Plaintiff serve on the Dean Search Committee during two academic years, even though this service deprived Plaintiff of a semester leave of absence.  However, Interim Provost Stanley refused to reduce Plaintiff's teaching load or to otherwise accommodate or compensate her for this heavy administrative responsibility.

173.    Plaintiff told Dean Collins that the absence of a leave of absence was left her burnt out physically and mentally. Plaintiff's colleagues advised her to request a reduced course load for one semester or an honorarium (e.g. token compensation of $10,000 for example, to cure the failure to honor the contractual obligation. In response, Dean Collins advised her to speak to Provost Stanley. However, Provost Stanley refused to discuss the matter with Plaintiff.

174.    Therefore, SMU discriminated by providing this semester leave of absence to the male candidates for tenure.  Tenure candidates use the semester leave of absence to research and write law review articles or to prepare class preps.  Without the leave of absence, Plaintiff was forced to do such research and work during the same semesters she taught classes.

175.     Several faculty members told Professor Butler that the Tenure Advisory Committee's recommendation that SMU deny tenure based on "teaching" was surefire pretext for discrimination. Professor Armour complained that other professors had poor teaching evaluations, but SMU still granted tenure. On tape, Professor Armour, told Professor Butler that "you were targeted."  They came after you because you asserted your rights under the civil rights code.  They said you were uppity and difficult because you asserted your rights." Particularly, Professor Armour reported that the faculty was particularly shocked and offended that Plaintiff had accused Associate Dean Thornburg of FMLA discrimination.

176.     SMU also subjected Plaintiff to racially discriminatory tenure standards and process by failing to provide her with institutional support and accommodations provided to similarly situated white males.  For example, SMU provided special accommodations for white male candidates, including Professor Josh Tate, to help them meet the standards for tenure and promotion but failed to provide those accommodations for Plaintiff, who is Black and female.

177.     Professor Tate testified that when he was a candidate for tenure, but had poor student evaluations in his courses, SMU helped him gain by removing some difficult courses from his teaching schedule.

178.     For example, on the eve of the faculty vote on her tenure application, Professor Tate assessed Plaintiff's student teaching evaluations as follows: "For your file, it looked like there was no problem with your Employment Discrimination evaluations or your semesters… and, the problems were only with Torts…and it reminded me of what happened to me.  I was teaching Property, Trusts and Estates, and my Seminar.  But, I actually had problems with ALL of my evaluations in ALL of my classes."

179.     However, Professor Tate stated that in response to his poor teaching evaluations, SMU accommodated him with a reduced number of distinct courses to teach.  He explained: "And what happened was, I was offered a different teaching schedule where I would only teach Trusts and Estates every semester and my seminar.  And, I didn't have to teach Property again."

180.     Professor Tate added that the accommodation gave him time to master the remaining courses and to therefore improve his student teaching evaluations in those courses. In his words, "I was given this accommodation, and the great thing about it was, it just wasn't that I wasn't teaching a difficult class.  I was given the opportunity to really master that one subject,

28

Trusts and Estates, because I taught it semester after semester. And, by the time I went up for tenure, I had excellent teaching evaluations because I knew it so well."

181.    Professor Tate explained to Plaintiff that SMU should have offered a similar accommodation to Plaintiff after Third Year Contract Renewal "after people raised questions about your teaching after that meeting.  Somebody should have done for you what [the Associate Dean] John Lowe did for me when he said: 'Here are these concerns.  We are going to offer you this plan.'"  Professor Tate concluded that the failure to provide Professor Butler with the same accommodation was discriminatory.

182.    Therefore, Professor Tate stated that, during the faculty meeting on tenure candidates, he was going to ask: "What the hell is going on? … I was given this accommodation, so why wasn't it given to her?

183.    Particularly, Professor Tate reported that "for your file . . . it looked to me like there was no problem . . . with your Employment Discrimination evaluations or your seminars . . . And the problems were only in the Torts [evaluations].  And so, it reminded me of . . . When You know what happened to me was I – I was teaching Property, Trusts and Estates, and my seminar.  But, I actually had problems with ALL of my evaluations -in all of my classes.  I had a semester, the first time I Taught Trusts and Estates, I had very bad evaluations. Then, I read what people said in your Torts.  I had the same thing. I had, "Fire Professor Tate."   "He's the worst professor." You know – the same thing the negative ones said in yours, I got all that same stuff. Um, they had specific reasons that were different. But, the bottom line was some people who thought that I should be fired . . . And what happened was that I was offered a different teaching schedule. The way I see it, is why should we judge you based on these Torts evaluations? Why don't we just say, okay well, Cheryl is having trouble with that class, but so what? If you look at her other evaluations, she's clearly an outstanding teacher.  This issue of the Torts class can be resolved by just not having her teach that course anymore.  And, just like that.  And, then what do we have?  What's the reason for not giving you tenure?"

184.    However, during Plaintiff's probationary period, Associate Dean Lowe did not offer Plaintiff, who is Black, the same or similar accommodation that he offered to Professor Tate, who is White.

185.     Professor Weaver and other faculty members told Professor Butler that in her case as well, SMU applied its tenure standards for teaching in a racially discriminatory and retaliatory manner.  Professor Weaver stated: "What they have on [your] teaching is sketchy at best.  I mean, yes, they can say you didn't have stellar, outstanding, knock it out of the park, where all your students say you rock - evaluations.  But not everybody that got tenure had that.  People were given tenure who had similar, and possibly even worse [laughs] teaching evaluations.  So, the moving target of what is acceptable and is not acceptable depends on [what candidate] is sitting in front of you. I'm saying who's sitting in front of the faculty, and whether they like you or not, what color you are, what gender you are, all that has something to do with it . . . "

#### Failure to Remedy Discriminatory Standards for Scholarship & Teaching

186.     Professors Weaver and Butler repeatedly complained about discriminatory tenure standards and hereto, SMU failed to take prompt remedial action and instead, retaliated against Professors Weaver and Butler.  Particularly, SMU retaliated with Plaintiff's humiliating tenure process.  Professor Weaver testifies on tape that the humiliation of Professor Butler had the effect, even if not the intent, to intimidate and humiliate her as well and to teach her to stop complaining about discrimination.

187.     In Spring 2014, one semester before Professor Butler submitted her application for tenure, Professor Weaver, who just one semester prior had just become the first African American female to receive tenure at the law school, complained to Dean Collins and other defendants that SMU discriminated based race by applying less stringent tenure standards for White male candidates.  Professor Weaver insisted that Professor Butler join her in that protest, and Professor Butler joined the protest.  SMU did not take prompt remedial action and change its pattern of discrimination.

188.     For example, Professor Weaver asked Professor Butler to protest SMU's attempts to lower the standards by allowing Professor Chris Jenks to apply for Contract Renewal without allowing the faculty to review his poor student teaching evaluations.

#### Defendants Subject Plaintiff to Race & Gender Discrimination in the Standard for Service

189.     On information and belief, Plaintiff's Tenure Advisory Committee did not dispute that she met the Tenure Standard for Service.

190.     Nevertheless, imposing a discriminatory standard for service upon Plaintiff caused Plaintiff to suffer illness at work, thereby undermining her performance in teaching.

191.     Defendants further engaged in race discrimination by critiquing even Professor Butler's outstanding record of service. Professor Weaver and other professors also warned Professor Butler that SMU was discriminating against her by subjecting Professor Butler to racial and gender stereotyping of black women as "bad wives" and "bad mothers."

192.     Particularly, as other colleagues observed, Dean Forrester repeatedly asked Professor Butler whether she felt "ashamed" or "like a bad mother" for not living with her children and stated that her living arrangement suggested that Plaintiff was not "committed" to the university.

193.     When Professor John Lowe was the Associate Dean of Faculty, he too frequently criticized Professor Butler for "not sleeping in the same bed with her husband every night."

194.     Dean Forrester or Dean Lowe did not subject White professors and or Black male professors to the same prejudgments.

195.     Several white male colleagues told Plaintiff that these attacks were discriminatory because several male professors on the faculty temporarily resided outside of Dallas and or that their wives and children resided outside of Dallas during their employment at SMU.

196.     Professor Weaver told Professor Butler that these gendered attacks resurfaced during the debate on her application for Tenure and Promotion and that the law faculty argued that the fact that Plaintiff allowed her husband and children to reside in Houston was proof that she was not "committed" or "suited" for tenure at SMU.

197.     Defendants also subjected Plaintiff to other forms of race and gender stereotyping with respect to her image as a law professor.  According to some faculty, Dean Forrester and Dean Thornburg thought that Plaintiff should be denied tenure because she was "too outspoken" and "pushy" in complaining about discrimination.  They also thought that she did not "know her place" as a woman and or "as a Black woman." Faculty testified that Provost Forrester "cried" as if she were a "victim" of Plaintiff's unfair and "meritless" complaints about discrimination.  One witness said that Provost Forrester "acted the Southern Bell" at the Tenure Advisory Meeting while portraying Professor Butler as "too uppity" and "too difficult" – the latter historically a "code word of sorts" among the faculty for tenure candidates who step out of line by accusing

31

their tenured colleagues of discrimination.  For such an offense, Professor Tate and others told Professor Butler that "she could never come back to the law school ever after what Julie and Beth (and/or Jennifer) said about you."

### **Discriminatory and or Retaliatory Tenure Process**

198.    SMU violated Policy 6:12, the Guidelines for the Award of Rank and Tenure Discrimination in <u>Procedure/Process</u>.

199.    Professor Josh Tate testified that, in addition to discrimination in teaching standards, SMU subjected Professor Butler to a racially discriminatory tenure process fraught with procedural irregularities. In Professor Tate's words: "there's so many procedural problems with the way they handled your tenure case. That you are not going to have a hard time pointing out procedural issues."  *For example, Professor Tate told Professor Butler: "I don't think they gave you . . . I don't think they followed the university procedures that they're supposed to follow when after your [Third Year] Contract Renewal.  They're supposed to give you all this information and they didn't give you a letter saying this what you are supposed to do . . . Then, there's things that are supposed to be done all across the university that aren't being done at the law school.  They just haven't been paying attention to what their rules actually are."*

200.    When Professor Butler asks for examples, Professor Tate told her: *All I know is there's supposed to be a process after you get contract renewals to where they tell you in a formal context, "This is what you need to do . . . to improve your teaching.  And, that's a university-wide thing. The law school just isn't doing that because for a long time we had a Dean who just didn't follow the rules. And then had the political capital and the friends to not have to follow the rules.  There are just a lot of things that happened at the law school that were not according to university policy. [Laughs]. so, uh, I just think it could actually change into a lawsuit.*

201.    SMU law professors created a hostile work environment by encouraging students to complete discriminatory and biased teaching evaluations.  One student reported that SMU faculty members told students that "is the worst Professor in the law school" and encouraging them to write poor student evaluations of her Torts class.

**Other Forms of Hostile Work Environment Throughout Plaintiff's Appointment**

202.    SMU also created a hostile work environment by fraudulently falsifying Professor Butler's student evaluations in her Torts class.

203.    Notwithstanding Professor Butler's qualifications, Defendants rejected her application for tenure and promotion. Defendants' rejection, as well as their subjecting Plaintiff to discriminatory tenure standards and process was in and of itself a violation of her civil rights.

204.    Further, and or in the alternative, several faculty members testify that the rejection of Professor Butler's application for tenure and promotion was not in isolation but part of a pattern and practice of discrimination, retaliation, and hostile work environment against Black female tenured and tenure track law professors at SMU.

205.    As several law faculty testify on tape, Defendants' denial of Plaintiff's application for tenure and promotion was in retaliation for her complaints about discrimination.

206.    At the time of the events described in this Complaint, SMU employed only two African-American tenured and or tenure track law professors, Professor Jessica Dixon Weaver and Professor Cheryl Butler.

207.    SMU law professors testify on tape that SMU created a hostile work environment and there was a pattern and practice of discrimination and of intimidation and retaliation against professors who challenged this hostile work environment.  This was a systematic issue at the University. This hostility discouraged Black female professors such as Professors Weaver and Butler to pursuing some of their complaints about discrimination.

208.    SMU subjected both Professor Weaver and Professor Butler to various forms of racial discrimination and that, cumulatively, this racial discrimination amounted to a hostile work environment.  SMU's hostile work environment based on race and gender included, but was not limited to, racial discrimination in hiring by SMU law school faculty and administrators against prospective Black female and other non-white applicants for tenured and tenure track positions.

209.    Defendants' hostile work environment also included a pattern and practice of harassment of Black and or Black female candidates for tenure and or promotion including, but not limited to, Professors Weaver and Butler.

210.    As Professors Weaver and Butler complain on tape, Defendants' hostile work environment also included harassment in the form of verbally berating and condemning Black

33

female tenure track professors as: "unqualified," "unfit," "noncollegial," "liars," "con-artists," "dangerous," "immoral," "dishonest," "bad mothers," "bad wives," and "uncommitted" members of the law faculty.

211.    Defendants' hostile work environment also included racially discriminatory tenure standards and processes applied to Black female professors.

212.    As Professors Weaver and Butler discuss on tape, Defendants' hostile work environment also included a failure to conduct fair and through investigations of complaints of racial discrimination. Along these lines, Defendants' hostile work environment also included a pattern of retaliation and coercion in response to complaints about race discrimination.

## Harassment of Black Female Candidates for Hire, Tenure & Promotion

213.    In response to her protests about discriminatory hiring, Professor Weaver says that then-Interim Dean Forrester and others retaliated against Weaver by sabotaging her bid for Third Year Review / Contract Renewal.

214.    Professor Weaver and Professor Butler both attest to the fact that they developed physical illness, humiliation, and demoralization over these acts of sabotage.  Professor Weaver describes how she developed an ulcer and considered seeking alternative employment as a result of SMU's hostile work environment.  Professor Butler, in turn, developed depression in part from watching SMU humiliate and sabotage Professor Weaver and other senior candidates for hire, tenure, and promotion.

215.    During Plaintiff's tenure probationary period, several, if not all, of the tenured and tenure track women of color on the law faculty have repeatedly complained that this hostile work environment includes systemic discrimination in the hiring and promotion of Black female law professors.

216.    SMU law professors testify on tape that SMU created a hostile work environment vis-à-vis a pattern and practice of discrimination and of intimidation and retaliation against professors who challenged this hostile work environment.  Professor Weaver testified that in several instances when she and other women of color complained of discrimination, SMU refused to take prompt remedial action and instead threatened to retaliate or did retaliate for such complaints.

217.    SMU failed to take prompt remedial action in response to 2013 Complaints against then-Interim Dean Forrester.   Professors Weaver and Butler complained to several faculty members about Dean Forrester.  In addition, and in the alternative, Dean Forrester and others engaged in coerced acts to discourage the filing of more formal charges of discrimination. As Professor Weaver discussed on tape, SMU administrators and professors made it known that a formal charge was a "kiss of death" that would only be met with more retaliation and sabotage. An alternative form of protests was to discreetly withhold support of Interim Dean Forrester's bid to become the Dean of the law school.

218.    For example, in 2013, Professor Weaver, Professor Butler, and former-SMU Professor Xuan-Thao Nguyen (who were members of the Appointments-Hiring Committee) complained to Dean Attanasio, and thereafter to Interim Dean Julie Forrester and to senior administrators at the University, that defendants intentionally discriminate against non-White candidates for tenure-track positions.

219.    Particularly, Professor Weaver complained that defendants discriminated by hiring a white female professor without advertising the position or subjecting Professor Mazur to the same process and standards as similarly situated Black candidates.


220.    Professor Weaver states on tape that in response to these specific complaints, Interim Dean Forrester marked Professor Weaver and Butler for retaliation. Dean Forrester responded by sabotaging Professor Weaver's attempt for promotion in the form of a Clinic leadership position and tried to thwart Weaver's application for Third Year Contract Renewal.

221.    SMU failed to take prompt remedial action to stop Dean Forrester from discriminating against Black women.  Instead, she continued the discrimination and pattern of harassment. Dean Forrester continued to retaliate by thwarting Professor Butler's tenure application.

222.    To the contrary, notwithstanding the complaints and open notoriety of Dean Forrester's discriminatory acts, SMU promoted Professor Forrester from Interim Dean to Associate Provost, a University-wide Position.

**Retaliation Against Professor Weaver During Her Contract Renewal/Tenure Bid;
Professor Butler Defends Professor Weaver and is Marked for Retaliation**

223.    On or about October 2014, SMU granted Professor Weaver's application for tenure and promotion and she became the first and only Black woman in SMU's history to become a tenured law professor at the university.  Even after receiving tenure, Professor Weaver complained of racial discrimination against herself and Professor Butler.

224.    Yet, Professor Weaver emphatically insists that she faced a lot of discrimination during her tenure bid and was able to overcome opposition in part because Professor Butler stood up with her and in her defense to protest discrimination against Professor Weaver. In January 2016, Professor Weaver recalled how Professor Julie Forrester tried to sabotage her application for promotion and contract renewal by submitting a lackluster "no confidence" tenure committee recommendation that failed to acknowledge in writing ANY of Professor Weaver's qualifications or professional accomplishments. Professor Weaver stated that the lack of support stemmed from Weaver's earlier complaints about discrimination in hiring.

225.    Reflecting on Associate Provost Forrester's attempts to sabotage her own tenure and promotion, Professor Weaver recalled that:  *Julie wrote like two sentences about my scholarship in my Contract Renewal Letter. She just said what my scholarship talks about, you know, in a general matter of fact manner and didn't write anything about the significance of it or anything, nothing.  I was really pissed because I knew . . . I had seen everybody else's contract renewal letters and I was like, well everybody else's person talked about their scholarship in a meaningful way. Talked about how it was important, significant . . . and [Julie] gave me two sentences. Like this bullshit.  Like that's not, that doesn't look like [she's] done justice. It doesn't tell the faculty anything, you know, who hasn't read my stuff. So, I was really upset.*

226.    And, Professor Butler responded*: Yes, I remember because in that [faculty] meeting for votes on your contract renewal], I commented on that, asking why there was nothing in the letter.  I remember the whole letter was like two sentences period. It wasn't even a letter. It wasn't even a paragraph.  It was like a "no support" thing.  And, I was like: "I don't understand.  We didn't talk about her scholarship. [Julie did not] talk about it much in the meeting.*

227.    In response, Professor Weaver agreed again that Provost Forrester's letter was an effort to derail her candidacy: *Professor Weaver: Yeah, well.  I think that was by design . . . based on, you know, who we're dealing with.  I think that was their attempt at that time, to try to at least derail me or put some hurdles in front of me so that I wasn't going to make tenure.*"

228.    Furthermore, Professor Weaver also testified on tape that Interim Dean Julie Forrester and other SMU professors attempted to defame Professor Weaver by claiming that her law review articles did not meet the standard for contract renewal because they were below the minimum page limits required by SMU.

229.    Professor Weaver recalled that the efforts to sabotage her promotion did not work because Professor Butler spoke up. Professor Weaver stated*: But it didn't work.  um, and you know, you spoke up . . . I mean it was real blatant for them to try to do that at that point. Then, everyone else spoke up and I think people were like okay.  I was real blatant for them to try to do that at this point. Um, like I said, I was ready. I'm about to hire somebody [i.e., an employment discrimination lawyer].  After that meeting, I went and had a meeting with [an SMU dean across campus] and she was like, "No, this is problematic.  You're right to feel this way [that Interim Dean Forrester] is discriminating against you] and you should be thinking about if it continues, getting a lawyer." And, I was like, Okay. We'll see what happens.*

230.    Professor Weaver agreed that when Forrester's efforts to sabotage Professor Weaver's application for contract renewal / promotion "didn't work," Interim Dean Forrester and other faculty member marked Professor Butler for future retaliation for defending Professor Weaver during her contract renewal.

231.    Professor Weaver testified that she reported the incident to a black female provost and or senior administrator who agreed that the incident was suspicious and or indicia of discrimination and that the administrator agreed with Professor Weaver that she should hire an attorney to prepare for racially discriminatory opposition for her continued bid to become the first African-American woman tenured law professor at SMU.

### Defamation of Black Female Dean Candidate Humiliates Professors Weaver & Butler

232.    During her tenure application process, Professor Weaver told Professor Butler that the same SMU law professors who defamed her character (Associate Provost Julie Forrester and former dean Professor Paul Rogers) were the same bad actors who defamed an African

American law professor that Professors Weaver and Butler supported as a finalist for law school dean in 2014.

233.    For example, during Plaintiff's tenure evaluation process, Professor Weaver warned her that certain faculty members were using the same defamatory tactics on Plaintiff that they had used to discredit, an Professor Beverly Moran, an African-American female candidate for Dean.  Professor Weaver also agreed that Professor Paul Rogers and Associate Provost Julie Forrester (an internal candidate for the deanship) also defamed Butler in retaliation for supporting a Black female candidate over then-Interim Dean Forrester, who is a White female: *Professor Weaver: You know the same thing they did with Vanderbilt Professor Beverly Moran [a Black female candidate for Dean.] You know they bring up little petty ante-shit. Oh, she didn't write letters to the staff. Then tried to attack her integrity.  That's the same thing they're doing to you.  Same thing. Professor Butler: And doing that to me because I supported her, right? Professor Weaver:  Shit . . . that's probably part of it.*

234.    As an example of the pattern and practice of defaming and discriminating against Black female candidates for tenure, Professor Weaver recalled that, when Professor Beverly Moran was a candidate for the deanship, Professor Paul Rogers asked the faculty to vote against Professor Moran because she was "a con artist" who was trying to "con the faculty."

235.    In contrast, Professor Rogers and Interim Dean Forrester treated White male candidates for the deanship with respect and collegiality.

236.    Professor Butler complained to members of the Dean Search Committee and later, to Dean Collins about Dean Forrester and Professor Roger's discrimination against Black women.

237.    Professor Weaver opined that it was useless to go to the Office of Institutional Equity to file a formal complaint.  Professor Weaver stated that she had worked at SMU for almost ten years (in a nontenure track and later, tenure track position) and that she knew that SMU would retaliate against faculty who filed formal complaints with that office.  Professor Weaver stated that SMU had a reputation of sabotaging or retaliating against employees who filed formal complaints; therefore, it was more productive to make their complaints known with sympathetic faculty or other administrators.

38

238.    Instead, like Professor Butler, she made her complaints known to the faculty members voting for a new dean and to members of the Dean Search Committee including Professor Butler and Professor Tate.

239.    Professor Tate, who was a member of the Dean Search Committee, did contact the Office of Institutional Equity to make an inquiry about discrimination.

240.    Instead of taking prompt remedial action, SMU allowed Dean Forrester and others to continue to harass and retaliate against Professors Weaver and Butler for protesting their disparaging remarks about Black women.

### Hostility and Defamation of Professor Lolita Buckner-Innis as "Unfit" Non-Collegial" and/or "Unqualified"; Professor Weaver Calls this a "Pattern & Practice"

241.    Professors Weaver and Tate explain on tape that, when Professor Butler applied for tenure and promotion, Professor Forrester, who by then welded power as an Associate Provost, engaged in a campaign to sabotage Professor Butler's application by secretly defaming her character and penalizing her for complaining about race discrimination.

242.    Even after SMU defamed Professor Butler's character, the same faculty again applied the same *modis operandi* to the next Black female candidate for hire, Professor Lolita Buckner-Innis.   Professor Weaver told Professor Butler that several of the same SMU law professors who defamed her character during the tenure evaluation process (Associate Provost Julie Forrester and former dean Professor Paul Rogers) were the same bad actors who defamed an African American law professor that Professors Weaver and Butler supported as a finalist for law school dean in 2014.

243.    Based on this defamation, SMU and or Dean Collins considered declining to hire Professor Buckner-Innis.   However, according to Professor Weaver, she was able to persuade Dean Collins and others to complete the hire on several grounds.   Professor Weaver reminded Dean Collins and the faculty that the hire was needed for SMU to maintain its accreditation with the American Bar Association, whose rules require a certain level of diversity on the faculty.   In other words, once Professor Butler was terminated, SMU's "numbers would not look good" for accreditation purposes.

244.     Second, Professor Weaver conveyed to Dean Collins that the sabotage represented a pattern and she could not allow this to happen to another Black female law professor.

245.     Third, Professor Weaver told Professor Butler that she was not going to "remain silent" about the discrimination against Professor Butler if SMU did not hire another Black woman. Outraged, Professor Weaver told Professor Butler that she would not let Professors Rogers and Forrester defame yet another Black female professor. She told Professor Butler that she was going to somehow warn SMU that, if they continued to sabotage Professor Buckner Innis, then Professor Weaver "was going to support Cheryl [Professor Butler]." She was "going to turn the file over to Professor Butler's lawyers." She was "going to tell it all."

### Professor Weaver's Direct Evidence Testimony about Fears of Retaliation for Protesting Discrimination in Professor Butler's Tenure Case

246.     Professor Butler's documented testimony chronicles how her promise to assist Professor Butler to complain about discrimination changed over time as SMU pressured her to fraudulently conceal discrimination in Professor Butler's tenure process. At first, she promised that  If they actually do an investigation . . . NOW [Dean] Jennifer [Collins] does know, because I did tell her after she asked me, or she said, "Well, I hope that you can say that there has been no racial or gender discrimination." I told her, "No, I'm not going to say that. So, you should not look to me to say that." She knows that I'm not going to be a yes woman on the whole "there is no racial discrimination" in the issue with Cheryl."

