IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHERYL BUTLER,

Plaintiff,

v.

JENNIFER M. COLLINS,
STEVEN C. CURRAL,
JULIE FORRESTER ROGERS,
HAROLD STANLEY, AND
SOUTHERN METHODIST
UNIVERSITY

Defendants.

CIVIL ACTION NO.
3:18-CV-00037-E

BRIEF IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO SUMMARY JUDGMENT

Ezra Ishmael Young
NY Bar No. 5283114
ezra@ezrayoung.com

LAW OFFICE OF EZRA YOUNG
210 North Sunset Drive
Ithaca, New York 14850
(949) 291-3185

John L. Green
TX Bar No. 00784165
Jlgreen488@aol.com

LAW OFFICE OF JOHN L. GREEN
4888 Loop Central Drive, Suite 445
Houston, Texas 77081

ATTORNEYS FOR PLAINTIFF
PROFESSOR CHERYL BUTLER

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iv

I.      INTRODUCTION ............................................................ 1

II.     RESPONSE TO DEFENDANTS'
        STATEMENT OF UNDISPUTED FACTS ...................................... 2

III.    FACTS PRECLUDING JUDGMENT AS A MATTER OF LAW ...................... 19

        Gender and Race Discrimination ....................................... 19

        Disabilities and Care Obligations..................................... 23

        Bias Compounded at the Margins ..................................... 25

        Butler's Doomed Bid for Tenure ..................................... 26

IV.     STANDARD OF REVIEW ...................................................... 34

V.      ANALYSIS AND AUTHORITIES............................................... 36

        A. Breach of Contract Claim ........................................... 36

        B. Family and Medical Leave Act Claims ...................................... 37

            1.  FMLA retaliation is cognizable ......................................... 37

            2.  FMLA privacy violations are also cognizable ................. 38

            3.  Curral and Collins are FMLA employers........................ 38

            4.  Prima facie cases of FMLA interference established ...... 39

            5.  Dismissal of the FMLA retaliation claim is improper .... 40

        C. Disability: ADA/Rehabilitation Act and TCHRA Claims........... 44

            1.  Attacks on discrete act discrimination lack merit........... 44

            2.  Failure to accommodate disability in tenure bid............. 45

            3.  SMU misapprehends disability harassment .................. 47

4.  Tenure denial claim is viable.............................................. 47

5.  Retaliation claim is viable ................................................. 47

D.  Race: Section 1981, Title VII, and TCHRA Claims.................... 48

1.  Individual Defendants are personally liable under

Section 1981 ....................................................................... 48

2.  Racially hostile environment is established ................... 49

3.  Burden on tenure denial claims is met ........................... 49

E.  Sex Discrimination Claim............................................................ 49

VI.   CONCLUSION ....................................................................................... 50

<u>T</u>ABLE OF <u>A</u>UTHORITIES

## <u>Cases</u>

*Acker v. Gen. Motors, L.L.C.*,
    853 F.3d 784 (5th Cir. 2017).......................................................................... 40

*Al-Khazraji v. Saint Francis College*,
    784 F.2d 505 (3d Cir. 1986)........................................................................... 48
    481 U.S. 604 (1987)....................................................................................... 48

*Ashely v. City of San Antonio*,
    2018 WL 4016484 (W.D. Tex. 2018)............................................................. 38

*Bellows v. Amoco Oil Co.*,
    118 F.3d 268, 274 (5th Cir. 1997)................................................................. 48

*Besser v. Texas Gen. Land Off.*,
    834 Fed.Appx. 876 (5th Cir. 2020) ............................................................... 44

*Cannizzaro v. Neiman Marcus, Inc.*,
    979 F.Supp. 465 (N.D. Tex. 1997) ................................................................ 44

*Carlile v. South Routt Sch. Dist.*,
    739 F.2d 1496 (10th Cir. 1984)..................................................................... 35

*Comeaux v. Sutton*,
    496 Fed.Appx. 368 (5th Cir. 2012) ............................................................... 36

*Devoss v. Southwest Airlines Co.*,
    903 F.3d 487, 491 (5th Cir. 2018)................................................................. 41

*D'Onofrio v. Vacation Pub., Inc.*,
    888 F.3d 197 (5th Cir. 2018).......................................................................... 40

*Doe v. United States Postal Serv.*,
    317 F.3d 339 (D.C. Cir. 2003)................................................................ 38, 45

*EEOC v. Horizon/CMS Healthcare Corp.*,
    220 F.3d 1184 (10th Cir. 2000)..................................................................... 41

*Evans v. Books-a-Million*,
    762 F.3d 1288 (11th Cir. 2014)..................................................................... 40

*Falk v. Brennan*,
    414 U.S. 190 (1973) .................................................................. 38

*Fisher v. Lufkin Indus., Inc.*,
    847 F.3d 752 (5th Cir. 2017) ...................................................... 49

*Foley v. Univ. of Houston Sys.*,
    355 F.3d 333, 337–38 (5th Cir. 2003) ........................................ 48

*Garrett v. Hewlett-Packard Co.*,
    305 F.3d 1210 (10th Cir. 2002) .................................................. 43

*Griffin v. United Parcel Serv., Inc.*,
    661 F.3d 216 (5th Cir. 2011) ...................................................... 46

*Halper v. Univ. of the Incarnate Word*,
    90 S.W.3d 842 (Tex. App.—San Antonio 2002) ........................ 37

*Hestor v. Bell-Textron, Inc.*,
    11 F.4th 301 (5th Cir. 2021) ...................................................... 43

*Kunda v. Muhlenberg Coll.*,
    621 F.2d 532 (3d Cir. 1980) ...................................................... 34

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167, 173–74 (2005) ...................................................... 50

*Jepsen v. Fla. Bd. of Regents*,
    610 F.2d 1379 (5th Cir. 1980) .................................................... 34

*Jones v. Barnhart*,
    349 F.3d 1260 (10th Cir. 2003) .................................................. 43

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) ........................................................ 50

*Lanier v Univ. of Texas Southwestern Medical Ctr.*,
    527 Fed.Appx. 212 (5th Cir. 2013) ............................................ 53

*Lee v. Offshore Logistical & Transp., LLC*,
    859 F.3d 353, 355 (5th Cir. 2017) .............................................. 35

*Loulseged v. Akzo Nobel, Inc.*,
    178 F.3d 731 (5th Cir. 1999)......................................................... 47

*Minnis v. Bd. of Sup'rs of Louisiana St. Univ. and Agr. and Mech. Coll.*,
    620 Fed.Appx. 215, 222 (5th Cir. 2015) .................................... 50

*Modica v. Taylor*,
    465 F.3d 174 (5th Cir. 2006)......................................................... 38

*Moes v. Mahmoud*,
    2021 WL 4132220 (E.D. Lou. 2021) .......................................... 36

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512, 520 (1982)............................................................... 50

*Nunez v. Superior Oil Co.*,
    572 F.2d 1119 (5th Cir. 1978)..................................................... 36

*Park v. Direct Energy GP, LLC*,
    832 Fed.Appx. 288 (5th Cir. 2020) ......................................... 39, 40

*Paz v. Brush Engineered Materials, Inc.*,
    555 F.3d 383 (5th Cir. 2009)....................................................... 35

*Reich v. Circle C. Invs., Inc.*,
    998 F.2d 324 (5th Cir. 1993)....................................................... 39

*Richardson v. Monitronics Int't, Inc.*,
    434 F.3d 327 (5th Cir. 2005)....................................................... 37

*Rudy v. Consolidated Rest. Co., Inc.*,
    2010 WL 3565418 (N.D. Tex. 2010) ........................................ 39
    2010 WL 3565422 (N.D. Tex. 2010) ........................................ 39

*Scott v. Harris*,
    550 U.S. 372 (2007) ..................................................................... 36

*Spuler v. Pickar*,
    958 F.2d 103 (5th Cir. 1992)....................................................... 37

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011) ..................................................................... 49

*Sweeney v. Bd. of Trustees*,
    439 U.S. 24 (1978)..................................................................... 34

*Texas Dep't of Community Affairs v. Burdine*,
    450 U.S. 248, 255 n. 9 (1981)...................................................... 35

*Tidwell v. Exel Global Logistics, Inc.*,
    2008 WL 360999 (N.D. Tex. 2008) ............................................. 46

*Trudeau v. Univ. of N. Texas*,
    861 Fed.Appx. 604 (5th Cir. 2021) ............................................. 50

*Tudor v. Southeastern Okla. St. Univ.*,
    13 F.4th 1019 (10th Cir. 2021) ................................................... 35

*Univ. of Penn. v. EEOC*,
    493 U.S. 182, 190 (1990) ............................................................ 34

*United States v. Ackerman*,
    831 F.3d 1292, 1299 (10th Cir. 2016)......................................... 45

*U.S. Fed. & Guar. Co. v. Planters Bank & Tr. Co.*,
    77 F.3d 863 (5th Cir. 1996)........................................................ 36

<u>Statutes</u>

Americans with Disabilities Act/ Rehabilitation Act
    29 U.S.C. § 26111.................................................................... 38
    42 U.S.C. § 12112(d) ............................................................... 45

Family and Medical Leave Act
    29 U.S.C. § 2615............................................................... 37, 41

<u>Misc.</u>

*SMU Mourns Death of Law Professor Sarah McQuillen-Tran*,
    SMU.edu, Mar. 13, 2014............................................................. 5

## I.    INTRODUCTION

Professor Butler has worked hard her entire life to earn a seat at the table. Her stellar credentials helped Butler launch her scholarly career, ultimately landing a tenure track job at Southern Methodist University's (SMU) Dedman School of Law (the Law School or SMU Law) in 2011. And yet, she was denied tenure in 2016 and terminated in 2017.

There are disproportionately few Black women on law faculties in the United States, even fewer at elite schools like SMU Law. While on occasion Black women land tenure track jobs, most are pushed out by bias baked into the tenure process and a small but powerful cadre of administrators and faculty.