247.     But over time, SMU Law Professors told Professor Butler they could not confront Dean Collins and others because they were afraid of retaliation and that SMU was forcing them to lie or to remain silent. Professor Weaver expressed fear stating that: "Some of them are evil. I know what they are capable of.  I see what they do to people who dissent."

248.     Professor Weaver explained that Paul Ward, General Counsel and Secretary to the Board of Trustees, circulated a letter to the faculty which Professor Weaver interpreted as discouraging faculty from giving Professor Butler a copy of the defamatory tenure report or warning or retaliation if anyone helped her.

40

**SMU Conducts Sham Investigation into Title IX Complaint: When Professor Butler**
**Challenges the Fake Investigation, SMU Kills Her Tenure Bid**

249.     In addition to its discrimination and defamation of Black female law professors, SMU also maintains its hostile work environment by coercing and sabotaging discrimination complaints. SMU systemically avoided taking prompt remedial action to complaints of discrimination in part by conducting sham investigations.

250.     This discrimination is openly known.   On tape, Professor Weaver repeatedly states that it is useless to trust SMU's fake promises to conduct civil rights investigations.

251.     For example, in Plaintiff's case, each civil rights administrator at SMU is caught via tape recordings in making intentionally false and misleading statements about its investigations of Plaintiff's claims of discrimination.

252.     Another aspect of SMU's system of sham investigations is its intentional coercion of complainants and witnesses. For example, Professor Weaver states on tape that Dean Collins, and possibly Paul Ward, coerced her into remaining silent and, on information and belief, making false statements to the Office of Institutional Equity regarding Plaintiff's tenure case.

253.     On tape, you can hear the fear in Professor Weaver's voice: "I don't want them to know that I am talking to you because they told me not to help."   "The Office of Institutional Equity never contacted me (even though I am the only African American witness in your case) because Jennifer told them not to contact me because she knows where I stand on the whole 'there's no discrimination against Cheryl thing' . . . she knows I am not going to lie for her." Professor Weaver also told Professor Butler "the internal investigation is a waste of time because they are not going to conduct a fair investigation . . . SMU does not keep people who complain about discrimination . . . it's like Roy told you when y'all first met – the University is against you because you complained about discrimination." Professor Weaver also stated that she was warned that if she participated in the internal investigation, SMU would retaliate against her "by making things very difficult for me here.   Particularly with Paul and Julie since they are the powerful people at SMU right now."

254.     SMU also refused to conduct timely and thorough investigations of claims of discrimination.   SMU's Office of Institutional Equity often sabotaged employee's complaints

about discrimination by failing to investigate the claim or by making false and fraudulent statements about employee's discrimination claims.

255.    In September 2015, Professor Butler met with Carol Hernandez and Ms. Thomas. In that meeting she made three distinct complaints of discrimination—1.  FMLA discrimination; 2. Race Discrimination with respect to tenure standards and 3. The Title IX harassment issue related to the student.  Approximately three days after the meeting, Dean Collins wrote Plaintiff a letter indicating that her tenure committee had resigned alleging, in essence, "Professor Butler had complained so much about discrimination that they could not complete their tasks on the tenure committee."

256.    As Professor Weaver discusses on tape how SMU failed to take prompt remedial action and instead, retaliated or otherwise coerced Professors Weaver and Butler to remain silent about discrimination.

257.    SMU also refused to conduct timely and thorough investigations of claims of discrimination.  SMU's Office of Institutional Equity often sabotaged employee's complaints about discrimination by failing to investigate the claim or by making false and fraudulent statements about employee's discrimination claims.

258.    For example, SMU also created a hostile work environment by ignoring complaints of student harassment of law professors.

259.    For example, Professor Butler complained to Dean Collins, Associate Dean Thornburg, and Professor Joe Norton that a student was verbally and physically harassing Professor Butler.  In response to this complaint, Associate Dean Thornburg told Professor Butler not to file an Honor Code Complaint against the student because "that is not how you want to spend your time."

260.    Even though Associate Dean Thornburg discouraged Professor Butler from filing a complaint against the student, she and Dean Collins went to the Office of Institutional Equity to conduct an investigation without Professor Butler's knowledge or participation.

261.    Samantha Thomas, Executive Director of SMU's Office of Institutional Equity and or Dean Collins wrote Professor Butler a letter stating that SMU had investigated her claim of harassment and had concluded that no such harassment or civil rights violations had occurred.

262.   Plaintiff immediately wrote back to Samantha Thomas "to cry foul."  Professor Butler asked Ms. Thomas, in essence: "How could your office had conducted an investigation into this matter without having ever contacted me, interviewed me or notified me of your investigation."

263.   Ms. Thomas conceded that she had never interviewed Professor Butler before conducting or concluding an investigation.  To supposedly cure this injustice, Ms. Thomas invited Professor Butler to meet in her office to provide, for the first time, her account of what happened.

264.   Prior to meeting with Ms. Thomas, Professor Butler sent her numerous emails giving her account of the alleged discrimination.  In these emails, Professor Butler named the student who was involved in the alleged misconduct and described the acts of misconduct.  For example, Professor Butler told Ms. Thomas that the student would verbally assault her via email and in person.  Professor Butler also told Ms. Thomas in writing that the student refused to follow Professor Butler's orders that he not approach her in her office but instead, only meet with her in class or in the Dean's office and that the student violated these orders by coming into her office and refusing to leave.

265.   Plaintiff sent an Email to Jennifer Collins and Samantha Thomas (IAE) August 10, 2015 @ 4:13 pm.  Notably, the email clearly identified the type of discrimination that she complained about and identified by name the persons she accused. ("Jennifer, Thank you for writing.  We should talk because you may have unintentionally misconstrued the facts regarding [student] Pin Wu. As he seems to have damaged my reputation and caused me distress, I am wondering what steps the university can take to cure that.  And, to make sure that no other harm is done.  Also, since his acts of harassment - yelling and screaming at me, imposing himself physically in my space, threatening to damage my reputation - have been carried out by other students, what can the Dean's office and the OIE do to make sure that this does not occur again. I need your help.  I complained to the law school that I did not feel comfortable meeting with this student and the student was badgering me.  I told my colleagues and my family that the student had cornered me in my classroom and my office several times, appeared to be threatening, combative and manipulative.  Therefore, I did not feel comfortable being alone with this student. I did not feel comfortable teaching at night.  I did not trust the student.  I told the student to not

visit me in my office; that if he wanted to meet with me he would have to meet in the presence of a Dean or in a Dean's office. I requested that the student be moved to another class. The request was granted. The student still made threats to harm my reputation if I did not change his grade from a C (or C- whatever the grade was). I asked my colleagues to talk to the student and the class to inform everyone that further discussion of the dispute was not allowed."

266.     Plaintiff sent an Email to Samantha Thomas, Executive Director of the Office of Institutional Equity (IAE) and to Dean Jennifer Collins. August 2015: ("My complaints are not meant to attack but to cry out to say enough is enough. For years, some of us have worked under a discriminatory environment but had a fear of speaking out. Finally, due possibly in part to the stress that is generated from the hostile work environment, my health is deteriorating or is negatively affected. Thus, with respect to some of these issues, I want to make sure that I am not discriminated against based on any real or perceived disability.") I am trying to do better at protecting myself - in terms of my time, and my physical and emotional health. My concerns do not pertain to you and are not directed at you but I have to share them with someone so that I do not get too depressed or stressed out by continuing to keep them bottled up. In the past, before Jennifer [Dean Collins] came, I have felt obligated to take on extra work, unforeseen and shifting course assignments. I have been made to feel that I have to always do extra because what I had done thus far was never good enough. I never really got a pre-tenured leave of absence. Long story short. I do not want to feel anymore that I have to do more than others in order to be accepted by our colleagues. I love so many of my colleagues and my students. But, I also have a family. I want to pull my weight on the faculty, but over the next year, I do not want to take on more than that. I have LOVED teaching in the evening - in fact. But, if it is someone else's turn to do so, I would be so grateful if he or she could take that turn.

267.     Professor Butler had also reported the student's actions to Associate Dean Thornburg, Dean Collins, Dean of Students Martin Camp and to Professor Butler's tenure chair Professor Norton. Professor Norton was also the student's advisor.

268.     Professor Butler told Mss. Thomas that the student's actions and SMU's failure to investigate violated her rights under Title IX.

269.     At the time of Professor Butler's complaint of Title IX discrimination, SMU was under investigation or had recently been investigated by the Office of Civil Rights for the mishandling of Title IX complaints.

270.     Ms. Thomas scheduled an initial meeting with Professor Butler for September 2015.

271.     When Ms. Thomas and Professor Butler met in September 2015, Ms. Carolyn Hernandez joined them in the meeting.  During the meeting, Professor Butler told Ms. Thomas and Ms. Hernandez that she wanted to discuss three complaints: 1. FMLA discrimination; 2. Race Discrimination with respect to tenure standards and 3. The Title IX harassment issue related to the student.

272.     At Ms. Thomas' suggestion, Professor Butler discussed the tenure discrimination matter first.  Plaintiff also discussed the FMLA matter.

273.     During the meeting, Ms. Thomas then indicated that they ran out of time and suggested that they reschedule a follow up meeting to finish discussion on the allegations.

274.     Approximately three days after the meeting, Dean Collins wrote Plaintiff a letter indicating that her tenure committee had resigned alleging, in essence, "Professor Butler had complained so much about discrimination that they could not complete their tasks on the tenure committee."

275.     In addition to retaliating against Plaintiff for filing this formal claim of discrimination, defendants also created a hostile work environment by making false statements about what took place during her meetings with the Office of Institutional Equity.

276.     Even though Ms. Hernandez and Ms. Thomas did not (for whatever reason) complete an investigation discriminated against and defamed Plaintiff's character by telling the faculty that Plaintiff's claims of discrimination had no merit.

277.     Therefore, Professor Weaver told Professor Butler that the Tenure Advisory Committee specifically recommended to the faculty that they vote to deny her application for tenure and promotion in part because Plaintiff lied and or made false statements about experiencing discrimination at SMU.

278.     Notwithstanding the extensive paper trail documenting the detailed nature of the discrimination at SMU (detailed emails about discrimination in tenure standards, the Human

45

Trafficking Clinic, the Title IX issue and more), in SMU's EEOC Position Paper, SMU continues to deny that Plaintiff made any civil rights complaints *at all* to the Office of Institutional Equity.

279.    For example, in the EEOC Position Paper, SMU claims that each time Plaintiff contacted the staff of SMU's Office of Institutional Equity, plaintiff could not identify anyone who discriminated against her or could not explain the type of discrimination, e.g. race discrimination, FMLA, that she had experienced.    Therefore, the staff of the Office of Institutional Equity [made the preposterous claim that it] had to help Plaintiff "realize that she had not ever experienced any discrimination whatsoever at SMU."

280.    These statements by SMU are utter falsehoods made with malice.    At the very least, SMY made these statements with negligence.  SMU knew that these statements were false and or had reckless disregard for their truth.

281.    However, Plaintiff's email records and tape recordings of her meetings with the staff of the Office of Institutional Equity contrast sharply with SMU's accounts.  Much to the contrary, this documentation demonstrates that Plaintiff clearly identified the nature of her alleged discrimination and specifically identified the persons who allegedly discriminated against her.

282.    SMU allowed members of the Office of Institutional Equity to make these false statements in the workplace even though Plaintiff had previously warned the university that Ms. Hernandez and Ms. Thomas had intentionally made other false statements during their investigation of her discrimination claims.

283.    For example, in December 2015, Ms. Hernandez, SMU's ADA Coordinator met by conference call to discuss Plaintiff's allegation that Dean Collins and Interim Provost Stanley may have violated her ADA rights by refusing to extend her Tenure Evaluation Period by a semester or year due to medical reasons.

284.    During the meeting, Ms. Hernandez expressly agreed with Plaintiff that Dean Collins and Provost Stanley had violated her ADA rights.  Regardless of the merits of Ms. Hernandez' assessment, she made the statement.

285.    Plaintiff then wrote to Dean Collins several times to tell her that the Office of Institutional Equity had determined that Dean Collins violated her ADA rights.

286.    In response, Ms. Hernandez repeatedly and vehemently denied making the statements to Plaintiff.

287.    According to witnesses, SMU, relying on Ms. Hernandez' denials, recommended the denial of Plaintiff's application for tenure and promotion in part because Plaintiff lied about discrimination.  Professor Weaver reported that the Tenure Advisory Committee recommended the denial of tenure based on this dispute with Dean Collins and Provost Stanley.

288.    SMU also ignored Plaintiff's warning that Ms. Hernandez had lied about the investigation of Plaintiff's ADA allegations.

289.    In addition to this evidence that the staff of the Office of Institutional Equity made false statements about its investigations, there is similar evidence that SMU's FMLA Coordinator, Rhonda Adams also intentionally lied in her handling of Plaintiff's FMLA claims and intentionally sabotaged her tenure bid.

290.    Curiously, SMU's FMLA Coordinator, Rhonda Adams, also made knowingly false statements about her handling of Plaintiff's request for FMLA protection,

291.    For example, Ms. Adams wrote to Plaintiff in November 2015 stating that Plaintiff did not qualify for FMLA leave from work because Plaintiff allegedly had not met with Ms. Adams to state the basis for her need for FMLA leave (e.g., she had asthma, a family member is in the hospital etc). In essence, Ms. Adams was claiming that Plaintiff had not provided the requisite "employee notice" that is legally required for FMLA eligibility.

292.    In response, Plaintiff emailed Ms. Adams asking her why she had intentionally lied to Dean Collins and others about their conversation.  Plaintiff attempted to remind Ms. Adams that the two had indeed had a lengthy phone conversation in which Plaintiff provided the required notice of her FMLA-qualifying event.

293.    Ms. Adams emailed back refusing again to acknowledge that Plaintiff had ever provided any notice of the need for FMLA leave.

294.    In addition to intentionally denying that Plaintiff had provided employee notice of the need for FMLA, Ms. Adams retaliated by making knowingly false and misleading statements to Dean Collins and Plaintiff's Tenure Advisory Committee about Plaintiff's FMLA application.

295.    For example, on the eve of the faculty vote on her tenure application, Associate Dean Mary Spector, a member of the Tenure Committee told Professor Butler that Ms. Adams

47

told Dean Collins and the members of the Tenure Committee that Plaintiff "lied" on her FMLA application and or otherwise conveyed to the committee that Plaintiff made false statements about FMLA.

296.    For example, Associate Dean Spector explained that, after the conference with Ms. Adams, Associate Dean Spector concluded that Plaintiff "had lied" to her about being sick and needing FMLA during certain days in Fall 2015.

297.    During this conversation, Professor Butler began crying and told Associate Dean Spector that she never intentionally lied to her about FMLA.

298.    Plaintiff's Tenure Advisory Chair, Professor Roy Anderson also suggested to Plaintiff that there was a rumor that she had lied about her need for FMLA.  Therefore, Professor Anderson was concerned about acknowledging Plaintiff's FMLA eligibility in his Tenure Advisory Report because he was afraid that SMU President Turner would call him up and say (paraphrasing):"Why did you mention her FMLA in there, Roy.  She could have forged the doctor's signature on the FMLA forms."

299.    Associate Dean Spector conceded that it was discriminatory for the Tenure Committee to proceed with its recommendation and the faculty vote without "sorting out" these accusations that Plaintiff allegedly lied about FMLA.

<u>**Disability Discrimination**</u>

300.    Plaintiff has a medical history for asthma and bronchitis.

301.    Plaintiff provided her employer with medical records indicated that since childhood, she was diagnosed with asthma.

302.    During her probationary period, Plaintiff received medical treatment for two illnesses: bronchitis/asthma and depression. For example, on two occasions in June 2012, Plaintiff received medical treatment in a hospital emergency room for severe bronchitis.  In June 2012, Plaintiff made her disability known to former Law Dean John Attanasio who in turn, provided Plaintiff with a medical accommodation and confided that he too suffered from bronchitis and therefore, "understood how serious and illness it could be."   In January 2015, Plaintiff's symptoms of bronchitis and asthma returned (Plaintiff had previously been diagnosed with asthma in her childhood.)   Plaintiff spent four to five days overnight in a hospital for treatment for trouble breathing and other complications related to asthma.

303.    Throughout her tenure evaluation period, Plaintiff intermittently suffered from asthma.  During flair-ups or "asthma attacks," the illness interfered with Plaintiff's ability to breathe, walk, talk, concentrate, sleep, eat, and digest food.  During flair-ups, she can sometimes contain the asthma attack with an inhaler.  Sometimes during her tenure probationary period, an inhaler was inadequate and or Plaintiff had to seek emergency medical treatment at a hospital or an Urgent Care Emergency Room.

304.    Plaintiff is able to perform the job responsibilities of scholarly research, teaching, and service with and or without an accommodation for her asthma.

305.    At all times prior to applying for tenure and promotion, Plaintiff remained "qualified" within the meaning of the Americans with Disabilities Act (ADA) / Rehabilitation Act of 1973.  Plaintiff has the requisite education, skill, and experience to serve as a full-time tenured or tenure-track law professor.

306.    Particularly, Plaintiff's performance record speaks to her requisite skill as a law professor and could perform the essential elements of her job either with or without a disability.

307.    In Fall 2015, weeks before the scheduled vote on her application for tenure and promotion, Plaintiff's first Tenure Chair Professor Joe Norton wrote that she "met the standards for tenure and promotion" and "was a good person."

308.    On or about November-December 2015, weeks before her rescheduled vote on the application for tenure and promotion, Plaintiff's second Tenure Chair, told Plaintiff that her teaching in three courses, Employment Discrimination Lecture Survey; Employment Discrimination Edited Writing Seminar and Civil Rights Critical Race Theory Writing Seminar, met and or exceeded the standard for tenure and promotion.

309.    In the same conversation, Professor Anderson also told Plaintiff that he was certain, with an accommodation in the form of a deferred tenure vote and or extended tenure evaluation period of one semester and or one year, Plaintiff would achieve additional outstanding evaluations in her Torts class as well. Professor Anderson also told Plaintiff that with the accommodation of a qualified and engaged teacher mentor – an accommodation that had been provided to other SMU professors – plaintiff could quickly satisfy all the requirements for tenure and promotion. Professor Anderson reassured Plaintiff that, during such an extra semester of

evaluation, he could advise Plaintiff on some "minor adjustments" in the teaching of her Torts class, Plaintiff would achieve outstanding teaching evaluations in her Torts class as well.

310.   Professor Anderson also told Plaintiff that SMU had discriminated against Plaintiff and his tenure committee by failing to provide them with adequate time to fairly evaluate Plaintiff's teaching skills.  Independent of Plaintiff's illness, Professor Anderson stated that the designated evaluation period (of less than one semester) was inadequate for a far and thorough investigation.

311.   Professor Anderson told Plaintiff that the designated evaluation period was a discriminatory and or inadequate amount of time to evaluate Plaintiff's teaching qualifications, given Plaintiff's incessant coughing, wheezing, trouble breathing and steroid regimen, all which he acknowledged observing.

312.   Each semester, Plaintiff received outstanding teaching evaluations in three courses: Employment Discrimination Lecture Survey; Employment Discrimination Edited Writing Seminar and Civil Rights Critical Race Theory Writing Seminar.  Plaintiff also received outstanding teaching evaluations and awards in her Directed Research courses.

313.   Further, during semesters in which Plaintiff did not experience an FMLA-qualifying event, Plaintiff also received outstanding evaluations in her fourth and fifth courses, Torts I and Torts II.

314.   Plaintiff was a frequently invited lecturer for events at the Dedman School of Law, SMU and at top law schools throughout the United States.

315.   Despite her disability, Plaintiff developed an outstanding record of legal scholarship.

316.   During her probationary period, Plaintiff rarely took leave from work due to medical illness, In her several years of employment with SMU, Plaintiff rarely missed or rescheduled classes due to illness.  In January 2015, Plaintiff took five days leave from work due to a hospitalization.  Thereafter, between August 2015 and December 2015, during the last semester that Defendants allowed Plaintiff to teach courses, Plaintiff missed fewer than four classes due to illness.

317.   When her bronchitis and asthma symptoms did occur, they interfered with several major life functions, including the ability to breathe, eat, walk, talk, and concentrate.

## Plaintiff's Disabilities were known to Defendants

318.    Plaintiff's chronic bronchitis/asthma was known to SMU since Summer 2012, when Plaintiff's Dean provided her with a reasonable accommodation in the form of a week off from summer research following a hospital stay and a regimen of steroids.

319.    Plaintiff's depression was also known to Defendants. In May 2015, Plaintiff notified SMU that a family member was hospitalized for at least 4-5 days due to an illness/injury that qualified as a serious health condition under the FMLA.  In June 2015, Plaintiff notified Dean Collins and Dean Thornburg that upon release from the hospital, the family needed in-home care to recover from the injury/illness.  In August/September 2015, Plaintiff told Dean Collins that due to the family member's illness and harassment at work due to the family member's illness, Plaintiff was being treated for depression.

320.    Plaintiff also confided in Professor Weaver due to a hostile work environment based on race and disability, that she began to suffer from depression.  Professor Weaver responded that the depression was credible because, in her view, several defendants including Dean Collins, Provost Forrester, Professor Rogers, and Professor Anderson were harassing and discriminating against Plaintiff based on her disability and that the harassment took the form of accusations that she was "lying" about being sick.

321.    From September through January 2015, Plaintiff's asthma became known to Dean Collins, Professor Roy Anderson, Dean Spector, Professor Colangelo, Professor Weaver, Professor Ndiva Kofele-Kale, Mr. Ward, Ms. Adams, Ms. Hernandez, and Ms. Thomas by observation and medical verification.  Plaintiff suffered from a loud and incessant cough which was apparent to students and faculty with whom she worked. For example, in several tape-recorded conversations with Tenure Chair Professor Roy Anderson and Professor Weaver, one can hear Plaintiff coughing and wheezing to the point where her colleagues inquire about whether Plaintiff has sought medical treatment for this unusual coughing.

322.    In taped conversations, text messages and emails with Professors Anderson and Weaver, Plaintiff discusses the side effects of prescribed medicine for asthma.  In another instance, Plaintiff called Professor Kofele-Kale from the hospital and he warned her to get medical documentation for her illness in order to refute the rumors spread by faculty that she was "faking" illness.

323.     In November 2015, Ms. Adams interviewed Plaintiff about her medical condition and based on this interview, Ms. Adams "pre-qualified" Plaintiff for intermittent leave for asthma and provided her with FMLA certification forms for further verification by a doctor.  Ms. Adams also told Plaintiff that she could approve an ADA accommodation for Plaintiff's asthma if a doctor verified the illness on an FMLA medical verification form.

324.     In a tape-recorded conversation, Ms. Adams revealed to Plaintiff that Dean Collins secretly called Ms. Adams and instructed Ns. Adams to refuse and decline Plaintiff's request for leave and Ms. Adams withdrew the FMLA "pre-qualification" for asthma.   After Dean Collins instructed Ms. Adams to refuse approval for FMLA leave, Ms. Adams also reversed course and withdrew her original offer to approve Plaintiff's request for an ADA accommodation based on asthma and or depression.

325.     In January 2015, Plaintiff's disability of asthma was known to Dean Collins and Dean Thornburg.  Plaintiff notified them of the hospital stay and the diagnosis.  In addition, the illness became known to them when, in 2015, Plaintiff came to work daily with a persistent cough that interrupted her ability to breathe, speak, and lecture.   Plaintiff has recorded conversations with SMU faculty in which they can hear her coughing and urge her to seek medical treatment.

326.     In a recording made on or about January 12, 2016, Dean Spector confirms to Plaintiff that the medical documentation that she submitted to Ms. Adams was discussed with Dean Collins, Professor Anderson, and Professor Colangelo. However, according to Dean Spector, Ms. Adams convinced Dean Collins and the tenure committee that Plaintiff allegedly had "lied" on her medical documentation and the committee had used these allegations to recommend the denial of tenure.

327.     On or about January 2016, Plaintiff's disabilities were also known to Dean Collins and members of Plaintiff's Committee when Plaintiff emailed her medical documents directly to Dean Collins.

328.     Defendant SMU also acknowledged that Plaintiff is a qualified person with a disability, having granted some, although not all, of Plaintiff's requests for accommodation and or leave under the ADA or Rehabilitation Act.

329.    Plaintiff was perceived by her employer and several Defendants as having a disability.  For example, during Plaintiff's tenure process, Professor Weaver wrote a statement to the faculty arguing that Plaintiff appeared to have a disability and that the faculty was discriminating against her by not accommodating her disability.