Butler was an all-star at SMU, the kind of young scholar that senior colleagues predicted would become a leader in her field. She published articles in flagship law reviews, traveled around the nation to give invited lectures, and advised both Congress and the Senate on her issues of expertise all while teaching a full course load, caring for her beloved colleague Sara who died shortly before she went up for tenure, mentoring students, and juggling caretaking duties of her ill husband and preteen and teen children.

Of course, no federal lawsuit results where things end well. The year Butler was slated to go up for tenure her husband got sick and her own health deteriorated. Butler tried pushing herself past her limit, but she got even sicker. She did what any smart professional would—Butler asked SMU to stop her tenure clock and let her take some time off to get well.

Years of litigation has uncovered a damning mountain of evidence that shows exactly what went down at SMU. Butler's requests for time off and accommodations to take care of her family's and her health were a straw too far for a faculty that was inhospitable to minority colleagues. Especially tenacious ones like Butler who attempted to push her colleagues to grapple with how race and gender bias pushes out minority professors when they go up for tenure.

Butler's career quickly unraveled . Her requests for leave and accommodations were twisted into lies to attack her character and, ultimately, administrators and faculty sabotaged her tenure bid. Rather than give Butler time to get well, Defendants repeatedly broke the rules, disparaged her, and at times tried to outright break her spirit. Their attacks were not subtle to anyone paying attention. Tellingly, the only other Black woman on the faculty at the time bluntly observed, "[i]t's like they lynched you." (Pla. App. 299).

## I.   RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

1.  SMU extended Professor Butler a tenure-track offer via letter dated March 3, 2011, which she counter signed on March 30 of that same year (Def. App. 118–19). It is agreed that the counter-signed letter formed a binding employment contract between SMU and Butler and that it incorporated by reference SMU's Guidelines and Bylaws. The Bylaws also incorporate by reference Statements made by the American Association of University Professors (AAUP) (*See, e.g.* Def. App. 31, 43). An AAUP directive pertinent to tenure is its Statement on Governance of Colleges and Universities (AAUP Shared Governance Statement) (Pla. App. 2–9), which explains

that tenure decisions are ultimately the providence of the faculty, not administration. The Contract states that Butler would "normally be considered" for tenure in the 2015–16 academic year (Def. App. 118). But read in conjunction with SMU's Guidelines and the Law School's Bylaws, this is merely a predication of the time of Butler's tenure application. The Guidelines make clear that tenure decisions will be made "[a]t an appropriate time" (Def. App. 137) which is clarified via footnote as being during "the probationary period [] not to exceed seven years" (*id.* at 139). The Bylaws state that a candidate for tenure is not typically "considered for tenure until the candidate is in his or her fifth year of teaching" (Def. App. 130). At SMU Law, Butler taught Torts I, Torts II, Employment Discrimination (lecture), Employment Discrimination (seminar), as well as a Civil Rights seminar (Pla. App.).

2.  There are three criteria for awarding tenure—teaching, scholarship or research, and service. It is agreed that SMU's university wide rules are articulated in the Guidelines and that the Law School's rules are in the Bylaws (Def. App. 106). The Guidelines identify two factors for tenure—teaching and research—and state that tenure is awarded where the candidate is deemed "outstanding" in either area and at least "of high quality" in the other (Def. App. 137). The Bylaws identify two factors for tenure—teaching and "contributing to the growth and understanding of the law," and state that these factors are to be "given equal weight in the determination whether to award tenure" (Def. App. 132).

3.  There is no requirement under the Guidelines or Bylaws that a professor go up for tenure in her fifth year. The Guidelines provide that one goes up for tenure at "an

appropriate time" defined as a "probationary period not to exceed seven years" (Def. App. 137, 139), whereas the Bylaws state that a candidate is not ordinarily considered until at least "her fifth year of teaching" (Def. App. 130). The Bylaws set forth the Law School internal process for tenure: (a) the Dean appoints a three-member tenure committee, (b) the tenure committee visits the candidate's classes, reviews her writings, and provides counsel on teaching and research throughout her probationary period, (c) the Dean calls a special meeting for the faculty to consider the tenure application, (d) the faculty vote via unsigned secret ballots, and (e) if the Dean agrees with the faculty, that recommendation is made to the Provost (Def. App. 130–31). The Guidelines set forth the tenure process beyond the law school: (f) the Dean submits their recommendations to the Provost no later than February 1, (g) the Provost submits the Dean's recommendations to the Provost's Advisory Committee, and (h) the Provost makes their recommendations to the President and ultimately, to the Board of Trustees (Def. App. 136). The Guidelines permit appeal of negative recommendations made by the Dean (appealed to the Provost) and the Provost (appealed to the President) (Def. App. 138). The Bylaws vest tenure candidates considered in their fifth year or later with the right to appeal the decision of the Faculty during their terminal year (Def. App. 131).

4. Four candidates initially were slated to go up for tenure in the 2015-15 academic year: Butler (Black woman), David Taylor (white man), Keith Robinson (Black man), and Sarah McQuillen-Tran (white woman). (McQuillen-Tran died in

2014.[1]) The other surviving candidates continued to work with their original tenure committees during the 2015-16 application cycle. However, Butler's First Tenure Committee (FTC) and Second Tenure Committee (STC) were disbanded by Dean Collins (Pla. App.  and a Third Tenure Committee was with just weeks to evaluate Butler's tenure candidacy (Pla. App. 83). Disagreed that Butler insisted she wanted to be considered for tenure in the 2015-16 academic year. The declaration Defendants rely upon states the opposite—that Butler applied for a tenure extension because she did not wish to be considered while she was ill (Def. App. 110).

5. Butler was assigned her First Tenure Committee in 2013 (Pla. App. 59). Agreed that SMU renewed Butler's Contract in March 2014 (Def. App. 141). In the Second Tenure Committee's recommendation letter to the faculty, they reported that Butler "has all the attributes in line for tenure" (Def. App. 145). The Committee did not advise that Butler's teaching fell short of "high quality." Rather, they stated that they "are confident that by tenure time, her teaching will remain excellent in her specialty seminar course and will be at least at a high-quality level in her large Torts classes" (Def. App. 144).

6. Agreed that the Second Tenure Committee wrote the March 2014 contract renewal letter and that the Committee told Butler she met the scholarship and service benchmarks for tenure. Disagree that the Second Committee concluded that Butler's teaching failed "to meet the high-quality standard for teaching." To the contrary, members of the Second Tenure Committee repeatedly gave positive

---

[1] *SMU Mourns Death of Law Professor Sarah McQuillen-Tran*, SMU.edu, Mar. 13, 2014, https://blog.smu.edu/forum/2014/03/13/smu-mourns-death-of-law-professor-sarah-mcquillen-tran/.

feedback to Butler on her teaching. *See, e.g.*, Pla. App. 37–44 (Norton's teaching qualifications evaluating Butler); *id.* 52 (Norton recalling Contract Renewal report as being positive as to teaching); *id.* 53 (similar). Butler did not accuse the Second Committee members of wrongdoing, she grieved that her rights at SMU were being violated by others. *See, e.g.*, Pla. App. 63 (Butler: "I did not accuse my tenure committee members individually of discriminating against me".) There is nothing in the record that substantiates the Committee's rationales for resigning. Defendants point to a single email from Dean Collins (Def. App. at 146) accepting the resignations but fail to point to any record substantiating the Committee's position. Agreed that Collins emailed the Committee purportedly accepting their "resignations" on September 15, 2015 (*id.*).

7.Agreed that Butler was notified of the Third Tenure Committee's membership via email on September 27, 2015, and that Butler expressed optimism that same day via email (Def. App. 147). Agreed that Professor Anderson testified that in his 51 years at SMU Law he voted in favor of tenure of two Black professors (Def. App. 14). It is agreed that Jessica Weaver became the first Black woman tenured at SMU Law in 2015. Disagree that SMU fairly applied the Guidelines and Bylaws to Butler's tenure bid. Moreover, SMU's reliance on Anderson's testimony for that point is inappropriate—he has no personal knowledge of other decision-maker's motivations or actions.

8.Disagree that the Third Tenure Committee was never given a reason (true or not) why the Second Tenure Committee resigned. As one example, Professor

Anderson attests that he was told that the Second Committee resigned because Butler accused it of "discrimination" (Pla. App. 81–82). Agreed that on at least one occasion Collins advised Butler of her right to file grievances with the Office of Institutional Access and Equity (OIAE).

9.Butler made multiple requests for a tenure clock extension prior to the dissolution of the Second Tenure Committee and otherwise notified both Collins (in her capacity as Dean) and Thornburg (in her capacity as Associate Dean) of FMLA qualifying events including Butler's husband's poor health and her own depression in Summer 2015. *See, e.g.*,  Pla. App. 112, 116–17. Butler never sought a tenure-clock extension premised on her need to improve her teaching. Each and every request made pertained to her husband's and her own poor health. The Third Tenure Committee never directly advised Butler that her teaching was sub-par prior to her requesting those extensions. Defendants' own evidence undercuts their proffered chronology. As one example, Butler requested a tenure clock extension in a meeting with Collins on October 27, 2015 and Collins advised her the next day to bring the request to Provost Stanley (Def. App. 148). Provost Stanley confirmed receipt of Butler's written request via letter on November 4, 2015 (Def. App. 149) and denied it on November 10 concluding that if Butler was well enough to teach classes in both the Fall 2015 and Spring 2016 terms, she was not too ill to continue with the tenure process (Pla. App. 114–15).

10.Butler formally petitioned Collins for a tenure extension in October 2015 (Def. App. 148) after she was advised to do so by Professor Anderson, the chair of the Third

Tenure Committee (Pla. App. 83–84). The extension was denied by Provost Stanley for the reasons stated in ¶ 9.

11.Dean Collins advised Butler that the Faculty would vote on the three candidates whenever they were all ready to go up for tenure, "[w]hether that happens in November, December, or January depends on when all three files are complete" (Pla. App. 94). However, Collins later directed Butler that she must submit her full tenure box no later than November 16, 2015, on the premise that the full faculty was voting on tenure in "early December" (Def. App. 166). Candidates' tenure applications were assembled into what is called a "tenure box" containing curriculum vitae, syllabi, teaching evaluations, and personal statements along with other materials such as published articles and peer evaluations. The Law School did not delay the Faculty tenure vote because Butler failed to complete her tenure box. The Second and Third Committees set deadlines for external reviewers that precluded an earlier vote (Pla. App. 92).