330.    During Plaintiff's tenure process, Defendants perceived Plaintiff as having a disability by calling her a "pathological liar" and accusing her of being "unfit to be an attorney or a law professor" because she allegedly "had a penchant for lying."  Defendants also said that because Plaintiff "lied about being sick" and or "lied about needing FMLA or ADA leave," they "did not want someone like her on the faculty."

## ADA Harassment and Interference

331.    Professor Weaver warned Plaintiff that "to mount a defense" to Plaintiff's complaints of discrimination, Dean Collins told the law faculty that Plaintiff "was crazy" and therefore did not deserve any support for her application for tenure and promotion.

332.    Professor Kofele-Kale warned Plaintiff that Dean Collins was the "main leader" behind a conspiracy to harass Plaintiff based on disability.  Professor Kofele-Kale warned Plaintiff that it was a mistake to tell Dean Collins that she was treated for depression because Dean Collins had made her rounds telling him and other faculty members that she planned to "frame Plaintiff as going coo-coo" and a "crazy person making false claims about discrimination.

### Plaintiff's 2015 Request for Reasonable Accommodation Deferred Tenure Process

333.    In November 2015, Dean Collins violated Plaintiff's ADA rights by declining her request for accommodation on the impermissible grounds that the disability did not appear to interfere with Plaintiff's ability to perform the essential responsibilities of her job. Dean Collins wrote to Plaintiff that Plaintiff did not appear to need an accommodation due to her disability. Dean Collins stated that since Plaintiff had written a personal statement as part of her application for tenure and promotion, she obviously could finish the remainder of her application and did not need an accommodation in the form of a deferred tenure process.

334.    Likewise, in November 2015, Provost Stanley also denied Plaintiff's request for accommodation based on the illegal grounds that Plaintiff's disability did not appear to interfere with her abiliy to perform the essential functions of her job.

335.    In January 2016, Dean Collins told Plaintiff in her opinion, Plaintiff was a great teacher and a very productive legal scholar, adding that Plaintiff was so productive and functional as a member of the law faculty that Plaintiff "did not need" a medical accommodation based on disability.

336.    Professor Anderson agreed that it was discriminatory for Defendants to evaluate Plaintiff's application for tenure and promotion while she was suffering from and being treated for asthma.  Professor Anderson said that this treatment by SMU was different from the way that SMU had treated other faculty members who were sick and needed medical accommodations. Professor Anderson used himself as an example, indicating that SMU was so supportive of him while he battled lung cancer.  Professor Anderson provided other examples of times in which SMU supported Professor Forrester, Dean Thornburg, and Professor Tran (White women) who had experienced FMLA-qualifying events.

337.    Professor Anderson also told Professor Butler that, if SMU did not grant Plaintiff an accommodation in the form of a medical leave or delayed tenure vote, the decision would also be discriminatory and or unfair to his tenure committee.  Professor Anderson stated that the tenure committee had only been given a few weeks to evaluate Plaintiff's teaching qualifications and that, independent of Plaintiff's illness, this was not enough time to fairly and thoroughly evaluate a tenure candidate.

338.    Professor Anderson also opined that he noticed that Plaintiff was very ill and he personally felt it was difficult and inappropriate to evaluate candidate while she was so ill. Professor Anderson told Plaintiff that personally, he thought that the fact that Plaintiff had submitted FMLA paperwork to SMU was very relevant; however, he could not factor the FMLA into her tenure evaluation without SMU's permission.

339.    Provost Stanley wrote to Plaintiff, stating that SMU "does not have a Stop the Tenure Clock" policy or process to delay a tenure vote due to illness.

340.    Several faculty members disputed Provost Stanley's claim that SMU could not delay Plaintiff's tenure process based on the need for FMLA accommodation or illness.  Faculty members pointed to SMU Bylaws that provided such accommodations.

341.    To evaluate Plaintiff's request for FMLA and ADA leave, Provost Stanley subjected Plaintiff to a discriminatory process that was different from SMU's standard policies and procedures for evaluating employee requests for medical leave.

342.    For example, SMU's policy is that employees seeking a disability accommodation must request and submit medical documentation to the ADA Coordinator, who is a staff member of the Office of Institutional Equity.  But, instead, Provost Stanley required that Plaintiff submit the documentation *to him.*  Further, The ADA coordinator is supposed to determine the request.

343.    Provost Stanley denied Professor Butler's request to delay her tenure vote due to FMLA or medical illness.  As part of the denial, Provost Stanley explained that, in his opinion, Plaintiff did not need a medical accommodation in the form of a delayed tenure vote.

344.    In December 2015, Plaintiff appealed Provost Stanley's denial of the request for her accommodation to Dean Collins.  Here too, Dean Collins denied the request to stop the tenure clock, telling Plaintiff that "if she was well enough to write stellar law review articles, she was well enough to put her application for tenure to a vote."

345.    Provost Stanley advised Plaintiff that she could apply for another form of medical leave by contacting FMLA coordinator Rhonda Adams.  Ms. Adams, in turn first agreed to review Plaintiff's request for an ADA accommodation in the form of a delayed tenure vote.

346.    But, in December 2015-January 2016, after several weeks, Ms. Adams denied that she had ever offered to review the application for an ADA accommodation in the form of a delayed tenure vote and told Plaintiff to appeal to the ADA coordinator.

347.    Dean Collins also began humiliating and harassing Plaintiff for being sick.  For example, when Plaintiff missed a day at work to go to the hospital for work, Dean Collins emailed her stating that Plaintiff should feel ashamed and that Plaintiff's students thought lowly of her for not coming to work.  Plaintiff wrote Dean Collins back expressly shock and dismay, stating, "What kind of Dean shames a law professor and makes her feel bad" for having an asthma attack?"

348.    Defendants also violated Plaintiff's ADA rights by refusing to allow her to appeal the denial of her application for tenure and promotion by Provost Currall.  On or about May 6, 2016, Provost Currall notified Plaintiff that he had denied her application for tenure and

promotion and that pursuant to the SMU Bylaws, she had three weeks to write an appeal to President Turner.

349.    However, SMU had already granted Plaintiff an accommodation of a few weeks off from work (SMU had already relieved Professor Butler of her teaching duties).  The appeal deadline would, in essence interfere with or reverse, the ADA accommodation, SMU then required that she write an appeal while she was on the ADA leave.  Devastated that Provost Currall had denied her application for tenure, even in the face of her protests of sabotage and discrimination throughout the process, Professor Butler could not appeal the denial while sick.

350.    SMU then notified Plaintiff that the denial of tenure was final.

### Violations of the Family & Medical Leave Act:Refusal to Retroactively Designate FMLA-Qualifying Events

351.    Dean Collins Interferes with Plaintiff's Efforts to Seek FMLA Retroactive Designation

352.    In December 2015, Plaintiff sought a retroactive designation for FMLA-qualifying events that occurred during her tenure probationary period.

353.    In Fall 2015, Plaintiff's new tenure advisory chair, Professor Roy Anderson informed her that he did not feel that the few weeks allotted to his tenure committee was a fair amount of time for his committee to fairly evaluate Plaintiff's teaching skills.  Professor Anderson also opined that he preferred not to evaluate Plaintiff's teaching ability while she was visibly suffering from some type of respiratory ailment that caused incessant coughing, wheezing, and other trouble breathing.

354.    Therefore, Professor Anderson and other faculty members, including Professor Weaver, told Professor Butler that she had a right to defer or extend her tenure evaluation period if she had experienced FMLA qualifying events during the tenure evaluation and or probationary period.

355.    Plaintiff informed SMU's FMLA coordinator- Rhonda Adams that she needed the FMLA designation to qualify to have her tenure evaluation period extended for an additional year or semester.

356.    Defendants SMU, Ms. Adams and Dean Collins interfered with Plaintiff's efforts to seek retroactive FMLA leave designation. Plaintiff asked Ms. Adams why she would not

approve any FMLA leave – current or retroactive – for any medical events occurring prior to the end of the tenure evaluation period. Ms. Adams disclosed that Dean Collins instructed her to decline Plaintiff's requests for FMLA protection.

357.    In response, Ms. Adams also said that she would not certify the retroactive FMLA because "I'm just not going to do it" or "because you were given the time off."

358.    SMU 's refusal to retroactively designate Plaintiff's FMLA leave during the tenure probationary period harmed Plaintiff by depriving her of a fair tenure evaluation period. Plaintiff's Tenure Chair and other faculty colleagues advised her that she could delay or extend her Tenure Advisory Period by demonstrating that she had experienced an FMLA-qualifying event during her tenure advisory period.  However, Tenure Chair Professor Anderson and Dean Collins required an FMLA-designation.  Professor Anderson advised Plaintiff that he could not fairly evaluate her teaching skills without additional time.   Without the formal FMLA designation, SMU denied the extra evaluation time.   Tenure Chair Professor Roy Anderson proceeded with evaluating Plaintiff in the time that SMU provided him, even though he and others observed that Plaintiff was sick during the Fall 2015 when Professor Anderson conducted his evaluation.

<u>**Plaintiff's Employee Notice of FMLA-Qualifying Events**</u>

359.    During her employment at SMU, Plaintiff notified her employer and Defendants that, on several occasions before the vote on her application for tenure, she and her family members experienced a "serious health condition" within the meaning of the FMLA.

360.     In other words, during her employment at SMU, Plaintiff notified Defendants that she experienced "a condition that incapacitated her or her family member (for example, unable to work or attend school) for more than three consecutive days and required ongoing medical treatment (either multiple appointments with a health care provider, or a single appointment and follow-up care such as prescription medication)."

361.    In addition to providing employee notice to her law deans and other supervisors, Plaintiff also notified SMU's FMLA coordinator of her FMLA qualifying events.

362.    In December 2015, Plaintiff sent a memo to SMU's FMLA coordinator, Defendant Rhonda Ice Adams, reminding her of the FMLA qualifying events she experienced during her employment at SMU.

363.    In her wrote in her memo to Defendant Adams, Plaintiff notified Ms. Adams and her employer that, on two separate occasions in June 2012, she experienced "a condition that incapacitated her for more than three consecutive days and required ongoing medical treatment." Specifically, she stated: "In June 2012, I visited the emergency room for coughing and trouble breathing.  The records indicate that I had already been sick for a week when I finally went to the ER.  My medical records indicate that I was treated in the ER with asthma medication and other medications administered through a breathing machine.  The doctors also prescribed 14 days of medication including steroids and antibiotics.  Despite this regimen of care, I returned to the ER a few weeks later at the end of June.  The ER provided a repeat regimen of the same medicines."

364.    In the December 2015 memo, Plaintiff also reminded SMU and Defendant Adams that these FMLA-qualifying events interfered with her ability to perform her work duties. In addition to providing Ms. Adams with this notification, Plaintiff also attached the medical documentation to corroborate these 2012 medical events.

365.    In January 2015, at the commencement of the Spring 2015 semester, Plaintiff also experienced another FMLA-qualifying event, a trip to the emergency room, immediately followed by a hospitalization for four days and a subsequent regiment of medication for thirty days.

366.    Plaintiff reminded Defendant Adams and SMU that she had given notice to her employer. Because I had to cancel my appearance at a leading law conference, I notified my Law Dean and explain what happened.  I notified my former Dean John Attanasio that I had been sick with severe bronchitis and that the illness has affected my ability to complete my work.  Dean John Attanasio confided that he understood what I had gone through because, from what he told me, he too had a medical history of bronchitis.  Plaintiff also had to forfeit an opportunity to publish a Book Chapter, for which SMU had provided funding.  Dean John Attanasio, upon receiving notice, allowed Plaintiff to keep the funding and complete an alternative research project during Fall 2012.

367.    Even though Plaintiff gave notice to SMU and Dean Attanasio of her illness, SMU did not notify Plaintiff of her right to technically designate the time off from work as FMLA or to otherwise acknowledge her as having experienced an FMLA qualifying event.

368.    In December 2015, Plaintiff reminded Defendant SMU and Adams that SMU never provided employer notice that Plaintiff qualified for FMLA leave or designation. However, notwithstanding my notice to my Dean, the university did not provide employer notice of my rights to take FMLA leave or to designate my time as FMLA-protected.

369.    In December 2015, Plaintiff reminded Defendants SMU and Adams of this Spring 2015 FMLA qualifying event.  She wrote: "On January 5, 2015, I was in Houston, Texas with my family.  I experienced severe chest pains and shortness of breath.  As a result, my husband took me to the St. Luke's Urgent Care facility – a neighborhood urgent care - emergency room.  I have visited this ER several times whenever my family has needed urgent care . . . this January 5, 2015 visit . . . led to a four[-]day hospital stay - a medical event for which the FMLA, on its face, guarantees protection.

370.    In addition to providing Ms. Adams with this notification, Plaintiff also attached the medical documentation to corroborate these 2015 medical events.

371.    Plaintiff also specified to Defendants SMU and Adams how the hospitalizations undermined her ability to do her work.

372.    In the December 2015 memo, Plaintiff also reminded Defendants SMU and Ms. Adams that she had also experienced an FMLA qualifying event due to hospitalization and continuous care for her husband.  The memo described how the event was life-threatening.

373.    As Dean Collins and Dean Thornburg continued to attack her for mistakes on her exam, Plaintiff kept trying to remind them that she had experienced FMLA-qualifying events while trying to meet their work demands.

374.    By October 2015, weeks before Plaintiff was to submit her application for Tenure and Promotion, Dean Thornburg began making disparaging and humiliating remarks casting doubt on the truthfulness of Plaintiff's notice of her husband's illness. Dean Thornburg repeatedly suggested that Plaintiff was using the so-called illness as a "cover" or "excuse" to justify needing more time to grade her exams.  For example, Dean Thornburg told Plaintiff that she should "start now to tell Jarvis not to get sick during exam period" and "exam period is coming so start preparing now by checking with Jarvis."   Later, Plaintiff wrote to Dean Thornburg telling her that she found such comments humiliating and hurtful.  Dean Thornburg responded in writing that she was "'just joking."

375.    Sensing that Dean Thornburg was not just joking, Plaintiff wrote to Dean Thornburg bring her husband's medical records so that Dean Thornburg could stop with the comments and innuendo. On, October 7, 2015, Plaintiff wrote: "Perhaps I should give you a copy of the documentation that my husband was in the hospital during exam period . . . . We also have FMLA documents that chronicle his time off due to illness prior to and following the actual hospital stay including during grading period." Dean Thornburg agreed that as Associate Dean of the Faculty, she was entitled to keep Plaintiff's FMLA paperwork on file.  Therefore, she replied, "I would love to take you up on your offer to share his medical records for my records."

376.    On November 8, 2015, Plaintiff also notified Dean Collins and the members of her new tenure committee that she and her husband recently had experienced several overnight hospitalizations, including the hospitalization during Spring 2015 exam period.

377.    In the December memo, Plaintiff reminded Defendants SMU and Rhonda ice Adams of these and several other FMLA-qualifying events during her tenure evaluation period and that these events merited an extension of her tenure advisory period (extension of the "tenure clock.")

## FMLA-Qualifying Events Involving "Continuous Treatment by a Health Care Provider" and "Chronic Health Conditions"

378.    Plaintiff provided her employer with timely notice of several medical events during her employment which qualified for FMLA protection because they involved "continuous treatment by a health care provider" and a "chronic health condition."

379.    In addition, in her December 2015 memo to FMLA-Coordinator Rhonda Adams, Plaintiff wrote to SMU advising SMU and Ms. Adams that, on several prior occasions, she had fulfilled her FMLA Employee Notice requirements but, SMU had failed to fulfill its Employer Notice Requirements.

380.    For example, Plaintiff sent an Email to Dean Jennifer Collins, Associate Dean Spector, Tenure Chair Professor Roy Anderson, Tenure Committee member Professor Anthony Colangelo on  November 8, 2015 @ 12:55pm ("In addition, as previously mentioned last Spring, I had to deal with my own health issues at the same time that my husband was suffering from a serious health condition was hospitalized for several days during the Spring 2015 exam period

and remained on FMLA leave and otherwise rehabilitating during May and June 2015 (while I graded exams)).''

## Constructive & Other Notice of Severe Asthma Fall 2015

381.    During the Spring 2015 and Fall 2015 semesters, Plaintiff's supervisors and colleagues also have actual notice that Plaintiff suffered from a serious health condition because they have personally observed her sick at work, with a major breathing problem.

382.    Plaintiff's colleagues, including Associate Dean Beth Thornburg, Tenure Chair Professor Roy Anderson, and Professor Jessica Dixon Weaver witnesses – and told Plaintiff that they witnessed her wheezing and coughing at work and or during conversations with her.

383.     On or about December 16, 2015, Associate Dean Beth Thornburg witnessed Plaintiff having an asthma attack at work. Dean Thornburg did come to Plaintiff's aid with water and cough drops.  Given the severity of the coughing and wheezing, Dean Thornburg expressed concern to Plaintiff as to whether she should leave Plaintiff alone at work.  But, Plaintiff told Associate Dean Thornburg that she was having an asthma attack and that she would try to stop the attack by using her inhaler.

384.    On other occasions, Plaintiff notified Dean Collins and her tenure committee member Dean Spector via text message that she had to leave work to go to emergency room specifically because she was having trouble breathing.

## Interference with FMLA Leave for 2015

385.    Virtually every time Plaintiff requested FMLA protection during the Tenure Advisory period, either Dean Thornburg or Dean Collins interfered with the leave in some way.

386.    For example, Plaintiff expressed concerns that Dean Thornburg was interfering with her decision to take FMLA leave by attacking her for turning in the grades despite the hospitalization.  For example, Plaintiff sent an Email to Associate Dean Beth Thornburg on 10.7.15 @ 7:17pm: ''As I mentioned to you and Jennifer, the grades were submitted late due to the following factors (1) my husband was hospitalized *and when released from the hospital had to recover at home on FMLA l (or FMLA eligible) leave away from work.*  I think your statement here, and your other recent statements when we have talked about this before, reflects (or I worry that it reflects) a bias or unwillingness to acknowledge or credit these circumstances.  When we talked about this in person a few weeks ago, there too, you told me that moving forward, I should

"get my grades in on time and tell Jarvis to not get sick."   And, you expressed your view that "I had had the exams awhile after he got out of the hospital." (emphasis added).

387.     In May 2015, during exam period, Plaintiff notified Dean Collins and Associate Dean Thornburg that Plaintiff's immediate family member was hospitalized overnight with a serious health condition.   Dean Collins and Dean Thornburg did not provide Employer Notice to Plaintiff of her right to take FMLA leave. Plaintiff notified Dean Collins and Associate Dean Thornburg that, notwithstanding the hospitalization, she would try her best to administer a review session (although not required) and her final exam to her Torts class. Due in part to the hospitalization, Plaintiff did not have time to proof read a Torts exam.   As a result, Plaintiff provided the exam to Torts students with two spelling errors which made two questions ineffective.  However, aware that it is common for multiple choice questions to proof ineffective, Plaintiff took the measures that professors normally take for such contingencies.  Rather than offer an exam with the 30 questions that the professor would count, Professor Butler added 2-3 extra multiple-choice questions.     After she the exam, Professor Butler "threw out" the ineffective questions and retained the standard 30 questions.

388.     Defendants interfered with Plaintiff's FMLA rights by refusing, on the one hand, to offer FMLA-leave or designation, on the one hand, and then penalizing Plaintiff, on the other hand for the two spelling errors.  Later, Dean Collins and Plaintiff's tenure advisory committee, later recommended that SMU deny Plaintiff's application for tenure and promotion because she has "spelling errors" on the Spring 2015 Torts exam.

389.     Defendants further interfered with Plaintiff's FMLA rights by harassing her and intimidating her from taking FMLA leave a few weeks later when her family member was released from the hospital in June 2015.

390.     In June 2015, during exam grading period, Plaintiff notified Dean Collins, Associate Dean Thornton and other law colleagues that she would need a few extra days to grade her exams in part because Plaintiff's family member was at home for three weeks recovering from the hospitalization.

391.     Professor Butler also noted that she needed extra time grading because her seminar courses were often registered beyond capacity with 20-22 students while other faculty

members only had 6-10 students in their classes.  Professor Butler advised that it took longer to grade 22 final research papers than it would six papers.

392.    In a phone call, Dean Thornburg badgered Professor Butler stating that "you always turn in your grades late" and "next semester tell your husband not to get sick or go into the hospital during exam period."  Professor Butler reported the inappropriate comments to Dean Collins.  Dean Collins reiterated the insensitive comments, stating in emails to Professor Butler that "you turn in your exams late every semester."  Professor Butler wrote back the allegation was untrue.

393.    Plaintiff notified Dean Collins that she wanted to take FMLA leave and in response, Dean Collins told Plaintiff to told make contact with SMU's FMLA-Coordinator Rhonda Adams.

394.    When Professor Butler spoke with Ms. Adams in June 2015, MS. Adams told her that Dean Collins and or Associate Dean Thornburg told Adams that Professor Butler had "breached her contractual duties" with the University by turning in her grades late and that this failure called into question her tenure application.

395.    Professor Butler immediately emailed Dean Collins expressing concerns about Ms. Adams' discouraging comments.

396.    Later, in an email on August 7, 2015, in which Plaintiff expressed fears about retaliation, Plaintiff would remind Dean Collins of her concern about Ms. Adams' intimidating response to Plaintiff's request for FMLA leave: "The administrator who called me after I needed extra time to complete my exams due to a family medical situation also alarmed me.  She expressed that, in her words, I failed to meet the terms and conditions of my contract by not turning in my grades in on time.  This seemed to reflect insensitivity and a lack of institutional support.  I also disagree with her assessment as a matter of law.  I did not agree with her assessment that, by requesting an extension or accommodation in light of medical circumstances, I had violated any contractual terms or acted unprofessionally in any way.  I am appreciative of any help that you can provide."

397.    Professor Butler also spoke with Associate Dean Thornburg, who at the time was a member of Plaintiff's tenure advisory committee.   Associate Dean Thornburg agreed, stating

that the failure to turn in the exams late this time would be grounds for withdrawing support for Professor Butler's upcoming tenure bid in Fall 2015.

398.    To make no mistake, Plaintiff emailed Dean Collins clearly stating that she did NOT withdraw the request for leave because the need for the leave had passed.  Instead, she made clear that she was withdrawing the FMLA leave request because the comments by Dean Collins, Associate Dean Thornburg, and Ms. Adams had intimidated or discouraged Plaintiff from taking the leave.

399.    Plaintiff also emailed Dean Collins that the need for leave stemmed not only from the family member's hospitalization but from discrimination at work. Plaintiff asked Dean Collins for the opportunity to discuss the matter in person.

400.    Plaintiff emailed Dean Collins that she was starting to suffer from depression. Dean Collins did not immediately respond to the email.

### FMLA Retaliation: Faculty Warn that Dean Thornburg No Longer Supports Tenure Bid after FMLA / Grading Delay

401.    In July 2015, Plaintiff's tenure advisory chair, Professor Joe Norton contacted her by phone.  Professor Norton explained that SMU had delayed Professor Butler's tenure process because Associate Dean Thornburg had complained about her failure to turn in her grades on time.  Professor Norton added that "someone on the Provost level" was opposing Professor Butler's upcoming application for tenure and promotion.

402.    Professor Norton stated that SMU had stalled her tenure process by failing to send out letters to outside reviewers of Professor Butler's law review articles.  Professor Butler told Professor Norton that she believed these actions were discriminatory.

403.    At that time, Professor Weaver eventually reported to Plaintiff that "the word at the law school" was that Associate Dean Thornburg and her good friend, Associate Provost Julie Forrester were working to sabotage Professor Butler's application for tenure and promotion. Professor Weaver also warned Professor Butler to take the warning seriously, to immediately retain an attorney and to consider applying for alternative employment.

404.    In addition to reporting the perceived FMLA-retaliation to Professor Weaver, Plaintiff also expressed her concerns in writing with Dean Collins.

405.    for FMLA leave was a rouse.

**Interference with Intermittent FMLA Leave for November-December 2015**

406.     In December 2015, Defendants SMU, Rhonda Adams and Dean Collins conspired to intentionally interfere, and did interfere, with Plaintiff 's FMLA rights.

407.     At the direction of Dean Collins, FMLA Coordinator interfered with Plaintiff's FMLA fights by making fraudulent statements denying that Plaintiff have given notice of her need for FMLA intermittent leave.  As a prerequisite for FMLA leave, an employee must give her employer "notice" of her need for FMLA leave by providing the FMLA coordinator with the "nature" of the illness so that the coordinator may "certify" the employee's eligibility for FMLA leave.

408.     Therefore, in November 2015, Plaintiff called Ms. Adams by phone from her doctor's office and turned on her tape recorder.  Plaintiff spent over 30 minutes talking to Ms. Adams about the specific FMLA-qualifying events that she had experienced during her probationary status.  Plaintiff also told Ms. Adams that she was concerned that Defendants had failed to certify these FMLA-qualifying events and sought a retroactive designation to exercise her contractual right to defer her tenure process and vote to a later semester when she was not having repeated episodes of stress-related asthma attacks.