12.The Third Tenure Committee was not named until September 27, 2015, as explained in ¶ 7, almost half-way through the term, thus there is no way the Third Committee could have evaluated Butler "throughout the Fall 2015 semester." Moreover, only 52 days of the 103 day "evaluation" period fell during a period Butler was not on FMLA approved leave (Def. App. 164). Members of the Third Committee, Collins, and other faculty visited Butler's classes throughout the Fall 2015 term. The Third Committee's and Collin's evaluations—all of which fell *after* Butler reported being sick and was in the process of seeking a tenure clock extension as well as a

leave of absence were negative. But evaluations by other faculty and SMU administrators were positive. *See, e.g.*, Def. App. 100 (Joshua Tate opining that "Butler is an outstanding teacher"); Def. App. 104 (positive independent evaluation from Ann Batenburg from SMU's Center for Teaching Excellence); Pla. App. 45 (Cortez positive evaluation). There is a "Tenure Report" written by Roy Anderson dated January 8, 2016 (Def. App. 49–69). The Tenure Report reflects Mary Spector abstained indicating that "the faculty should not be making a recommendation regarding tenure at this time" (Def. App. 69). Via email, Spector explained to the other members of the Third Committee that it was unfair to give an opinion on Butler's teaching judging only a period of time when she was obviously ill, noting that "[a]s Cheryl began to complain about her health, the reviews got worse" (Def. App. 99). There is evidence that Dean Collins played a direct role in crafting the substance of the Tenure Report including making her own negative observations about Butler's teaching and soliciting negative evaluations from others which she then passed on to Anderson, all of which were ultimately highlighted in the Tenure Report. *See, e.g.*, Def. App. 96 (Oct. 30, 2015 email); Def. App. 95 (Jan. 5, 2016 email). Additionally, there is evidence that Anderson shared negative evaluations directly with Collins months before the Tenure Report was complete and long before it was appropriate under SMU's process for Collins to make an independent decision on tenure. *See, e.g.*, Def. App. 101 (Nov. 5, 2015 email).

13. The Third Tenure Committee served only as Butler's committee, thus there is no credence to Defendants' assertion that that Committee applied the same

9

standards for tenure to all members of the 2015-16 cohort. As explained *supra* ¶ 9, the Tenure Report reflects that two of three members recommended a vote against tenure and one recommended tenure be considered at another time. It is agreed that two of the Third Committee's members believed tenure was not warranted because Butler's teaching fell short of the "high quality" mark (Def. App. 54), the standard required under the Bylaws (Def. App. 44). However, the Tenure Report reflects that Butler's teaching was not evaluated by the metrics set under the Bylaws (explained further *infra* ¶ 67(a)). Rather than consider the range of factors that the Bylaws define as the only proper metrics of teaching, the Tenure Report hyper-focuses on Butler's supposed deficiencies teaching Torts II in Spring 2015 and Torts I in Fall 2015—when Butler and her husband were both seriously ill—and places undue emphasis on a handful of negative student evaluations received in that short period in only those courses. Contrary to Defendants' assertions, the Tenure Report does not claim Butler lacked a commitment to teaching for the reasons stated. The Report does not accuse Butler of never turning in her grades on time. *See also* Pla. App. 54 (Butler email to Collins, "Last Spring I turned in grades past the time that they were needed or required by the school. That has not happened before.") The Report does elevate that students complained Butler used the same exam twice, but admits there is no corroboration of that accusation (Def. App. 66). The Report does disclose that Butler candidly shared some of her exams had misspellings in them, but does not state they had not been proofread (Def. App. 66). The Chair, Anderson, did highlight his own

10

negative evaluations of Butler's Torts I class visited on September 29 and October 13, 2015 (Def. App. 62–65), further dissected *infra* ¶ 68).

14. The Tenure Report contains a subsection in which Butler is accused of being untruthful about matters outside the scope of tenure review as set by the Guidelines and Bylaws (Def. App. 68). Anderson testified that those accusations were premised on his judgment—without corroboration—that Butler had been untruthful with him during the review process (Def. App. 22–23). Anderson's charge that Butler was "uncooperative" is premised on accusations that she (a) did not turn in her "tenure box" on time and (b) never provided a *curriculum vitae* (Def. App. 16–17). However, evidence reflects that there was no deadline Butler missed (*infra* ¶__) and she shared her *curriculum vitae* with her Tenure Committee and Dean Collins at the beginning of the Fall 2015 (see, e.g., Pla. App. 94). It is totally unclear why Anderson felt the need let alone insisted Butler produce a revised *curriculum vitae* in the middle of the process, let alone why he did not simply rely on the copies originally provided (Pla. App. 12–29).

15. Agreed that the three candidates were considered at the same meeting on January 13, 2016 and that of the three candidates, only Butler's tenure was denied. Agreed that Anderson "presented" Butler's application to the Faculty but given his negative recommendation it can hardly be characterized as being "on behalf of Butler." *Cf.* Pla. App. 62. Denied that race was not brought up by the faculty and administrators. *See, e.g.,* Pla. App. 295–96 (describing threats and retaliation re bias complaints). There is also ample evidence that both the Second and Third

11

Committee's took race into account in making decisions pertinent to the substantive representations made in the Tenure Report that was ultimately presented to the Faculty to inform their votes. *See, e.g.*, Pla. App. 65–66). Collins notified Butler of the faculty's recommendation, but declined to meet with her to explain the Faculty's position in further detail (Pla. App. 95–97). Collins also refused to give Butler the Tenure Report, despite it being made available to other candidates (Pla. App. 296–97). The Bylaws do not empower the Dean to decide appeals of the Faculty's vote—rather, if an appeal is filed, "the Dean ***shall promptly convoke a special meeting*** of those members of the Faculty eligible to vote on the candidate's tenure" which is a "reconsideration" of the tenure case (Def. App. 131–32) (emphasis added). As to the Guidelines, Policy 6.12(D)(1) does not apply to the Law School tenure process—the Law School does not have departments (Def. App. 72), thus there is no appeal from a Department heard by the Dean (Def. App. 138).

16. Butler did notify Collins that she intended to appeal the Faculty's negative recommendation. However, Butler's appeal should have (but was not) been heard by the Faculty under both the Guidelines and Bylaws, as explained *supra* ¶ 15. Acting outside the bounds of her limited authority, Collins rejected Butler's appeal without ever having brought it to the Faculty via letter on May 4, 2016. In that same letter, Collins also conveyed that she was, purportedly independently of the appeal, also recommending against Butler's (Def. App. 154). Assertions that Butler did not provide Dean Collins with a supplemental dossier before Collins adjudicated Butler's appeal are inapposite—the Bylaws unequivocally state that if the Faculty accepts the

appeal, the Dean "shall appoint an Ad Hoc Advisory Committee to prepare a dossier and to report to the Faculty at a subsequent meeting" (Def. App. 132). Thus, Butler did not have a duty to assemble her own dossier, rather, Collins had a duty to bring the appeal to the Faculty and if accepted, to assemble a special committee which had the duty to put together the dossier.

17. Collins' negative recommendation of Butler did not follow the procedural requirements set forth in either the Guidelines or Bylaws. In addition to failing to bring Butler's appeal to the Faculty (*supra* ¶ 16), Collins failed to make her recommendation to the Provost by the February 1 deadline (Def. App. 138). On Mary 4, 2016—93 days past the deadline set by the Guidelines—Collins presented her negative recommendation to Provost Curral (Def. App. 155–60). Collins' negative recommendation does not abide by the limits on the Dean's role in tenure determinations set by the Guidelines, Bylaws, or AAUP's Shared Governance Statement. Because the Dean is an administrator (even if separately a tenured member of the faculty), her role is limited to reviewing the Faculty's determination (Pla. App. 2–9). Collins oversteps her role repeatedly. Instead of reviewing the Faculty's determination, Collins provides her independent analysis of Butler's teaching separate and apart from the Faculty (Def. App. 156). She indicates that her recommendation is premised off of the Tenure Report—written by the Third Committee—not the Faculty (Def. App. 156). Collins goes on to present what she labels as her own independent analysis of Butler's teaching separate and apart from the Third Committee (*id.*). Collins goes on to conduct what she claims is a

13

"comparative review" of Butler's teaching against other faculty (Def. App. 157), despite that not being a legitimate measure at SMU (Pla. App. 51). Collins also falsely accuses Butler of wrongdoing in connection with exams. As one example, Collins asserts Buter "did not begin to prepare" her Fall 2014 Torts exam until the day and other issues (Def. App. 158). Problematically, Collins had been exhaustively briefed on that matter by Butler the year prior via email the particulars of which directly conflict with Collins' accusations (Pla. App. 99–104). There is considerable evidence reflecting that Collins took Butler's race into account (*see, e.g.*, *infra* ¶¶ 37–49, 60–62, 64, 66, 67, 68).

18. Provost Curral also failed to follow two key procedural requirements set forth in Guidelines. First, Curral treated the Third Tenure Committee's Tenure Report as if it were the Faculty's recommendation (Def. App. 80), despite the rules requiring that there must be separate evaluations made at each level of the decision-making process. Def. App. 30 (Guidelines establishing documentation requirement at "each of the levels"). Second, rather than wait on Dean Collins' recommendation as is required (Def. App. 72, 138), Curral skipped the Dean step and purportedly directly reviewed the Faculty's decision via the Provost's Advisory Committee in starting in late January 2016 (Def. App. 79–80). On May 5, 2015, *one day after Dean Collins made her negative recommendation to Curral*, Curral turned around and purportedly completed his independent evaluation of Butler's case without having possibly had time to review Collins' recommendation let alone the Faculty's recommendation given the fact that he was not even provided with such a report (Def. App. 93). It is

impossible that Curral applied the "same standards" to reviewing all members of the Law School's 2015-16 cohort—the only candidate the Provost did not have a timely Dean recommendation from was Butler. Defendants' own admissions evidence that any appeal that could have been filed by Butler as to earlier decision-makers was futile.