409.     As a follow-up to the conversation, on or about November 2015, Ms. Adams sent Plaintiff a letter confirming that, based on information received in the initial conversation, Ms. Adams confirmed that Plaintiff was FMLA-qualified.   As is required under the FMLA regulations, Ms. Adams then sent Plaintiff the FMLA-certification forms that Plaintiff and her doctor had to complete.

410.     However, Ms. Arnold then interfered with Plaintiff's FMLA rights by denying that she had ever agreed to retroactively designate FMLA leave and then refusing to retroactively designate the leave.  Ms. Arnold told Plaintiff that Dean Collins had contacted Ms. Adams and told Ms. Adams to deny Plaintiff's requests for FMLA leave.  Plaintiff taped these statements by Ms. Arnold.

411.     In addition to the taped conversation in which Plaintiff gave Ms. Adams notice of the specific nature of her FMLA-qualifying events, in December 2015, Plaintiff also emailed Ms. Adams a detailed memo in which Plaintiff chronicled every FMLA-qualifying event that had

occurred during her probationary period and asked that Ms. Adams retroactively certify these claims.

412.    Ms. Arnold's decision to deny retroactive certification of her FMLA qualifying events during the probationary period was a material adverse action because without the designation for retroactive FMLA leave, Plaintiff was denied a contractual ground to delay or defer her tenure process to a later semester when she was not having repeated asthma attacks sending her back and forth to the hospital. Without the delayed tenure vote, tenure chair Professor Anderson (who had urged Plaintiff to get the medical leave in the first place) was "stuck" having to assess Plaintiff's teaching in an unusually short period of only a few weeks and during a period in which Plaintiff was visibly ill.

413.    Ms. Arnold then made it a point to only grant FMLA leave that was after the tenure probationary period and after Professor Anderson completed his tenure report.

414.    In the meantime, Dean Collins and Dean Thornburg further interfered with Plaintiff's FMLA rights by making false legal statements that the FMLA did not provide for intermittent leave.  Specifically, Dean Thornburg told Plaintiff that she could not actually take leave from work until after she had submitted medical paperwork to SMU and after FMLA-coordinator Rhonda Adams reviewed the paperwork and approved the leave.  Dean Thornburg and or Plaintiff copied Dean Collins and Ms. Adams on these email communications.  Plaintiff politely explained to Dean Thornburg that her interpretation of the FMLA was incorrect.

415.    In response to this email exchange, Ms. Adams sent Plaintiff a letter on SMU letterhead *denying* that Plaintiff had any legal right to take FMLA intermittent leave before a doctor completed FMLA paperwork.

416.    Plaintiff warned Ms. Adams that she was committing fraud and resolved to take the intermittent leave from work.

417.    Dean Collins further interfered with Plaintiff's rights by sending emails to her to shame her for "abandoning her students."  Dean Collins wrote to Plaintiff stating that "her students were mad at her for missing a class."  Outraged, Plaintiff wrote to Dean Collins asking her, "what kind of Law Dean shames a Professor for requesting and taking FMLA leave."

418.    Dean Collins further interfered with Plaintiff's SMU rights by spreading false rumors that Plaintiff had acted unprofessionally in covering her classes.

66

419.    Later, Dean Forrester interfered with Plaintiff's FMLA rights by perpetuating Dean Collins' rumor when Plaintiff applied for tenure.  On tape, Professor Weaver told Professor Butler that during the private faculty meeting to vote her application for tenure and promotion, Associate Provost Forrester recommended that Plaintiff's application be denied because Plaintiff had lied to faculty and students about the need to reschedule her torts classes.

420.    SMU's decision to proceed with an evaluation by Tenure Chair Roy Anderson's Tenure Advisory Committee also amounted to FMLA discrimination because SMU had provided other SMU candidates with a delay or rescheduling of their tenure evaluation when they experienced an FMLA qualifying event during their tenure probationary period.

421.    In the alternative, SMU discriminated against Professor Butler by requiring that she prove that her illnesses were FMLA-qualifying.  Tenure Chair Roy Anderson explained to Professor Butler that SMU supported other faculty members during serious illnesses (to paraphrase) "without requiring that the faculty members go through HR to prove that their illnesses were FMLA-qualifying.  For example, Professor Anderson explained that when he was diagnosed with cancer, SMU provided him with leave and other forms of institutional support "without having to go through HR."  Professor Anderson pointed out to Professor Butler that this treatment was different than how SMU's refusal to provide support to her without an FMLA-designation.

422.    Even though SMU granted FMLA leave for the Spring 2015 semester, Defendants engaged in FMLA interference and harassment by forcing Plaintiff to come to work to address the controversy over the discriminatory and defamatory content of the tenure report.  As explained in the February 2018 Request for Retraction, several professors including Professor Weaver suggested that Plaintiff interrupt her FMLA leave by helping to plan to "go public" about discrimination against Black women.  The faculty stated that even though Professor Butler had a right to read her tenure report, they would only provide the tenure report if Professor Butler helped the University hire Professor Buckner-Innis by telling the news station about the discrimination in her tenure process.  When Professor Butler refused to "go public" while SMU was reviewing her application for tenure and process, the professors refused to give her the tenure report.

**Defendants' Status as "Employers" for Individual FMLA Liability the Authority to Hire and Fire: Collins, Currall, Stanley, Adams, Thomas, and Ward**

423.    Defendants Collins and Currall, exerted authority to hire and fire tenure track faculty members including Plaintiff. At SMU, the law dean makes the recommendation for hiring her faculty.  The hire is subject to approval from the Provost. At SMU, the law dean has the final authority to determine whether to fire a tenure track professor at the culmination of her Third Year Review.    Dean Collins maintained the power of a single vote and the right to recommend a candidate for tenure and promotion and to vote with or against the faculty recommendation.

424.     Interim Provost Stanley and Provost Currall has the authority to grant or deny tenure.  Provost Currall denied Plaintiff's application for tenure and promotion,

425.    In this case, Associate Dean of Faculty and the Tenure Committee (Anderson, Colangelo, and formerly, Thornburg) had extraordinary power to influence Plaintiff's application for tenure and promotion.  Based on their recommendation, the faculty voted to deny Plaintiff's application for tenure and promotion.  It is rare for a professor to gain tenure once her faculty votes to deny tenure.

426.    According to witnesses, Dean Thornburg is a former member of the Tenure Committee and she helped publish the defamatory rumor that "Plaintiff complained so much about discrimination" that she was unfit to be a law professor.

427.    Defendants Thomas and Adams played such an integral part in the denial of Plaintiff's application for tenure and promotion – by falsely accusing her of fraudulent FMLA and fraudulent or false discrimination claims, that they can be said to have power over her termination.

428.    Witnesses state that General Counsel Ward also played a key role in the decision to retaliate against Plaintiff by sabotaging her tenure bid and hence terminate her employment. Plaintiff's Tenure Chair told her that Dean Collins went to Mr. Ward to defend against Plaintiff's complaints of discrimination. The law faculty also stated that Mr. Ward advised the faculty to refrain from helping Ms. Thomas and Plaintiff to investigate alleged FMLA retaliation.  Without a finding of FMLA discrimination and retaliation, Plaintiff had no grounds to appeal her adverse tenure decision and was terminated.

68

**Supervision over Day to Day Activities: Collins, Thornburg, and Thomas**

429.    As Dean of the Law School, Jennifer Collins clearly supervised Plaintiff's day to day activities.  Dean Collins and Associate Dean Thornburg supervisors each of Plaintiff's three work responsibilities – teaching, scholarship, and service.

430.    For example, as to teaching, SMU concedes in its EEOC Position Paper (and is otherwise verifiable by email correspondence between the parties), Plaintiff had to notify Dean Collins of her textbook selections and proposed teaching schedule as a prerequisite for returning to the workplace after FMLA leave.

431.    In addition, Dean Collins and Samantha Thomas did not allow Plaintiff to resume her teaching schedule after her Spring 2016 FMLA leave.  Plaintiff also had to provide such notice to Ms. Thornburg as she served as the Associate Dean of the Faculty.

432.    By design, the Associate Dean of the Faculty, along with the law dean, is an immediate supervisor.  Plaintiff had to notify Associate Dean Thornburg as to her teaching schedule. If she canceled or rescheduled a class, she had to notify the Associate Dean.  When Plaintiff was sick in the hospital, and could not teach, she notified Associate Dean Thornburg and Dean Collins.  Furthermore, Dean Thornburg required that, if Plaintiff was invited to lecture or present her research at another university or legal conference, she had to clear the matter first with Dean Thornburg.  Plaintiff also notified Dean Collins of such travel.

433.    Each semester, Plaintiff also had to notify Dean Collins and Thornburg of her plans and progress with respect to legal scholarship.  Applications for summer research grants, as well as all updates on research, had to be submitted to Deans Collins and Thornburg.

434.    Each year, the faculty had to submit an Annual Personal Assessment to Dean Collins.  Dean Collins would then discuss the assessments with the Provost and determine whether law professors were eligible for a performance bonus.  Based on this process, the law dean and provost notified Plaintiff that she had earned a performance bonus each year.

435.    Furthermore, Dean Collins and Tenure Chair Roy Anderson also exercised her supervisory authority over Plaintiff by evaluating her classroom teaching and writing a recommendation opposing Plaintiff's application for tenure and promotion.

436.    Particularly during the last year of the tenure probationary period, the Tenure Advisory Chair exercised increased control over Plaintiff's day to day activities.  Several email

communications and phone conversations demonstrate how Plaintiff advised Dean Collins and Professor Anderson weekly, as to her teaching and other activities.

### Determine the Rate and Method of Payment: Collins &  Currall,

437.    Several Defendants also determined the rate of Plaintiff's salary.  Each year, the law dean and Provost meet to determine salary and bonuses for the tenure track law faculty based on performance and achievement.  Therefore, Dean Collins, Interim Provost Stanley, and Provost Currall meet this element of the Economic Realities test.

### Maintained Employment Records: Defendants: Collins, Thornburg, Adams, Thomas, Currall,

438.    Several individual FMLA Defendants maintained Plaintiff's employment records. Dean Collins, Associate Dean Thornburg, Provost Stanley, and Provost Currall, and General Counsel Ward maintain Plaintiff's academic employment records and tenure dossier.

439.    Samantha Thomas, Rhonda Adams and Paul Ward maintain Plaintiff's administrative employment records.  Ms. Thomas and the Office of Institutional Equity also maintain records of Plaintiff's discrimination complaints. The Provost's office maintains the employment files and Tenure dossier.

440.    Defendants Adams, Thornburg, and Collins each independently asked Plaintiff for documentation to prove Plaintiff's eligibility for FMLA.

### Authority to Control University Compliance with the FMLA : Defendants Currall, Collins, Adams, Thomas,  Thornburg

441.    Defendants' argument that SMU is the only Defendant who controlled university compliance with FMLA is shamefully false.

442.    SMU's own FMLA coordinator clearly played a major role.  Defendant Adams reviewed Plaintiff's FMLA paperwork, determined their adequacy, and determined whether Plantiff could take FMLA leave.  Defendant Adams also engaged in numerous email exchanges and hours of (taped) phone conversations with Plaintiff regarding her FMLA application and certification process.

443.    Defendant Adams interfered with Plaintiff's FMLA rights and privacy by conspiring with other Defendants to sabotage Plaintiff's tenure application.  Ms. Adams telling

Dean Collins and the Tenure Advisory Committee the outrageous lie that Plaintiff lied on her FMLA application and falsified FMLA documents.

444.    In addition to FMLA coordinator Rhonda Adams, other Defendants also took control of Plaintiff's FMLA process. As Defendants admit on tape, Defendants Collins, Anderson, Spector, Adams, and Stanley had authority to control the university's compliance.

445.    SMU's own FMLA coordinator Rhonda Ice Adams told Plaintiff that Dean Collins also interjected herself into the FMLA application process by taking the highly unusual step of calling Ms. Adams up and telling Ms. Adams to block and or deny plaintiff's requests for emergency FMLA leave in November 2015.

446.    Witnesses state that Dean Collins specifically encouraged the faculty to deny Plaintiff's application for tenure and promotion because she lied about FMLA.

447.    Dean Spector told Professor Butler that the only decisionmaker who could address these accusations about FMLA was Interim Provost Stanley.  Therefore, she promised to meet with Provost Stanley to stop the tenure vote "so that we could all sort this thing out."

448.    When Plaintiff requested emergency FMLA leave during November 2015, Associate Dean Thornburg interjected herself into the process by writing to Plaintiff that she was not entitled to take FMLA leave.  Ms. Adams then sent Plaintiff a letter supporting Dean Thornburg's order that Plaintiff report to work.  Dean Thornburg also asked Plaintiff for copies of FMLA documentation.

449.    When Plaintiff sought approval for an ADA or FMLA accommodation in the form of a deferred or extended tenure evaluation period, Dean Collins and other administrators told Plaintiff that the Interim Provost Stanley was the sole decisionmaker for her request. Under the Bylaws, the Deans and Provosts are charged with developing anti-discrimination and FMLA policy and ensuring that the policies are implemented in their departments.

450.    Ms. Thomas purported to have evaluated and investigated all the actions taken by Ms. Adams.

### Defamation

451.    During her employment, Defendants began to defame Plaintiff's character, both orally and, upon information and belief, in the written tenure report.  Such statements were published to various member of the faculty, the SMU administration, and to outsiders.

452.     On multiple recordings several faculty members are on tape accusing Dean Collins, and others, of intentionally and maliciously retaliating against Plaintiff for attempting to file an internal discrimination complaint with SMU's Office of Institutional Equity.  The retaliation included using fraud, defamation and coercion to persuade the faculty to vote against Plaintiff's application for tenure and promotion.

453.     In November 2015, less than 72 hours after Plaintiff filed her formal complaint of discrimination with SMU's Office of Institutional Equity, Dean Collins wrote Plaintiff a letter on SMU letterhead stating that her Tenure Committee had "resigned" because "Plaintiff complained so much about discrimination that the committee could not function as a committee." The Tenure Committee consisted of Professor Joe Norton, Associate Dean Beth Thornburg, and Professor George Martinez. These false statements hurt Plaintiff in her profession as a law professor. Honesty, professionalism and an ability to work without disrupting the workplace is required conduct in the work of a law professor. Dean Collins later used the false statement of fact as grounds to deny Plaintiff's application for tenure and promotion.  Dean Collins and others then used coercive tactics to discourage Plaintiff from filing a lawsuit.

454.     In November – December 2015, Professor Anderson also told Plaintiff that Dean Collins told SMU President Turner that Plaintiff had provided a false and fraudulent application for FMLA leave.  Professor Anderson did not reveal the exact words that Dean Collins used. Professor Anderson and others coerced Plaintiff into delaying a lawsuit.

455.     Professor Anderson then told Plaintiff that President Gerald Turner, Interim Provost Harold Stanley, and Dean Collins then told him that he should deny Plaintiff's application for tenure because she allegedly provided false information in her application for FMLA protection.  Professor Anderson did not disclose the exact words that these administrators used to accuse Plaintiff of misconduct.

456.     Professor Weaver warned that the tenure report contained "a red herring" – a recommendation that SMU deny tenure based on alleged character flaws.  She warned further that, if Professor Butler "went public" the faculty would further defame her character.

> *Professor Weaver:  What I said to you was, you get yourself out there first.*
> *Because you better believe that they're gonna try to claim that you're the liar . .*
> *. You need to be aware there's that . . . you know, that that's the narrative.*

*Professor Weaver:  Okay Here's what I want you think about . . .*

*Professor Butler: Okay.*

*Professor Weaver: Here is what I want you to think about in preparation for Friday's meeting.*

*Professor Butler: Yes.*

*Professor Weaver: So, remember what I said about the whole red herring thing.*
*Professor Butler: Now what did you say?*

*Professor Weaver: The issues of character – whether you're telling the truth or not as a red herring . . . They're trying to use that to say, well she shouldn't be a faculty member here.*

457.    On the eve of the January 2016 faculty vote on tenure candidates, the Tenure Committee distributed its Tenure Committee report recommending that the faculty deny Plaintiff's application for tenure and promotion.  Professor Weaver called Plaintiff to report to her that Professor Meghan Ryan read the Tenure Committee report to Professor Weaver. Professor Weaver told Plaintiff that, in the letter, the Tenure Committee was accusing her of lying about being sick and about other unspecified matters: "I think that's part of it honestly the sickness issue . . .  I just think it's trying to call into question whether you are a truth-teller period.  I got the sense from what Meghan . . .  [Professor Meghan Ryan] showed me in a little bit of the last paragraph today . . .  and she [Professor Ryan] was like 'Yeah, this past part is the worst.  And it just talks about untruthfulness.  It doesn't say credibility necessarily.  It's not worded like that.  Um, I think something to the effect of things were stated to the Dean and the Provost. Like that [Plaintiff] made different and untruthful statements to the people on the Tenure Committee or to the other people on the faculty."

458.    During several conversations between January and November 2016, Professor Weaver disclosed that during the tenure meeting, Dean Collins, Associate Provost Julie Forrester, and, during her tenure process, the law faculty made other false and defamatory statements about Plaintiff.

459.    In the month prior to the vote on tenure candidates, faculty members including Professor Weaver, Professors Anderson, Professor Colangelo, and Professor Spector (i.e. members of Plaintiff's Tenure Committee) had discussed with Plaintiff the rumor that Plaintiff

was "lying about being sick" while teaching or lying about needing or qualifying for FMLA leave from work.  These discussions were had with full knowledge that Plaintiff needed FMLA leave and had provided the proper medical documentation.

460.    Professor Weaver and Professor Armour each told Plaintiff that SMU law professors, attending a faculty meeting to vote on candidates for tenure and promotion, advocated and recommended that Plaintiff should be denied tenure because she lied in her complaint about discrimination.  Professor Maureen Armour told Plaintiff that, in the tenure meeting, Roy Anderson exclaimed Plaintiff is "a pathological liar."

461.    Professor Weaver said that at least five (5) people stood up and made malicious statements with accusations of misconduct or moral turpitude against Plaintiff. However, Professor Weaver expressly stated that she could not disclose all of the persons who made the statements because SMU had demanded her loyalty, and she was afraid of retaliation.

462.    Beginning in January 2016, members of the law faculty made known to Plaintiff some of the exact words used to defame her.   However, in several instances, SMU faculty members failed to or outright refused to tell Plaintiff the exact words that other colleagues had used to defame her character and undermine her credibility. The defamatory statements included the following:

463.    For example, in January 2016, Professor Weaver testified that the faculty voted to deny tenure based on the tenure report's reference to accusations of dishonesty but she refused to tell Plaintiff what the faculty alleged that she was lying about.  Rather than give Plaintiff a copy of the tenure report itself or tell Plaintiff outright the nature of the accusation, Professor Weaver forced Plaintiff to participate in a "guessing game" in which Plaintiff, not Professor Weaver, had to articulate what the Tenure Committee was accusing her of "lying about."

464.    On July 28, 2016, Professor Weaver and Plaintiff spoke for almost four hours by phone.  During much of the conversation, Professor Weaver disclosed that there was additional defamatory content to the tenure report that she had not previously disclosed. In this conversation, for the first time, Professor Weaver disclosed that Professor Anderson wrote in his committee's report that Plaintiff was "unfit to be a lawyer" and/or "unfit to be a law professor."

465.    On or about September or October 2016, Professor Weaver also retracted her earlier statement that the faculty's accusations were not really about the FMLA.  She explained

that, based on further discussion, she stated, that in hindsight (paraphrasing) "they were accusing you of lying about needing FMLA, to tell you the truth."   This was the first time that Professor Weaver revealed to Plaintiff that she was being accused of "lying" about being sick (i.e. needing FMLA leave).

466.    The statements are of or concerning Plaintiffs Cheryl Butler.

467.    The statements are defamatory because it is a false statement of fact that injured Plaintiff's reputation and caused the law faculty to deny her application for tenure and promotion and consequently, to terminate her employment.

468.    The statements are Defamation Per Se because it accuses Plaintiff of engaging in immoral, dishonest, unprofessional, and or criminal behavior.  The statement also injures her in her profession as a lawyer and a law professor.

469.    As discussed in the February 2018 Request for Retraction the statements are all timely because they were published or republished with the statutory period and  or because Defendants continue to fraudulently conceal the Tenure Report in which they were published.

470.    Professor Weaver said that the statements were made in retaliation for Plaintiff's complaints about discrimination and were known to be false.  However, Plaintiff reserves her right to plead, complain, and discover in the litigation process for herself the true intent or circumstances in which each statement was made.  Indeed, Plaintiff has evidence that, in addition to an intent to discriminate and or the alternative, the statements were made with negligence (that Defendants knew or should have known that the statements were false) and or that the statements were made with malice (not intent to retaliation but instead simple knowledge of their untruthfulness or reckless disregard for the truth).

471.    The statements are not privileged because they were published in the workplace with knowledge that they were untrue, with reckless disregard for the truth and or because they are sheer falsehoods and farfetched falsifications for which the law provides no Constitutional protections.

## Requests for Retraction

472.    Plaintiff timely served Defendants with a Request for Retraction, Correction, and Clarification as well as an amended retraction letter.  A copy of the Request is attached as Exhibits C-E.

75

473.     Plaintiff incorporates by reference the facts stated in Plaintiff's February 2018 Request for Retraction which has been duly served on all Defendants.   The Request for Retraction sets forth the facts supporting Plaintiff's prima facie case for Defamation as well the timeliness of her claims.

### The Defamatory Statements and Defendants' Requisite Fault

474.     **Count 1: On or about July 28-29, 2016, Professor Weaver discloses to Professor Butler that, in the tenure report and or during the January 2016 tenure vote meeting, Dean Collins and the tenure committee (both orally and in its report) recommended that the faculty deny Professor Butler's application because "Professor Butler complained so much about discrimination that Dean Collins could no longer run the law school."**

475.     This statement was made with malice, *i.e.*, that Defendants knew the statements were false and or had reckless disregard for the truth.   First, by SMU's own admission, Defendants knew the statement was false and or entertained serious doubts as to its truth.   In its own EEOC Position Paper, SMU claims that Professor Butler allegedly did not make any complaints of discrimination at all and, that, instead, each time she went to the Office of Institutional Equity, the staff members convinced her to see eye to eye that there was no discrimination at all.

476.     Defendants' shifting and inconsistent explanations aside, the fact of the matter is that Plaintiff did complain about discrimination; however, Defendants knew or should have known that her complaints did not undermine the Dean's ability to run the law school.   To the contrary, in Fall 20165, Dean Collins invited Plaintiff to meet with the Dean could hear her complaints.

477.     Prima facie evidence of malice here includes ample evidence that the publishers and re-publishers intentionally disregarded information that would change the story. Particularly, when the first tenure committee first published this story to Dean Collins (who in turn reported it to Professor Butler), the tenure committee intentionally disregarded thee written confirmation from Tenure Chair Joe Norton that his committee had completed his evaluation of Plaintiff's qualifications for tenure and was ready to proceed with the committee's recommendation for tenure and promotion.

478.    Defendants also knew the statement was false or entertained serious doubts as to its truth because one of the original publishers, Professor Norton himself, told Professor Butler in writing that his tenure committee had already taken several years to complete its investigation and assessment of Professor Butler's qualifications for tenure.

479.    Along these lines, Professor Norton told Professor Butler in writing that he and his committee had concluded that she was "qualified for tenure and promotion" and "was a good person."   Professor Norton had stated in writing that the Committee had (1) completed its evaluation of Plaintiff's teaching ability and found her to be qualified; (2) had sent her publications to outside reviewers and that the reviews were quite favorable and (3) confirmed there was no debate that Plaintiff met the qualifications for service.

480.    Defendants also knew that the statements were false and or had a reckless disregard for the truth because Professor Norton reassured Plaintiff that her complaints about discrimination would have no bearing on the workings of his tenure committee.   Therefore, Professor Norton must have entertained serious doubts as to the truth of the statements.

481.    Defendants knew or should have known that the statement was false and had reckless disregard for its truth because, in November 2015, when the defamatory statement was first published, he only task left for the committee was to formally state the observations in a Tenure Advisory Letter.   Professor Norton advised his committee members to proceed with doing so.   Dean Collins, Interim Provost Stanley and General Counsel Paul Ward were aware that Professor Norton had completed these tasks when they completed the pretextual letter.

482.    Instead, Dean Collin's state of mind was to fix herself on a plan to retaliate against Professor Butler by assigning a new committee and instruct the members to write a defamatory report.   Blinded by her determination to discriminate, her disregard for the truth was reckless and intentional.

483.    As further evidence that the Defendants entertained serious doubt as to the truth of the publication, Plaintiff's discrimination claims did not STOP Dean Collins from rejecting Plaintiff's request to stop, delay or defer her tenure process until the following year when she was not suffering from asthma.   To the contrary, Dean Collins and others proceeded took the time to proceed with the evaluation of Plaintiff's application for tenure and promotion.

484.     Professors Anderson published the statement while intentionally disregarding evidence that may have changed the story.  Specifically, Plaintiff emailed Professor Anderson the correspondence in which Professor Norton confirmed that the investigation of Plaintiff's tenure qualifications was complete and therefore, the committee his ready to proceed with the final task of writing a favorable tenure advisory report recommending her for tenure and promotion.