19. Butler was informed of Curral's decision via a letter dated May 5, 2015 (Def. App. 93). However, Butler notified OIAE that denial was made while she was on leave and requested time to appeal after leave was over but request was denied. Butler separately filed an appeal to OIAE alleging discrimination in the tenure process.

20. Butler was employed by SMU in the 2016-17 academic term, but she was not fully paid as a law professor and not permitted to teach classes. Denied as to Butler being free to work on her research and scholarship as SMU withheld financial support of her work that she was afforded in previous years. As one example, SMU withheld $20,000 research grant that Butler had been awarded the five previous years, and withheld bonuses normally awarded for Christmas among others (Pla. App. 281).

21. SMU's FMLA forms direct faculty to submit directly to either Rhonda Adams or the dean. Agreed faculty were notified of FMLA procedures and were generally aware of the web portals.

22. Butler notified Collins of FMLA need repeatedly in 2015. Disagree that Butler did not submit FMLA requests—repeated requests made to Collins, Adams, and Stanley as well as the Second and Third Tenure Committees in 2015. *See, e.g.*, Pla. App. 118–58.

23. Agreed to the extent that Butler was in fact on FMLA leave from November 18 through 21, 2015 and for Spring 2016 term. Disagree as to Butler's work responsibilities—Butler was still forced to grade exams as well as participate in the tenure and tenure appeal process throughout this period of FMLA leave (see, e.g., Pla. App. 194–97, 219). Disagree that Adams followed SMU FMLA policy. Among other things, there is also evidence that Adams improperly was in contact with SMU's police department sharing information about Butler's confidential requests (see, e.g., Pla. App. 218) and also shared them with Collins who, in turn, shared her own biased impressions with the Third Committee (Pla. App. 165). Agreed that Butler was paid salary during FMLA leave, however, her bonuses were withheld (Pla. App. 281).

24. Disagree that Adams based all FMLA determinations on SMU policy and procedures. *See, e.g.,* Pla. App. 118–51, 294–95. Butler complained about the FMLA leave process.

25. Adams did not make FMLA decisions herself (Pla. App. 294–95). At several points, Adams was directed by Collins to deny FMLA requests made by Butler during the tenure probation period (once the tenure process begins in 2015-16 cycle). People outside of Human Rosources did have influence over the FMLA process and regularly interacted with Adams about it. As one example Adams told members of the Third Tenure Committee that Butler misrepresented the merits of FMLA application and its Tenure Report makes reference to Adam's representations. Additionally, Vice Provost Starkey directly requested documentation from Butler substantiating her reasons for seeking a tenure clock extension, inviting medical records exchanges.

26.Butler provided FMLA documentation to Collins, as directed to by Collins herself which Butler understood as being a direction made pursuant to SMU policy. Butler also provided documentation to Adams.

27.SMU maintained an ADA policy during Butler's employ. Hernandez was not the only decisionmaker about Butler's accommodations requests.

28.Butler made several ADA accommodation requests throughout Fall 2015 and into Spring 2016. Requests were made repeatedly to Collins, Vice Provost Stanley, Adams, and Hernandez. Butler's ADA requests were made in writing to decision-makers using her SMU email and additionally made via SMU's own ADA forms. No ADA accommodations were given to Butler in the classroom in Fall 2015 which was, incidentally, the last time she taught at SMU. SMU later claimed to grant Butler accommodations in the classroom but these were illusory—Butler never returned to the classroom at SMU.

29.Others at SMU represented to Butler that they were ADA decisionmakers. Butler did not try to side-step any SMU policies. Butler was given confusing and conflicting directions about who should hear her ADA requests all of whom at one point or another were identified as ADA decision-makers. Butler did not try to side-step establish ADA policy, Butler was repeatedly directed to file and follow up with ADA requests with various persons identified by SMU administration as decision-makers (see, e.g., Pla. App. 131, 143, 159, 185, 187–88, 192).

30.The First Tenure Committee never raised a concern that Butler did not meet the teaching standard. Collins never directed Butler to complain to the OIAE about

17

the tenure process, but rather about the requirement that Butler was told to write extra law review articles. Denied that Butler never grieved discrimination at SMU previously—Butler filed a complaints in Spring 2015 about harassment from a student (see, e.g., Pla. App. 209–12). Butler initially filed a complaint with IAE about discrimination in the scholarship standards represented to her by the Tenure Committee, days later the Committee was disbanded, at which point Butler attempted to withdraw complaint recognizing and otherwise fearing retaliation (Pla. App. 296).

31. Butler repeatedly complained throughout Fall 2015 and Spring 2016. Butler is aware that at some point Hernandez started but did not complete an investigation of Butler's complaints. Denied that Butler did not cooperate with investigations— Butler regularly emailed and made and returned phone calls concerning her complaints during the investigation period. Further, Butler reasonably believed that the "investigation" was in fact a sham investigation (Pla. App. 297–98).

32. Hernandez did not conduct let alone completed a merits investigation. Among other things, Hernandez admits that she never actually reviewed materials—such as the Third Tenure Committee's report which contained discriminatory statements— from the tenure process, making it impossible for her to have actually reached a merits decision. *Compare* Def. App. 236–37 (Hernandez representing that she merely reviewed denial letters not the actual Tenure Report or other documents in the "tenure box").

33.Agreed that Hernandez found no violations made by SMU. Disagree that no violations sown by SMU. Moreover, Butler not given the maximum FMLA leave in Fall 2015, and SMU did not actually give ADA accommodations at all in Fall 2015, and SMU only offered ADA accommodations on paper thereafter.

34.Deny as to representations about what the investigation covered and what it revealed. It was impossible under  purported rules for Butler to secure either an FMLA or ADA accommodation in the form of a tenure clock extension. Otherwise denied to the extent that Collins directed Butler to correspond with students and grade exams during her FMLA leave (¶ 23).

35.Butler willingly participated in process.

36. Butler desired to appeal the Hernandez investigation because it was a sham and she also wished to complain about new FMLA violations during her terminal year. It is true that Butler had recordings of conversations with faculty and administrators at SMU and the Law School that corroborated her complaints as well as her claims in this lawsuit which were served in discovery in this litigation.

## II.    FACTS PRECLUDING JUDGMENT AS A MATTER OF LAW

**Gender and Race Discrimination**

37. The Law School's tenured faculty has historically been homogenous— predominantly white and male (Pla. App. 222).

38. During Butler's employ, the faculty was predominantly white and male (Pla. App.293 ).

39. As Dr. Shubha Gosh shares, the Law School has a long history of harboring bias, openly expressing hostilities at efforts to recruit, promote, and retain minority faculty (see, e.g., Pla. App. 210–228, 270–71, 294–95).

40. Though Jessica Weaver earned tenure in 2015, the fact that it took the Law School 90 years to tenure its first Black woman law professor speaks volumes. To date, no other Black woman has been tenured at the Law School.

41. During her probationary period, Butler repeatedly raised concerns that her status as a Black woman may negatively impact both her colleagues' and students evaluations of her. *See, e.g.,* Pla. App. 55, 57, 209–212, 294).

42. SMU was steadfastly committed to diversity and inclusion in the abstract for much of Butler's employment.

43. However, Butler's colleagues shared her concerns and, for a time, members of her various Committees as well as Dean Collins expressed support in learning more about how race and gender bias operate to lock Black women from the legal academe. *See, e.g.*, Pla. App. 88,

44. Unfortunately, SMU failed to adequately grapple with bias on the ground during Butler's employ. Two examples stand out:

a. Butler's concerns that students gave her poor evaluations because of bias were not taken seriously at the Law School (see, e.g., Pla. App. 66).

b. Colleagues failed to grasp that when Butler and her supporters said point blank that Black women in the legal academe face bias in tenure evaluations, they were

talking about *her* experience, not congratulating the faculty for conferring tenure on Jessica Weaver in the previous cycle (Def. App. 24).

    c.Despite the Law School claiming that Weaver's tenure evidenced that the climate was hospitable during Butler's employ, Weaver privately expressed that she was afraid to speak up about discrimination (Pla. App. 299). Tellingly, Thomas never checked in with Weaver about bias issues (Def. App. 246).

45.Butler's efforts to ask more senior colleagues and administrators to take proactive steps to rid the tenure process of bias were steadfastly rebuffed. Evidence also reflects that many of her champions who previously supported her tenure bid turned against her fearing her critiques of institutional and structural biases of SMU were personal attacks. Examples include:

    a.The Second Tenure Committee disbanded because two white members of the Committee feared they would personally be accused of bias—and reported *they had* been accused of bias—when Butler simply asked the Committee to explain for the rest of the faculty how implicit bias has locked Black women out of the legal academe for decades as a means of ensuring Butler a fair tenure review (Pla. App. 65).

    b.Butler's concerns about structural bias in the tenure process were cast by white colleagues as being unreasonable or irrational anxieties in light of her solid credentials for tenure (Pla. App. 59–60, 63–70). Yet those same colleagues disbanded her Second Tenure Committee in such a way and on such short notice that Butler's fears about bias in the process proved true—to wit, all of the positive good will and institutional knowledge built up with her Second Committee about Butler's

qualifications was disregarded by the Third Committee who were primed to cast Butler as unqualified from the start (Pla. App. 85).

46. Butler was subjected to disparate treatment throughout her time at the Law School. Examples include: (a) Butler was not given an Advisory Committee like others in her cohort until three years into her probationary period, which her colleagues acknowledged put her at a disadvantage in prepping her for tenure (Pla. App. 59). (b) Butler had three *different* tenure committees in her first five years at the Law School, whereas her peers had the same committee mentor and advocate for them in their contract renewals and ultimately successful tenure bids. (d) Butler's minority colleagues confided in her that her tenure bid was subjected to more stringent standards than other colleagues and both her gender and race were factors (Pla. App. 296). (e) The Law School withheld Butler's Tenure Report from her, despite regularly making it available to others (Pla. App. 297).