485.     The fact that Associate Dean Spector refused to sign the tenure report (she admits on tape that she questioned the veracity of statements made therein) is also evidence that Defendants knew the statements were false and or that they had reckless disregard for the truth.

486.     Several witnesses told Professor Butler that Dean Spector did not sign the tenure report because she entertained serious doubts as to its truth.

487.     In the alternative, the abovementioned facts also show that the statements were published and republished with negligence and or gross negligence.  A reasonable person and a reasonable dean (as opposed to one motivated by discriminatory animus) would not have made such false and reckless statements at all.  Further, Dean Collins and members of the second tenure committee were negligent in writing these statements in Plaintiff's tenure report and recommending the denial of tenure based on her complaints of discrimination.

488.     A reasonable dean of law knows that it is a violation of a professor's civil rights to recommend the denial of tenure based on Plaintiff's complaints of discrimination.  Dean Collins and the faculty also knew that it is breach of contract to place any information about civil rights complaints in an employee's employment file and or to use the complaints as a basis for denying a promotion as such acts are prima facie retaliation.

489.     Defendants failure to vote against a candidate based on these and other uninvestigated accusations of wrongdoing also constitutes negligence and breach of contract.

490.     When the statement was republished in the tenure report and in the Dean's adverse tenure recommendation, Defendants also entertained serious doubt about the truth of the statement because they knew that Plaintiff's first tenure chair, Professor Norton, had stated in writing that Plaintiff was qualified for tenure and promotion.  Professor Norton had already confirmed in writing that Plaintiff's discrimination complaints did not interfere with the work of

his tenure committee.  He confirmed in writing that the Committee had completed virtually all its evaluation tasks and was ready to proceed with the writing of a favorable tenure advisory report.

491.    Likewise, there is ample evidence that and others had to entertain serious doubt the veracity of these statements. This proof includes, but is not limited to, tape recorded conversations in which Professor Anderson, Associate Dean Spector, Professor Tate and others warn that the University was intentionally discriminating and or retaliating against Professor Butler during the tenure process.  These faculty members knew that defamatory statements were part of the scheme to harass, discriminate, and retaliate against Plaintiff.

492.    Plaintiff has requested retraction, correction, and clarification about this statement. However, Defendant has not denied publication of the statement or otherwise clarified the statement.

493.    Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

494.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

495.    Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Therefore, Defendants must have entertained serious doubts as to the truth of its statements here.

496.    Likewise, by their own admission, the second tenure committee members, Professor Anderson and Defendants also had to entertain serious doubt the veracity of such statements. This proof includes, but is not limited to, tape recorded conversations in which Professor Anderson, Associate Dean Spector, Professor Tate and others warn that the University was intentionally discriminating and or retaliating against Professor Butler during the tenure process.  These faculty members knew that defamatory statements were part of the scheme to harass, discriminate, and retaliate against Plaintiff.

497.    **Count 2: Defendants accuse Plaintiff of "lying on her FMLA application" and or "forging or conspiring to forge FMLA documents" or otherwise "faking" the need for FMLA protection.**

498.   As to fault, Defendants made the statement with knowledge of its falsity and or reckless disregard for truth.  Dean Collins and Tenure Chair Professor Roy Collins knew or should have known that in December 2015 SMU had GRANTED Plaintiff's application for FMLA leave. Furthermore, SMU did not provide Plaintiff with due process notice of this accusation and did not subject her to any formal disciplinary action based on any accusations of misconduct.

499.   Further, Defendants also knew or should have known that these accusations of forgery or FMLA fraud were false because Plaintiff addressed these rumors in several conversations with Tenure Chair Roy Anderson and others before the vote.   Furthermore, on the eve of the faculty vote on her Tenure application, Plaintiff also discussed these accusations with Associate Dean Mary Spector.  Dean Spector agreed that Rhonda Adams' accusations that Plaintiff "lied about FMLA" were discriminatory because SMU had not fully investigated the accusations or given Plaintiff due process notice of Ms. Adams' accusation.  For these reasons, Associate Dean Spector stated that even though 'there was nothing we [the tenure committee] could do because Central Administration had tied the ]Tenure Committee's] hands" on the matter,"  she would still ask the Tenure Committee to stop the Tenure Vote "until we can sort this whole thing out," (*i.e.,* thoroughly investigate whether Plaintiff had lied to the Tenure Committee about the need for FMLA.)

500.   On tape, Dean Spector identifies Rhonda Adams as one of the original publishers of this false statement and yet, Ms. Adams – SMU's own FMLA coordinator – of all people – knew that the statement was false and or had to entertain serious doubts as to its truth.  Ms. Adams GRANTED Plaintiff's request for FMLA leave.

501.   Ms. Adams knew that her accusation that Plaintiff lied or forged FMLA paperwork is pure fabrication.  In her conversations with Plaintiff, Ms. Adams never raises the accusation that Plaintiff lied, forged, or otherwise provided false information in connection with her application for FMLA leave.

502.   Defendants also knew or should have known that these accusations were false and or had reckless disregard for the truth because the statements are too farfetched.  Plaintiff had a reputation for honesty, integrity, and care for fellow faculty who were ill and needed FMLA. She had never been accused of wrongdoing or dishonesty by her colleagues.  Therefore, the

accusation that she lied about FMLA, proffered by the FMLA coordinator who GRANTED FMLA leave, was too farfetched.

503.    Finally, these statements were made with negligence and gross negligence.  As Associate Dean Spector conceded on tape, SMU should have investigated any accusation of fraud or forgery by a faculty member BEFORE denying tenure or recommending the denial of tenure on that basis.  The failure and refusal to provide due process notice of the accusation made by FMLA coordinator Rhonda Adams was also negligent, discriminatory, and retaliatory. Defendants failure to vote against a candidate based on these and other uninvestigated accusations of wrongdoing also constitutes negligence and breach of contract.

504.    Defendants failure to vote against a candidate based on these and other uninvestigated accusations of wrongdoing also constitutes negligence and breach of contract.

505.    Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

506.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

507.    Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Therefore, Defendants must have entertained serious doubts as to the truth of its statements here.

508.    Likewise, by their own admission, the second tenure committee members, Professor Anderson and Defendants also had to entertain serious doubt the veracity of such statements. This proof includes, but is not limited to, tape recorded conversations in which Professor Anderson, Associate Dean Spector, Professor Tate and others warn that the University was intentionally discriminating and or retaliating against Professor Butler during the tenure process.  These faculty members knew that defamatory statements were part of the scheme to harass, discriminate, and retaliate against Plaintiff.

509.    Several witnesses told Professor Butler that Dean Spector did not sign the tenure report because she entertained serious doubts as to its truth.

510.    Likewise, on the eve of the tenure vote, Dean Spector confessed to Professor Butler that she entertained serious doubts as to the truth of character attacks in the tenure report.

Therefore, even though she did not think that there was anything that she could do because the tenure committee's "hands were tied" by "Central Administration," she was going to contact the Provost and tell him to "stop the faculty tenure vote" so that the University could "sort this whole thing out" and investigate the tenure committee's accusations that Plaintiff had "lied" about FMLA and other matters.

511.    Further, these allegations against Plaintiff are so inherently improbable that only a reckless person would put them into circulation.

512.    **Count 3: In January 2016, Professor Weaver disclosed that Associate Provost Forrester stated that Professor Butler "lied to her students" and lied about something related to her work responsibilities. Professor Weaver did not disclose the exact words that Associate Provost used to accuse Professor Butler of misconduct.  Professor Weaver also suggests on tape that Professor Paul Rogers likewise accused Professor Butler of unspecified misconduct. Professor Weaver stated on tape that, after the tenure vote, several faculty members confronted Provost Forrester and Professor Rogers about their misconduct but suggested that the professors would not retract their statements.**

513.    Particularly, Professor Weaver told Plaintiff that Associate Provost Forrester had accused her of lying about an incident involving students but subjected me to a guessing game to try to figure out what was said.  Their conversation included the following:

*Professor Butler: [00:25:00] What are they saying that I'm lying about?*

*Professor Weaver: Just think about, think about some of the things that were issues with you with your students in the past.*

*Professor Butler: Okay . . . that I said that I needed to go to a conference to speak at Yale Law School.  The students accused me of lying about being a speaker at Yale Law School [and complained to then-Interim Dean Julie Forrester about it.] What are the issues that were, the issues with students? What issues with students? We're talking about honesty, honesty issues, right?*

*Professor Weaver: Yeah, yeah, yeah.  Yeah, yeah.*

*Professor Butler: Okay, let me try . . .  Oh, I said that a student was harassing me, yelling and screaming at me in the classroom [about his low grade].*

82

*Professor Weaver: No, not that . . . You were right, you were right the first time.  You were right the first time.*

514.     As to fault, the statements were made with negligence and or malice (knowledge or reckless disregard for the truth).  Particularly, Defendants knew or should have known that Professor Butler has never made any materially false statements to or about her law students. First, Dean Collins and the Tenure Advisory Committee knew that Professor Butler's reputation was that of a dedicated, caring faculty member.

515.     Defendants knew or should have known that this statement was false because Professor Butler does not have a record or habit of missing classes. Further, the tenure committee never discussed this matter with Plaintiff. In five years of teaching at SMU, Professor Butler rarely missed, canceled or rescheduled classes.

516.     Defendants knew or should have known that these statements were false because Professor Butler has never received due process notice of an accusation of lying to her students. Nor has she ever been the subject of any disciplinary action regarding alleged lies to students or alleged lies about her work responsibilities.

517.     Dean Collins knew or should have known that any unsubstantiated accusations made by Associate Dean Forrester about or concerning Professor Butler were suspicious or retaliatory because Professor Butler had complained to Dean Collins and other colleagues that Associate Provost Forrester and Professor Paul Rogers (her romantic partner) sought retribution against Professor Butler for supporting a Black female for the deanship over then Interim-Dean Forrester.

518.     Defendants knew or should have known that these statements were false and had a reckless disregard for the truth given the prior complaints by Plaintiff and the faculty that Associate Provost Forrester sought retribution and retaliation against Professor Butler.  Law faculty also testified that Associate Provost Forrester made racist statements against Professor Butler, calling her "uppity'" or an "uppity Black" during the tenure vote meeting.

519.     Defendants failure to vote against a candidate based on these and other uninvestigated accusations of wrongdoing also constitutes negligence and breach of contract.

520.     Furthermore, Plaintiff had filed an internal complaint alerting the SMU Office of Institutional Equity that Associate Provost Forrester and others had discriminated and retaliated

against Plaintiff during the tenure process.  Faculty witnesses also protested or tried to protest the discrimination in Plaintiff's tenure process.

521.    Further, several faculty members were on notice that Ms. Forrester and her romantic partner, Professor Rogers had a history, pattern and practice of defaming Black women law professors and therefore, that their testimony against Professor Butler was unreliable.

522.    Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

523.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

524.    Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Therefore, Defendants must have entertained serious doubts as to the truth of its statements here.

525.    Likewise, by their own admission, the second tenure committee members, Professor Anderson and Defendants also had to entertain serious doubt the veracity of such statements. This proof includes, but is not limited to, tape recorded conversations in which Professor Anderson, Associate Dean Spector, Professor Tate and others warn that the University was intentionally discriminating and or retaliating against Professor Butler during the tenure process.  These faculty members knew that defamatory statements were part of the scheme to harass, discriminate, and retaliate against Plaintiff.

526.    Further, these allegations against Plaintiff are so inherently improbable that only a reckless person would put them into circulation.

527.    **Count 4: In a four-hour phone call from July 29-30, 2016, Professor Weaver, for the first time discloses to Professor Butler that the tenure report not only accused her of lying but also recommended the denial of tenure because she was "unfit to be a lawyer or a law professor."  In context, Professor Weaver says that the faculty said she was "unfit to be a lawyer or law professor" because of the attacks on her character published in the tenure report.**

528.    As to fault, Defendants published these statements with negligence and or malice. They knew these statements were false and or had reckless disregard for the truth.

529.   Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

530.   Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

531.   Likewise, by his own admission on tape, Professor Anderson's estimation of Professor Butler's fitness as an attorney and professor is exactly to the contrary.   Professor Anderson opined on tape that Plaintiff was an outstanding professor and attorney who had a right to a fair tenure process but was being deprived of one by Dean Collins and or President Turner.

532.   Further, Defendants knew or should have known that Plaintiff was fit to be a lawyer and or had reckless disregard for the truth because she is a member in good standing of the New York State Bar.   Plaintiff's membership in the New York State Bar was reported the University upon her hire and her continued membership generally as well as her specific membership in good standing in the New York State Bar is easily verifiable.

533.   Defendants also knew that Plaintiff was fit to be an attorney because she has never received due process notice of any complaint of unethical conduct or misconduct by her faculty.   Further Dean Collins at least stated in writing that at no time during the tenure advisory period was Plaintiff accused of any misconduct.

534.   Defendants also knew or should have known that it was false that Plaintiff was unfit to be a law professor because  Plaintiff is a nationally recognized and accomplished legal scholar.   Her colleagues reported to her that she received unanimously outstanding and or excellent peer reviews of her legal scholarship.

535.   Defendants also knew or should have known (and or had reckless disregard for the truth) that it was untrue that Plaintiff allegedly was "unfit" to be a law professor because she had an outstanding and or otherwise strong record of service to SMU as a law professor and to the profession.

536.   Defendants also knew or should have known (and or had reckless disregard for the truth) because  Professor Butler received outstanding evaluations in three out of five courses every semester that she taught these classes: Employment Discrimination Lecture; Employment Discrimination Special Topics Writing Seminar and Civil Rights Writing Seminar.

85

537.    The Committee also should have known that mixed teaching evaluations does not make one unfit to be a law professor because several faculty members including Associate Dean Spector – a committee member had mixed teaching evaluations in the year that she went up for promotion to full professor.  Further law professors such as Professor Josh Tate (who is a white male); Professor Jessica Dixon Weaver (black female) and other professors testify that is not uncommon for law professors at SMU who have mixed teaching records to receive tenure and promotion with that mixed record.

538.    **Count 5: On or about September – October 2016, Professor Weaver told Professor Butler for the first time that her tenure committee report included a "paragraph" that accused her of lying about experiencing discrimination at SMU and recommended the denial of tenure based on these lies. Professor Weaver did not disclose the exact words used in this "paragraph" but explained the intent and overall meaning.**

539.    As to fault, Plaintiff incorporates by reference the statements regarding malice and negligence as to the other defamatory statements because they apply to this statement as well.

540.    The tenure committee and other publishers knew that Plaintiff was not lying about discrimination because on tape and or in writing they too agree and warn Plaintiff that SMU is discriminating against her during the tenure process, especially with respect to FMLA.

541.    Witness testimonies on tape are further evidence of Dean Collins' state of mind – that she knew or should have known that accusations that Plaintiff lied about anything related to FMLA or other civil rights were false and that she insisted on a reckless disregard for the truth. Dean Collins demanded proof that Plaintiff was not lying about FMLA.  She asked Plaintiff to provide the FMLA records directly to her.  When Plaintiff complied, Dean Collins, by email, said she refused to look at them.

542.    Further, FMLA coordinator Rhonda Adams stated that Dean Collins directed Ms. Adams to interfere with Plaintiff's attempts to take or designate any FMLA leave during the tenure probationary period.  Following that directive, Ms. Adams only approved FMLA leave for Plaintiff AFTER the official close of the faculty's tenure advisory period.

543.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

544.    Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Therefore, Defendants must have entertained serious doubts as to the truth of its statements here.

545.    Further, like all of the defamatory statements at issue, these allegations against Plaintiff are so inherently improbable that only a reckless man would put them into circulation.

546.    **Count 6: On or about September – October 2016: For the first time, Professor Weaver discloses to Professor Butler that, during that time-period, Dean Collins was going around telling the faculty that Professor Butler "is crazy" or "going crazy" and or "that she was not all there mentally."**

547.    Professor Weaver explained that the context for the statement was that Professor Butler was mentally unfit to serve as a law professor. Professor Weaver discloses that Dean Collins motive for spreading this knowingly false rumor, even though the tenure process is over, is to discourage the faculty from helping Professor Butler investigate her claim of discrimination in the tenure process. Professor Weaver also said that Dean Collins was advancing this statement to develop a defense or mount a defense for herself and SMU in the event Professor Butler sued.

548.    Defendants knew or should have known that any claims made behind Plaintiff's back that she was "not all there mentally" or in any way mentally unfit were false and malicious. Defendants made these statements with reckless disregard for the truth.

549.    In her emails to Plaintiff, Dean Collins told her that no accusations of misconduct were made against Plaintiff or played a role in her tenure process.

550.    Witnesses also testify to Dean Collins' state of mind when she made the statements.  For example, Professor Weaver explained that, through several campaigns, Dean Collins sought to portray Plaintiff as mentally unfit to discourage faculty members from supporting an internal investigation of discrimination and to develop a defense strategy Plaintiff sued SMU and or Dean Collins.

551.    Further, these allegations against Plaintiff are so inherently improbable that only a reckless man would put them into circulation.

552.     Dean Collins on the eve of the tenure vote and possibly on tape, told Plaintiff that she was an excellent teacher and productive member of the faculty; therefore, she had to seriously doubt about the veracity of such a statement.

553.     **Count 7: On September 30, 2016, Professor Weaver tells Professor Butler that the tenure committee and report accused her of "lying to the faculty for years even way before the FMLA" incidents. Professor Weaver stated to Professor Butler for that reason, the tenure decision "really all came down to your credibility."**

554.     As to fault, Defendants knew or should have known that such an accusation is false.  Defendants have demonstrated a reckless disregard for the truth on this matter. SMU has never provided Plaintiff with any due process notice of an accusation that she has "lied to the faculty for years" about any matter relevant to her employment or her application for tenure and promotion.  Prior to the faculty's disclosure of such accusations made behind her back during the vote on her tenure application, Plaintiff has no knowledge or notice of any type of misconduct in her employment file.

555.     Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

556.     Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

557.     Further, these allegations against Plaintiff are so inherently improbable that only a reckless man would put them into circulation.

558.     **Count 8: September 2016: Professor Weaver told Professor Butler for the first time that the tenure report accused her of some unholy act or conduct involving turpitude.  Professor Weaver insisted that: "You need to repent to God for the things that you've done. Why couldn't you just apologize for what you did? . . . I'm talking about what they said about you in the [tenure] letter."**

559.     Defendants published such statements with negligence and or malice.  Defendants knew that these statements were false because Plaintiff has never been accused to her face of any acts of moral turpitude by the SMU faculty or anyone else for that matter.  As Dean Collins

conceded in her emails to Plaintiff, Plaintiff has not been accused on any misconduct at work. Plaintiff does not have a reputation for moral turpitude.

560.   Defendants also had a reckless disregard for the truth because they are aware that the tenure standards are based on scholarship, teaching and service.  Plaintiff's religious views or activities, including her failure to repent to God, should have no bearing on her qualifications.

561.   Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

562.   Further, these allegations against Plaintiff are so inherently improbable that only a reckless man would put them into circulation.

563.   Plaintiff incorporates by reference all of the abovementioned evidence of negligence and malice as they apply to this statement as well.

564.   **Count 9: In its EEOC Position Paper, Defendants falsely stated: "Plaintiff turned in her grades late every semester." Along these lines, SMU also stated: "It [The Tenure Advisory Committee noted that Butler . . . missed her grading deadlines in every semester."**

565.   Defendants had to seriously doubt the truth of this statement because via email with Dean Collins and Dean Thornburg, Plaintiff refuted this Charge.

566.   Further, if Dean Collins and Defendants are aware of FMLA law, they know that Plaintiff's late submission of grades during an FMLA-qualifying event cannot be used in an EEOC Position Paper to defend against a Charge of discrimination. Defendants are in essence admitting that they violated Plaintiff's FMLA rights by disregarding the late submission of grades during an FMLA hospitalization.

567.   Defendants could have easily verified with the law school registrar that Plaintiff has turned in her grades on time during other semesters.  The failure to do so was negligence and a reckless disregard for the truth.

568.   Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

569.     **Count 10: In its EEOC Position Paper, Defendants falsely stated: "Butler not care about teaching . . . The Tenure Advisory Committee also concluded that Butler lacked a commitment to teaching."**

570.     The statement is a false statement of fact.

571.     The statement is of or concerning Plaintiff Cheryl Butler.

572.     Defendants' reckless disregard for the truth is best evidenced by the Student Evaluations which they purportedly used to deny tenure.  Therein, each and every semester, Plaintiff received overwhelming strong student evaluations of her commitment and dedication to teaching – even from students who simultaneously alleged that she was not effective as a teacher. According to the evaluations, Professor Butler "wants to be there," "is really good [or better] one on one with students during office hours" and is "one of the high energy professors in the classroom."

573.     Further, Defendants had to seriously doubt the veracity of this statement. On tape, the tenure chair says that Plaintiff "is a star" and that her evaluations show "her many talents in the classroom" and that "the students love you."

574.     Further, Plaintiff incorporates by reference the abovementioned Paragraphs about her reputation as a caring colleague and professor.  The Tenure Committee had her Resume / Vitae which includes pages and pages of teaching and speaking engagements.  Professor Butler obviously LOVED teaching and LOVES her students.

575.     **Count 11: In its EEOC Position Paper, Defendants falsely stated: "Butler alleges that SMU purportedly discriminated against her by not promoting her to a newly created Director of Human Trafficking Position in the law school . . . The facts show that Butler never applied for the position, never expressed an interest in the position, and never raised this as a basis for discrimination with SMU."**

576.     Plaintiff incorporates by reference the abovementioned Paragraphs detailing her discussion/complaints about the Human Trafficking course and clinic.

577.     Without Discovery, Plaintiff stands with the emails about these complaints in her hand.  Plaintiff discussed this matter with Dean Collins and Dean Thornburg shortly before the tenure vote.  They knew or should have known that the statement is false and had reckless disregard for the truth.

578.    **Count 12: In its EEOC Position Paper, Defendants falsely stated: "Butler then claims that she and Jessica Dixon Weaver, a tenured African American professor in the law school in 2014 and has never complained of discrimination, retaliation or a hostile work environment. And when IAE questioned Butler regarding facts that might support such claims, she could identify none. Her assertion amounted to concern regarding general discrimination in the academic environment of society at-large and nothing that could support a claim against SMU." Along these lines, SMU falsely stated: "Butler contacted IAE in September 2015 but identified no discrimination or retaliation by SMU or the tenure committee and asked IAE not to take further action." SMU similarly stated: "IAE met with Butler to determine her complaint and fully investigate it. Butler had none. Butler was unable to specifically point to any issue with SMU, stating only that she believed that society generally discriminated against African Americans and females in the academic field. By the conclusion of the meeting with IAE, it seemed clear that both IAE and Butler understood that there was no specific misconduct on the part of anyone at SMU and nothing that SMU could remedy. Butler had identified no individual at SMU who had discriminated against her, and she specifically asked IAE not to further investigate." Defendants also state: "Her complaints of alleged civil rights violations dealt with general discriminatory treatment in the academic world as it related to African American women law professors. She did not identify any member of the tenure committee who had engaged in civil rights violations and could point to no actions of SMU that were discriminatory or retaliatory."**

579.    Plaintiff incorporates by reference the discussion of this outrageous statement in the Request for Retraction, this statement.

580.    With all due respect, this statement is so utterly absurd and desperate that it is beneath her dignity as an attorney and a law professor to have to respond to it.

581.    Above all others, is so inherently farfetched and improbable that only a reckless person would put it in circulation. Defendants knew that Plaintiff's understanding of Employment Discrimination Law was strong. For years, Plaintiff received unanimously outstanding teaching evaluations in three courses covering Employment Law. She knows how to state an employment discrimination claim.

582.   Defendants also had to entertain doubt about the truth of this statement because there is a mountain of emails in this case that document Plaintiff's complaints of discrimination in this case.  Even before Plaintiff attended her in person and phone meetings with the staff of the Office of Institutional Equity, she chronicled her complaints in a series of emails.  To make sure that no point was missed, Plaintiff also memorialized her conversations with the staff of that Office with emails to them.

583.   Given the Professor's propensity to articulate in writing her complaints both before and after meetings with the Office of Institutional Equity, it is inherently improbable that she could not articulate the nature of the complaint in a face to face meeting or on the phone.

584.   Finally, there is proof that this statement is a sheer and utter fabrication.  The substance of the conversations between Plaintiff and the staff of the Office of Institutional Equity are tape recorded.  These tape recordings, like the emails, impeach the testimony *and the integrity* of the SMU Office of Institutional Equity.

585.   **Count 13: In its EEOC Position Paper, Defendants falsely stated: "Butler failed to submit her textbook selection on a timely basis, did not agree to the times or dates of the courses to be taught and had not confirmed her availability for teaching with the Dean.  In light of this, SMU informed Butler that she would not be assigned any classes and could use her final year to continue to advance her scholarship or to continue to recover as she saw fit."**

586.   Dean Collins and Samantha Thomas had to seriously contemplate the truth of this statement but they figured by their titles and stature someone might believe this preposterous lie.  Unfortunately for them, this lie further undercuts their credibility.