47. Butler was also subjected to heightened scrutiny. Examples include: (a) Dean Collins put Butler under a microscope and invited other administrators and faculty to do the same. (b) Collins frequently reached out to administrators in and outside of the law school as well as university legal counsel to navigate what should have been very basic workplace issues concerning Butler. *See, e.g.,* Pla. App. 75, 88, 106, 185, 187–88. (c) Some of Collins' surveillance efforts are racially coded. As one example, Collins started treating Butler's presence on campus and academic status inquiries as police matters, sharing them with SMU's internal police force via email (Pla. App. 218). (d) Even when faculty like Joe Norton, raised concerns about bias with Butler,

Collins encourage faculty to ignore red flags and break with established precedents and norms (Pla. App. 62).

48. Butler was systemically critiqued and maligned for simply doing her job: Colleagues criticized Butler's use of notes during her large Torts lecture course, despite Dr. Ghosh, who also taught Torts at the Law School, reporting that this is perfectly normal (Pla. App. 231).

49. Butler was also systemically critiqued for invoking workplace protections (see, e.g., Pla. App. 167).

## Disabilities and Care Obligations

50. Like many married, working parents, Butler did her best to juggle work and career. For most of her time at SMU, Butler managed just fine.

51. For a time, Butler even took on extra care responsibilities in support of her Law School colleagues, like Sarah McQuillen-Tran. When McQuillen-Tran's illness became terminal, Butler took her into her home and made sure her final months were comfortable (Pla. App. 148–49, 167).

52. Things changed dramatically in early 2015.

53. Butler has several disabilities, including asthma, anxiety, and depression. These conditions were, for the most part, well managed for the majority of Butler's probationary period. From time-to-time Butler had health scares—e.g., a trip to the hospital to manage an asthma attack, but with basic informal accommodations she got by just fine. Unfortunately, Butler's health seriously deteriorated in 2015 and dramatically worsened through her tenure bid. *See, e.g.,* Pla. App. 198–201, 294–95.

54. Butler's husband also got seriously ill during this same period

55. And in October and November 2015 both Butler's son (broken arm requiring orthopedic care) and daughter (severe allergic reaction that required monitoring to prevent progression to life threatening condition) also had medical emergencies.

56. Butler did her best to timely notify SMU and the Law School about the problems she was experiencing and work through normal channels to take leave and otherwise obtain accommodations (Pla. App. 294–95).

57. Despite giving plenty of notice and dutifully following SMU's policies, Butler repeatedly encountered increasingly more absurd barriers to taking leave and obtaining accommodations. Butler exhaustively detailed these problems via a forty-one page formal memo to Rhonda Adams dated December 18, 2015 (Pla. App. 118–58).

58. Despite candidly sharing with SMU administrators her needs and reasons for seeking leave and accommodations, even the most minor of requests were denied on increasingly preposterous reasons, the most ridiculous of which is that neither SMU nor the Law School had notice.

59. A small cache of the voluminous documentation covering Butler's FMLA and ADA requests appears in Pla. App. 118–207. A few overarching takeaways from these documents: (a) Administrators erratically switched positions on who had the authority to hear Butler's requests. (b) Butler was simultaneously accused of failing to provide documentation substantiating her requests and slammed for making those disclosures. (c) Administrators, like Collins and Adams, backchanneled with faculty

and others spread rumors that Butler was lying about the legitimacy of her FMLA and ADA requests despite being privy to documentation that substantiated their bona fides. (d) Administrators like Collins unjustifiably insisted that Butler's requests required inordinate documentation to approve, yet simultaneously told Butler that if she tried to provide it directly that broke SMU's rules. (e) No reasonable administrator operating free of bias could possibly have concluded that Butler was not ill or that she had not properly made FMLA and ADA requests given the voluminous documentation she submitted even as SMU's demands grew ever more onerous and bizarre.

### Bias Compounded at the Margins

60. The homogeneity of the faculty and its hostilities toward minority faculty, made it difficult for many at the Law School to grasp that Butler was being mistreated. (Pla. App. 222).

61. A culture of distrust and skepticism about the value of minority professors at the Law School (Pla. App.). no doubt clouded some administrators and faculty members' judgment when Butler and her family members got seriously ill (see, e.g., Pla. App. 222–29, 293–98)

62. Though much of the mistreatment happened in plain sight, Butler's plight was invisible to some because they did not grasp that her multiple identities coupled with her deteriorating health compounded the hostilities to which she was subjected. (Pla. App. 294–96).

25

63. Butler's minority colleagues, however, could readily see precisely what was happening to her. As one example, Jessica Weaver confided in Butler that she was getting physically and emotionally ill over the Law School's mistreatment of her. She used stark terms to characterize what happened: *"It's like they lynched you"* and *"I see how they destroy people."* (Pla. App. 299).

**Butler's Doomed Bid for Tenure**

64. Butler's tenure bid was far from normal and, ultimately, appears doomed from the start. *Cf.* Pla. App. 278 (describing in great detail the Law School's struggles to treat minority faculty fairly).

65. **Culture of tenure discrimination and retaliation.** (a) Before Butler even arrived at the Law School, there was a long history and established culture of withholding tenure and promotions from Black professors. *See, e.g.,* Pla. App. 278. (b) Members of the faculty who voted on Butler's tenure application had in the past withheld tenure female colleagues women who complained about sex discrimination (Pla. App. 228). (c) Alarmingly, Dr. Ghosh attests that named Defendants Anderson and Forrester—along with other voting members of the faculty—had previously been involved in a truly bizarre bias incident. In brief, Ghosh warned a Black professor who applied for a professorship at the Law School about the toxic environment and poor outcomes of other Black men who were forced out in the past (Pla. App. 278.). When the Dean learned of this, he banded together with Defendants Anderson and Forrester and other faculty to publicly censure Ghosh at a sting emergency faculty meeting that a special Committee of the SMU Faculty Senate condemned as violating

university rules. Dr. Ghosh's recollection of the disturbing experience (Pla. App. 222–28) is backed-up by documentation in the record (Pla. App. 274–88).

66. ***References to disability and leave requests in tenure process.*** Though tenure decisions are supposed to be narrowly focused on scholarship and teaching (¶2), records Defendants point to in defense reflect that decisionmakers openly prodded Butler's disabilities and requests for leave and that these inquiries, which some baselessly concluded reflected that Butler lied about making or being entitled to leave and accommodations, were repeatedly referenced in the tenure process.

67. **Procedural irregularities.** Butler encountered considerable deviations and some outright refusals to abide by the Guidelines and Bylaws during her tenure bid, including: ***Multiple tenure committees.*** Butler had three different tenure committees, the last of which was assembled midway through the Fall 2015 term, leaving just days for the committee to review years of Butler's work that is supposed to be done over a period of years. Anderson admits that it is not normal for the Law School to reconstitute tenure committees weeks before the Committee's vote is rendered. (Pla. App. [Anderson Dep p. 12–13]).***Shifting internal deadlines.*** In both the Fall 2015 and Spring 2016 terms, Butler was repeatedly advised of arbitrary and ever changing hard deadlines for steps in the tenure process that appear nowhere in the Guidelines or Bylaws. *See, e.g.*, Pla. App. 92–93 (Butler is told that there is a hard and fast November 16 deadline to submit her tenure box, despite Collins and Anderson candidly discusses on a private email chain that there was no plan for the tenure box to be complete by that time).  In nearly every case, administrators and faculty blamed

Butler personally for deadlines imposed upon her from on high. *See, e.g.*, Pla. App. 166. Moreover, Collins repeatedly blamed Butler for missing deadlines she herself set (see, e.g., Pla. App. 196–97). ***Interference by Collins with other decision-makers.*** The Guidelines  and Bylaws along with the AAUP's Statement (¶1_) spell out the specific order of tenure review and clarify the roles of all decisionmakers in the chain. Despite this, Collins intervened at nearly every stage, influencing others to look at Butler's tenure bid negatively. *See, e.g.*, Pla. App. 62, 92, 106, 108, 109, 165. ***Appeals unavailable.*** Both the Bylaws and Guidelines establish clear junctures at which candidates may appeal a decisionmaker's tenure vote. Nonetheless, normal appeals were unavailable to Butler. Most glaringly, Collins adjudicated Butler's appeal of the Faculty vote herself, when the Bylaws provide that it is the Dean's role to bring the appeal to the Faculty directly for consideration. See discussion *supra* ¶ 18.

68. **Heightened scrutiny.** The record also reflects that Butler was subjected to heightened scrutiny throughout the tenure evaluation process, including: ***Demands for unnecessary documents.*** Butler was repeatedly asked to supply the same documents, like her curriculum vitae, over and over again to the Third Committee while being falsely accused of failing to submit it in the first place, as was done in the Tenure Report (¶14). The Third Tenure Committee also demanded that Butler submit truly bizarre materials, such as old student exams, with little notice and no legitimate justification. *Compare* Pla. App. 93 *with* Pla. App. 229–31. None of these unnecessary document demands are reconcilable with the directions Butler received from Norton when he was still chair of the Second Committee (Pla. App. 32–34). Glaringly,

28

Norton's instructions were shared with Collins so she *knew* what Butler had been instructed and nonetheless attacked Butler for not providing documents Collins herself previously deemed unnecessary (Pla. App. 35). ***Teaching.*** Butler's teaching was bizarrely surveilled and criticized in the Fall 2015 term in anticipation of her tenure bid. As one example, Dr. Ghosh, who also taught Torts at the Law School, reports that teaching with prepared lecture notes and reading from a casebook is perfectly normal (Pla. App. 231). Despite that, the Tenure Report  and Collins' negative recommendation treat these as evidence that Butler is an incompetent teacher.