587.   There is no privilege for sheer fabrications as this.  Plaintiff has tape recorded evidence as well as repeated emails to show that she provided this information to Dean Collins on the deadline.

588.   Further, Plaintiff expressly emailed the Office of Institutional Equity to provide this information because she anticipated that Dean Collins would lie about it (given the many other lies that she has made in this case).

589.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

590.    **Count 14: In its EEOC Position Paper, Defendants falsely stated: "On one occasion, Butler did not even write her exam until the day of the test, resulting in an exam that was inadequate and far different than what the students were expecting." SMU also stated: "The Dean also noted other issues such as Butler's failure to prepare for class as demonstrated by Butler not preparing a December 2014 exam until the very day of the exam and a May 2015 [sic] containing multiple choice questions that failed to ask a question."**

591.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

592.    Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Plaintiff may have "typed" an exam in a day; however, in each and every exam she administered, she spent extensive time planning and preparing the exams.

593.    **Count 15: In its EEOC Position Paper, Defendants falsely stated: "Butler just began failing to appear for class or cancelling classes at the last minute with no explanation until the students complained. . ."**

594.    Plaintiff incorporates by reference any and all paragraphs discussing how she rarely missed class despite FMLA events and spent great care working with the entire faculty to cover classes whenever she missed class.

595.    Plaintiff incorporates by reference the abovementioned statements as to defamation malice and negligence because they are also relevant in this case.

596.    Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

597.    Given Dean Collins written confirmation to Plaintiff that there are no valid accusations of misconduct made against her, Defendants must have entertained serious doubts about this statement.

598.   Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Therefore, Defendants must have entertained serious doubts as to the truth of its statements here.

599.   Likewise, there is ample evidence that second tenure committee members, Professor Anderson and Defendants also knew that defamatory statements were part of the scheme to harass, discriminate, and retaliate against Plaintiff.

600.   **Count 16: "The first mention of any discrimination complaints came in the Fall 2015 semester (September) when it became clear to Butler that her teaching evaluations were negative and this could impact her tenure decision. Butler began vaguely complaining of discrimination in the academic environment as it related to African American Women professors.  She did not file any formal or informal complaint of discrimination."**

601.   Plaintiff incorporates by reference the abovementioned statements as to defamation malice and negligence because they are also relevant in this case.

602.   Defendants have not provided Plaintiff or any court with any source of supporting evidence of truthfulness for this statement.

603.   Plaintiff incorporates by reference all of the abovementioned paragraphs painstaking detailing the hostile work environment that she and Professor Weaver experienced about discrimination.

604.   Defendants knew what it had heard when Plaintiff repeatedly complained of discrimination but reported something else.  Therefore, Defendants must have entertained serious doubts as to the truth of its statements here.

605.   Defendants' inconsistent and shifting explanations of what happened in this tenure case provide additional obvious reasons that Defendants doubted the truth of this statement.  For example, Defendants stated in writing that "Plaintiff complained so much about discrimination that Dean Collins could not run the law school" and or that "the tenure advisory committee could not do its job.  But here, in the alternative, Defendants want to argue that Plaintiff did not timely complain of discrimination at all.

606.   Likewise, there is ample evidence that second not committee members, Defendants had to entertain serious doubt the veracity of these statements. This proof includes,

but is not limited to, tape recorded conversations in which Professor Anderson, Associate Dean Spector, Professor Tate and others warn that the University was intentionally discriminating and or retaliating against Professor Butler during the tenure process.  These faculty members knew that defamatory statements were part of the scheme to harass, discriminate, and retaliate against Plaintiff.

## **FRAUD**

607.    Defendants engaged in a "cat's paw" scheme to fraudulently concealed the defamatory and discriminatory statements made against Plaintiff during her tenure process.

608.    Dean Collins fraudulently concealed the defamatory statements and discriminated further against Plaintiff by lying to her about the statements.

609.    Dean Collins fraudulently concealed the defamatory statements by denying to Plaintiff that defendants made any defamatory statements, attacked her character or accused her of misconduct during the faculty vote on her tenure candidate.

610.    Dean Collins responded to Professor Butler in writing by denying that any such statements existed in the tenure report.

611.    Members of the Law Faculty testify on tape that Dean Collins and other defendants are lying about the defamatory and or discriminatory statements.

612.    Professor Weaver and others also argue that SMU's refusal to give me a copy of the tenure report is discriminatory because every other recent candidate for tenure was given a copy of their report.

*Professor Butler: [TC 1456] They usually give the candidate a copy of their [tenure committee] letter to see if there is anything that the candidate would like to ask that they add?*

*Professor Weaver: Oh yeah, or discuss if the issue is in the committee.  The committee gives the [report].  Well, for me it was that so and they sent the letter to me.*

*Professor Butler: Yeah, well, do you think that was the procedure or that was an usual courtesy of letting you see your [letter].*

*Professor Weaver: No, that's standard.*

*Professor Butler: They didn't do that' they didn't let me see anything.*

*Professor Weaver: So that's the problem they are going to have.  And we already know this and [Dean] Jennifer [Collins] already knows this . . .and that from the outside [in the legal academy] everyone thinks that you are awesome . . .*

*Professor Weaver: If they have the vote [on your tenure application] before you even get a chance to see the letter?  Hm, that's not gonna go over so well.*

*Professor Butler: Really?*

*Professor Weaver: Not in court. Not when there's a practice [of giving the letter to other candidates]. So, you know discrimination law.  So, when they veer away . . . when they don't follow the practice and pattern of what they've been doing then that means they're treating you differently than they treated other people.*

613.    Professor Weaver described how the same dean – Dean Collins – who lied to Professor Butler by stating that SMU did not allow tenure candidates to review their tenure committee report – in fact allowed Professor Weaver to review her report just one year earlier.

*Professor Butler]: [Dean] Jennifer [Collins] knows that people have a right to see their tenure report.?*

*Professor Weaver: Yeah . . .  It was a standard procedure for you to have seen the letter. And, the fact that you didn't, is another form of discrimination. What they said was, that they verbally told you what was going to be in the letter but they didn't let you see it, read it, and that's what they always do [allow the candidate to read it].  You know, that's what I was told.*

*Professor Butler: Beforehand.  You're saying [they let you see you it]*

*Professor Weaver: Yes. Beforehand. It may not be more than two days beforehand, but whatever the case may be, the practice was, you got the letter. You read the letter. If the letter is not, you know, written in a way that you like or whatever, you can go to the committee and request that they make changes. Or, you know, talk to them, discuss it with them or say what you feel like is unfair or whatever the case may be, You know?  That is part of the process. And, I didn't get my letter very far in advance of the time it was distributed to the faculty. But, I'm sure [Associate dean of Faculty] Beth Thornburg knew I wasn't going to make any changes because it was a very thorough letter.*

*Professor Weaver: [When I reviewed my tenure committee report when I applied for tenure]. It was not what [Interim Dean] Julie Forrester wrote for me . . . when I went up for contract renewal[referencing a "no confidence" letter that Professor Forrester wrote a year earlier to sabotage Professor Weaver's first bid for promotion].*

*Professor Butler: Mm-hmm (affirmative)*

*Professor Weaver: So, you need to read yours.*

*Professor Butler: Okay. Did you make any changes?*

*Professor Weaver: I didn't have any changes to make. It was a glowing letter. I had made such a stink about Professor Julie Forrester's letter that . . .*

*Professor Butler" Oh, for contract renewal?*

*Professor Weaver" Yeah, I mean Beth wasn't on [my tenure committee] then. It was Professor Julie Forrester. And so, Because Julie wrote like two sentences about my scholarship in my [tenure committee's] contract renewal letter.*

*Professor Butler: Mmm Hmm. [affirmative]*

614.    Professor Armour warned Plaintiff that Dean Collins and others had decided to hide the defamatory and discriminatory statements in the tenure report by secretly taking it out.

615.    Professor Weaver also corroborated the accusation that Dean Collins was attempting to lie and conceal the defamatory and discriminatory content in the tenure report. At one point, Professor Weaver told Plaintiff, to paraphrase, "I'm not sure whether Jennifer took the [defamatory content] out of the report before she sent it to Provost Currall."

616.    Professor Weaver told Plaintiff that, to cover up, Dean Collins may have fraudulently removed the defamatory content from the tenure report before she forwarded the tenure report to Provost Currall for his vote on the application.

617.    SMU administrators and professors, including General Counsel Paul Ward, Dean Collins, Professor Martinez, fraudulently concealed the discriminatory and defamatory tenure report by discouraging Professor Weaver from protesting about the fraud and discrimination.

618.    In the context of complaining about Dean Collin's fraudulent concealment of the tenure report, Professor Weaver told Professor Butler that "even though we have a new dean the

same people are still there doing the same underhanded, racist stuff . . . and unless somebody pushes back, it will stay the same."

619.    Several other Defendants fraudulently concealed the defamatory statements and or intentionally discriminated against Plaintiff by refusing to provide Professor Butler with a copy of her tenure report.

620.    SMU fraudulently concealed the defamation and discrimination by coercing and intimidating witnesses.

621.    Defendants fraudulently concealed the defamatory and or discriminatory statements by threatening members of the law faculty with retaliation and or otherwise creating a climate of fear and intimidation to discourage faculty members from exposing the defamation and or discrimination against Professor Butler.

## I.    COUNT 1 – DEFAMATION *PER SE*
### (All Defendants except SMU)

622.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

623.    Plaintiff asserts that Defendants' maliciously published false, defamatory statements of fact about Plaintiff and was negligent and malicious in determining whether the statements were true or published such statements with a total disregard for the truth. Specifically, Plaintiff contends that: 1) Defendants made false statements about Plaintiff; 2) Defendants published to a third party, without legal excuse, such false statements; and 3) that statements injured, and caused harm to Plaintiff's office, profession and occupation.

624.    Defendants' statements have injured Plaintiff's occupation as she was denied tenure as a direct result of Defendants' statements.

625.    Defendants published these statements with negligence.  Plaintiff submitted the Family & Medical Leave Act (FMLA) and Americans with Disabilities Act / Rehabilitation Act (ADA) paperwork requested by Defendant Ms. Adams.  In a recorded conversation, Professor Spector confirms that Dean Collins and members of Plaintiff's Tenure Committee, namely Professor Anderson, Dean Spector, and Professor Colangelo, spoke with Ms. Adams about Plaintiff's eligibility for FMLA leave. Prior to the faculty's vote on Plaintiff's application for tenure and promotion, Ms. Adams granted the FMLA leave and Defendants SMU and Ms.

Hernandez ultimately granted ADA leave based on Plaintiff's repeated visits to the hospital for asthma. Therefore, Defendants knew or should have known that Plaintiff did not "lie" about being sick or needing FMLA protection.

626. Defendants defamatory statements were made with negligence and or malice, i.e. knowledge that they were false and or reckless disregard for the truth. Provost Stanley, Associate Provost Forrester, Dean Collins, Professor Anderson, Professor Colangelo, and other Defendants defamed Plaintiff's character because they sought to retaliate against her. Their animus drove their reckless disregard for the truth and motivated them to make statements they knew were false.

627. Defendants' false statements were *per se* defamatory, which entitles Plaintiff to a presumption of general damages.

628. Plaintiff's injury resulted from Defendants' malice.

## II.  COUNT 2-DEFAMATION (LIBEL)
### (All Defendants except SMU)

629. Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

630. Defendants' negligently or maliciously published false, defamatory statements of fact about Plaintiff, a private individual and or published such statements with a total disregard for the truth. The false statements include, but are not limited to, claims that Plaintiff was not fit to practice law and/or be a law professor; that Plaintiff lied about being sick and needed medical leave from work; that Plaintiff did not deserve to be on the faculty because she was not a truthteller; that Plaintiff complained so much about discrimination, that she was not qualified to be on the faculty; and that Plaintiff was crazy and/or going crazy.

631. Defendants defamatory statements were made with malice. Provost Stanley, Associate Provost Forrester, Dean Collins, Professor Anderson, Professor Colangelo, and other Defendants defamed Plaintiff's character because they sought to retaliate against her. Their animus drove their reckless disregard for the truth and motivated them to make statements they knew were false.

632. Defendants statements were made in writing and were published multiple times in a Tenure Report and other documents distributed to faculty and administrators at SMU.

633.    Plaintiff has suffered substantial injury as a direct result of Defendants' defamatory statements, including but not limited to, injury to character and reputation, mental anguish, loss of past and future income, and loss of earning capacity.

634.    Defendants' statements have injured Plaintiff's occupation as she was denied tenure as a direct result of Defendants' statements.

635.    Defendants published the statement with actual malice; thus, Plaintiff is entitled to damages.

### III.    COUNT 3-DEFAMATION (SLANDER)
### (All Defendants except SMU)

636.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

637.    Defendants' negligently or maliciously published false, defamatory statements of fact about Plaintiff, a private individual and or published such statements with a total disregard for the truth.   The false statements include, but are not limited to, claims that Plaintiff was not fit to practice law and/or be a law professor; that Plaintiff lied about being sick and needed medical leave from work; that Plaintiff did not deserve to be on the faculty because she was not a truthteller; that Plaintiff complained so much about discrimination, that she was not qualified to be on the faculty; and that Plaintiff was crazy and/or going crazy.

638.    Defendants defamatory statements were made with negligence and or malice. Provost Stanley, Associate Provost Forrester, Dean Collins, Professor Anderson, Professor Colangelo, and other Defendants defamed Plaintiff's character because they sought to retaliate against her.   Their animus drove their reckless disregard for the truth and motivated them to make statements they knew were false.

639.    Defendants statements were made orally and were published multiple times in a Tenure Report and other documents distributed to faculty and administrators at SMU.

640.    Plaintiff has suffered substantial injury as a direct result of Defendants' defamatory statements, including but not limited to, injury to character and reputation, mental anguish, loss of past and future income, and loss of earning capacity.

641.    Defendants' statements have injured Plaintiff's occupation as she was denied tenure as a direct result of Defendants' statements.

642.    Defendants published the statement with actual malice; thus, Plaintiff is entitled to damages.

## IV.    COUNT 4-SLANDER *PER SE*
### (All Defendants except SMU)

643.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

644.    Defendants' defamatory statements were made in orally to the faculty at SMU.

645.    Defendants defamatory statements were made with malice.  Provost Stanley, Associate Provost Forrester, Dean Collins, Professor Anderson, Professor Colangelo, and other Defendants defamed Plaintiff's character because they sought to retaliate against her.  Their animus drove their reckless disregard for the truth and motivated them to make statements they knew were false.

646.    Plaintiff asserts that Defendants' maliciously published false, defamatory statements of fact about Plaintiff and was negligent and malicious in determining whether the statements were true or published such statements with a total disregard for the truth.

647.    Defendants' statements impeached Plaintiff's honesty, integrity, virtue, and reputation.

648.    Plaintiff has suffered substantial injury as a direct result of Defendants' defamatory statements, including but not limited to, injury to character and reputation, mental anguish, loss of past and future income, and loss of earning capacity.

649.    Defendants' statements have injured Plaintiff's occupation as she was denied tenure as a direct result of Defendants' statements.

650.    Defendants published the statement with actual malice; thus, Plaintiff is entitled to general damages.

651.    Plaintiff's injury resulted from Defendants' malice, which entitles Plaintiff to exemplary damages.

## V.    COUNT 5-LIBEL *PER SE*
### (All Defendants except SMU)

652.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

653.     Defendants' statements injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule or financial injury.   In addition, Defendants' statements impeached Plaintiff's honesty, integrity, virtue, and reputation.

654.     Defendants published such statements, in writing, in Plaintiff's tenure report with reckless disregard for the truth of the statements with actual knowledge that statements that Plaintiff was "crazy" and "unfit to be an attorney" would injure Plaintiff's reputation, cause financial injury, and impeach Plaintiff's honesty, integrity, virtue, and reputation.

655.     Defendants' statements have injured Plaintiff's occupation as she was denied tenure as a direct result of Defendants' statements.

656.     Defendants published the statement with actual malice; thus, Plaintiff is entitled to general damages.   Defendants defamatory statements were made with malice.   Provost Stanley, Associate Provost Forrester, Dean Collins, Professor Anderson, Professor Colangelo, and other Defendants defamed Plaintiff's character because they sought to retaliate against her.   Their animus drove their reckless disregard for the truth and motivated them to make statements they knew were false.

657.     Plaintiff's injury resulted from Defendants' malice, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).

## VI.     COUNT 6- CONSPIRACY TO DEFAME
### (All Defendants except SMU)

658.     Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

659.      As stated by witnesses, two or more Defendants schemed together to defame Plaintiff's character.   Dean Collins contacted Ms. Adams and Ms. Hernandez and instructed them to deny Plaintiff's request for FMLA and ADA leave, respectively and encouraged or caused Ms. Adams and Ms. Hernandez to make false statements about Plaintiff's requests or eligibility for leave.

660.     Dean Spector testified that Ms. Adams consulted with members of the tenure committee and told them that Plaintiff "lied" on her applications for FMLA.

661. Professor Weaver, Professor Tate and Professor Anderson testified that their colleagues who had animus toward Plaintiff conspired to falsely accuse Professor Butler of "lying" about several matters.

## VII. COUNT 7- FRAUD (MISREPRESENTATION, OMISSION & CONCEALMENT)
### (All Defendants except SMU)

662. Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

663. SMU not only engaged in fraud by nondisclosure but also by misrepresentation.

664. Dean Jennifer Collins and SMU's Office of Institutional Equity (OIE) made several false misrepresentations by denying that false, discriminatory and defamatory comments were made in the tenure meeting and in the Tenure Committee's report.

665. First, the OIE fraudulently claimed that SMU would conduct a fair investigation of discrimination and defamation in the tenure process. However, according to the faculty, OIE allowed Dean Collins and SMU coerced and intimidated faculty members from reporting the discrimination and defamatory statements made in the meeting.

666. Further, Dean Collins misrepresented to Plaintiff that there was no discriminatory, false, and defamatory information in the tenure dossier.

667. Further, Dean Collins misrepresented that there were no accusations of misconduct played a role whatsoever in the tenure process.

668. Other faculty members challenge Dean Collins' representations as false and fraudulent. The inconsistent accounts indicate that one account is true and the other intentionally fraudulent.

669. Defendants fraudulently misrepresented that it is SMU's policy to withhold tenure reports from faculty members. However, the SMU bylaws provide that faculty members are entitled to their personnel files. Furthermore, members of the law faculty rebutted SMU's misrepresentation by confirming that several members of the law faculty were allowed to review their tenure reports during the tenure process.

670. Moreover, Defendants concealed and failed to disclose to Plaintiff that discriminatory and defamatory statements stated in the tenure dossier when there was a duty to

speak to SMU faculty and to plaintiff.  Specifically, SMU refused Plaintiff's repeated requests that they provide her with a copy of her tenure report so that she could assess allegations made by the faculty that the report contained false, defamatory and discriminatory content.

671.    Plaintiff also asked members of the faculty, including Dean Jennifer Collins, Associate Dean of Faculty Beth Thornburg, and administrator Samantha Thomas to give her a copy of the report.  Each faculty member failed to provide the report.

672.    Dean Collins and the faculty at SMU had a duty to disclose the contents of the tenure report to Plaintiff.  SMU's bylaws, policies and procedures clearly state that professors have a right to their personnel files and that the law faculty has a duty to deal in good faith and without discrimination when evaluating faculty candidates for tenure and promotion.

673.    Professor Weaver balked at Dean Collin' claim that SMU does not have a duty to disclose the tenure report to Plaintiff. Professor Weaver expressly states that SMU's position is pretext for discrimination and fraudulent concealment. SMU has a duty to give Plaintiff a copy of her tenure report because withholding the report violates SMU's own anti-discrimination policy.

674.    SMU had a contractual duty to review the tenure report for discriminatory content and refused to do so. The individual defendants had an ethical and professional duty to do the same. SMU refused to review the report and comment at all on whether it contained discriminatory content even though the faculty protested that the tenure report with Plaintiff or review it on their own to see whether it was discriminatory.

675.    The contents of the Tenure Report are material to Plaintiff's qualifications for tenure and her claim of discrimination, retaliation, fraud and defamation in the tenure process. Furthermore, the faculty accuses Dean Collins of failing to disclose the content of the tenure report because she knew the contents were material to the investigation of Plaintiff's legal claims of fraud and discrimination.

676.    Dean Collins and Professor Anderson knew that Plaintiff was ignorant of the defamatory statements when published.  Specifically, when published, Dean Collins and Professor Anderson knew that Plaintiff had no idea that the tenure report would contain such defamatory and malicious statements such as "Plaintiff is unfit to be an attorney"; "Plaintiff is unfit to be a lawyer" or such outrageous claims such as Plaintiff lied to Dean Collins and Provost

Stanley about the need for FMLA leave.  Dean Collins knew that SMU granted FMLA leave to Plaintiff.  Having been awarded the leave, Plaintiff had no idea that a false claim to the contrary would be made in her tenure report.

677.    Dean Collins and the Faculty were deliberately silent when they had a duty to speak. Dean Collins' silence was by design.

678.    Dean Collins withheld content in the tenure report as part of a scheme to deny tenure in retaliation for complaints about discrimination.  Dean Collins also withheld the tenure report to fraudulently conceal content that she knew was false, discriminatory and defamatory.

679.    By failing to disclose these facts, Dean Collins, Professor Anderson, and other defendants who were members of the law faculty, intended to induce the plaintiff to take action or refrain from acting.  Dean Collins knew that Plaintiff would dispute these actions.  However, because she did not know of all the contents of the tenure report, she could not appeal grounds for the faculty's denial of tenure set forth in the tenure report.

680.    Plaintiff relied on SMU's nondisclosure.  Because she was unaware the defamatory and discriminatory contents of the tenure report, Plaintiff allowed Dean Collins to submit her application for tenure and promotion to the faculty.  She also did not immediately file a complaint with SMU's Office of Institutional Equity or the U.S. EEOC prior to the faculty vote and did not sue for defamation for the defamatory statements that remain concealed or difficult to uncover.

681.    Plaintiff was injured because of defendants' actions and omissions.

682.    Defendants Dean Collins, Rhonda Adams and Samantha Thomas fraudulently represented that the SMU Office of Institutional Equity upholds a mission of conducting fair and thorough investigations of employment discrimination at SMU and in preserving the privacy of medical records and employment disputes. OIE employees Carolyn Hernandez and Samantha Thomas repeatedly conducted sham and fraudulent investigations of Professor Butler's claim of discrimination.  SMU then allowed Ms. Hernandez and Ms. Thomas to investigate allegations against themselves.  Plaintiff relied on these representations. Hernandez and Thomas falsely represented to Plaintiff that they would and had conducted a fair and thorough investigation of her civil rights claims.  Plaintiff relied on these statements and submitted her application for tenure and promotion and initially participated in their sham investigations.

683.     However, contrary to the promise of a fair investigation, Hernandez and Thomas made knowingly false statements to Plaintiff, to SMU faculty/staff and even to the EEOC about their work on Plaintiff's internal complaint.

684.     SMU negligently retained FMLA coordinator Rhonda Adams as the investigator in Professor Butler's claim of FMLA discrimination even though she informed SMU that Ms. Adams committed fraud in its handling of Ms. Butler's FMLA claims.

685.     Each and every one of these statements were made with malice – knowledge that they were false and or reckless disregard for the truth.  Indeed, the reason for the statements was to deceive Plaintiff.  The Defendants know that the Bylaws and customs of the law school are to provide professors with their tenure reports and tenure files.  However, they refused to do so because they were lying about defamatory content in the report.

686.     Shamefully so, that *IS* fraud.

## VIII.   COUNT 8-NEGLIGENT RETENTION, HIRING, AND SUPERVISION
### (Defendant SMU)

687.     Defendant SMU had a duty to hire, supervise, and retain competent employees.

688.     SMU's duty to retain competent employees infers a duty to refrain from keeping unfit or incompetent employees.

689.     SMU breached its duty to hire, supervise, and retain competent employees.

690.     SMU hired and retained several unfit and incompetent employees who it knew or, by the exercise of reasonable care should have known, was incompetent and unfit, thereby creating an unreasonable risk of harm to others.

691.      Particularly, SMU retained Ms. Collins as Dean of the Dedman School of Law even though SMU knew or should have known that Dean Collins engaged in unethical and illegal activity while acting as Dean of the Dedman School of Law.  Between December 2015 and May 2016, Plaintiff repeatedly gave SMU notice that Dean Collins' own law faculty had complained that she had engaged in discriminatory, fraudulent, and unethical behavior in evaluating Professor Butler's application for tenure and promotion.  SMU was on notice that the faculty believed that not only had Dean Collins engaged in fraud toward Professor Butler but may have also engaged in fraud toward Provost Steve Currall and President Gerald Turner by

allowing the faculty to place defamatory statements in the Tenure Report and secretly removing the defamatory content before university officials became aware.