69. **Distorted Teaching Standard.** The Bylaws expressly detail things that *should* be taken into consideration when evaluating teaching, including: (i) teaching effectiveness, (ii) professor's accessibility in and outside the classroom, (ii) supervision of written student work, (iv) development of new course materials (Def. App. 44). The Bylaws also identify three kinds of evaluations that *must* be considered: (i) the report of the candidate's advisory committee, (ii) student evaluations, and (iii) opinion of faculty who are familiar with the candidate's performance (Def. App. 44). These are not the standards applied to Butler's tenure bid (Pla. App. 296). Several examples illustrate the disconnect: ***Hyper-focus on 53 days when Butler was ill.*** Both the Guidelines and Bylaws instruct that the totality of the tenure candidates' performance during the probationary should be taken into account in tenure decisions. However, the Second Tenure Committee only evaluated Butler for approximately three months and did not take into consideration the assessments of

the First Committee beyond simply reading their March 2014 contract renewal letter. As Professor Anderson explains, "generally a committee works for a much longer period." (Pla. App. 85). ***Ignoring evidence of good teaching.*** Anderson's evaluation focuses limitedly on his personal observations of Butler teaching Torts I on two occasions in Fall 2015, Anderson did not take into account Butler's teaching of any other classes, including those that he admits had positive evaluations (Pla. App. 86). Both Anderson and Collins fail to take into account the evidence Norton summarized in a formal memorandum speaking to Butler's teaching bona fides (see Pla. App. 37–44). ***Outsized weight on odd factors.*** Many of the criticisms of Butler's teaching fixate on supposed problems that are in reality bizarre details or make problems out of nothing. These are not appropriate evaluations—appropriate assessments should give a holistic assessment of the professor's aptitude and pedogeological approach (Pla. App. 243). Assessment is supposed to be of the "whole package," not issues in isolation (*id.*). When it comes to peer evaluations, those should be focused on pedagogy and provide feedback on classroom presence and interaction, not the substance of the course (*id.*). It is patently absurd, as one example, to critique a professor for using notes or reading straight from a casebook during a large lecture course (Pla. App. 244). And yet, that is precisely what the Tenure Report and Collin's negative recommendation do. **Fatal critiques of teaching are a red flag for bias.** As Professor Ghosh explains, "No professor is a perfect teacher. If someone is having difficulties with teaching, this is usually easily fixed during the probationary period because one's committee intervenes early and often to make sure the candidate is connected

with additional resources (e.g., specialized trainings) to help them improve their craft" (Pla. App. 243). A committee not "intervening to ensure success under the teaching criteria sounds like someone was setting a trap to ensure the candiate did not get tenure" (*id.*). "[A] tenure denial premised solely on a candidate's supposed poor teaching is highly unusual and likely suspect" (*id.*). ***Inexplicable refusal to admit Butler's skill as a teacher.*** Even where pushed to admit that Butler has objective qualities of a skilled teacher, decisionmakers still do mental gymnastics to try to justify their negative recommendation. Anderson is a prime example. At deposition, Anderson candidly shares that Butler is "a brilliant person [and] has all the attributes to be a—I think superb teacher." He goes on to explain that Butler is "personable, charismatic, articulate, as I say, extremely bright. And she has a talent that very virtually I think is God given in that she can command a room, and that's a very important tool for a teacher so gifted. So her classroom presence and ability to control a classroom, I would rate as superb." He nonetheless goes on to say that those things do not make Butler a "good teacher." Then later admits that his opinion is, at bottom, a subjective not objective evaluation of Butler's teaching because he held the personal belief that Butler did not desire to be a good teacher. (Pla. App. [Anderson Dep 50–51]).***Temporally impossible claims.*** Many of the specious attacks made on Butler's teaching are premised on impossible timelines. Again, Anderson is a prime example. In the Tenure Report Anderson critiques Butler's teaching in part by arguing that he had "talked at length" with Butler about her teaching and negative reports from others *before* he visited her classes. However, that could not possibly have occurred.

Anderson was not seated on the Third Committee until September 27, 2015—two days before his first visit (¶12). This doubt on Anderson's capacity to have confirmed as of the first class "many of the negative comments from colleagues and students" which the Tenure Report reflects were elicited *after* Anderson completed both of his visits. ***Glaring contradictions.*** Butler's critics almost all deride her teaching in ways that their own evaluations undercut. As one example, Anderson claims Butler is a terrible teacher based on his observations, but then concludes student evaluations proved his "pessimism to be misplaced" (Def. App. 65). As another, Anderson accuses Butler of both being "ill-prepared" for class and simultaneously using her prepared lecture notes—which obviously evidence preparation for class—too much (Def. App. 63). ***Collins' Heightened Scrutiny.*** Rather than premise her decision based upon the Faculty's recommendation, Collins inexplicably deferred to the Third Committee's rationales alone and then purported to add additional analysis she herself undertook which is not called for or appropriate under the Guidelines and Bylaws. ***Shoddy analysis.*** Even if Collins' additional analysis were permissible, her methods were fatally flawed. (a) Collins misrepresents students' enthusiastic support of Butler's tenure bid which is *premised* on her skill as a teacher of Torts I and Torts II. Collins claims she has only heard positive feedback from students directly concerning Butler's seminars courses (Def. App. 156). However, there is evidence that multiple alums directly wrote to Collins lauding Butler's prowess in Torts classes which go on to recommend Butler for tenure premised *on her superb teaching* (*see, e.g.,* Pla. App. 47–48). (b) Collins purported to identify objective measures of Butler's poor teaching

by compiling student evaluations from the Spring 2015 term—one of nine semesters Butler taught at SMU—and compared Butler's student evaluations to all other faculty, none of whom had the same teaching package as Butler let alone the same cohort of students. Glaringly, Collins hyper-focusses only on Butler's Torts II class, ignoring positive reviews of her other course, and contraposes Butler's scores against her two male cohorts who taught classes other than Torts II in Spring 2015 (Def. App. 156). (c) Collins goes on to purportedly independently assess materials the Third Committee claimed it reviewed and, at points, inexplicably asserts she assessed documents the Third Committee claimed were not in the "tenure box" (such as past exams), casting doubt on whether Collins in fact reviewed the documents she claims she did. *Compare* Def. App. 158 (purporting to review past exams) with Def. App. __ (claiming no past exams were provided). (d) Collins takes particular umbrage at Butler's supposed mishandling of her Fall 2015 Critical Race Theory seminar. She claims in pertinent part that Butler mishandled the end of the class starting in December 1, 2015 (Def. App. 160). This is an inexplicable criticism given the fact that Collins was well aware that Butler was on FMLA approved leave between November 18 and December 21, 2015 (Pla. App. 171). Thus, any problems with students in the CRT course were the responsibility of the instructor the Dean assigned to take over the class, not Butler's while she was on leave. While elsewhere in her letter Collins acknowledges' Butler's poor health (Def. App. 158), she inexplicably fails to mention she is accusing Butler of malfeasance when she was out on leave.

33

70. ***Where is Butler's Tenure Box?*** Butler's tenure box is to date still unaccounted for (Pla. App. 298). This is particularly troubling given that the tenure box is the alpha and omega of tenure review. Professors spend months preparing their tenure box with their committees and colleagues and each and every decisionmaker in the process is supposed to have access to it. Butler reports that colleagues advised her years ago that once her tenure box was delivered to Collins, pieces of it went missing (Pla. App. 298).

## III.   STANDARD OF REVIEW

In addition to the standard articulated by Defendants (SJ Mot. at 18–19), Professor Butler points out the following:

Review of Butler's claims touching on her tenure application and the ultimate denial of tenure should be afforded normal judicial review, not deference as Defendants insist. SJ Mot. at 20. Universities accused of violating civil rights laws are held to the same standard as non-academic employers. *Univ. of Penn. v. EEOC*, 493 U.S. 182, 190 (1990) (Title VII totally "expose[s] tenure determinations to the same enforcement procedures applicable to other employment decisions"); *Jepsen v. Fla. Bd. of Regents*, 610 F.2d 1379, 1382–83 (5th Cir. 1980) (citing *Sweeney v. Bd. of Trustees*, 439 U.S. 24, 24–25 (1978)) (applying *McDonnell Douglas* test to academic adverse action); *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 550–51 (3d Cir. 1980) (Congress did not intend that those institutions which employ persons who work primarily with their mental faculties should enjoy a different status under Title VII than those which employ persons who work primarily with their hands[.]").

Where a university insists that it applied its own objective standards at the time tenure is denied, it cannot avoid judicial review by insisting in litigation academic tenure decisions are inherently subjective. *Tudor v. Southeastern Okla. St. Univ.*, 13 F.4th 1019, 1030 (10th Cir. 2021) (refusing invitation) (citing *Carlile v. South Routt Sch. Dist.*, 739 F.2d 1496, 1500 (10th Cir. 1984) ("Despite the fact that courts are reluctant to review the merits of tenure decisions, such decisions are not exempt under Tilte VII. Plaintiffs seeking to show discriminatory purposes in tenure or reappointment decisions out to have available means of challenging such decisions.")).

In discrimination and retaliation cases, employers must do more at summary judgment that proffer a bald, self-serving defense. "An articulation not admitted into evidence will not suffice. Thus, the [employer] cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 9 (1981).

Relatedly, an employer cannot ignore let alone block this Court's consideration of evidence at summary judgment on the pretense that it *might* not be admissible at trial. C*ontra* SJ Mot. at 17 n.5. "The admissibility of evidence is governed by the same rules, whether at trial or on summary judgment." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 387–88 (5th Cir. 2009). However, "the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017).

"[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no [factfinder] could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, should refrain from credibility calls and deny summary judgment where a recording offers at least some support for the nonmovant's version of the events. *Moes v.* Mahmoud, 2021 WL 4132220, *11 (E.D. Lou. 2021) (citing *Comeaux v. Sutton*, 496 Fed.Appx. 368, 371–73 (5th Cir. 2012)).

Even though this case is set for a bench trial, binding Fifth Circuit precedent teaches that this Court "has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result." *U.S. Fed. & Guar. Co. v. Planters Bank & Tr. Co.*, 77 F.3d 863, 866 (5th Cir. 1996). As one example, summary judgment is inappropriate where it turns on credibility determinations of witnesses—such judgments must be made by the Court at the bench trial. *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978).

## IV.    ANALYSIS AND AUTHORITIES

### A. Breach of Contract Claim

SMU breached its March 2011 contract (Count 9) with Butler by (1) failing to follow its rules in adjudicating her tenure bid and her related appeals and complaints and (2) failing to guard and/or remedy other discrimination and retaliation.