692.    The faculty's allegations against Dean Collins are a serious matter.  The alleged behavior is a violation of not only SMU's own Policies and Procedures but also the Accreditation Standards of the American Bar Association.  Dean Collins actions also are against the Best Practices and Code of Ethics of the American Association of University Professors (AALS) and the American Association of University Professors (AAUP).   Dean Collins' fraudulent and discriminatory acts also violate the Code of Professional Responsibility for licensed attorney members of the District of Columbia Bar and any State Bar in the United States.

693.    The Dedman School of Law faculty accuses Dean Collins of fraud and fraud is conduct that SMU would consider as grounds for dismissal and termination.

694.    SMU was also on notice that several of its faculty engaged in fraud and discrimination and that, even short of termination, such misconduct makes such professor unfit to hold an executive or supervisory position.  SMU knew that Provost Julie Forrester had been accused of discrimination, fraud and retaliation but to date, still allows Ms. Forrester to retain her position as a Provost supervising programs at SMU.

695.    Even after SMU was on notice that faculty members accused then-Provost Harold Stanley of conspiring to violate Professor Butler's civil rights and violating SMU's own procedures for evaluating requests for accommodations under the Americans with Disabilities Act, SMU nevertheless promoted Mr. Stanley from Interim-Provost to Vice President.

696.    SMU negligently retained Associate Dean Beth Thornburg as a member of Professor Butler's first Tenure Committee even though Professor Butler complained that, on several occasions, Dean Thornburg harassed and humiliated Professor Butler for requesting FMLA leave from work for her hospitalization due to asthma and to care for an immediate family member who was hospitalized with an FMLA-qualifying illness.

697.    SMU negligently allowed Dean Thornburg and Associate Provost Forrester to defame Professor Butler's character and call for the faculty to deny her application for tenure and promotion even though SMU was on notice that Professor Butler and others reported that these faculty members planned to retaliate against her.

698.    SMU is also liable for negligent supervision and retention of Professor Anthony Colangelo as a member of Plaintiff's Tenure Committee.   SMU was on notice that Professor Colangelo had a history of alcoholism and reporting to work under the influence of alcohol. SMU nevertheless placed Professor Colangelo as a supervisor on Professor Butler's Tenure Committee.   SMU also refused to investigate Professor Butler's complaint of "Violence in the Workplace" stemming from Professor Colangelo's outbursts and humiliation of Professor Butler while under the influence of alcohol at work.

699.    SMU negligently retained OIE employees Carolyn Hernandez and Samantha Thomas as the investigators of Professor Butler's claim of discrimination despite accusations that Ms. Thomas and Ms. Hernandez had committed fraud during the investigation.   SMU then allowed Ms. Hernandez and Ms. Thomas to investigate allegations against themselves.

700.    SMU negligently retained FMLA coordinator Rhonda Adams as the investigator in Professor Butler's claim of FMLA discrimination even though she informed SMU that Ms. Adams committed fraud in its handling of Ms. Butler's FMLA claims.

## IX.    COUNT 9- BREACH OF CONTRACT
### (Defendant SMU)

701.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

702.    SMU breached its employment contact by failing to follow its own Bylaw Provisions regarding academic due process.   The SMU Bylaws provide that a professor accused of misconduct or dishonesty is entitled to a fair hearing.   SMU never provided Plaintiff with any notice of any grievance or accusation of misconduct related to honesty or truth telling prior to the faculty vote.   Instead, Dean Collins and SMU used the Faculty meeting on tenure applications as the first and only forum to accuse Plaintiff of wrongdoing.   This decision violated Plaintiff's civil rights and contractual rights of due process.

703.    SMU violated its Bylaws by engaging in fraud by denying that the faculty accused Plaintiff of wrongdoing and used those accusations to deny tenure.   The SMU Bylaws provide for academic honesty on behalf of the faculty. Similarly, SMU violated its own Code of

Ethics in its dealings with Plaintiff which requires that the University "seek truth"…act "honestly"…and "seek diversity."

704.    SMU's conduct breached its contract by allowing and encouraging its law faculty members to violate the ethical rules set forth by the State Bars of which their faculty are licensed, including, but not limited to, the State Bar of Texas and the District of Columbia Bar.

705.    Moreover, SMU breached its contract by failing to follow its own procedures with respect to academic tenure.

706.    SMU Policy guarantees that employees have a right of access her employment file includes access to the performance reviews, evaluations of teaching and scholarship, tenure dossiers, and reprimands, complaints, or records of disciplinary action.

707.    SMU breached its contract with Plaintiff by allowing its dean and supervisor to place medical information in her employment file and or to use her application for ADA or FMLA leave, and her complaints about alleged ADA or FMLA discrimination as grounds to deny or in any way consider her application for tenure and promotion. The SMU Bylaws also provide that records related to complaints of discrimination are to be kept separate from the employee's employment file and generally, are confidential.

708.    SMU breached its contract with Plaintiff by applying its tenure standards in a discriminatory manner based on race.

709.    SMU also breached its contract with plaintiff by failing to provide clear, consistent and nondiscriminatory guidelines on how to meet SMU's tenure standards.  Neither the SMU Bylaws nor plaintiff's Appointment Letter provide specific guidelines or criteria for meeting the standards for "legal scholarship, teaching or service to the law school."  Neither of these documents specify how many or what type of law review articles a professor must write to produce "outstanding" legal scholarship or how much "service to the law school and profession" is sufficient for the award of tenure and promotion.  Nor do these documents define or explain how to measure teaching that is "outstanding" or "of high quality."  Complaints from faculty at the Dedman School of Law throughout the university put SMU on notice that its tenure standards were vague and discriminatory.  Yet, SMU failed to act to protect Plaintiff from the use of arbitrary and discriminatory standards and tenure processes.

710. SMU breached its contract with Plaintiff by refusing to uphold its own Policy regarding Nondiscrimination, Affirmative Action and Equal Employment. Specifically, Policy 1.2 of SMU's bylaws provides that "SMU will not discriminate in any employment practice, educational program, or educational activity on the basis of race … or disability." Defendants intentionally and with malice and reckless disregard discriminated against Plaintiff because of her race. Similarly, SMU intentionally and with malice and reckless disregard discriminated against Plaintiff because of her disability.

711. SMU further breached Policy 2.1 when the Office of Institutional Equity failed to or refused to address Professor Butler's report of discrimination pursuant to SMU's policy. In fact, SMU's Policy 1.23 protects against Whistleblowers; however, SMU violated Policy 1.23 when Dean Collins, Professor Roy Collins and Professor Colangelo committed fraud by lying to Plaintiff about impermissible defamatory and discriminatory content in her tenure report—added to the report with malice and reckless disregard for the truth to ensure that Plaintiff was not granted tenure because of her complaints of discrimination.

712. In violation of its own university Bylaws, Plaintiff was targeted and singled out because she spoke up for herself by asserting her civil rights under the University code. SMU and its Board of Trustees violated its own policies by coercing law professors to remain silent and by creating a culture of intimidation and fear of retaliation.

713. SMU also breached its contract by failing to provide Plaintiff with a copy of her Tenure Committee Report, her external reviews of her legal scholarship, and other documents in her tenure dossier. SMU's Bylaws provide that employees have a right of access to their employment files. The employment file includes access to the performance reviews, evaluations of teaching and scholarship, tenure dossiers, and reprimands, complaints, or records of disciplinary action.

714. SMU also breached its contract with Plaintiff by its intentional and or reckless disregard for the core values of the AALS. As a condition of its membership in the AALS, the SMU Dedman School of Law agreed to comply with Articles 6.1 and 6.3 of the AALS Bylaws. Article 6.1 of the AALS Bylaws provides that, as a condition for membership, its members must value "justice, academic freedom, diversity of viewpoints . . . honesty, integrity, and professionalism in dealing with students, faculty, staff, the public and the association." SMU's

110

own faculty members testify on tape that SMU's administrators committed fraud and were intentionally dishonest with Plaintiff with respect to the reasons in which the university denied her application for tenure and promotion.

715.    Further, as a member of the AALS, SMU contracted to comply with Article 6.3 of the AALS Bylaws, which provides that "a member school shall provide equality of opportunity in legal education for all persons, including faculty and employees with respect to hiring, continuation, promotion and tenure . . . without discrimination or segregation on the ground of race . . . sex . . .  or disability."   Here too, a diverse group of SMU professors – junior and senior, male and female, White and Black all testify to witnessing SMU's intentional discrimination and retaliation against Plaintiff after she complained about discrimination.  SMU faculty also testify that Dean Collins and others created a hostile work environment in which not only Plaintiff, but any faculty members were intimidated and coerced into remaining silent about discriminatory practices at the Dedman School of Law.

716.    SMU breached its contract with Plaintiff by violating the American Association of University Professors (AAUP)'s *1940 Statement on Principles of Academic Freedom and Tenure* and any other applicable AAUP guidelines and Best Practices.

717.    SMU violated its contract with Plaintiff by knowingly engaging in discriminatory and unethical conduct in violation of the AALS Bylaws and Core Values.

718.    SMU breached its contract with Plaintiff by its intentional racial discrimination and reckless disregard of plaintiff's contractual and civil rights. In particular, SMU violated several ABA accreditation standards including: (1) ABA Standard 205(b), which requires that accredited law schools provide a workplace that is free of discrimination based on race, gender, or disability and offers equality of opportunity; and ABA Standard 207, which prescribes discrimination or harassment based on disability and the need for reasonable accommodation.

### X.    COUNT 10- 42 USC § 1981 HOSTILE WORK ENVIRONMENT – RACE DISCRIMINATION
**(Defendants SMU, Currall, Collins, Interim Dean Forrester, Provost Stanley)**

719.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

720.    Plaintiff was subject to a hostile work environment.

721.     The racial harassment was unwelcomed.

722.     The harassment was motivated by the fact that Plaintiff's race as an African-American.

723.     The harassment was so severe and pervasive that a reasonable person in Plaintiff's position would find SMU's work environment to be hostile and abusive.  For years, Professor Jessica Dixon Weaver, who is an African American tenured Professor at SMU complained and agreed with Professor Butler that SMU has a hostile work environment based on race.  Her extensive testimony about SMU's hostile work environment is documented by tape recordings, made over the course of a year. Further, law professors of several races and genders have complained that SMU has a racially discriminatory work environment.  Their testimony is also tape recorded.

724.     In other circumstances, SMU's hostile work environment was based on unwelcomed harassment based on African-American race plus other factors such as racial retaliation; race plus gender; and race plus disability.

725.     The conduct was frequent, severe, humiliating and undermined Plaintiff's work performance, physical and mental health.  Due to the hostile work environment, Plaintiff's physical and emotional health deteriorated.  At work, she suffered from stress-induced asthma attacks, panic attacks, fainting spells and chest pains.  Due to racism and harassment at work, Plaintiff developed depression.

726.     Professor Weaver also testified that the racism and retaliation at work undermined her moral, created stress, created physical pain, and possibly contributed to signs of an ulcer.

727.     When Professor Weaver and Professor Butler gave SMU notice of the hostile work environment, SMU refused to stop the harassment.  Instead, it was SMU's pattern and practice to respond to the complaints of discrimination with retaliation, threats, coercion and other illegal activity.

728.     SMU'S hostile work environment and race discrimination interfered with Plaintiff's ability to make an enforce her employment contract with SMU, including the enforcement of her right, including but not limited to, the rights to apply for tenure and promotion, and her right to a fair and thorough internal investigation of her civil rights claims.

729. SMU's racial discrimination and racially hostile work environment resulted in several tangible employment actions including the denial of Plaintiff's application for tenure and promotion, a change in her work assignments (SMU's refusal to assign any teaching assignments in her terminal year) and adverse compensation decisions including SMU's refusal to award a summer research grant or reimburse Plaintiff for expenses incurred during prior business trips and conferences on behalf of SMU.

730. Defendants knew or should have known of the hostile work environment based on race and failed to take remedial action. For example, Defendants knew that Plaintiff believed that Dean Thornburg held racial animus and discriminated against Plaintiff but delayed her removal from Plaintiff's tenure committee. Even when SMU removed Dean Thornburg from the tenure committee, SMU and Defendants allowed Dean Thornburg to go behind closed doors and defame Plaintiff's character, outwardly recommend that she be denied tenure because she complained about discrimination and allegedly "lied about being sick."

731. Defendants were also on notice that Provost Forrester, Professor Rogers and Dean Collins had marked Plaintiff for retaliation for the reasons stated in the above numbered paragraphs. Here too, Defendants, including but not limited to, President Turner, Associate Provost Eads, Provost Currall, failed to take remedial action.

732. The individual defendants had supervisory authority over Plaintiff and acted as the employer. Alternatively, Defendants acted as the employer's "cat's paw."

733. Plaintiff suffered damages as result.

## XI.  Count 11-42 USC § 1981 RACE DISCRIMINATION - DENIAL OF TENURE AND PROMOTION
### (Defendant SMU, Stanley, Currall)

734. Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

735. Defendants intentionally discriminated against Plaintiff based on her race.

736. Racial discrimination was a motivating factor in Defendants' decision to deny Plaintiff's application for tenure and promotion.

737. Racial discrimination was a motivating factor in Defendant's decision to refuse to investigate her discrimination claims.

738.     Racial discrimination was a motivating factor in Defendant's decision to apply discriminatory tenure standards and subject Plaintiff to a different tenure process as compared to other candidates.

739.     Witnesses who are members of the law faculty testify on tape that several defendants, including but not limited to, Dean Collins, Associate Provost Julie Forrester, Professor Paul Rogers and Associate Dean Beth Thornburg held racial animus toward Plaintiff.

740.     Plaintiff was denied tenure and subsequently terminated as a result of Defendants' actions.

## XII.     COUNT 12- 42 USC § 1981 RETALIATION
### (Defendants SMU, Collins, Currall, Forrester,  Stanley)

741.     Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

742.     Plaintiff engaged in activity protected by 42 USC § 1981.  Plaintiff, along with her colleagues, complained of racial discrimination in hiring, the application of tenure standards, the tenure process and other terms and conditions of employment at SMU.

743.     Plaintiff was subject to a materially adverse action at the time or after the protected activity took place.  SMU denied Plaintiff's application for tenure and promotion. SMU also refused to conduct a bona fide, honest, and thorough investigation of her claim of hostile work environment based on race and her claim of discrimination in the tenure process.

744.     As SMU witnesses attest on tape, there is a causal connection between Plaintiff's protected activity and the adverse action.  Witnesses state that defendants blatantly and expressly argued that Plaintiff should be denied tenure because she engaged in protected activity and asserted her civil rights.

745.     There is no legitimate, no-discriminatory reason to justify Defendants' adverse actions toward Plaintiff.  There is no legitimate, non-discriminatory justification for Defendants' decision to defame and otherwise attack Plaintiff's character – calling her a liar – and then lie themselves about whether these attacks too place.  Even if Defendants' critique of Plaintiff did not meet the legal standard of "defamation," they are still discriminatory and breach of contract. It was discriminatory for Defendants to commit fraud and lie to Plaintiff about the tenure process and the standards that Defendants used to evaluate her application.   Further, there is no

114

legitimate non-discriminatory justification for conducting a "sham" investigation of Plaintiff's claims of hostile work environment and discrimination in the tenure process.

746.    Plaintiff's stated justification for such adverse actions are mere pretext. As argued by several of Dean Collin's own law faculty, "but for" the protected activity, Defendants would not have taken its adverse actions against Plaintiff.

### XIII.   COUNT 13- TITLE VII-HOSTILE WORK ENVIRONMENT-RACE DISCRIMINATION
### (Defendant SMU)

747.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

748.    Plaintiff was subject to a hostile work environment.

749.    The racial harassment was unwelcomed.

750.    The harassment was motivated by the fact that Plaintiff's race as an African-American.

751.    The harassment was so severe and pervasive that a reasonable person in Plaintiff's position would find SMU's work environment to be hostile and abusive.  For years, Professor Jessica Dixon Weaver, who is an African American tenured Professor at SMU complained and agreed with Professor Butler that SMU has a hostile work environment based on race.  Her extensive testimony about SMU's hostile work environment is documented by tape recordings, made over the course of a year. Further, law professors of several races and genders have complained that SMU has a racially discriminatory work environment.  Their testimony is also tape recorded.

752.    In other circumstances, SMU's hostile work environment was based on unwelcomed harassment based on African-American race plus other factors such as racial retaliation; race plus gender; and race plus disability.

753.    The conduct was frequent, severe, humiliating and undermined Plaintiff's work performance, physical and mental health.  Due to the hostile work environment, Plaintiff's physical and emotional health deteriorated.  At work, she suffered from stress-induced asthma attacks, panic attacks, fainting spells and chest pains.  Due to racism and harassment at work, Plaintiff developed depression.

115

754.   Professor Weaver also testified that the racism and retaliation at work undermined her moral, created stress, created physical pain, and possibly contributed to signs of an ulcer.

755.   When Professor Weaver and Professor Butler gave SMU notice of the hostile work environment, SMU refused to stop the harassment.  Instead, it was SMU's pattern and practice to respond to the complaints of discrimination with retaliation, threats, coercion and other illegal activity.

756.   SMU'S hostile work environment and race discrimination interfered with Plaintiff's ability to make an enforce her employment contract with SMU, including the enforcement of her right, including but not limited to, the rights to apply for tenure and promotion, and her right to a fair and thorough internal investigation of her civil rights claims.

757.   SMU's racial discrimination and racially hostile work environment resulted in several tangible employment actions including the denial of Plaintiff's application for tenure and promotion, a change in her work assignments (SMU's refusal to assign any teaching assignments in her terminal year) and adverse compensation decisions including SMU's refusal to award a summer research grant or reimburse Plaintiff for expenses incurred during prior business trips and conferences on behalf of SMU.

758.   Defendants knew or should have known of the hostile work environment based on race and failed to take remedial action.  For example, Defendants knew that Plaintiff believed that Dean Thornburg held racial animus and discriminated against Plaintiff but delayed her removal from Plaintiff's tenure committee.  Even when SMU removed Dean Thornburg from the tenure committee, SMU and Defendants allowed Dean Thornburg to go behind closed doors and defame Plaintiff's character, outwardly recommend that she be denied tenure because she complained about discrimination and allegedly "lied about being sick."

759.   Defendants were also on notice that Provost Forrester, Professor Rogers and Dean Collins had marked Plaintiff for retaliation for the reasons stated in the above numbered paragraphs.  Here too, Defendants, including but not limited to, President Turner, Associate Provost Eads, Provost Currall, failed to take remedial action.

760.   Plaintiff suffered damages as a result of the discrimination.

116

### XIV.   COUNT 14- TITLE VII- DENIAL OF TENURE
### (Defendant SMU)

761.   Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

762.   Defendants intentionally discriminated against Plaintiff based on her race.

763.   Racial discrimination was a motivating factor in Defendants' decision to deny Plaintiff's application for tenure and promotion.

764.   Racial discrimination was a motivating factor in Defendant's decision to refuse to investigate her discrimination claims.

765.   Racial discrimination was a motivating factor in Defendant's decision to apply discriminatory tenure standards and subject Plaintiff to a different tenure process as compared to other candidates.

766.   Witnesses who are members of the law faculty testify on tape that several defendants, including but not limited to, Dean Collins, Associate Provost Julie Forrester, Professor Paul Rogers and Associate Dean Beth Thornburg held racial animus toward Plaintiff.

767.   Plaintiff was denied tenure and subsequently terminated as a result of Defendants' actions.

### XV.   COUNT 15-TITLE VII-RETALIATION
### (Defendant SMU)

768.   Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

769.   Plaintiff engaged in activity protected by Title VII.  Plaintiff, along with her colleagues, complained of racial discrimination in hiring, application of tenure standards, the tenure process and other terms and conditions of employment at SMU.

770.   Plaintiff was subject to a materially adverse action at the time or after the protected activity took place.  SMU denied Plaintiff's application for tenure and promotion. SMU also refused to conduct a bona fide, honest, and thorough investigation of her claim of hostile work environment based on race and her claim of discrimination in the tenure process.

771.   As SMU witnesses attest on tape, there is a causal connection between Plaintiff's protected activity and the adverse action.  Witnesses state that defendants blatantly and expressly

argued that Plaintiff should be denied tenure because she engaged in protected activity and asserted her civil rights.

772.    There is no legitimate, no-discriminatory reason to justify Defendants' adverse actions toward Plaintiff.  There is no legitimate, non-discriminatory justification for Defendants' decision to defame and otherwise attack Plaintiff's character – calling her a liar – and then lie themselves about whether these attacks too place.  Even if Defendants' critique of Plaintiff did not meet the legal standard of "defamation," they are still discriminatory and breach of contract. It was discriminatory for Defendants to commit fraud and lie to Plaintiff about the tenure process and the standards that Defendants used to evaluate her application.    Further, there is no legitimate non-discriminatory justification for conducting a "sham" investigation of Plaintiff's claims of hostile work environment and discrimination in the tenure process.

773.    Plaintiff's stated justification for such adverse actions are mere pretext. As argued by several of Dean Collin's own law faculty, "but for" the protected activity, Defendants would not have taken its adverse actions against Plaintiff.

## XVI.   COUNT 16-REHABILITATION ACT REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a), INCORPORATING BY REFERENCE, THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. 12112(B): HOSTILE WORK ENVIRONMENT BASED ON DISABILITY (CONTINUING VIOLATION)
### (Defendant SMU)

774.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

775.    Defendant SMU receives federal financial assistance for its educational programs.

776.    Plaintiff is a qualified person with a disability.

777.    Defendant SMU has acknowledged that Plaintiff is a qualified person with a disability, having granted some, although not all, of Plaintiff's requests for accommodation and or leave under the ADA or Rehabilitation Act.

778.    Plaintiff was perceived by her employer and several Defendants as having a disability.  For example, during Plaintiff's tenure process, Professor Weaver wrote a statement to the faculty arguing that Plaintiff appeared to have a disability and that the faculty was discriminating against her by not accommodating her disability.

118

779.     During Plaintiff's tenure process, Defendants perceived Plaintiff as having a disability by calling her a "pathological liar" and accusing her of being "unfit to be an attorney or a law professor" because she allegedly "had a penchant for lying."   Defendants also said that because Plaintiff "lied about being sick" and or "lied about needing FMLA or ADA leave," they "did not want someone like her on the faculty."

780.     Plaintiff suffered from asthma, a physical impairment that, during occasional flair-ups substantially limited one or more of her life functions including, but not limited to, breathing, speaking, and concentrating.

781.     Due to a hostile work environment based on race, disability, and FMLA-harassment, Plaintiff developed depression, a physical and mental impairment that limited one or more of her life functions including, but not limited, to breathing, sleeping, concentrating, and eating.

782.     Plaintiff was more than qualified for the position of a tenure-track and tenured law professor.   Plaintiff's record of scholarly publications is equal to or stronger than several tenured law professors at SMU.   Likewise, according to taped testimony by several SMU law professors, Plaintiff's teaching record is equal to or stronger than several law professors who earned tenure at SMU.

783.     Plaintiff was able to perform the essential functions of her job with or without a reasonable accommodation.   During some semesters, Plaintiff was able to earn outstanding teaching evaluations in all her courses and to write outstanding scholarship.

784.     Each of Plaintiff's tenure chairs opined to her that she was qualified for tenure and promotion.   Plaintiff's first tenure chair, Professor Joe Norton wrote to Plaintiff shortly before her tenure vote to make known for the record that he determined that she was qualified. Even after Defendants SMU, Provost Stanley and Dean Collins stripped Plaintiff of the first tenure committee, the second tenure Chair, Professor Roy Anderson, secretly told Plaintiff that she was "on track for tenure" and that, if SMU had delayed her tenure vote for a short time – even one semester, and he could evaluate her teaching while she was not sick, and he could have a fair amount of time to help her with a few pointers on teaching her Torts class, he was 100 percent sure that he would recommend her for tenure and that she would earn tenure and promotion at SMU.

785.    However, Professor Anderson also warned that his opinions might not matter because, as he told Plaintiff, "the university was not invested in you because you complained about discrimination . . . the FMLA complaint was the last straw because that makes the university and the individual professors liable.  It's not personal. SMU is a quirky institution and does not tolerate that kind of thing."  Professor Weaver agreed with Professor Anderson's assessment, warning Plaintiff that, the faculty was going to vote to deny her application for tenure and promotion because, "It's like Roy said.  The university does not see it's interests as aligned with yours."  Almost a year later, she maintained the same view, telling Plaintiff that "It's like Roy said all along.  SMU does not keep people who sue or complain about discrimination.  But they will settle."

786.    These and other statements are evidence that Plaintiff was subjected to a hostile work environment.  Defendants harassed and humiliated Plaintiff because she sought an accommodation for asthma.     They accused her of faking illness because they did not think asthma was a legitimate ground for an accommodation at work.  Defendants harassed Plaintiff in secret by defaming her as one who lied about being sick and who was not wanted on the faculty because she complained about disability discrimination and sough an accommodation.