At the threshold, academic employment contracts are not treated with kid gloves. Defendants' reliance on *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992) is misplaced and the portion quoted is taken out of context. *Spuler* speaks to procedural due process challenges where a tenure process is created by the government acting as an employer, not a private university's employment contracts with tenure track faculty. Similarly, *Halper v. Univ. of the Incarnate Word*, 90 S.W.3d 842, 845 (Tex. App.—San Antonio 2002, no pet.) is also inapt. Butler grieves SMU's failure to follow all of the steps of the tenure process (¶¶ 12–19), which *Halper* itself recognizes as being required as a matter of state contract law.

Lastly, Defendants did not follow their own rules in denying Butler tenure. Among other wild deviations from the Guidelines and Bylaws (¶ 2): (a) Dean Collins adjudicated Butler's appeal of the faculty vote herself, when the Bylaws plainly state that it is the faculty, not the dean decides the appeal; (b) Collins missed the deadline to submit her recommendation to the Provost, and (c) Provost Curral considered Butler's application before Collins issued her decision, skipping and then reversing the order of decisionmakers.

### B. Family and Medical Leave Act Claims

**1. FMLA retaliation is cognizable.** Butler's FMLA retaliation claim (Count 24) survives. Butler's FMLA retaliation claim is supported by evidence of a hostile environment. Retaliation is expressly prohibited by statute. 29 U.S.C. § 2615(a)(2). And the Fifth Circuit recognizes that evidence of a hostilies is probative of retaliation. *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 335 (5th Cir. 2005).

Consequently, it is of no moment that some trial courts in and outside of this Circuit have *questioned* whether a standalone FMLA environmental claim is viable.

**2. FMLA privacy violations are also cognizable.** Dismissal of the FMLA invasion of privacy claim (Count 25) is also inappropriate. Butler's disclosure of medical information in the course of requesting FMLA leave is not a "voluntary disclosure." A "voluntary disclosure" is one that the worker makes to the employer *not in connection* with an FMLA inquiry. *Ashely v. City of San Antonio*, 2018 WL 4016484 *4–5 (W.D. Tex. 2018) (if rule were otherwise it would "return[] employees to the very bind Congress sought to avoid by enacting the confidentiality requirement") (quoting *Doe v. US Postal Serv.*, 317 F.3d 339, 343–45 (DC Cir. 2003) (voluntary submission of FMLA request does not constitute a "voluntary disclosure")).

**3. Curral and Collins are FMLA employers.** The FMLA claims brought against Curral (Counts 24 and 25) and Collins (Counts 23–26) also survive. The FMLA defines an "employer" as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 26111(4)(A)(ii)(l). The Fifth Circuit teaches that an FMLA employer is substantially identical to a Fair Labor Standards Act (FLSA) employer, thus both FMLA and FLSA precedent is instructive. *Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006).

"[P]ersons with managerial responsibilities" who exercise "substantial control of the terms and conditions of the work of the employees" as employers. *Falk v. Brennan*, 414 U.S. 190, 195 (1973) (FLSA). Individuals are statutory employers where they "effectively dominate the employer's administration or otherwise acts, or

has the power to act, on behalf of the employer vis-à-vis its employees." *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (FLSA) (cleaned up).

Curral and Collins' attempts to escape the employer label fail on this record. There is evidence that both Curral and Collins were involved in Butler's FMLA requests (see, e.g., ¶¶ 19, 22), noticed of leave when granted (see, e.g., Pla. App. 171), discussed and notified others of the supposed merits of Butler's leave requests (¶ 23; Pla. App. 166), directed subordinates to ignore Butler was on leave to force her tenure application through (see, e.g., Pla. App. 106). Moreover, both Curral and Collins bear culpability for the FMLA violations Butler grieves because they at the very least were partially responsible. *Rudy v. Consolidated Rest. Co., Inc.*, 2010 WL 3565418, at *6 (N.D. Tex. 2010) (recognizing that employer label appropriately attaches to person who is "responsible in whole or part of the alleged violation), *report & recommendation adopted*, 2010 WL 3565422 (N.D. Tex. 2010).

4.Prima facie cases of FMLA interference is established.   Defendants interfered with Butler's attempts to secure FMLA leave (Count 23) as well as with job restoration (Count 26). The fact that Butler received some FMLA benefits, does not absolve Defendants of liability for their interference with her FMLA rights. Defendants actively interfered with her obtaining more significant leave, delayed Butler's access to leave depriving her of the benefits of the FMLA, forced her to work while on FMLA leave undermining the leave itself, and interfered with full job restoration (Pla. App. 118–58, 159–62, 301). These are all forms of FMLA interference. *See, e.g.*, *Park v. Direct Energy GP, LLC*, 832 Fed.Appx. 288, 293 (5th

Cir. 2020) (FMLA interference reaches refusals to authorize leave as well as "discouraging an employee from using such leave"); *D'Onofrio v. Vacation Pub., Inc.*, 888 F.3d 197, 210 (5th Cir. 2018) (citing *Evans v. Books-a-Million*, 762 F.3d 1288, 1297 (11th Cir. 2014) (coercing employee to work while on leave constitutes interference).

      **5. Dismissal of the FMLA retaliation claim is improper.** There is no merit to Defendants challenge that the retaliation claim (Count 25) fails because there is neither a causal connection or that, alternatively, denying her tenure is not retaliatory because she was unqualified for tenure.

      To begin, a prima facie case of FMLA retaliation has been established. Butler (1) was protected under the FMLA, (2) suffered adverse actions, and (3) the adverse actions were taken against her because she sought FMLA protection. *Acker v. General Motors, LLC*, 853 F.3d 784, 790 (5th Cir. 2017).

      Defendants' wild mischaracterization of Butler's retaliation claim cannot save them. This claim is about so much more than just the tenure denial.  Butler alleges that in opposition to her protected FMLA activities, deprived her of a tenure clock extension, spread false rumors about her requests and complaints, applied pressure by way of intimidation and coercion of Professors Weaver, Armour, and others to silence those who supported Butler exercising her rights, and improperly injected Butler's FMLA requests and the supposed merits thereof into the tenure evaluation process. Butler exhaustively explained this to SMU via a formal, forty-page memo in December 2015 (Pla. App. 118–59). She also alleges—segregated her in the

workplace, which Defendants admit outright in their brief explaining that Buter was demoted and not restored to her job upon returning from leave (SJ Mot. at 47). SMU also retaliated against Butler by withholding her upon her return (Pla. App. 301).

Efforts to harass, demean, defame, and humiliate a worker who attempts to exercise their FMLA rights is retaliation. 29 U.S.C. § 2615(a)(1) (defining as retaliatory acts that "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter"). As is refusing to restore a worker to her job upon return from leave. *Devoss v. Southwest Airlines Co.*, 903 F.3d 487, 491 (5th Cir. 2018) (recognizing that employees have an "entitlement to be restored to their position after going on FMLA leave [] independent of any requirement that the employer act with discriminatory intent).

The causality argument also lacks merit. Defendants insist that there is no evidence that their nonretaliatory rationale for denying tenure (that Professor Butler was unqualified) is pretextual. This is flatly wrong for at least three reasons.

Looking just at the tenure denial, this claim survives. Butler need only show that there is some evidence that she was qualified for the position at summary judgment. The pertinent inquiry "is not whether an employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that she possesses the objective qualifications necessary to perform the job sought." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). There is no question here that Butler, as a tenure-track professor green lit to go up for tenure at the end of her probationary period was qualified to be

considered for the job. Whether Butler should have ultimately gotten the job requires making credibility judgements and a close look at the evidence. Defendants can't avoid that scrutiny by simply doubling down on their proffered nonretaliatory rationale.

As to the tenure clock extension, the claim also survives. There is strong evidence that Defendants' withholding of the extension was pretext for retaliation. SMU claimed at the time that the following premises undergirded its decision to deny the tenure clock extension: (a) Butler was seeking the extension to give her time to improve her teaching and/or scholarship (Pla. App. 109–10) and (b) she was going to teach full time during the period of the proposed extension (Pla. App. 113). But those rationales are unworthy of credence—the decisionmakers were well aware that Butler was seeking the extension because she was ill and she had already actively sought and put SMU on notice of her desire to take a leave and, with that, stop her tenure clock. Indeed, Stanley acknowledges Butler raised those precise points in her request for the extension when he denied it (Pla. App. 114).

An additional reason why the tenure clock extension decision can be deemed retaliatory is that  there is evidence that SMU treated similarly positioned workers who didn't take FMLA better. Under Policy 6.13.1 untenured faculty who take a leave without pay can stop their tenure clock (Pla. App. 109). Not only did SMU administrators not share that key piece of information with Butler, but their own email chain working out why they wanted to deny Butler's request evidences that they were treating Butler's request differently than  they would have if she had

42

sought it outside the FMLA process. *Hester v. Bell-Textron*, 11 4th 301, 306 (5th Cir. 2021).

Another reason why both the tenure denial and denial of the tenure clock extension are retaliatory is that there is evidence that the proffered rationales are so infirm—riddled with "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). Examples of pretext include prior treatment of plaintiff, disturbing procedural irregularities (such as falsifying or manipulating criteria), and use of subjective criteria. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). Among other things, there were most certainly procedural irregularities when it came to both the denial of tenure and extension of the clock.

An additional reason that Defendants' nonretaliatory rationale for denying Butler tenure is infirm is that they have yet to produce a very necessary piece of evidence to establish that they actually denied Butler's tenure on the merits. Setting aside the fact that Defendants did not follow their own rules for tenure, they have yet to even try to establish that they evaluated Butler's tenure application on the merits because they refuse to produce Butler's tenure box into evidence. The tenure box is supposed to be the alpha and omega of the review process—it compiles all the evidence that the committee and subsequent decisionmakers are supposed to review (¶70). Without it, it is impossible to know what materials the decisionmakers had in

43

front of them to consider let alone to check their written negative recommendations against the evidence of merit they supposedly reviewed. This is a very serious failure given other evidence in the record that Collins and potentially other decisionmakers tampered with Butler's tenure box (Pla. App. 298–99).