787.    Defendants also harassed and humiliated Plaintiff for depression.  Defendants sent her harassing emails questioning whether she was "really sick" and spread rumors that she faked illness.  Faculty members warned Plaintiff that Dean Collins was going to use knowledge of Plaintiff's depression to paint her as a person who "was crazy" or "going crazy."

788.    Clearly, this type of harassment was unwelcomed and unwanted.

789.    The harassment and hostile work environment resulted in several adverse actions, including but not limited to, the denial of her application for tenure and promotion.  Witnesses are on record stating that the denial of Plaintiff's application was directly tied to the discrimination and harassment that she faced based on disability.

790.    Defendants knew or should have known about the harassment "on account of" disability and failed to take remedial action.

791.    Particularly, President Turner, Associate Provost Eads, Provost Currall, failed to take remedial action.

**XVII.  COUNT 17- REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a),
INCORPORATING BY REFERENCE, THE AMERICANS WITH
DISABILITIES ACT (ADA), 42 U.S.C. 12112(B)
DISABILITY DISCRIMINATION -  DENIAL OF TENURE AND
PROMOTION
(Defendant SMU)**

792.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

793.    Defendants "discriminated" against Plaintiff within the meaning of the ADA by "utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability or that perpetuate the discrimination of others who are subject to the common administrative control."    Particularly, Defendants subjected Plaintiff to different and discriminatory tenure process and standards "on account of" her disability.

794.    Defendants subjected Plaintiff to a discriminatory investigation of her complaints "on account of" her disability.

795.    Plaintiff has a disability and, in any case, was "regarded as" disabled by the defendants.

796.    Plaintiff was subject to several adverse actions because of and "on account of" her disability. Witnesses on the faculty testify that behind closed doors, Defendants recommended that SMU deny Plaintiff's application for tenure and promotion because she had a disability, was perceived as having a disability.

**XVIII. COUNT 18-REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a),
INCORPORATING BY REFERENCE, THE AMERICANS WITH
DISABILITIES ACT (ADA), 42 U.S.C. 12112(B):  DISCRIMINATION BASED
ON SEGREGATION OF PLAINTIFF FROM WORKPLACE AND
TERMINATING ALL TEACHING DUTIES DURING 2016-17 SCHOOL
YEAR
(Defendant SMU)**

797.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

798.    Defendants actions of "limiting, segregating, and classifying" Plaintiff as a faculty member who could no longer teach any classes – including those classes where she received outstanding teaching evaluations each semester – also indicated that Plaintiff's Defendants

regarded Plaintiff as disable and discriminated against her based on their unsubstantiated assumptions about her disability.

799.    Plaintiff suffered damages as a result of Defendant's actions.

### XIX.   COUNT 19-REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a), INCORPORATING BY REFERENCE, THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. 12112(B):  ASSOCIATIONAL DISCRIMINATION CLAIM
### (Defendant SMU)

800.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

801.    Defendants SMU, Dean Collins, Dean Thornburg, and Ms. Hernandez violated Plaintiff's FMLA rights by harassing her and discriminating against her based on her association with an immediate family member who they knew suffered from an FMLA-qualifying serious health condition that required Plaintiff's care and supervision.   Dean Thornburg and Dean Collins harassed and humiliated Plaintiff for her associational case by making disparaging remarks that discouraged Plaintiff for taking FMLA leave to care for her family member. Dean Thornburg warned that taking leave "would hurt her tenure case."  And, indeed it did.

802.    Both Tenure Chairs, Professor Norton and Professor Anderson, told Plaintiff that her FMLA complaints against Dean Thornburg doomed her case.  Likewise, Professor Weaver and Professor Tate warned Professor Butler that, during her tenure process, Dean Thornburg made disparaging remarks to cast doubt on whether in fact Plaintiff had  a family member who was really sick.

803.    Dean Thornburg and Dean Collins repeatedly subjected Plaintiff to humiliating and shaming remarks about her need for FMLA leave. For example, Dean Thornburg also made humiliating remarks to Plaintiff's face, advising her to tell her "[family member, identified by name] not to get sick during the next grading period so that you do not have to turn in your grades a day late."

804.    Professor Weaver, Professor Tate and Professor Armour told Professor Butler on tape that her Tenure Report called into question her honesty about her FMLA claims.

805.    Tenure Chair Professor Anderson told Plaintiff on tape that he could not include information about Plaintiff's FMLA claims (particularly those related to her family member) in

her Tenure Report because SMU President Gerald Turner would call him up again and say, to paraphrase, "Roy, why did you mention these medical records in the Tenure Report.  She probably forged the signature on the doctor's forms."

### XX.   COUNT 20-REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a), INCORPORATING BY REFERENCE, THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. 12112(B)-(D) DISABILITY DISCRIMINATION - INVASION OF MEDICAL PRIVACY
(Defendant SMU)

806.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

807.    SMU breached Plaintiff's contract and invaded her right to privacy by placing confidential information about her complaints about discrimination and her requests for medical leave and or accommodations in her tenure dossier and employment file.

808.    SMU also violated her contractual rights and right to privacy by allowing the law faculty to discuss or use these complaints or request for medical accommodation as a basis for denying tenure and promotion. The SMU Bylaws also provide that records related to complaints of discrimination are to be kept separate from the employee's employment file and generally, are confidential.

### XXI.   COUNT 21 –REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a), INCORPORATING BY REFERENCE, THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. 12112(B):  DISABILITY DISCRIMINATION FAILURE TO ACCOMMODATE
(Defendant SMU)

809.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

810.    On several occasions between November 2015 – until the eve of the tenure vote on or about January 14, 2016, Defendants failed to make a reasonable accommodation in the form of a delayed vote on her application for tenure and promotion.  Plaintiff requested a delay for the following semester or on a later date within a year. Defendants denied the request each time that Plaintiff asked for the accommodation.

811.    Plaintiff's request for this accommodation in the form of a deferred tenure vote was reasonable.  Plaintiff was visibly sick, going in and out of the hospital for asthma during the

semester in which the faculty evaluated her teaching.   Even her tenure chair, Professor Roy Anderson thought that it was difficult, if not discriminatory – both for Plaintiff and the members of the tenure committee, to evaluate Plaintiff while she was sick and to evaluate her for only one semester, regardless of illness.   Several professors advised Plaintiff that the SMU Bylaws afforded professors the right to request FMLA leave and or an unpaid leave of absence if the professor was not ready for a vote on tenure and promotion at the scheduled time.

812.    When Provost Stanley initially denied Plaintiff's request for this accommodation in November 2015, Plaintiff repeated her request to Dean Collins several times in December 2015, only to have the request denied again.   Plaintiff then repeated her request to FMLA coordinator Rhonda Adams who claimed that she could evaluate ADA requests but then caused undue delay by refusing to evaluate the request once the paperwork was submitted.

813.    Plaintiff also asked ADA coordinator Carolyn Hernandez to contact Provost Stanley to reverse his decision.   On information and belief, Provost Stanley refused to do so,

814.    Plaintiff also asked her tenure committee member, Dean Spector to ask Provost Stanley to reverse his decision.   Dean Spector promised to do so but doubted that the university would do anything to help Plaintiff, warning Plaintiff that her tenure committee's "hands were tied" by the university administration.

815.    Plaintiff also asked her tenure chair, Professor Roy Anderson, to help reverse the decision or to work around it by stating in the tenure report that Plaintiff was entitled to a leave or delayed vote.   Professor Anderson stated that he did not think he could do anything and or was not sure he could do anything to change the university administration's pre-termination that Plaintiff would not get tenure because she complained too much about discrimination.

816.    In May 2016, Defendants violated Plaintiff's rights by withdrawing a reasonable accommodation that it had already granted.   On or about April 2016, Defendants granted Plaintiff a reasonable accommodation of two weeks leave from work due to asthma.   However, on or about May 6, 2016, Provost Currall adopted the recommendation of the law faculty and Dean Collins and officially denied Plaintiff's application for tenure and promotion.   As per the SU Bylaws, Provost Currall provided three weeks to appeal the decision to SMU President Gerald Turner.   However, Defendants SMU, Provost Currall, and Ms. Thomas told Plaintiff that

she would not get three weeks after she returned to work.  Instead, her only recourse was to write the appeal during her leave from work.

817.    Defendants also engaged in undue delay and subjected Plaintiff to harassment when she requested accommodation, even where her request for reasonable accommodation was ultimately granted.

818.    Defendants violated Plaintiff's civil rights by only offering accommodations which, in its estimation, "facilitated the essential functions of her position at work" (the old-ADA/Rehabilitation Act standard) as opposed to granting accommodations that "helped her perform an essential life function." (the current legal standard for ADA/Rehabilitation Act accommodations).

### XXII.    COUNT 22- REHABILITATION ACT of 1973, 29 U.S.C. 701-794(a), INCORPORATING BY REFERENCE, THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. 12112(B): RETALIATION
### (Defendant SMU)

819.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

820.    Particularly, Plaintiff reasserts and incorporates by reference the above numbered Paragraphs which set forth key elements of a *prima facie* claim under the Rehabilitation Act of 1973.

821.    Plaintiff engaged in activity protected by the Rehabilitation Act of 1973.  Plaintiff complained of the failure of Dean Collins and Provost Stanley to accommodate her request for reasonable accommodation under the ADA; of Defendant's failure to provide a timely and fair investigation of her ADA discrimination claim as well as her complaint of sabotage, harassment, and undue delay in granting those requests for accommodation.

822.    Plaintiff complained of ADA harassment by her colleagues in the context of degradation, humiliation and defamation behind closed door during the faculty discussion and vote on tenure candidates.

823.    Plaintiff also complained that SMU failed to honor its grant of ADA disability leave and instead mandated that she use leave time to appeal a denial of tenure and promotion.

125

824.    Plaintiff was subject to a materially adverse action at the time or after the protected activity took place.  SMU denied Plaintiff's application for tenure and promotion. SMU also refused to conduct a bona fide, honest, and thorough investigation of her claim of hostile work environment based on race and her claim of discrimination in the tenure process.

825.    As SMU witnesses attest on tape, there is a causal connection between Plaintiff's protected activity and the adverse action.  Witnesses state that defendants blatantly and expressly argued that Plaintiff should be denied tenure because she engaged in protected activity and asserted her civil rights.

826.    There is no legitimate, no-discriminatory reason to justify Defendants' adverse actions toward Plaintiff.  There is no legitimate, non-discriminatory justification for Defendants' decision to defame and otherwise attack Plaintiff's character – calling her a liar – and then lie themselves about whether these attacks too place.  Even if Defendants' critique of Plaintiff did not meet the legal standard of "defamation," they are still discriminatory and breach of contract. It was discriminatory for Defendants to commit fraud and lie to Plaintiff about the tenure process and the standards that Defendants used to evaluate her application.     Further, there is no legitimate non-discriminatory justification for conducting a "sham" investigation of Plaintiff's claims of hostile work environment and discrimination in the tenure process.

827.    Plaintiff's stated justification for such adverse actions are mere pretext. As argued by several of Dean Collin's own law faculty, "but for" the protected activity, Defendants would not have taken its adverse actions against Plaintiff.

### XXVI. COUNT 23-FAMILY & MEDICAL LEAVE ACT (FMLA) INTERFERENCE WITH FMLA LEAVE
### (Defendants Collins, Adams, Thomas, Thornburg)

828.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

829.    Each time Plaintiff sought FMLA leave, Plaintiff was entitled to time from work under the FMLA.  At the time she requested leave from work, Plaintiff was employed with SMU for at least 12 months and had worked at least 1250 hours during the previous twelve-month period.

830.     Each time she sought FMLA leave from work, Plaintiff provided the requisite notice for the need for FMLA leave from work and provided the reasons for such leave to her employer.

831.     As stated in the above numbered paragraphs, Plaintiff sought five days of FMLA leave from work in January 2015 while hospitalized overnight for asthma. Defendants SMU, Dean Collins, and Dean Thornburg interfered with her FMLA rights by failing to direct he to the SMU FMLA coordinator or Human Resources Office to formally designate the time away from work as FMLA leave.  Defendants Rhonda Adams, Dean Collins, Provost Stanley, Mr. Ward, and SMU further interfered with Plaintiff's FMLA rights by later refusing to retroactively this time from work as FMLA leave.  Without the FMLA designation, Plaintiff was not able to receive a deferred tenure process to a time when she was not suffering from severe asthma.

832.     Plaintiff sought a few days of intermittent FMLA leave from work in May to care for an immediate family member who was hospitalized overnight for approximately four days with an FMLA-qualified serious health condition.  Defendants SMU, Dean Collins, and Dean Thornburg interfered with her FMLA rights by failing to direct her to the SMU FMLA coordinator or Human Resources Office to formally designate the time away from work as FMLA leave.  Furthermore, Dean Thornburg made disparaging remarks that discouraged Plaintiff from taking any time off for work while her family member was hospitalized. Defendants Rhonda Adams, Dean Collins, Provost Stanley, Mr. Ward, and SMU further interfered with Plaintiff's FMLA rights by later refusing to retroactively this time from work as FMLA leave.  Without the FMLA designation, Plaintiff was not able to receive a deferred tenure process to a time when she was not suffering from severe asthma.

833.     Plaintiff sought 2-3 days of full-time FMLA leave from work in June 2015 to care for an immediately family member who recovered at home for approximately 2-3 weeks following an overnight hospital stay in May 2015 for an FMLA-qualifying serious health condition.  Defendants Dean Thornburg interfered with her FMLA rights by coercing Plaintiff to withdraw her request for FMLA leave, warning that her FMLA leave would hurt her tenure application. Defendants Rhonda Adams, Dean Collins, Provost Stanley, Mr. Ward, and SMU further interfered with Plaintiff's FMLA rights by later refusing to retroactively this time from

work as FMLA leave.  Without the FMLA designation, Plaintiff was not able to receive a deferred tenure process to a time when she was not suffering from severe asthma.

834.    In December 2015, Plaintiff sought 2 days of intermittent FMLA leave following several trips to the emergency room for stress-induced asthma attacks and the assignment of a regiment of steroids by her physician.  Dean Thornburg, Dean Collins and Ms. Adams, and on information and belief, Mr. Ward, Provost Stanley and President Turner, interfered with her FMLA rights by refusing to grant intermittent leave and spreading false rumors that Plaintiff was "faking her need for FMLA leave"'.  SMU refused to designate any FMLA leave taken during her tenure track probationary period as FMLA-qualifying, thereby depriving her of her contractual right to defer evaluation of her tenure application for a later date when she was not in and out of the hospital suffering from asthma.

835.    In December 2015, after the end of the official probationary period for evaluation of applications for tenure and promotion, SMU granted Plaintiff's request for FMLA leave. However, SMU interfered with that FMLA leave by submitting Plaintiff's application for tenure and promotion amidst scandal and controversy.  All Defendants allowed SMU to submit a tenure report that secretly defamed Plaintiff's character.  When faculty notified her of the scandal, she was compelled to end her FMLA leave to fight for her rights and confront Dean Collins and others who were involved in the scandal.

836.    SMU and Defendants also interfered with Plaintiff's FMLA rights by intimidating and coercing Professor Weaver, Professor Armour and other witnesses to stop protesting or testifying about the discrimination.  According to Professor Weaver, the coercive tactics including promises to hire other Black faculty members, promises of promotions to Chaired positions and administrative positions at the school, concessions for the Black Law Students Associations, and when these perks were not enough, SMU resorted to intimidation, threats and requests that Professor Weaver call Plaintiff by phone and threaten her with further retaliation and defamation if Plaintiff did not quickly settle her case and avoid embarrassing the university.

## XXVII.   COUNT 24-FAMILY & MEDICAL LEAVE ACT (FMLA)
## RETALIATION & HARASSMENT
### (Defendants SMU, Collins, Currall, Adams, Thomas, Thornburg)

837.   Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

838.   As explained throughout this lengthy Complaint, SMU and Defendants engaged in a scheme to retaliate against Plaintiff for requesting FMLA leave and then filing a formal complaint of FMLA discrimination against Dean Thornburg on or about September 2015.

839.   Defendant's retaliation took the form of a conspiracy to defame her character by spreading false rumors that both her request for FMLA leave as well as the Complaint lacked credibility.   These rumors also violated her Contractual right to have complaints of discrimination protected by confidentiality.

840.   The FMLA retaliation also took the form of a scheme to secretly defame her character and to commit fraud by hiding the defamatory statements that her FMLA leave requests were fraudulent.

841.   Defendants' acts of retaliation include the acts of interference described above. SMU and Defendants also interfered with Plaintiff's FMLA rights by intimidating and coercing Professor Weaver, Professor Armour and other witnesses to stop protesting or testifying about the discrimination.   According to Professor Weaver, the coercive tactics including promises to hire other Black faculty members, promises of promotions to Chaired positions and administrative positions at the school, concessions for the Black Law Students Associations, and when these perks were not enough, SMU resorted to intimidation, threats and requests that Professor Weaver call Plaintiff by phone and threaten her with further retaliation and defamation if Plaintiff did not quickly settle her case and avoid embarrassing the university.

## XXVIII. COUNT 25-FAMILY & MEDICAL LEAVE ACT (FMLA) INVASION
## OF PRIVACY
### (Defendants Collins, Currall, Adams, SMU)

842.   Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

843.    SMU breached Plaintiff's contract and invaded her right to privacy by placing confidential information about her complaints about discrimination and her requests for medical leave and or accommodations in her tenure dossier and employment file.

844.    SMU also violated her contractual rights and right to privacy by allowing the law faculty to discuss or use these complaints or request for medical accommodation as a basis for denying tenure and promotion. The SMU Bylaws also provide that records related to complaints of discrimination are to be kept separate from the employee's employment file and generally, are confidential.

### XXIX. COUNT 26-FAMILY & MEDICAL LEAVE ACT (FMLA) INTERFERENCE WITH JOB RESTORATION (Defendants Collins, Thomas, SMU)

845.    Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

846.    After Plaintiff returned from FMLA leave on April 2015, Defendants refused to restore her to the same position with similar terms and conditions.  Specifically, Defendants stripped Plaintiff of ALL of her teaching assignments including the three classes, Employment Discrimination Lecture, Employment Discrimination Seminar and or Critical Race Theory Civil Rights Seminar in which Plaintiff had always received outstanding teaching evaluations.

847.    Instead, Defendants informed Plaintiff that during the 2016-2017 school year, Plaintiff could only engage in research activities.  Defendants told Plaintiff she was welcomed to use the university facilities to research but could not teach in the classroom. However, Defendants refused to reimburse any standard work expenses related to research, e.g., printing, photocopying or business travel for conferences.

848.    Defendants did not provide Plaintiff with any legitimate reason or any reason at all as to why she could no longer teach classes.

### XXX.  COUNT 27- TCHRA RACE DISCRIMINATION (DEFENDANT SMU)

849.    Plaintiff hereby incorporates by reference all of the allegations contained in the above-identified paragraphs as though fully set forth herein.

850. Chapter 21 of the Texas Labor Code makes it unlawful for an employer to refuse to hire or to discharge an individual, or otherwise discriminate against any individual because of that individual's race or national origin." *See* Tex. Lab. Code Ann. § 21.051.

851. Pursuant to Section 21.051 of the Texas Labor Code, Plaintiff pleads a cause of action against Defendant SMU for race discrimination.

852. Defendant intentionally engaged in unlawful employment practices against Plaintiff because of Plaintiff's race (i.e., black), including discriminating against Plaintiff. Specifically, Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or, limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect Plaintiff's employment status because of Plaintiff's race (i.e., black), in violation of Texas Labor Code § 21.051 et seq.

853. As a result of Defendant's discrimination, Plaintiff suffered damages (in an amount that is within the jurisdictional limits of this Court).

## XXXI. COUNT 28: CHAPTER 21 RETALIATION

854. Chapter 21 of the Texas Labor Code makes it unlawful for an employer to retaliate against any individual who has opposed any practice made unlawful under the stature" *See* Tex. Lab. Code § 21.055.

855. Pursuant to Section 21.055 of the Texas Labor Code, Plaintiff pleads a cause of action against Defendant SMU for retaliation.

856. The allegations contained in all paragraphs of this Complaint are hereby incorporated by reference with the same force and effect as if set forth verbatim.

857. Plaintiff engaged in protected activity by complaining to the Human Resources Department and her superiors regarding the discrimination she was facing at SMU before, during and after the tenure process.  Her complaints included discrimination during the tenure process, systematic discrimination against African American professors and failure to accommodate her disability.

858. In response to her protected activity, SMU escalated its pattern of discrimination and abuse.  Plaintiff was singled out, harassed, denied tenure and eventually terminated from her employment. Plaintiff was told that she was denied tenure because "she complained too much about discrimination."

859. The effect of these practices has been to deprive the Plaintiff of equal employment opportunities and otherwise adversely affected her status as an employee.

860.    Plaintiff alleges that she was terminated from her position in retaliation for her protected complaints of discrimination in violation of Chapter 21 of the Texas Labor Code.

## XXXII- COUNT 29- CHAPTER 21 DISABILITY DISCRIMINATION (DEFENDANT SMU)

861.    Chapter 21 of the Texas Labor Code prohibits discrimination against persons with disabilities because of the disability and requires employments to make reasonable accommodations to the known limitations of a qualified individual with a disability.  *See* Tex. Lab. Code Ann. §§ 21.051, 21.128.

862.    Pursuant to Section 21.051 of the Texas Labor Code Plaintiff pleads a cause of action against the Defendant for disability discrimination.

863. The allegations contained in all paragraphs of the Complaint are hereby incorporated by reference with the same force and effect as if set forth verbatim.

132

864. The Defendant engaged in discrimination and harassment against Plaintiff, a qualified person with a disability.

865. The effect of these practices has been to deprive the Plaintiff of equal employment opportunities and otherwise affected her status as an employee.

866. The Plaintiff alleges that the Defendant failed to accommodate her disability and ultimately fired her in violation of Chapter 21 of the Texas Labor Code.

## XXXIII. COUNT 30-TITLE IX, 28 U.S.C. 1681(a): HOSTILE ENVIRONMENT & DELIBERATE INDIFFERENCE
### (DEFENDANT SMU)

867. Plaintiff reasserts and incorporates by reference all the above numbered paragraphs.

868. Defendant SMU is an institution subject to the anti-discrimination provisions of Title IX, which implies a private right of action for gender discrimination.

869. Defendant SMU is an environment permeated with discriminatory intimidation, ridicule and insult.

870. This hostile environment was sufficiently severe and pervasive to alter the terms and conditions of employment.

871. In fact, the hostile environment caused the Office of Institutional Equity to sabotage discrimination complaints by Plaintiff and to fail to conduct a prompt and through investigation and otherwise enforce civil rights.

872. Furthermore, Defendant SMU was deliberately indifferent to the gender discrimination that Plaintiff faced as a teacher harassed and threatened by students and ignored and harassed by faculty and the Office of Institutional Equity staff.

873. An official of the university who had the authority to institute corrective measures – Dean Collins, Provost Currall, President Turner – had actual notice of these incidents and was deliberately indifferent to the conduct.

## XXXIV-DAMAGES

Plaintiff sustained damages as a result of the actions and/or omissions of Defendants described herein. Accordingly, for the reasons set forth above, Plaintiff respectfully prays that the Defendant be cited to appear and answer herein, and for the following relief:

a.  The loss of reputation and character;

b.  Mental anguish;

c.  Lost wages less any interim earnings;

d.  Loss of fringe benefits for employees including discounted tuition for herself, her spouse, and her children;

e.  Front pay damages;

f.  Liquidated damages;

g.  Compensatory damages;

h.  an award of pre-judgment and post-judgment interest on all amounts awarded at the highest rate allowable by law;

i.  For reasonable attorneys' fees and costs;

j.  Declaratory Judgment;

k.  Retraction; and

l.  all such other and further relief to which Plaintiff may show himself to be justly entitled.

## XXXV.   EXEMPLARY DAMAGES

Defendants' conduct, when viewed from the standpoint of the actors at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff.  Furthermore, Defendants' conduct illustrates not only an attitude of conscious indifference for the rights, safety, and welfare of Plaintiff, but also shows Defendants' actual malice when engaging in such conduct.

Nevertheless, knowing the falsity of Defendants' statements, Defendants proceeded with a conscious indifference to the rights, safety and welfare of others, including Plaintiff. Therefore, Defendants are liable or exemplary/punitive damages.

## XXXVI.   <u>JURY DEMAND</u>

Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## XXXVII.      <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, CHERYL BUTLER, respectfully prays that Defendants, be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants for damages in an amount within the jurisdictional limits of the Court, together with interest as allowed by law, costs of court, and such other and further relief to which the Plaintiff may be justly entitled at law or in equity.

Respectfully Submitted,



_ /S/ Alfonso Kennard Jr._ _____
Alfonso Kennard, Jr.
Texas Bar No. 24036888
2603 Augusta Drive, Suite 1450
Houston, Texas 77057
Main: 713.742.0900
Fax: 713.742.0951
Email: Alfonso.Kennard@kennardlaw.com
E Filing: Filings@kennardlaw.com

**ATTORNEY FOR PLAINTIFF**
**CHERYL BUTLER**