### C. Disability: ADA/Rehabilitation Act and TCHRA Claims

1.**Attacks of discrete act discrimination lack merit.** Butler's segregation in the workplace (Count 18), associational discrimination (Count 19), and invasion of medical privacy (Count 20) all survive. Defendants' challenges to all three claims fail for the same reason—they are each cognizable forms of discrete act discrimination.

The segregation in the workplace claim (Count 18) survives. Bizarrely enough, the very case Defendants purport to rely on to dismiss this claim freely quotes and affirms that workplace segregation violates the ADA. SJ Mot. at 30–31 (quoting *Cannizzaro v. Neiman Marcus, Inc.*, 979 F.Supp. 465, 474 (N.D. Tex. 1997) (Solis, J.)).

Defendants' attack on the associational discrimination claim (Count 19) is also infirm. Once again, one of the cases Defendants cites cuts against them. *Besser v. Texas Gen. Land Off.*, 834 Fed.Appx. 876, 887 (5th Cir. 2020) (citing 29 C.F.R. § 1630.8), recognizes that the ADA prohibits associational discrimination. The worker's claim in *Besser* failed because it was not properly pled, not because it was uncognizable. 834 Fed.Appx. at 887 ("Besser has not sufficiently alleged illegal associational discrimination").

Defendants' challenge to the invasion of medical privacy claim (Count 20) is also fatally flawed. They do not even attempt to point to authorities supporting this

44

absurd position.. This Court need not and should not have to undertake independent research to help Defendants make their merits argument. *United States v. Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016) ("[O]urs is a party-directed adversarial system and we normally limit ourselves to the arguments the parties before us choose to present."). That said, employers are obliged to treat medical information obtained through the ADA process as confidential. 42 U.S.C. § 12112(d)(B). Defendants' contention that Butler's participation in the ADA process made her disclosures "voluntary" and thus unprotected is total nonsense. When an employer conditions ADA accommodations or FMLA leave on disclosure of medical facts, it is obliged to keep the employee's medical status confidential. *Doe v. United States Postal Serv.*, 317 F.3d 339, 442 (D.C. Cir. 2003).

Lastly, Butler's TCHRA disability discrimination claim grieving her tenure denial (Count 29) survives for the same reasons articulated *supra* Part IV-B-5.

**2. Failure to accommodate disability in tenure bid.** Butler's failure to accommodate claim (Count 21) grieves SMU's refusal to engage in the iterative process when Butler requested that her tenure clock be stopped so that she could go through the grueling tenure process in a year when she was not seriously ill. That is, Professor Butler sought an accommodation in connection with seeking a promotion from tenure track professor to tenured professor. SMU's tenure rules freely permitted faculty to apply for tenure on the fifth or sixth year (¶ 3). Despite repeated requests, SMU denied Butler's requested accommodation, forcing her to go through the tenure

process without pause even when she was out on FMLA and ADA leave in the 2015–16 academic term (¶ 23).

SMU incredulously asserts that the ADA offers no protection against an employer's refusal to accommodate an employee's disability when she is seeking a promotion. SJ Mot. at 33 (arguing that because "tenure" is not an essential function of a "tenure track" professor's job, failure to make accommodations in the promotion process is uncognizable). Far from it.

It is true that a disabled employee does not have a right to a promotion. *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). However, employers are obliged to engage in the iterative process where a worker seeks accommodation in connection with seeking a promotion. Indeed, the Northern District has previously recognized that an employer's obligation to engage in the iterative process is triggered when the worker merely inquires about accommodations available in connection with applying for a promotion. *Tidwell v. Exel Global Logistics, Inc.*, 2008 WL 360999, at *2 (N.D. Tex. 2008) ("That plaintiff did not apply for a promotion is irrelevant to defendant's obligation to investigate a reasonable accommodation.").

SMU's assertion that Professor Butler was not "a qualified individual" strains credulity. There is nothing in the record even suggesting that Butler was unqualified to apply for tenure. Quite the opposite—the Renewal Report expressly recognizes she was so qualified (¶ 6).

SMU's contention that its refusal to engage in the iterative process is excused because the accommodation Butler initially requested—"stopping the tenure clock"—

46

was merely her preferred accommodation is fatally flawed. The iterative process is supposed to be a back-and-forth process. An employer cannot categorically reject the accommodation and satisfy its obligation. And yet, that is precisely what SMU did. *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) ("employer's unwillingness to engage in a good faith interactive process" triggers violation).

**3. SMU misapprehends disability harassment.** SMU charges that Professor Butler's disability harassment claim (Count 16) is infirm because there is "no evidence of harassment." That is a patently absurd position to take on this record. Butler was repeatedly mistreated, demeaned, and insulted because of her disability and in connection with her efforts to seek accommodations as well as when she filed complaints grieving mishandling of her requests. Moreover, SMU forced Butler to work while she was seriously ill and participate in the tenure process (and appeals) she had repeatedly advised she was too ill to navigate. When Butler "returned" to work in April 2016, SMU further demeaned her by stripping her of her normal teaching duties and research support, segregating her from her colleagues and students. She was also repeatedly ridiculed by her colleagues and administrators who offishly insisted her disabilities were not real and accused her of being a liar.

**4. Tenure denial claim is viable.** The challenge to the disability discrimination tenure denial claim (Count 17) fails for the same reasons articulated *supra* Part IV-B-5.

**5. Retaliation claim is viable.** The challenge to the disability retaliation claim (Count 22) fails because there is causality here. SMU is wrong about the

sequencing of events. Butler sought ADA accommodations prior to and during the tenure decision-making process (see, e.g., Pla. App. 198–201). Moreover, Butler grieves additional adverse actions other than the Tenure Report's negative recommendation none of which Defendants even attempt to grapple with.

### D.  Race: Section 1981, Title VII, and TCHRA Claims

**1.  Individual Defendants are personally liable under Section 1981.** Section 1981 claims for race discrimination (Count 10), discrete act discrimination (specifically, denial of tenure) (Count 11), and retaliation (Count 12) are properly brought against the Individual Defendants.

University professors and administrators who exercise control over faculty positions and titles held by the grieving professor. *See Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 337–38 (5th Cir. 2003); *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997) (citing with approval *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986), (holding that plaintiff could bring §1981 claim against individual members of tenure committee for denying plaintiff tenure if individuals were personally involved in the discrimination and if they intentionally caused the college to violate plaintiff's right to contract), *aff'd on other grounds*, 481 U.S. 604 (1987).

Even if the Individual Defendants provided only "information" to the decision-making authorities at SMU (SJ Mot. at 39), liability still attaches under the cat's paw theory. Exercise of judgment by the ultimate decisionmaker does not prevent the earlier agent's action from being the proximate cause of harm. *Fisher v. Lufkin*

*Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). Moreover, the "information" Individual Defendants provided the ultimate decision-maker (Defendants do not name it, but presumably the president), actually bolsters liability because Defendants all urge that the information was generated to provide the decisionmaker with a basis to make its determination. *Fisher*, 847 F.3d at 334–35.

**2. Racially hostile environment is established.** Defendants' brazenly insist there is no evidence of racial hostilities. That kind of posturing cannot satisfy their burden on summary judgment where there is a record replete with hostilities (*see, e.g.*, ¶¶ 37–49, 60–63).

**3. Burden on tenure denial claims is met.** The challenge to the racial discrimination tenure denial claims (Counts 11, 14, and 27) fail for the same reasons articulated *supra* Part IV-B-5.

**4. Retaliation claims survive.** Counts 12, 15, and 28 charge that Defendants retaliated by (a) denying Butler tenure and (b) conducting sham investigations of her complaints. These claims survive for the same reasons articulated *supra* Part IV-B-5.

### E. Sex Discrimination Claim

The pure legal challenge to Butler's Title IX sexual hostile environment claim (Count 30) is infirm because Title VII does not totally preempt Title IX. The Supreme Court *has never* held that Title VII preempts Title IX. In fact, forty years ago, the Supreme Court clarified that Title IX's "broad directive that 'no person' may be

discriminated against on the basis of gender appears, on its face, to include employees as well as students." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 520 (1982); *id.* at 529 ( in explaining that Title IX is not preempted by another part of the Civil Rights Act of 1964, "[i]t is Congress' intention in 1972, not in 1964, that is of significance in interpreting Title IX"). Moreover, the Court construes the metes and bounds of Title IX protections in cases where the complained of conduct arose in the workplace. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) (holding employee's Title IX retaliation claim is viable).

Defendants' reliance on *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995) is misplaced. *Lakoski* turned on the assumption that since the Supreme Court had not decided a Title IX employment case, there was a jurisprudential inference that Title VII preempted Title IX. 66 F.3d at 754–55. The inference *Lakoski* drew cannot survive *Jackson*. Recent decisions by the Fifth Circuit reflect the same. *See, e.g.*, *Minnis v. Bd. of Sup'rs of Louisiana St. Univ. and Agr. And Mech. Coll.*, 620 Fed.Appx. 215, 222 (5th Cir. 2015) (recognizing *Jackson* as setting forth the standard for Title IX employment retaliation claims); *Trudeau v. Univ. of N. Texas,* 861 Fed.Appx. 604, 607–08 (5th Cir. 2021) (similar).

## V.   CONCLUSION

For all the reasons explained above, Professor Butler respectfully asks that this Court deny Defendants' motion and permit her case to be heard on the merits.

Dated: February 19, 2022

Respectfully submitted,

<u>/s/ Ezra Young</u>
Ezra Ishmael Young
NY Bar No. 5283114
ezra@ezrayoung.com

**LAW OFFICE OF EZRA YOUNG**
210 North Sunset Drive
Ithaca, New York 14850
(949) 291-3185

John L. Green
TX Bar No. 00784165
Jlgreen488@aol.com

**LAW OFFICE OF JOHN L. GREEN**
4888 Loop Central Drive, Suite 445
Houston, Texas 77081

**ATTORNEYS FOR PLAINTIFF
PROFESSOR CHERYL BUTLER**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 19, 2022, I electronically filed a copy of the foregoing with the Clerk of Court by using the CM/ECF system, which will automatically serve all counsel of record.

/s/ Ezra Young

Ezra Ishmael Young