IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

CHERYL BUTLER, ) 3:18-CV-00037-E
)
Plaintiff, )
)
VS. ) DALLAS, TEXAS
)
JENNIFER M. COLLINS, ET AL )
)
Defendants. ) APRIL 24, 2026

------------------------------

TRANSCRIPT OF

SHOW CAUSE HEARING

VOLUME 1

BEFORE THE HONORABLE ADA E. BROWN

UNITED STATES DISTRICT JUDGE

------------------------------

A P P E A R A N C E S

Ezra Ishmael Young
Law Office of Ezra Young
210 North Sunset Drive
Ithaca, New York 14850
Phone: (949) 291-3185
E-mail: Ezra@ezrayoung.com

## C H R O N O L O G I C A L   I N D E X


**April 24, 2026** **PAGE**

Proceedings....................................4

Court in Recess................................126

Reporter's Certificate.........................127


## E X H I B I T   I N D E X

COURT'S EXHIBITS:


| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 1 | Sealed Documents in Appendix 1 | 7 |
| 2 | ECF Document 208 | 19 |
| 3 | Sealed Documents in Appendix 3 | 25 |
| 4 | Sealed Documents in Appendix 4 | 25 |
| 5 | Dropbox Link Screenshot | 40 |
| 6 | Screenshots of Appendices 1-4 Link | 38 |
| 7 | Screenshots of Social Media Post | 42 |
| 8 | Screenshots of Social Media Post | 38 |
| 9 | Sealed Documents in Appendix 2 | 23 |
| 10 | 9/2/25 Social Media Post Screenshot | 48 |
| 11 | 11/21/25 Social Media Post Screenshot | 48 |
| 12 | 2/21/25 Social Media Post Screenshot | 48 |
| 13 | 8/28/25 Social Media Post Screenshot | 50 |
| 14 | 5/6/24 AUSA Press Release | 51 |
| 15 | NACP "Lynching Record for 1920" Report | 61 |
| 16 | 12/6/1920 The New York Times Screenshot | 61 |
| 17 | 7/23/25 Social Media Post Screenshot | 64 |
| 18 | Screenshot of Rebecca Nagle Reposting | 64 |
| 19 | Duke Class of 2025 Photo | 67 |
| 20 | Duke Graduation Celebration Screenshot | 69 |
| 21 | Screenshot of Thurgood at Halloween | 74 |
| 22 | 7/7/25 Social Media Post Screenshot | 76 |
| 23 | 4/4/26 Screenshot of Judge Brown's Phone | 15 |


* * * * *

(P R O C E E D I N G S)

THE COURT: All right. On the record. The Court calls Civil Action No. 3:18-CV-00037-E, styled Cheryl Butler, Plaintiff, v. Jennifer M. Collins, Steven C. Currall, Julie Forrester Rogers, and Harold Stanley.

We're here today on the Court's order to show cause.

And I'll read into the record, in an order dated November 17th, 2025, in ECF Number 205, this Court ordered all briefing relating to recusal and sanctions to be filed under seal. It appears former counsel for Plaintiff, Mr. Ezra Young, may be in violation of this order as of today's date, by publicly posting sealed documents; including, but not limited to, at a website located at www.ezrayoung.com. This website contains documents that are accessible to the general public, potentially in violation of this Court's November 17th, 2025, order.

And so the Court ordered Plaintiff, Mr. Young, to appear today in person for a hearing at 3 o'clock in this court to show cause, one, whether Mr. Young violated the Court's order at ECF Number 205, regarding filing sealed documents; two, whether Mr. Young violated Federal Rule of Civil Procedure 11; three, whether Mr. Young should be held in contempt or otherwise sanctioned.

The purpose of this hearing is to give Mr. Young

an opportunity to show cause why he should not be held in contempt of Court or sanctioned. The only individual or party facing potential contempt or sanctions is Mr. Young.

Mr. Young may file any response to this order by 5:00 p.m. Central Standard time, April 23rd, 2026. Any such filing should be filed under seal. And the Court requested the clerk direct the order to Mr. Young by mail [sic].

And so the Court has a person in court, and I ask them to make their appearance for the record, please.

MR. YOUNG: Yes, Your Honor. My name is Ezra Ishmael Young.

And if I may just offer one correction. I realize Your Honor was reading your order. It -- I think it was just a typo. It identifies me as Plaintiff.

THE COURT: Oh, counsel, former counsel for Plaintiff.

MR. YOUNG: It says that the first time. And then the second time it says Plaintiff.

THE COURT: Oh --

MR. YOUNG: And I realize the Court's super busy. I was just going to --

THE COURT: -- I appreciate that. I will put a little caret on it and I'll go back and fix it.

The Court hereby orders counsel for Plaintiff.

Thank you, Mr. Young.

MR. YOUNG: And, Your Honor, if we could just be a little bit more correct. Former counsel, because I'm not an attorney in this court anymore.

THE COURT: Oh, okay. Well, I'll let you quibble about semantics, okay?

MR. YOUNG: Yes, Your Honor.

THE COURT: Glad to have you here.

Are you Mr. Young, Mr. Ezra Young, one in the same who's been in this Court since your appearance on the case?

MR. YOUNG: Yes, Your Honor. We've met, I think, a couple other times.

THE COURT: Okay. Well, I mean, what I'm asking you is, are you the same lawyer who made the notice of appearance, who's previously been before this Court?

MR. YOUNG: Yes, Your Honor.

THE COURT: Okay. You and I have actually met in person on a prior show cause; fair?

MR. YOUNG: Yes, in, I believe, a status hearing via Zoom.

THE COURT: Well, we met in person on a show cause --

MR. YOUNG: Yes, Your Honor.

THE COURT: Okay. All right. Just making sure we're on the same page.

Any objection to me taking judicial notice of the

filings on the ECF filing system?

MR. YOUNG: What filings, Your Honor?

THE COURT: The docket --

MR. YOUNG: The docket that exists?

THE COURT: Yeah.

MR. YOUNG: No, Your Honor.

THE COURT: Okay. So by consent, I'm going to talk about those. And let me give you kind of a headline for what you can expect today.

MR. YOUNG: If I may, Your Honor, would it be okay if I use the podium?

THE COURT: Sure, when it's your turn. If you'll have a seat for now.

MR. YOUNG: Okay. Thank you, Your Honor.

THE COURT: Yeah. So I'll give just you the lay of how this works.

So what I'm going to do is ask you some questions, talk to you about some things. Learn some information. And then I will hand it to you to make any presentation you'd like; show cause as to why you shouldn't be sanctioned. And we will take it from there.

And so I want to begin by talking about Exhibit Number 1 to my show cause order, which is at ECF Docket 205. And it's an order that says -- I'm going to read it.

It's two paragraphs, Nikki.

Before the Court is Plaintiff Cheryl Butler's motion to withdraw, which seeks withdrawal of local counsel Andrew A. Dunlap. The Court grants withdrawal of Andrew A. Dunlap, ECF Number 204. However, Butler no longer has local counsel. The Court orders Butler to obtain local counsel on or before December 5th, 2025.

And it makes reference to a local rule.

The Court previously ordered briefing related to recusals and sanctions; makes reference to order 203. And in order 205, the Court herein orders, all caps, all briefing relating to recusal and sanctions to be filed under seal. For clarification, the Court is not considering any sanction on Plaintiff Cheryl Butler individually. The only sanction the Court is considering at this time is whether to revoke counsel Ezra Young's pro hac vice.

So ordered, the 17th day of November, 2025.

And so you've read the show cause notice and the attachments. And so before I ask you any questions, I'd like my court reporter to put you under oath, since you're not an officer of the court anymore.

(Mr. Young sworn.)

THE COURT: Have a seat, please.

So I'm going to -- Mr. Young, you own the website www.ezrayoung.com, don't you?

MR. YOUNG: I am pretty sure I -- for -- in

perpetuity, yes.

THE COURT: Okay. Do you have care, custody, and control of its contents? Can you upload and download documents to your own website?

MR. YOUNG: Yes. Sometimes not successfully, but yes.

THE COURT: Well, you have a lot of documents on your website. So I'd say you're pretty successful.

Is it fair to say you're the one who uploads and lets people download?

You act mystified by that question. Should I rephrase it, sir?

MR. YOUNG: No, Your Honor. I was just going through in my head to make sure I've never had a clerk or a student or anyone --

THE COURT: Well, let me ask a better question, then. Because you're being show caused for your behavior, and so let me narrow it down for you.

What I'm trying to find out is, were you aware of the Court's order, 205, ordering you, Mr. Ezra Young, to file any briefing relating to either sanctions or recusal under seal? You're aware of 205, aren't you?

MR. YOUNG: Yes, Your Honor.

THE COURT: All right. And is it fair to say -- let me get my little list out here. Actually, why don't you

give me the list.

What websites do you control? I know we have ezrayoung.com. What else do we have? You're hosted by Squarespace; is that right? Something like that?

MR. YOUNG: Yeah. I -- I'm telling the truth. I'm just a little not tech savvy. Squarespace is like a platform that allows you to edit things. And I think technically there's like a domain registration that's handled by GoDaddy, and all these other things.

THE COURT: And I'm not trying to get that high level. So let me ask a better question.

MR. YOUNG: Yes, Your Honor.

THE COURT: What I'm trying to figure out is, are you morally, ethically, legally, and for all good reasons to be here in this Court, responsible for documents that this Court has ordered, cleanly and clearly, to be filed under seal? If they are out on the internet, in connection with the name Ezra Young, would that have connection to you? Would that be an act that you have done?

So let me just ask you a crazy hypothetical. Let's say you go by the name of something like, I don't know, Ezrasaurus on Facebook. And that you provided a Dropbox link to all of your 20,000 people who pay attention to you on Facebook. And that you provided a link to sealed documents that were guided by my order 205.

And just work with me. If you were to allow members of the public to download, read, take documents that dealt with either sanctions or recusals -- that were properly filed under seal, per this Court's order, on this Court's docket -- if you were to take them out to the internet, and throw them out like candy, would that be in violation of Rule 205?

MR. YOUNG: Does Your Honor mean ECF --

THE COURT: Order -- I'm sorry, yes. Would you be in violation, if you publicly allowed people access -- free access. Not through PACER. Not with this Court's permission -- to sealed documents? Documents this Court has ordered to be filed under seal, whether you like it or not. If you provided plain access to anyone who would click on your Dropbox to those sealed documents, would you be in violation of this Court's ECF Number 205 sealing order, yes or no?

MR. YOUNG: Well, Your Honor, I'm a little confused. Because in the order to show cause, the -- and I'm looking at it right in front of me -- I was asked to show cause based upon three exhibits, and I don't see anything. I see a --

THE COURT: Well, I -- I've got some exhibits for you.

MR. YOUNG: Okay, Your Honor.

THE COURT: Sure. I mean, are you denying that you publicly uploaded these documents? I've got you under oath, just remember that.

MR. YOUNG: Yeah, Your Honor. Again, I'm -- I did a lot of due diligence going through my website, trying to be very specific as to this order.

THE COURT: Well --

MR. YOUNG: I'm prepared to talk about that. I can say, Your Honor, that I do store a lot of my law firm and a lot of my personnel files on Dropbox.

THE COURT: Okay. You're talking about collateral matters. So let me help you with this.

Okay. You're on a show cause for violating a specific order.

MR. YOUNG: Yes, Your Honor.

THE COURT: So in the show cause order, I really try to have it all turnkey.

At your website, ezrayoung.com, when you click on Legal Work, you can click on a bunch of documents. And one of them is Appendix Volume 1, December 2025, all right? And when I click on that -- and I clicked on it this morning.

MR. YOUNG: Uh-huh.

THE COURT: Uh-huh.

MR. YOUNG: Yes, Your Honor.

THE COURT: Yeah. Is that your website?

MR. YOUNG: Yes. And those are filings on the Fifth Circuit's docket, Your Honor.

THE COURT: And some of those fili- -- well, they're not on the Fifth Circuit's docket. They're on your website, aren't they?

MR. YOUNG: Well, no, Your Honor. I believe these are copies of as-filed documents filed in the Fifth Circuit.

THE COURT: Well, if they were filed somewhere else, that doesn't mean they don't violate this rule. If they were filed in the Fifth Circuit, the Fifth Circuit has sealing rules. And I'm not talking to you today about that at all.

What I'm talking to you about is that Ezra Young -- and also at some Facebook and Twitter accounts that we'll talk about. That's all. That's all I'm talking about.

MR. YOUNG: So you --

THE COURT: Let me talk. Let me phrase it for you.

MR. YOUNG: Uh-huh.

THE COURT: All I'm asking about -- I'm not asking about law clerks or any storage devices. What I want to know is, are -- I'm going to have my assistant hand this to you.

When I clicked this morning on Appendix 1 --

MR. YOUNG: Yes.

THE COURT: -- on your website, I found my sealed documents at your site. So I want you to take a look at those and tell me, did you have anything to do with those being posted at ezrayoung.com? And that's a yes or no question.

MR. YOUNG: Is it possible that this is -- one second.

So I haven't seen this version of the document, Your Honor. At the top, it -- there's -- it looks like the ECF, like, automatic stamps. And for documents -- at least any document that I have filed under seal in this Court, when you file it under seal, I think as of last year, when the sealing rules changed, the attorney doesn't get this.

THE COURT: Okay. Well, I'm asking -- I'm not asking about like Fifth Circuit filings. I'm not even talking about filings on my own Court's docket.

What I'm talking about, Mr. Young, just to be clear, and to get us back home here is, at www.ezrayoung.com, this morning -- literally this morning I printed that out. And when I -- let me finish, so I can get us where we need to go, keep us in our lane.

When I clicked on your website, documents this Judge right here ordered to be under seal, those documents -- which I'll represent to you, all of which on

the docket, properly filed, are sealed -- are available to anyone who clicks on them on your website.

MR. YOUNG: So, Your Honor, I'd ask that the Court provide a URL. Because, again, I've never received -- I did e-mail the court clerk, actually, when I was trying to figure out how to serve these --

THE COURT: So let me pause you. Pause, pause, pause. So you want me to provide you a URL to your own website, www.ezrayoung.com?

MR. YOUNG: No, Your Honor. The link that Your Honor says that the Court clicked this morning.

THE COURT: I clicked your web- -- where's my iPhone? Yeah, we're just going to do an in-court experiment so that we can just cut through the nonsense.

MR. YOUNG: Yes, Your Honor.

THE COURT: Okay. I'm going to take judicial notice of my own phone in a minute.

(Brief pause.)

THE COURT: Ezra Young is your personal website, though, correct?

MR. YOUNG: It is, Your Honor. I think I can explain. And this might just be a paperwork snafu.

THE COURT: It's not a paperwork snafu, I assure you.

MR. YOUNG: Okay, Your Honor.

THE COURT: That's what you told Judge Cauthron. When you got caught posting things in her court, you explained it was a misunderstanding and --

MR. YOUNG: Your Honor, I didn't post anything in the Western District of Oklahoma.

THE COURT: I think you did. We'll talk about that a little later, too.

MR. YOUNG: Okay, Your Honor.

THE COURT: Okay. So here's what I'm going to do.

MR. YOUNG: Yes, Your Honor.

THE COURT: I am, right now, opening up my Google, and I'm going to go to -- ready? -- www.ezrayoung.com.

Here we go. And when I go to your website, ezrayoung.com, boom, here's a picture of you. You look just like that, sir. Pops up, Biography.

And I'm going to click on these little three bars right now live. And when I click on Legal Work, oh, wow, look at this. I scroll down. And, look, we've got equal protection, election law, writ of mandamus. And we've got things that were also filed in the circuit, and also filed in this Court. And also uploaded to Twitter and to Facebook, I will tell you. But also on your website.

And so, for example, just real live time, I'm going to click right here on Appendix Volume 1. It says December 2025. I'm going to touch that PDF. Boom, and

163 pages pop up.

Now, whatever you've got in front of you, I guarantee you is this.

MR. YOUNG: And I can tell you, Your Honor, it's not. This has demarcations on it that reflect someone pulled it from this Court's docket in a form that attorneys never get. Because it says: Ex parte, under seal.

Attorneys, at least in this Court, when you file under seal, at least as of, I think, 2025, there's no like link to click to download anything.

THE COURT: Okay.

MR. YOUNG: And so like I -- I literally don't have a copy of this.

THE COURT: So you don't recognize these documents at all?

MR. YOUNG: No. Your Honor, I'm saying Your Honor asked me is this on my website. This set of papers, Your Honor, is not.

THE COURT: Okay. Well, I -- I'm going to take judicial notice of the fact that it is, because I downloaded it today. And I will give it to you, Mr. Young -- I mean, you've been before this Court for incremental efforts at rehabilitation of your constant misbehavior, which has obviously failed miserably. I'll give it to you for standing on business on sanctionable behavior. I mean, you

are the first show cause I've ever had where like, literally, in my own courtroom, I can pull up the file.

MR. YOUNG: But, Your Honor --

THE COURT: Hold on. I don't have a question on the floor. I get that you want to talk about a header or something, but let's take the header off. Let's just talk about the content of stuff.

Like, for example -- give you a good, firm example. I think we will both agree -- let me pull this for you.

For example, ECF Number 208, okay, whatever the header is, whatever the header says, is Defendant's Response to Ezra Young's Response to Order to Show Cause. And it was filed by an attorney named Kim Askew. And in it, she asked for sanctions against you. And she asked that I yank your pro hac vice, and I did.

Would you agree with me that something asking to yank your pro hac vice would be sanctions, yes or no?

MR. YOUNG: If I -- again, that's not noted in the show cause --

THE COURT: I'm asking you --

MR. YOUNG: -- to my recollection. Yes, Ms. Askew filed something. I'll assume that it's 208, I don't recall.

THE COURT: Well, I tell you what. I don't want to play hide the --

MR. YOUNG: I believe it's about three pages long, Your Honor; is that correct?

THE COURT: You're about to see it, sir.

MR. YOUNG: Okay.

THE COURT: I'm going to make this Court's Exhibit 2, just so we're all on the same page.

And I tell you what, don't even fuss about the header, okay? Just look at the content, and then I'm going to ask you a question.

(Brief pause.)

THE COURT: You'll agree with me that deals with sanctions, yes or no?

Where'd you go to law school again?

MR. YOUNG: One moment, Your Honor. I'm trying to read the document.

(Brief pause.)

THE COURT: Do you recognize it? That's a four-page document; you're taking quite some time, sir. It's going to be a long hearing.

You've looked at it now, Mr. Young. And so here's my question for you. Is that a document dealing with sanctions, yes or no?

MR. YOUNG: I believe it's Defendant's response to an earlier order to show cause.

THE COURT: That's the name of it.

MR. YOUNG: Yes.

THE COURT: It asks to yank your pro hac vice, which is something bad that happens. What else would you call that in court? I would call that a sanction. What would you call it?

MR. YOUNG: To remind the Court, I have autism. I was checking to see if Ms. Askew used the word "sanction." That's all, Your Honor.

THE COURT: Yeah. Well, you mentioned that the first time you were in trouble, that you had autism. What you're being show caused for -- and I've got friends with autism. I helped raised someone with autism. Has nothing to do with that. I don't know anybody whose autism makes them violate Article III rules. So whatever you think you have, I promise it has nothing to do with the alleged misbehavior.

MR. YOUNG: Your Honor just said Article III rules?

THE COURT: Yeah, well -- yeah, federal judge rules.

MR. YOUNG: Yes, Your Honor. I'm just making sure we're on the same page. I believe you used a helpful phrase the last hearing. I don't want to butcher this. Something with ships missing each other?

THE COURT: Yeah, you -- we're not ships missing

in the night. I think that's not what's happening here.

So let's go back and -- and let me ask some real pointed questions, okay?

MR. YOUNG: Yes, Your Honor.

THE COURT: Do you recognize that document?

MR. YOUNG: Not this specific one. I was given one, again, without headers. But I believe I received this from Ms. Askew via e-mail at some point.

THE COURT: All right. And that resulted in you no longer being a member of this Bar, correct?

MR. YOUNG: I believe this Court issued a summary order that same day. And then --

THE COURT: Let me back up. I'm not asking about -- like, I'm not wanting to know what time things were made. What I'm trying to do is get to square business. I'm just going to ask you some yes-no questions, where we don't go off in the weeds, okay?

So that -- I will represent to you that should have been filed under seal. That was properly filed under seal on this Court's docket. It is available right now, as I click. And I'm looking at it now on your website, at ezrayoung.com. Whatever hyperlink you want to call that --

MR. YOUNG: I --

THE COURT: -- don't talk over me. Don't talk over me.

And so my question to you is, you're aware of the order that says not to publicly allow documents that are supposed to be sealed to be revealed. You're aware that that's the purpose of the whole order, yes or no?

MR. YOUNG: Your Honor, I --

THE COURT: Just answer yes or no, Mr. Young. These are not difficult questions. Yes or no, you were aware that the purpose of a sealing order is so that things remain contained under seal? That's the point, yes or no?

MR. YOUNG: I'm aware that this Court issued an order directing things to be filed on this Court's docket under seal.

THE COURT: That's not how it works. Okay, so let me ask you this. If I order you to not do something, to not commit some act under my Article III power --

MR. YOUNG: Uh-huh.

THE COURT: -- and you hop on your plane and you go to LaGuardia. Because you're now in New York, are you no longer subject to that rule, because you have moved from the location where the rule was given? Is it your -- are you telling this Court today, with a straight face, that whatever you do on the internet with the Court's documents, as long as you don't violate them, I guess, in this courtroom, that that -- somehow that's not violating the sealing order?

So let me ask this a better way. I'm not going to get you to agree, apparently, that you recognize things or that you know what rules are. So let me just back up and say, this is your website and you do control it, yes?

MR. YOUNG: Yes.

THE COURT: Okay. So let me show you, when I clicked on Appendix 2 today, this morning, I found even more sealed documents. Yeah. Documents that were properly filed here --

MR. YOUNG: I --

THE COURT: -- don't talk over me. Listen, don't talk over me ever. Don't. You have a real problem doing it. Don't do it again at all. Period. I'll let you know when it's your turn to talk, and it's not.

So Appendix 2, I downloaded.

If you would hand that to Mr. Young.

Mr. Young, I represent to you today I downloaded this from www.ezrayoung.com. And it contains documents that, per several of this Court's orders; including ECF Number 205, should have been under seal. And they were publicly available to whoever wanted to look at them on your website.

And all I need to know is, do you deny or admit that? Because I don't want to discuss it. And I'm not going to --

MR. YOUNG: This is not Appendix 2, Your Honor.

THE COURT: Well, what makes it -- what do you think makes it different other than a header?

Well, hang on a minute. Let me click on Appendix 2.

No, that's Appendix 2. I just pulled it up.

MR. YOUNG: If I may, Your Honor?

THE COURT: I pulled it up. So all I'm asking you -- I'm not asking you to agree with it. I'm just asking you, are you in control of that site?

MR. YOUNG: Your Honor, this is not Appendix 2.

THE COURT: Okay. Well, I -- I'm saying that it is, is what I'm saying. You can disagree with that. You can call it Appendix whatever. Is that on your website right now --

MR. YOUNG: No.

THE COURT: -- in any form?

MR. YOUNG: There is a copy of Appendix 2, as filed in the Fifth Circuit. That is what I'm looking at, Your Honor.

THE COURT: Okay. When you say "as filed in the Fifth Circuit," are you saying like it links to PACER?

MR. YOUNG: I'm saying it is the copy of Appendix 2 that I filed in the Fifth Circuit, and that was like spit back out at me by PACER.

THE COURT: Okay. Well, what I'm talking about are my documents, with my header, that are on your website. I don't know what your headers say.

MR. YOUNG: And --

THE COURT: Don't talk over me.

You are here not for anything in the Fifth Circuit. My court orders have been violated on ezrayoung.com. And so if you are here at your show cause hearing acting completely perplexed about documents that I found this morning on your website, I'm not sure how well this hearing's going to go.

So let me go ahead and hand you Appendix 3 and 4, and see if these look completely, absolutely unfamiliar also. Because I will represent to you, as an officer, I guess, of my own court, that these sealed documents I pulled down from your website, too.

And don't worry about the headers. Look at the content. All of these things deal with sanctions and recusals, in this Court's opinion and expertise. So I'll give you a chance to look at them.

MR. YOUNG: So the document that -- or, excuse me. Are these all -- okay. These are all Appendix 3?

THE COURT: I'm handing you what came from your website this morning.

MR. YOUNG: So again, Your --

THE COURT: So pause for a second. Here's what I don't want to hear you do: Chatter about things. So look at it, and then I'm going to ask you some questions. Let me know when you're ready.

MR. YOUNG: I have a question, Your Honor?

THE COURT: No, I'm not entertaining any at this time. I have questions for you.

MR. YOUNG: Okay, Your Honor. Yes, Your Honor.

THE COURT: My question is, were you responsible in any way, header or not, for documents that should have been filed, according to my Court's order, under seal, being publicly available on your website, yes or no? And there's only one answer to that, and it is either the word "yes" or it's the word "no."

MR. YOUNG: Not these documents. These aren't on my website, Your Honor.

THE COURT: Okay.

MR. YOUNG: Wait, Your Honor --

THE COURT: No, no. You've answered my question. You've answered --

MR. YOUNG: You -- you asked me about two different exhibits, and I haven't --

THE COURT: I -- okay. So here's how this works. You're -- I have met you so many times, trying to rehabilitate what you're doing here. So I'm just going to

say some things out loud that need to be said, all right?

MR. YOUNG: Yes, Your Honor.

THE COURT: You are here for several things. Let me tell you what you're not here for, just to set aside concerns.

When I read your briefing, you seem to be very, very, very concerned about this Court retaliating against you for investigations, either real or imagined, in your mind.

So I do want to tell you before we dive in, I'm not aware of any such investigations. So if there have been some and they exist, I promise I don't hold it against you. I think you've been a lawyer about ten years; is that fair? Ish?

MR. YOUNG: 12, I believe.

THE COURT: 12 years, okay. So I'm 51. I became a judge at 30. So I've been doing this a little while, too. I can tell you anecdotally, just to give you a flavor for who your judge is, and kind of how I roll, literally by the time I was 30, I had been jumped in court by a rapist's father, who attacked me because I sent his son to prison for rape.

And I tell you that only to tell you, that's kind of a -- like, that's an interesting story, right? I can't tell you today the name of the rapist, the name of the dad.

And I declined to press charges.

I say that to you to set aside any fears or concerns you may have that some investigation you have launched, past, present, or future, will color how I look at this. Or any of these alleged violations.

What you're here for today has nothing to do with any motion to recuse, or anything you have said or done to the Court. The Court is discussing this with you, because I am concerned at what I see as a disturbing pattern of misbehavior towards lawyers of color, that I see in your actions towards counsel, both opposing and those who preceded you on this case.

And so let the record reflect this is an African American woman judge making these findings. I think that what is going on in this case -- and we're going to talk about some of the e-mails you've sent, and some of the temper tantrums you've thrown, and some of the racial bullying you've done of lawyers who preceded you in the case and opposed you. We're going to talk about that.

The -- I think what's happening here, quite candidly, is you are very intimidated for some reason, Mr. Young, with Black excellence, in light of your White mediocrity. Yeah. Right? You should write that down. I mean, you -- I'm -- you look like a White man, right?

MR. YOUNG: I'm not White, Your Honor.

THE COURT: Oh, okay. What are you?

MR. YOUNG: I'm Latino, Your Honor.

THE COURT: Oh, okay.

MR. YOUNG: I took my wife's name, so it doesn't show as easily anymore.

THE COURT: Well, you are White-presenting; is that fair to say?

MR. YOUNG: I'm fair-skinned, Your Honor, yes.

THE COURT: All right. Will you agree with me that when you accuse Black attorneys of misconduct, when you do it, you have White privilege; fair? I mean, if -- I'm just going to make this up.

If you stood up, let's say, and talked to a Court, and told him that -- told this Court of people that Black lawyers had hidden evidence and lied to the Court, and done all kinds of nefarious things, would that be a misuse of your White male privilege?

(Brief pause.)

THE COURT: I mean, I'm talking to the secretary of the African American, what is it?

MR. YOUNG: The African American Policy Forum, Your Honor.

THE COURT: Okay. That sounds very important. And so I'm guessing that you do lots of things for African Americans; fair?

MR. YOUNG: Yes.

THE COURT: You're an ally, right?

MR. YOUNG: I'm not sure I'd use that word. But, yes.

THE COURT: Well, I mean, I'm just going to keep it real with you.

MR. YOUNG: In the Gen Z parlance, yes.

THE COURT: Okay. I have not paid a lot of attention until recently into the finer points of the discovery disputes in this case. Until you have begged for my notice. And now you have it.

And so I spent the past few days kind of catching up on the shenanigans in this case. And I'll tell you that since you entered in, I think it was like January-something of 2022 -- there's a category on Reddit called The Main Character. Have you ever seen it?

MR. YOUNG: I have not, Your Honor.

THE COURT: Okay. Well, it's about a person who, whatever's happening, it is just all about them.

And so I can tell you, having presided over beaucoup cases, that when you came on to the stage in the Butler v. Collins case, you very much became the main character, Mr. Young. And you immediately displayed what this Court believes is a disturbing pattern of bullying Black lawyers. And I want to talk about some of that.

So, for example, including, but not limited to, last time you were before this Court, I cautioned you, as Black folks would say, about keeping people's names out of your mouth, or calling people out their names. You know what that means.

MR. YOUNG: I do not, Your Honor.

THE COURT: On the African American, what was it again?

MR. YOUNG: The African American Policy Forum.

THE COURT: They don't teach you that? So --

MR. YOUNG: We're a legal think tank, Your Honor.

THE COURT: Okay. Well, I can tell you that -- I'm just going to read from Document 148. And this is you bad-mouthing, we'll just call it, Black Lawyer Number 2, for this case.

All right. In her motion for reconsideration, Professor Butler asked this Court to free her from further collaboration with Black Lawyer Number 2, a former lead counsel in this case whom she terminated the week of January 3rd, 2022. While the overarching reasons for relief are properly elucidated in the merit's motion, the evidentiary support Professor Butler proffers should be accepted under seal.

And so what you say is: Exhibit 1 is a 16-page declaration, with 38 pages of marked exhibits, made by

Professor Butler. This document candidly reveals privileged attorney-client communications, and otherwise -- and here comes the disturbing pattern: Elucidates a disturbing course of conduct for Mr. Black Lawyer Number 2, that ultimately precipitated the undersign's appearance in this matter, and Black Lawyer Number 2's termination...

It also explains in gross details problems with the summary judgment opposition briefings that Black Lawyer Number 2 told this Court could be completed and timely filed.

And then you say: Additionally, Professor Butler asks that the Court also give due consideration to her preference that she not be forced to disclose the extent of Black Lawyer Number 2's mistreatment to opposing counsel -- to you -- and defendants, let alone the general public, while her merit case litigation is live.

So that was Black Lawyer Number 2. And so let me just read something from -- let's pick another Black lawyer whom you bullied and abused, in this Court's opinion.

Oh, here's one. Here we go. I'll do this one.

Okay. This is Document 158-2, Black Lawyer Number 1. And, by the way, I've got to tell you, when I read this, it reads like a very racist Downton Abbey, where you're sort of the Earl of Grantham, and all of the lawyers on the case are your servants, who are Black.

Kim, good morning. At the threshold, thank you for your offer to share contacts with the court reporters. Please do go ahead and ask your paralegal to share those.

I most certainly understand how litigation costs are traditionally covered. To be honest, I'm utterly unclear what Black Lawyer Number 1 paid or didn't pay on this case... all Black Lawyer has told me is that over the two-plus years he worked on this case, he estimates he billed slightly over 100 hours. I think that limited amount of work helps explain much of the mess in this litigation to date.

And so one of the things that you asked opposing counsel, a Black lawyer who does not work for you, to do is: If you could also relay the letters and any responses you might have received to outstanding discovery requests, I'd really appreciate it. I don't see any discovery correspondence to file.

And then later you say: Professor Butler had some serious issues with two sets -- other Black lawyers -- both of whom she terminated for good reason. Unfortunately there are a lot of terrible, parentheses, Black plaintiffs' lawyers out there. This isn't too surprising to me, even if quite disappointing.

And so you have another little temper tantrum: I hear your concern re your belief of prejudice on Defendants

because of the discovery screw-ups. The, quote, file is so piss-poor that it's hard to discern what on earth might have been produced to you, let alone Black Lawyer Number 2's rationales for not producing materials he was directed to produce by his client. I will personally assure you Professor Butler did not intend to withhold discovery.

And so I'll give you another example. Black Lawyer Number 3 files a declaration with the Court:

Mr. Young, Ms. Butler's attorney, accuses me of having a practice and pattern of promising Ms. Butler that I would draft filings in this manner and then not do it. This is not true. Ms. Butler voluntarily e-mailed me several drafts. Most of them 50 pages in length. I relied on Ms. Butler's briefing, first, because she's a scholar in this subject matter; and, second, because she's most knowledgeable of the facts.

Throughout my representation of Ms. Butler, I have been frank, direct, and supportive. Even when she did not make her financial obligations, I continued to represent her. My goal has always been to matriculate her case.

And later on it says: According to the case management log, Mr. Young has only viewed one document since I granted him access. Plaintiff has chosen to expend valuable time filing declarations, in hope of the Court eventually granting an extension to file a response, instead

of using that time to complete the opposition brief. I have made myself available to Plaintiff and her lawyer to assist in doing so. So I'm replying so that the Court can get the complete story.

And so this is Black Lawyer Number 3 saying: I object to the misrepresentations made in this motion, because Plaintiff is committing a fraud upon the Court.

And in another filing, a Black lawyer, whom you abused and bullied, asked to be let off the case, because continuing to stay on would be an ethical violation.

So it's a disturbing pattern of misbehavior. And as a Black judge, it is my duty to call you out on it. And so you've misbehaved throughout this case. You call lawyers who are not Black with honorifics. You call Black lawyers by their first names, despite having been told repeatedly not to do so.

You treat them like they are servants and stupid, and in need of your help. When they don't throw the fight -- I mean, I'm going back to some of your shenanigans. When I was reading the recap of this file, it -- like I learned so much about you, Mr. Young.

You are certainly the main character in everything. But maybe the wildest racial bullying example I would give, is you demanding that opposing counsel reopen discovery when it had closed, and the case had been won for

them, essentially, to their client's detriment. And when they refused to do so, you did what -- I'm not sure what your generation would call it. We would call them Karens and Chads, my age.

Do you know what that is?

MR. YOUNG: I'm familiar with Karen, not Chad.

THE COURT: Okay. Chad is the man version, okay?

MR. YOUNG: Okay.

THE COURT: Yeah. It's someone who calls the manager when they don't get their way. They stomp their foot when the rules are supposed to apply to them, right?

And so I've read lots of e-mails. I'm giving you a little synopses of them, just to kind of give you a flavor. But a disturbing pattern that this Court has seen, since your entry and exit in the case, of you abusing Black lawyers, who don't need your help and don't want your help.

And so I think it needs to be addressed. It needs to be addressed, just like your filings online do.

And I want to ask you a little bit more about that, too. What are your handles on Twitter?

MR. YOUNG: It's probably some version of my real name.

THE COURT: Okay.

MR. YOUNG: I think it may be Ezra I. Young, but I don't recall.

THE COURT: So the last time we had a show cause hearing, do you remember that?

MR. YOUNG: Yes, but I haven't recently reviewed it.

THE COURT: Okay. Well, I'm going to represent to you that before that show cause hearing -- let me find this so I can just hand it to you -- you filed a response to the notice to show cause the morning of the hearing. And I remember that because I -- when I was going back and re-reading the transcript, Ms. Askew had not had the ability to prepare a proper response to rebut your recent filing, because you gave it to her that morning. And you filed it on the Court's docket that morning.

I'm going to ask you a true or false question. Is it true or false that you provided that filing to the press before you provided it to the Court or opposing counsel? True or false?

MR. YOUNG: I don't recall. I don't think I sent it to anyone, other than I believe I e-mailed it to opposing counsel the evening before. And then I believe I finally got unlocked out of PACER the morning of.

THE COURT: So if I had a screenshot of you sending it to a Texas Appellate writer, encouraging them to take a look, before you gave it to opposing counsel so they could be prepared, would that be crazy? Would that sound

familiar at all?

MR. YOUNG: Your Honor, I honestly don't recall.

THE COURT: Okay. I'm going to hand you some more exhibits.

So I'm going to hand you Court's Exhibit 6 and 8. And all I want you to do is tell me if these are your social media accounts.

MR. YOUNG: So Court's Exhibit 8 appears to be an e-mail with iPhone screenshots of what --

THE COURT: Is that -- the screenshot is of your Facebook and Twitter, yes?

MR. YOUNG: Yes, 8 appears to be Facebook and Twitter, or X, whatever it's called today.

THE COURT: Whatever it is now. And when it has the little globe symbol like that, will you agree with me that means that anybody who clicks on it can read whatever you have? That's what the world symbol means, right?

MR. YOUNG: I don't see that symbol, Your Honor.

THE COURT: Well, look on it. It's on one of them.

MR. YOUNG: Okay. I apologize, I don't see a globe.

THE COURT: Okay.

MR. YOUNG: But I'm familiar with that being public versus limited, yeah.

THE COURT: And I don't know how many followers you have. I think when I looked this morning it was, say, 20,000 on one of them. Something like that. Or --

MR. YOUNG: No, Your Honor.

THE COURT: -- well, whatever. Let me ask you this. Will you agree with me that you had documents that were properly sealed on this Court's document linked to a Dropbox, where anybody on Facebook or X could click on them, and download and read sealed documents from my court; yes or no?

MR. YOUNG: No, Your Honor. These both plainly reflect Fifth Circuit filings.

THE COURT: Well, what I'm talking about are not Fifth Circuit filings. I'm talking about if you see little blue hyperlinks, it clicks down to a Dropbox where you have all of the court filings.

Here, let me help you. Here's Court's 5. Yeah, take a look at this. This is an interaction between you and a member of the press, where you give them a little synopsis about how crazy this case -- this case being the case in this court -- and you have a link to, quote, everything in the case. And then a link to Dropbox.

And when I clicked on it, guess what? It was to all my sealed documents.

MR. YOUNG: So, Your Honor, for Court's

Exhibit 5 --

THE COURT: Uh-huh.

MR. YOUNG: -- this shows something that's dated March 2023.

THE COURT: Uh-huh.

MR. YOUNG: I don't believe there's anything that was sealed in March of 2023.

THE COURT: I think it was. I think it was, Mr. Young.

So are you -- remember that you are under oath, and remember -- we will follow up with subpoenas probably after this. And so it behooves you to be honest with this Court at this point.

Are you really trying to tell me with a straight face that you didn't have this Court's documents available to the public on X, on Facebook, on Ezra Young, and some other sites?

MR. YOUNG: So, Your Honor, again, I would need to --

THE COURT: No, you don't need to anything.

MR. YOUNG: -- click these and see what they lead to. But in 2023, I don't believe there was any sealing order.

THE COURT: Okay. The -- how about we just -- you're a master of minutiae. How about we take all of that

to the side and we'll just deal with today. What I just pulled up on my phone just two minutes ago.

I represent to you, whatever the header looks like, I know my own sealed documents, and they are on your website. They also have been uploaded to Facebook and Twitter. And I'll represent that, even though you seem to act like you have no idea about it.

So I just want to ask you a question, a leading question. Are you telling this Court, under oath, that you did not in any way upload or make available documents this Court believes should be sealed, per an order, whether you like it or not, to the members of the public, yes or no? And I just want a yes or a no.

MR. YOUNG: No, Your Honor.

THE COURT: Okay. Before you leave -- actually, I'll give you until probably Monday. I need you to provide, with declaration, a list of all of your social media handles. I believe that you are not being honest with this Court, based on evidence I have before me.

The credible evidence I have seen, that I have pulled up myself, shows you to be in open defiance of this Court's order. That you act like you have no idea about it is very consistent with your misbehavior in this case. Any time you are faced with facts that definitely prove you did something wrong, you get complete amnesia.

So let's move on. Let me ask you about this.

Would you hand this Number 7? Thank you.

And just take a look at it. I don't want you to comment on it. I just want to ask you a couple of questions about it.

So it appears, when I look at that, that you are claiming publicly that a lawyer who was on this case was fired. And so my question to you is, what facts and evidence do you have to support that belief? Not feelings; facts and evidence, do you have that the person mentioned there was fired, like you said on Facebook?

MR. YOUNG: There's no person mentioned here. It says: Troutman took over, as SMU fired DLA Piper law firm.

THE COURT: There's a lawyer's name mentioned there, isn't there? Kim Askew?

MR. YOUNG: Oh, apologies, Your Honor. Who, in turn -- yes, Your Honor.

THE COURT: Yeah, how did you miss that?

MR. YOUNG: Sorry, Your Honor. I woke up at 3:00 a.m. this morning. I'm a little tired. But you're right, Your Honor. I see that at the bottom of this page.

THE COURT: So you posted on Facebook that a woman who you've already -- if you will recall, you have already been in trouble with this Court for maligning, making baseless accusations.

Remember the tenure box game you played? When you couldn't get discovery to reopen, you claimed that Kim Askew didn't give you a tenure box. You claimed it, even though there was absolutely no evidence to support that claim. It was clearly untrue. I made those findings on the record, and you persist in those claims.

You also made all kinds of allegations much like that to prior Black counsel, who competently, by the way, represented Ms. Butler, until your White savior-ness showed up to help us all. To help all the Black lawyers who don't know how to do anything. The case was going fine until you came.

I want to know why. Why would you post something like that about a fellow lawyer? Do you believe that to be true? And if so, why? Who told you that?

MR. YOUNG: I do, Your Honor.

THE COURT: Okay. Who told you she was fired?

MR. YOUNG: I believe it's explained in the brief to the Fifth Circuit, Your Honor.

THE COURT: No, it's not.

MR. YOUNG: It is, Your Honor.

THE COURT: It's not. It's not. You have no facts to support that, Mr. Young, because it's a lie. It's a lie that Kim Askew was fired from anything.

You made it up out of whole cloth. Just like you

lied and said Andrew Dunlap didn't do things, you made it up out of whole cloth. Just like you accused Mr. Robinson, and all the other Black lawyers in this case, of not having provided things, of having lied to the Court, of having been unethical.

Any time you, Chad, don't get what you want, you call the manager. And usually that's the judge or the court of appeals or whatever. But you demand that, if you want something, whether the rules permit it or not, ethics; whether it hurts your client doesn't matter, if Chad wants it.

I mean, I went through and read your e-mails. You are insufferably entitled. And what's odd is you really seem to enjoy walking in to litigation, which I think of as like a chess board, right? Where we're all normally moving around on the chess board in litigation. You know, there's normal conflicts.

And if I could give you a visual for what it was like when you came on this case; that's been lingering since 2018, it's like you walked in and kicked the chess board full of Black lawyers, and just kicked it with your foot and enjoyed watching them fly. And you enjoyed calling people liars, and saying that they hid evidence and they didn't return phone calls.

And I can remember you would demand that they show

up in person and meet you during COVID. And hop on a flight to -- yeah, you did. Yeah, you did. Well, I don't expect you to tell me the truth at this point, Mr. Young. I'm just making facts for the record.

So it is time that someone look into your disturbing behavior. Because I really think the problem here is that your mediocrity is troublesome.

We've had some really good Black lawyers on this case who've done just fine until you showed up. And when you showed up, absolute mayhem and chaos happened. And you accused everybody of all kinds of horrific misconduct.

Now, I've looked through the record, and can see nothing to support any of the claims. Baseless claims you've made on lawyers in good standing. Not like yourself. You had to take an oath because you've been kicked out of this Court for misconduct.

The lawyers you have accused of -- and demeaned their good names, are still in good standing in this Court. Are allowed to reenter in this Court. Don't have to take oaths.

And so I just want to suggest to you, that even though you're in the African American -- what was it again?

MR. YOUNG: The African American Policy Forum, Your Honor.

THE COURT: And you are, at least on paper, such a

great ally for Black people that, in practice, you're incredibly hostile and abusive and a bully to Black lawyers who don't do what you say.

And so I want to let you know that I spot it. I'm going to write up on it. I'm going to ask for it to be investigated in New York. I think that's my duty. Because I think you have a troublesome pattern of coming on down here and misbehaving and showing your behind. And maligning Black lawyers for no reason, other than that they will not obey you in your racist Downton Abbey, Chad.

So I'll tell you, I'm not impressed with your skills as a litigator. I've been very impressed with most of the skills of the lawyers I've seen on this case. Once you exited the stage, the case went on normally, and is going just fine. The problem was the main character, which is you.

And so I think maybe it's time you think about your White-savior-complex-ally thing you have going, that makes you punish Black people who you can't control, like professionals. You are openly hostile, and it's incredibly racist.

And so that it's hypocritical, too, for someone who packages themselves as a woke, progressive, helping Black people in every way they can, it's rich. That at every turn, you're tanking their careers and casting

aspersions on them, that -- as far as this Court can see, and I have reviewed the record at length. I mean, I have been in this saga for some time. Every claim you've ever made has been baseless. Every accusation you've made against every lawyer in this case for shenanigans has turned out to be nothing.

The only person who has ever misbehaved in anything more than general movement on a chess board has been you. You're the only person I have show caused three times. And the last time you were here, I got on to you for maligning Black professionals. And so it's a pattern. It's disturbing. And I'm making that finding on the record.

I also want to ask you a couple of questions.

Have you heard of Spelman College?

MR. YOUNG: The one in Atlanta, Your Honor?

THE COURT: Yes, sir.

MR. YOUNG: Yes, Your Honor.

THE COURT: What can you tell me about it?

MR. YOUNG: Historically Black women's college. I know a few of the former presidents of Spelman College. Historic mission to educate Black women. I don't remember -- the term's like companion school to one of the traditionally male colleges. But it's a --

THE COURT: Morehouse.

MR. YOUNG: -- it's an elite ground to prepare

people. Strong academics, strong research.

THE COURT: I'm going to show you Court's Exhibits 10 and 11, which are posts about Spelman people. And I just want to ask you your interest and connection, if you'll share them with me.

What is your interest and connection with Spelman?

MR. YOUNG: So Court's Exhibit 11 appears to be a Facebook post. And I tagged Beverly Guy-Sheftall. She, I believe, is a former president; and she just celebrated her 50th year at Spelman. So this was re-sharing something she had shared on Facebook.

THE COURT: Okay. Got another question for you. Who is Gary Batton?

MR. YOUNG: I'm sorry, whom?

THE COURT: Gary Batton.

MR. YOUNG: I don't recall. I'm terrible with names. You said Gary Bat- -- Batman?

THE COURT: Batton.

What about this name: Nex, N-E-X, Benedict?

MR. YOUNG: I can't say for certain, but I believe Nex Benedict might have been a child in Oklahoma who died. And I believe it was like a terrible bullying situation.

THE COURT: Do you know who Gary Batton is?

MR. YOUNG: I really don't recall, off the top of my head, Your Honor.

THE COURT: Would you be surprised to find out he's the chief of the Choctaw Nation?

Would you hand this to him, please?

I just am curious about your interest in Choctaws, that's all.

MR. YOUNG: I represented a client years ago who's a member of the Choctaw Nation. I believe I'm still admitted to the Choctaw Bar.

THE COURT: You're not.

MR. YOUNG: Okay, Your Honor. I -- I had a mentee through Columbia that I -- I think she recently left their AG's office.

THE COURT: I thought you were Chickasaw.

MR. YOUNG: Sorry. Sorry, Your Honor. That was my bad. Chickasaw, not Choctaw. I know that they're sister nations. That was -- I misspoke, Your Honor.

THE COURT: Not really. No, they're not. No, they're not.

MR. YOUNG: I believe there's a historical tie. But I believe -- I'm not -- I believe Your Honor is also a -- I can't remember if you're a member or if it's your father. I believe your Choctaw, correct?

THE COURT: Actually, I'm two. I am Choctaw on my mom's side.

MR. YOUNG: Oh, okay. Apologies, Your Honor.

THE COURT: That's all right. Fair to say you are interested in Choctaw things?

MR. YOUNG: Just as a curiosity, learning about Oklahoma and tribal sovereignty, Your Honor.

THE COURT: How many Choctaw women do you know?

MR. YOUNG: Choctaw?

THE COURT: Like that you can say like, oh, Becky? Huh?

MR. YOUNG: I know a few people who I know hold multiple tribal citizenships. I don't recall anyone off the top of my head right now, Your Honor.

THE COURT: Okay. I didn't think so. I -- there aren't that many Choctaws. And what I can tell you is, out of, you know, 675-ish federal judges, there are five Native judges right now. One from each of the Five Civilized Tribes.

So I'm going to hand you Court's Exhibit Number 3. Can you tell me what it means when there's a picture of a Native woman with a red hand on her face? What's that mean?

MR. YOUNG: I believe that symbolizes the missing women and girls of Native citizenship, both in Canada and the United States.

THE COURT: So someone was kind enough to provide me with a screenshot of your Facebook page. And I just wanted to ask you your interest in murdered Choctaw women,

murdered missing Choctaw women.

You don't know any Choctaw women, do you? That's what you said.

MR. YOUNG: No, again, I think I may. Because I know several people with multiple tribal citizenships. I have been interested in the missing and disappeared Native women since I helped my mentor, Kimberlé Crenshaw, write a speech a few years ago at University of, I think, York.

THE COURT: Okay.

MR. YOUNG: She did a speech that the theme was about a report released in Canada. It was elevating the phenomena there, as well as the United States.

THE COURT: Does the name Tanner Dean Washington mean anything to you? I would think it would as a Chickasaw. Not familiar?

MR. YOUNG: Not off the top of my head, Your Honor.

THE COURT: I'm going to hand you Court's Exhibit Number 14.

Would you call being Choctaw or Chickasaw a niche community?

MR. YOUNG: In what respect, Your -- it -- small -- relatively small populations, yes.

THE COURT: How do you define niche? What makes a niche community?

MR. YOUNG: I would want to be very careful when we're talking about the sovereign status of Choctaws and Chickasaws in this nation. I feel like "niche" might be not respecting their sovereignty. Are they relatively small populations, yes.

THE COURT: So have you taken a look at what I've got in front of you there?

MR. YOUNG: Court's Exhibit 14, Your Honor?

THE COURT: Uh-huh. And I'll give you a movie trailer, just to cut to the chase.

MR. YOUNG: Uh-huh.

THE COURT: So there's a case I presided over.

MR. YOUNG: Uh-huh.

THE COURT: I go sit in Oklahoma to help out on cases with missing Indigenous women.

MR. YOUNG: Uh-huh.

THE COURT: And so someone from your tribe, Chickasaw --

MR. YOUNG: Uh-huh.

THE COURT: -- that was investigated by your policemen, the Chickasaw Lighthorsemen [sic], we had a big trial that was written about in your news, my news, all kinds of news, about a girl named Faith Lindsey, whose body was never found. And so that was one of the reasons that I sentenced her killer to life; they never found her body.

MR. YOUNG: I do believe I saw this posted by the Department of Justice, Your Honor, yes. And I -- I forgot that Your Honor presided.

THE COURT: There was a claim in one of your filings that you had been bullied for your religion. I looked through the record high and low, and I didn't see any mention of religion, other than the word Methodist from a party that's no longer in the case.

When was your religious observance mentioned, much less bullied, in this case? That's of deep concern to the Court, so I need to know about that.

MR. YOUNG: So I believe I said that in response to a filing made by Ms. Askew. I think it might have been 208 that I -- based upon my notes.

THE COURT: That sounds right. And I've got 208 in front of me. There's no citation to any facts or record when you say that.

So I couldn't find any evidence to support your claim of her having religiously bullied you. And so I wanted to ask you to tell me where that is in the record at all.

MR. YOUNG: Your Honor, I believe 208 is the document Ms. Askew filed.

THE COURT: It is.

MR. YOUNG: If you give me a moment, I can try to

look at the docket.

THE COURT: Well, I'll look at it. I can represent to you she doesn't mention your religion. Your religion isn't mentioned in the case at all.

So you can look at it. But my question to you is, what -- I mean, you put in a legal filing that opposing counsel religiously bullied you. So I wouldn't think you would need to look for that. I mean, that would be pretty memorable to me.

MR. YOUNG: I believe Ms. Askew made light of a representation I made in a sealed filing, which I said that I prayerfully reflected, as a devout Roman Catholic, on a certain matter.

THE COURT: That wasn't in the record. So let me ask you this. You also accused her of bullying you about your disability. There's no evidence in this record of any disability. At your show cause hearing you mentioned some autism, that obviously didn't keep you from doing your job, and uploading things very successfully.

And so I could not find -- and I have gone through the record with a fine-tooth comb, in preparation for this hearing -- where is there any evidence at all of you being bullied for some disability?

MR. YOUNG: Again, if I recall correctly, Your Honor, Ms. Askew, in what I think was 208, the 3- or 4-page

document, made reference to my disclosure about conferring with mental health providers. And then in the same thing, my disclosure that I had prayed and contemplated an action.

THE COURT: That was bullying?

MR. YOUNG: Your Honor, I don't recall what language I used to this Court. I'm saying that I do recall I said something. And sitting here today, I honestly don't recall if I said that on this Court's docket or the Fifth Circuit's docket. I know I've said it on some court's docket, Your Honor.

THE COURT: So let's go high level. I want to ask you a couple of questions about -- let's just talk the -- let's just talk about the religious bullying part, okay?

Who, what, when, where, why? Who bullied you? How'd it happen? What was said? Give me specifics.

MR. YOUNG: So, Your Honor, again, I don't have the entries in front of me. My recollection is, if this is right for 208 -- no, maybe --

THE COURT: I mean, it's pretty memorable, Mr. Young, if someone bullied you. I mean, I've been called the "N" word. It's memorable.

MR. YOUNG: Well, so, again, Your Honor, I don't recall the language I used. I believe I tried to say something to the effect of Ms. Askew fixated on my religion and my disability in responding to something, and I thought

that was irrelevant to the purpose of what the filing was supposed to be. I don't recall if I used the word bullying, Your Honor.

THE COURT: You accused her of misconduct based on religion and disability. Which, in these parts, is big accusations.

And so my question to you is -- I'm not asking what filing. I'm not asking how you memorialized it. I'm saying you accused yet another Black lawyer of misconduct, and I'm asking what your factual basis is for it. So tell me what it is.

MR. YOUNG: Your Honor, I don't believe I ever filed anything or used the word "misconduct" in --

THE COURT: Bullying.

MR. YOUNG: -- connection with Ms. Askew.

THE COURT: Okay. I'm going to ask you one more word, okay, that I want you to just imagine a really broad umbrella. And I want to ask you -- and remember, you're under oath -- any connection to this case, no matter how small, to this word, I want you to tell me about, all right? Ready for the word?

MR. YOUNG: Yes, Your Honor.

THE COURT: [redacted]

MR. YOUNG: Yes, Your Honor.

THE COURT: What connection does that word have to

this case in any way, no matter how tangential?

MR. YOUNG: To my recollection, there is a recording transcript, where a professor associated with SMU at some point, used the term "it was like they lynched you," I believe was the phrase, Your Honor. And I believe that phrase -- I know that some law professor's blog used that as like the lead of a -- I think of like a report of like an oral argument at the Texas Supreme Court, I believe.

THE COURT: Is that the only connection to lynching in this case?

MR. YOUNG: Well, you -- I know that -- I know that it's a quote --

THE COURT: From --

MR. YOUNG: -- "it's like they lynched you."

THE COURT: -- who said that?

MR. YOUNG: An SMU professor.

THE COURT: Who? That's pretty memorable.

MR. YOUNG: No, I'm really bad with names. I know that she's an African American woman. I believe she was recently like the research dean. She's fairly senior. Oh, I don't -- I don't -- I believe her first name was -- was it Jessica? I can't remember. And if I'm screwing up her name, I apologize.

THE COURT: And so how did lynching come up in this case?

MR. YOUNG: Oh, Your Honor, I believe Jessica Weaver, I believe, is her name. SMU professor.

My understanding is Professor Butler represented in complaints, and said that there were recording transcripts, where this other professor characterized -- I can't remember what particular incident -- as being, it's like they lynched you.

THE COURT: So what does lynching mean to you?

MR. YOUNG: In the United States, the context of lynching refers to usually the horrific and abominable period of Jim Crow, where gangs of White supremacists would murder people for simply existing as Black in our society. Typically targeting Black men with false accusations of rape.

Ida B. Wells studied and elevated lynching. Antilynching campaigns were crucial to the NAACP, and many major Black American civil rights organizations that formed after the failure of reconstruction.

THE COURT: Okay.

MR. YOUNG: And I believe lynching also occurred before or during periods of sla- -- it's a horrible, awful, detestable, and evil thing.

Very specifically, I know that there is a museum of lynching now. I believe it's in Birmingham. And I -- I believe the African American Policy Forum has some events at

the lynching museum coming up.

THE COURT: Okay. The reason I ask is, as a Black person, I can tell you, if in this record there was mention of somebody being lynched, or feeling like they were lynched, I would remember it. I promise it. And so when I read a headline about "it's like you've been lynched," I read through the record. And that's not anywhere in there. Anywhere in there.

MR. YOUNG: I could fill you in, Your Honor?

THE COURT: Well, you don't have to fill me in, because I've read the record. And when I asked you who said it, you can't tell me.

MR. YOUNG: Well, I did recall, as you were speaking, Your Honor. I believe it's -- and I don't want to get her title wrong, because I know that she was like the vice dean at some point -- but Professor Jessica Weaver, Your Honor.

THE COURT: And when did she give a statement saying that in this case?

MR. YOUNG: It's -- my recollection is it's based on a transcript of an audio file.

THE COURT: Okay. Well, the transcripts of the audio file, that game is not --

MR. YOUNG: No, no --

THE COURT: -- let me just pause for a moment. I

think we both know, like, there are no audiotapes to be had at this point, right? Do we both know that?

MR. YOUNG: No, Your Honor.

THE COURT: Okay. You believe -- okay. Well, I've never heard, in all these years of the case, the word lynching. I promise you I'd remember it.

And so when I read a headline -- a sensationalized, very racialized headline that says, "it's like I've been lynched," and it's literally got no connection to this case, I have to ask you, Mr. Social Media, Main Character Chad, White Hero, Savior, Loves to Help Black People Be An Ally, where the lynching in this case came from?

MR. YOUNG: If I'm remembering this correctly, Your Honor --

THE COURT: You should.

MR. YOUNG: -- that the -- the "it was like you were lynched" appeared in one of the merits briefs before the Texas Supreme Court. And I believe that -- I believe -- I can't remember the gentleman's name. I believe at the time he was the dean of, I think, Pepperdine. A western law school. And it might have been like the tax law professor blog or something. He used that as the -- the lead for something.

THE COURT: Will you agree with me there are no

facts, no deposition, and no evidence in this Northern District of Texas Court's record of any lynching?

MR. YOUNG: I believe --

THE COURT: Yes or no.

MR. YOUNG: -- no, Your Honor.

THE COURT: Okay. Where is it?

MR. YOUNG: I believe it was in the summary judgment filings that were struck, Your Honor.

THE COURT: Okay.

MR. YOUNG: So I'm not sure if you --

THE COURT: I read all of it.

MR. YOUNG: -- included --

THE COURT: I read all of it. And even the things that were struck. Because they're all posted on your website. Struck or not struck, everything's on your Dropbox. So I read the whole case from you. And I promise you it's not in there.

And so my question is -- I'm not asking you how it wound up in a brief. I'm asking you where it is in this record. Because a civil rights case already, in the south, is kind of -- you know, we kind of feel some type of way about lynching down here, is what I'll say.

Let me hand this to you. Court Exhibit Number 15 and Court's Exhibit Number 16. I want to talk to you a little bit about lynching.

So my family comes from Holdenville, Oklahoma, all right?

MR. YOUNG: I'm not sure where that is in Oklahoma, Your Honor. But I -- yes.

THE COURT: Okay. Hughes county. I'm going to tell you all about it. Because my father, an African American man who grew up in Holdenville, was raised on stories of strange fruit dangling from trees in Hughes county. And it even made The New York Times. And I gave you a little headline from 1920.

His uncle raised him and told him about what happened to that Negro who dared mess with that old White woman. They threw the Black man in the jail. And 30 to 50 men pulled him out, in a lynch mob, in my dad's hometown. Hung him. Let him sit there for days. And when his head popped off, put it on a spike, like Thomas Cromwell. So we don't find lynching jokes funny down here, sir.

And so I want you to tell me where it is in the record that anybody felt lynched. Because I didn't read that in any depositions. And I sure would remember it. So where is it?

And I don't mean buried in a summary judgment filing, not filed. I mean, what fact and what evidence do you have that anybody anywhere in this case ever said they felt lynched?

MR. YOUNG: I believe the statement was "it was like you were lynched."

THE COURT: Okay.

MR. YOUNG: So it was a characterization by one person of something.

THE COURT: And -- and where is that in the record?

MR. YOUNG: I believe it would appear in the record -- it was a pretrial filing, where we had to identify --

THE COURT: Let me stop you.

MR. YOUNG: -- the exhibits.

THE COURT: Because you're getting real granular. And here's what I'm looking for: Who, what, when, where, why. Who said it? When did they say it? Where was it? And not in some generic filing, with some person whose name you don't know --

MR. YOUNG: No.

THE COURT: -- because Black people all seem to look the same to you. Like I -- what I want to know is, you said in headlines, in this civil rights case, that it was -- there was some lynching. And that's a serious thing to say, coming down from New York, in a civil rights case in the south involving Black people.

So there's no lynching in this case that this

Court has read in this record. And I have read it from top to bottom. And so I'm going to make that finding on the record.

And I don't buy your shenanigans that somewhere, some random Black person, who you conveniently can't recall, said something along the lines of, I felt some type of way about lynching.

That's not now Black people talk. I've never heard anybody casually chat about lynching. And so I -- I don't find that credible. I think you made it up to get a headline.

Would you hand this to him, please?

Couple more exhibits.

I think it was a bad-faith effort to get headlines on this case. And I make a finding there's no lynching in this case. No allegations of it. No mention of it anywhere in this record, other than the headline someone put it in.

MR. YOUNG: Your Honor, I believe it's in one of Professor Butler's amended complaints. I believe it's also an allegation.

THE COURT: It's not in there, I assure you.

MR. YOUNG: Okay, Your Honor. So I'm looking at Exhibits 17 and 18, Your Honor.

THE COURT: So tell me your interest in Creek Freedmen, Muscogee Creek Freedmen. First of all, what is a

Muscogee Creek Freedmen?

MR. YOUNG: The Muscogee Nation that I know of, because I -- I realize some people were removed and some people weren't in Oklahoma -- it's one of several tribes that has been going through a very painful process, through their own sovereign judiciaries, to determine whether, using their tribal sovereignty, they're going to recognize people who were Black and owned as slaves during a period of more sovereignty.

THE COURT: Uh-huh.

MR. YOUNG: And I know that the Cherokee Nation, years ago, their Supreme Court had to decide whether they were members or not outright. And a good number of tribes, especially in Oklahoma, have been going through that process over the last decade.

And the Muscogee Freedmen specifically refer to that group of people. People who were owned, and I -- under their own tribal laws, were not otherwise considered citizens, is my recollection, Your Honor.

THE COURT: Do you know any Muscogee Creek Freedmen?

MR. YOUNG: Of the Muscogee Nation, no.

THE COURT: I just wondered, because you clearly have an interest in it.

MR. YOUNG: Yes. I'm friends on -- on Twitter or

X, friends, whatever one would call it, with Ms. Diana Williston. I think we've followed each other for maybe about a year or two now.

THE COURT: Okay. Would it surprise you to know that yours truly is a Creek Freedmen?

MR. YOUNG: I was not aware of that, Your Honor.

THE COURT: I'm actually proud to tell you that I am descended from Number 1, Paro Bruner, on the Dawes Rolls.

MR. YOUNG: Oh.

THE COURT: Yeah. And so I can kind of play every part in the Civil War myself at this point. Yeah. So my family was owned by Indians. We were their slaves. And until I was six, I was a member of the tribe, until all the Black people were kicked out in 1981.

MR. YOUNG: Disenrolled, Your Honor?

THE COURT: That's right.

MR. YOUNG: Okay.

THE COURT: That's right. And so I'm Choctaw on the White side of my family, but the Black side, no. So I follow the Freedmen too; I just wondered your interest.

MR. YOUNG: Oh, I have one additional explanation, Your Honor, to the extent --

THE COURT: Sure.

MR. YOUNG: -- it's helpful.

I was not aware of this phenomena until I was in

law school. I did the Native American law students moot court. And the year that we did it, it involved like a fictionalized version of this. Of what is the power of the tribal courts to have this, and whether a fictitious U.S. Supreme Court could overrule the tribal judges.

And that, I found -- you know, much like learning a lot about American history -- horrifying. Made sense, given our unfortunate history. But I found it really interesting.

And I also had interviewed -- bad with names. She's the incoming president of the University of Tulsa. She, I believe, was a justice, I want to say, of the Cherokee Nation Supreme Court at the time.

I interviewed her for a project as a law student, that I think was funded through the African American Policy Forum, when we were at the moot court competition about this. And she tried to teach me -- though I disagreed with her -- about the Cherokee Supreme Court's logic.

THE COURT: Okay.

Would you hand this to him, please.

(Court's Exhibit 19 tendered.)

THE COURT: I want you to take a look at this picture and tell me if you recognize any people in it.

MR. YOUNG: I recognize Judge Dillard.

THE COURT: How do you know him?

MR. YOUNG: We've been appellate Twitter friends for a few years. We're Facebook friends.

THE COURT: Have you met him in person?

MR. YOUNG: I don't recall.

THE COURT: He's pretty memorable.

MR. YOUNG: He's a significant juris, Your Honor. And I'm also aware -- Your Honor, again, I apologize. I'm face blind -- I'm aware that you and Judge Dillard were both in the -- was it a mas- -- the special master's program -- and I can't remember what it's called -- at Duke, that's, I think, only for sitting judges?

THE COURT: Let me talk to you about that. So you do lots of posting about the Duke Bolch Judicial Federal Judge LLM program. You do lots of posting -- trust me when I say this -- on the activities. Especially dealing with the class of 2025. And the class of 2025 only has about 30 people. And you do lots of Facebook posts on it.

So I just wanted to ask you your general interest in judges at the Duke University School of Law, class of 2025, in this program?

MR. YOUNG: My primary interest was following Judge Dillard's journey through the program. I know, for instance, his master's thesis was recently published. And he talks about -- I think Your Honor might be cited in it -- the ways that social media can be used in proactive, good

ways to inform the public about how courts work safely within ethical confines. And I found that fascinating.

Now, I might be misremembering. I think Your Honor, when you were a state court judge, some of your -- I guess we called them tweets at the time -- were cited. And some other scholars -- it was a earlier days of social media time. Like, hey, there are these judges. They have social media accounts. How do they use them? What does this mean? That sort of thing. Which I also found fascinating.

THE COURT: So just a question. Would you call that picture of people -- you see it's mostly women, mostly minorities in that class? Would you call that a niche community?

MR. YOUNG: I'd call it a small cohort for an academic program.

THE COURT: Okay. And so why are you so closely following federal judges and state Supreme Court judges? Like you post every day about it, or frequently, about on-goings at Duke.

MR. YOUNG: I --

THE COURT: Let me hand this to you.

MR. YOUNG: Yes, Your Honor.

THE COURT: This will help. Look at Court's Exhibit Number 20. What is that?

MR. YOUNG: This -- Court's Exhibit 20 appears to

be -- it appears to show --

THE COURT: Just look at the front top one for now. Just the top one.

MR. YOUNG: Yes, Your Honor.

THE COURT: What is that?

MR. YOUNG: So it's like the reply field on a Twitter account. And it shows a post to which I responded to that was made by Judge Dillard.

THE COURT: Okay. But what's in the photo, is my question. It's a diploma, isn't it? Isn't it a diploma from Duke's federal judge program that I was in?

MR. YOUNG: I'll take Your Honor's word for it. I would have said it's like a portfolio. I'm not sure if it's a diploma. I know that he also posted a like fancy notepad thing.

THE COURT: Uh-huh. The program that's posted, this 30 people, my name's in that program. He posted it on graduation day, for my graduation. Why were you following my graduation?

MR. YOUNG: Your Honor, I was following Judge Dillard. That was the person to whom I was responding with a celebration party hat. Like congrats, you finished.

THE COURT: The person you never met in real life?

MR. YOUNG: I follow a lot of people on Twitter, and interact with a lot of -- X, whatever we're going to

call it -- that I haven't met. Sometimes I do meet them in real life, Your Honor.

THE COURT: Is it fair to say you reached out to meet him?

MR. YOUNG: I think he reached out to me at some point.

THE COURT: Really? A Republican judge in Georgia?

MR. YOUNG: I have a good number of Republican judges who we follow each other on Twitter. My recollection of that, Your Honor, is -- and I'm not sure of the judges, federal and state, that are on social media. And I don't know what the phenomena is. More of them are Republican than not Republican, at least that I'm aware of.

THE COURT: Okay. Look at that second picture in there. And take the dog out of the photo, okay? Imagine that the dog is not there.

MR. YOUNG: Okay.

THE COURT: So what is that, if there's no dog? What are you looking at?

MR. YOUNG: It looks like a post from Judge Dillard, with a caption that says: Serious in Durham. That one, Your Honor?

THE COURT: That one.

MR. YOUNG: Yeah.

THE COURT: But where is it? If you take the dog out, what's that location?

MR. YOUNG: I'm not aware, Your Honor.

THE COURT: Well, you liked it. You were posting. What is it?

MR. YOUNG: Well, Your Honor, I don't think I posted this. I think this captures anything that like I liked or replied to, and...

THE COURT: Let me pause you --

MR. YOUNG: Yeah.

THE COURT: -- and we can shortcut this. You liked it. You talked about getting Duke swag. You made comments about it being in Durham. So can we both agree that you know that this is connected to a location in Durham; is that fair?

MR. YOUNG: I believe Judge Dillard posted he -- he brought his dog to the program for some period of time. I'm not sure how the program is structured. My understanding is there's like -- because it's a bunch of judges.

THE COURT: Well, just 30.

MR. YOUNG: Sorry, 30 judges. Y'all are very busy. And my understanding is that there were only like so many in-person, like, intensive periods there. And I believe that Judge Dillard kind of like posted cute little

adventures of bringing his dog with him for one of those bits of the in-person.

THE COURT: Uh-huh. Who do you think might be at the in-person while Judge Dillard's there? Take a wild guess.

MR. YOUNG: I mean, I would imagine Your Honor is. But again, I don't -- I assume that you all met together. I don't know how the program is structured.

THE COURT: Okay. So would it surprise you to know that that photo you have, when that photo was taken and when that photo was posted, that's my garden? That's my apartment? That's where I'm living, when you're posting and liking it?

MR. YOUNG: So I was not aware of that.

THE COURT: No idea, okay. No idea?

MR. YOUNG: I don't know what the lodgings are for that program.

THE COURT: Okay.

MR. YOUNG: I liked a picture of an online friend's dog.

THE COURT: You like a lot of photos about the Duke program and -- and suggests swag. And so I just wondered your interest.

Let me show you this while we're talking about labs.

If you'll hand him this, please.

MR. YOUNG: Yes, Your Honor. This is Court Exhibit 21.

THE COURT: What is that?

MR. YOUNG: This appears to be a picture -- a screenshot of my Twitter account. I'm not sure what the date on it is, but I recognize the photo. It's a photo of my dog. He's not a lab. He's actually a weird mutt, but he looks like a lab. He passes for a lab. And this is a photo I took of him that won a -- like a puppy Halloween costume contest at like his doggy daycare.

THE COURT: So describe it for the record. What's it look like in there?

MR. YOUNG: There is a picture of a lab-looking dog, who's not a lab.

THE COURT: Can we agree -- let me pause you for a second. Can we agree that he is pitch black? That's the blackest dog you could ever have. Black eyes, black nose, black paws. That dog is black, correct? That's a black dog, yes?

MR. YOUNG: The picture looks black. He's a little bit brown and other things, Your Honor. But, yes; here, black.

THE COURT: All right. What's his name?

MR. YOUNG: His name's Thurgood, Your Honor.

THE COURT: Who's he named after?

MR. YOUNG: Thurgood Marshall, Your Honor.

THE COURT: How would you describe him in this little photo there?

MR. YOUNG: Well, the description has it, too, Your Honor. But I believe the setup of this was --

THE COURT: Just -- let me just ask, what's he wearing? Because your dog's in a little outfit.

MR. YOUNG: Yeah. He's wearing like a doggy costume that's like a suit and tie-looking thing.

THE COURT: He's dressed up like Thurgood Marshall, right?

MR. YOUNG: As a lawyer, Your Honor, yes.

THE COURT: Okay. And he has a little fun- -- I think you think it's funny, at least -- a little Brown v. Board of Education, like a little funny news article --

MR. YOUNG: It's --

THE COURT: -- no, let me finish.

So your little black lab, right? Has a little chain on, and he's got a little suit on, your little Thurgood Marshall dog.

And your funny Halloween costume, Chad, is to have your little black dog, with the Brown v. Board of Education headline, like you've got a little prop or something for it for, I guess, when you walk him around on Halloween, that

sort of, I guess, yucks it up about school desegregation.

So this is your dog's Halloween costume; right? Is that right?

MR. YOUNG: When he was a puppy, yeah. There's no chain. He's wearing a collar. And I believe it was a pastiche of a more famous photo of actual Thurgood Marshall holding the headline, desegregation headline, on the steps of the Supreme Court.

THE COURT: I will tell you that Brown v. Board of Education is the reason I'm a federal judge today.

MR. YOUNG: I would agree, Your Honor. It was a milestone. One of the most important cases ever decided. And a rare one, that I think the vast majority of Americans, thank God, agree was a good thing. And a major improvement, Your Honor.

THE COURT: One last exhibit for you.

Court's 22, please.

If you'll tell me what this is. What's this?

MR. YOUNG: It appears to be a thread on Twitter to which I responded to.

THE COURT: And what's the name of the person you're talking to?

MR. YOUNG: The -- the identity that -- it's @faggyforthe.

THE COURT: No, not that one.

MR. YOUNG: And then the -- the name, which is -- I was -- that's the account, pseudo-nigga.

THE COURT: Would you spell that out for the record?

MR. YOUNG: Yes, Your Honor. P-S-E-U-D-O, dash, N-I-G-G-A.

THE COURT: And so you are yucking it up with pseudo-nigga; is that right?

MR. YOUNG: I responded to something that person said. Yes, Your Honor.

THE COURT: Okay. All right. So I'm going to give you an opportunity here in a minute to make any presentation you want. I want to make a couple findings.

This Court will take judicial notice of its prior experiences. Its experience as an African American woman. And I find a pattern of disturbing discrimination against Black lawyers that needs to be investigated in New York.

I also find that the credible evidence that I've heard so far shows that my sealing orders not only have been violated -- like, I pulled it up on my own phone today. And so that's deeply troubling to this Court. Especially in light of the warnings and cautions I've given you.

You know, we had a show cause hearing, where I got on to you about calling Black women out of their names, and treating them with disrespect like they work for you;

talking to them like servants. And here we are again.

And so now that I've had a chance to dive into the weeds of your discovery disputes, and read the vitriol and entitlement and insufferable just - I mean, you are so -- rules don't apply to you. There's always an exception for you, Mr. Young. You're special. Local rules don't apply. Any decision that's made that you don't agree with, you file a motion to reconsider.

Oh, and I want to make a note, too. I noted, when I was looking at that trial that you had in front of Judge Cauthron --

MR. YOUNG: Uh-huh.

THE COURT: -- when she warned you about posting things publicly on trials that were still ongoing, kind of like our case that's still ongoing? Even though you have exited the stage, the case still goes. We still have to pick a jury if that case doesn't settle. And so your uploads give this Court pause and concerns for a couple of reasons.

One, that you're violating my order. You're aware of it, you knew it, and you're doing it deliberately. And so this Court sees that as sort of a double middle finger to you from New York, to me in Texas here, in light of this Court's grace shown before for your misbehavior.

And so I find that disturbing that you encouraged

your followers on Twitter and Facebook to take a look at the wild shenanigans in the Northern District. And had a Dropbox -- trust me, I got the screenshots and the downloads -- to all the documents in this case.

I mean, you even told reporters, like: It's so wild below; take a look. And it links to everything, including sealed documents, on at least three social media accounts.

So I'm going to give you an opportunity to explain that. But I want to tell you that what I've heard so far doesn't get you out of trouble.

So having said that, now is your opportunity to show some cause. So I'm going to hand it to you. What would you like me to hear today? I'm listening.

MR. YOUNG: May I approach the podium, Your Honor?

THE COURT: Sure.

MR. YOUNG: Thank you, Your Honor.

So with respect to the show cause order issued, I believe, on the -- April 22nd, 2026, as Your Honor already noted, I filed a response. I stand by the response that I provided the Court.

THE COURT: Asserting First Amendment rights?

MR. YOUNG: I believe I clarified that I thought there would be a conflict if a judicial officer, acting in her judicial capacity, tries to control the statements on a

personal website, that that could create a First Amendment issue. And I gave the basic Shelley v. Kraemer analysis of a judge performing her duty, within the proper scope of what those duties are, is a state actor, which triggers the First Amendment.

THE COURT: So is it your position today in court that you're somehow exempted from this Court's orders under some First Amendment analysis, of which I'm completely unaware?

MR. YOUNG: No, Your Honor. I believe the point I made -- and again, I stand by the response I did in paper in advance -- is that that raises a serious First Amendment problem.

THE COURT: How so?

MR. YOUNG: Well, the First Amendment, as Your Honor knows, limits to what extent the government -- who we, under Supreme Court doctrine, understand that to cover state actors, judges or state actors in certain situations -- it limits what extent an agent of the government tries to control the speech of a citizen.

THE COURT: Well, I'm not asking you to take anything down, am I? I'm just asking you why you put it up.

MR. YOUNG: Well, Your Honor, I think that goes to some of the protections that the First Amendment affords.

THE COURT: So do you believe there's some First

Amendment protection that exempts you from Article III federal judges' sealing orders?

MR. YOUNG: No. Let me explain it in a different way, Your Honor.

THE COURT: Please.

MR. YOUNG: The powers afforded by Article III -- because government branch, right? -- are limited by the protections of, among other things, the Bill of Rights, of which the First Amendment is won.

THE COURT: So if I have an order that says you can't do something. And in your subjective opinion, as a seasoned litigator of a decade, you believe that your First Amendment rights trump it, do you get to violate a federal judge's sealing order and say, First Amendment; and there's no contempt and there's no sanctions? Is that how that works?

MR. YOUNG: I believe that analysis, from a court perspective, would be, is it within the power of the Court, in light of the First Amendment -- because Article III powers are restricted in lots of ways, as Your Honor knows. One of them is the First Amendment -- is it within the Article III powers to reach out to a particular person and, with the government hat on -- acting as a judge. Not as an individual, Your Honor --

THE COURT: Uh-huh.

MR. YOUNG: -- to what extent it can interfere with the statements of a citizen, yes.

THE COURT: Okay.

MR. YOUNG: I did not perform the analysis fully. I gave the basic analysis that was my understanding. Again, I stand by what was in that filing, Your Honor.

THE COURT: Great. So I just want to make sure we're on the same page. So you are ten toes down that you have got a First Amendment right to violate this Court's orders?

MR. YOUNG: No, Your Honor. That's not what I said.

THE COURT: Well, then, why did you violate this Court's orders?

MR. YOUNG: Your Honor, as I represented in my filings, I do not believe I violated this Court's orders.

THE COURT: Okay.

MR. YOUNG: And if I may add something else to that, Your Honor.

I did point to a case. I believe it -- and I don't want to butcher this party's name. Is it the Tollet case -- it's T-O-L-L-E-T -- that talks about -- and I know Your Honor cited that in some order at some point. So I know that Your Honor is specifically aware of it in the context of this case.

They talk about the careful balance that has to occur where a court can be rightly within its powers to sanction, but given the right to appellate review. If someone says, in the trial proceeding, I do not believe that I am sanctionable, it's okay for the person to take that position, because they have a right to appeal it. And it may be on appeal, the higher court -- because we have a hierarchy under Article III --

THE COURT: I've heard of it.

MR. YOUNG: -- decides a limit. Yes, Your Honor. I'm trying to make a record, Your Honor.

THE COURT: Excuse me?

MR. YOUNG: I said I'm trying to make a record for appeal, Your Honor.

I think that was all I had about that, Your Honor. I'm not...

THE COURT: Is there anything else you'd wish the Court to consider at this time?

MR. YOUNG: For the order to show cause? Yes.

So I stand by the filing I made about this specific order to show cause. I would like to note, for the purposes of record on appeal, that there was no court order to show cause for the vast majority of the Court's exhibits presented to me today.

I would also like to point out --

THE COURT: Can I pause for just a second? I just want to drop a footnote in.

So you were completely ambushed by this Court using its phone to download from your website today?

MR. YOUNG: No, Your Honor. That's not what I mean. I meant the -- many of the Court's exhibits -- and I don't have them all numbered in front of me, unfortunately -- appear to be e-mails from this Court to another person sometime this week, that appear to be screenshots of my public-facing social media accounts. Those were not contained in any order to show cause.

THE COURT: Weren't they?

MR. YOUNG: No, Your Honor.

THE COURT: Okay. Oh, I've got one more question for you.

You represented to Judge Cauthron, when you got in trouble the first time for this back in 2017 -- give me just a moment. I'm going to read a little bit.

Yeah, this is from Case 5:15-CV-00324-C, Document 265. Jury Trial Volume 4; November 16th, 2017 --

MR. YOUNG: Sorry, Your Honor, what -- do you have a page number for the show cause? Is that Exhibit 2?

THE COURT: It's Exhibit 3.

MR. YOUNG: One moment, Your Honor.

THE COURT: Well, you can read along while I talk.

The following proceedings were held outside of the presence of the jury, with all parties present.

Court said: Be seated. Before the jury is brought in, I want to make a record on a couple things.

This is in front of another woman federal judge.

First of all, Sherri, the court reporter, became aware last night, and made me aware, that transcripts were being posted online as soon as they're being provided to Mr. Young.

I don't even know the name of the website. What is it, Mr. Young?

And what you said in response is: Your Honor, I dealt with it. There was a miscommunication.

The Court said: I understand that. I'm just making a record.

To which you said: Oh, it's a nonprofit called Equality Case Files. My understanding is that all the transcripts have been removed at this time.

And so I did a little Googling on that. And can you tell me your connection to the Equality Case Files, and the efforts you make to upload your documents to it? Talk to me about that.

MR. YOUNG: I don't -- Equality Case Files, last time I checked, is a nonprofit. It's run and founded by -- I want to say her name's Kathleen -- I think it starts with

a P -- Perrin. I'm not sure if she's still running it. She's older. She --

THE COURT: Can I pause for a sec? And I'll tell you the ending and you can act surprised.

So she posts transcripts before they get on PACER. That's the whole thing, is that you get these unsanitized, like daily TMZ transcripts of whatever juicy, salacious legal stuff she wants to cover.

She comes and hangs out in the courtroom, and you slide her transcripts, or however that works. But judges expect you to pay court reporters and put it on PACER and wait for juries. But the whole point of the Equality Case Files is you don't have to do that.

And so when you were providing that information to them to upload, you knew that it would be uploaded immediately, and that potential jurors could see it, correct?

MR. YOUNG: No, Your Honor.

THE COURT: That's the whole point of it, is to not wait till PACER.

MR. YOUNG: No, Your Honor.

THE COURT: Okay. All right.

MR. YOUNG: I could explain, to make a record --

THE COURT: I don't need you to explain anything.

MR. YOUNG: Well, Your Honor, if I may make a

record for the purposes of appeal, because these are serious allegations.

THE COURT: They are serious allegations, and I'm tired of hearing you make stuff up. And so here's what I'm going to let you do. There's no question on the floor. Tell me whatever it is you'd like to tell me before you leave.

MR. YOUNG: With respect to the --

THE COURT: To anything.

MR. YOUNG: -- I --

THE COURT: To anything. Anything. I -- I have given you -- this is your -- this is your second live show cause for abusing Black lawyers repeatedly, and I made a record of it.

I find that you are a community narcissist. You're the main character. You're the White savior, come to save all the stupid Black lawyers in Texas who need your help, from New York.

And when Black lawyers don't do exactly what you say, right now, to their client's detriment, you get very angry and punish them. And you do things like say that they got fired on Facebook. Or accuse people who have served in the military of lying and hiding things.

And then every time this Court asks you for one iota of evidence to support any of your baseless claims,

slandering Black lawyers of fine repute in this community, you have zilch. And you always do this Pikachu face like, what, I have no idea?

You make these crazy allegations and you go back to New York -- and you've done it 3 or 4 times now. And you come down here and -- and what we call it is, you know, you need to keep people's names out your mouth, is what we say down here.

You like talking smack about Black lawyers who don't do what you say. You bully. You're a racial bully. And you come down here from New York, with your performative civil rights act. And when we don't buy it, you get real mad about it.

And so that's the finding I'm making, is that you are a raging hypocritical racist, who's abused lawyers on this case from the very beginning. And it needs to be looked into.

And so if there's anything you'd like to say on that point -- I have given you a smattering. I promise you I will write a wonderful opinion, with lots of details supporting this. There are like six Black lawyers you have maligned, by my count. And I don't even get into their names and numbers.

But your misconduct is gross and egregious. And you have treated people who are just trying to do their

jobs, Chad, with disrespect and contempt. You've threatened them.

The worst was when you threatened -- I don't know if anybody else remembers this. I'll tell you, I'll give you a moment of levity on this. In the whole crazy story of this trashy Real Housewives of New York that you're trying to turn this federal court into, right, the craziest thing was when you demanded a Black lawyer opposing you immediately give up the fight and cede the case, to the detriment of her client, or else you would sic your flying-monkey law professors on her.

I mean, the way the e-mail read, it was like -- I don't know if you'll get this. You're in the -- what's it again? The African American, what is it?

MR. YOUNG: The African American Policy Forum, Your Honor.

THE COURT: Okay. I don't know if this cultural reference will mean anything to you. So tell me if it does.

When I read that e-mail this weekend about you trying to sic the law review goons on Black lawyers who won't be obedient to your master's wishes, you acted like you were about to slide for O'Block.

I mean, I -- I don't know what your law professor goons do, when they're angry at misbehaving Black professionals who won't do things they want. I do know that

you like to call the manager a lot. I mean, every case I've clicked on, you filed sanctions.

Oh, I do want to read one last thing for the record before we go, just to show one more kind of tiny pattern. Because they need to take a look at you in Judge Cauthron's court. She wrote you up for doing repeated motions to reconsider, based on nothing, just like this Court did.

MR. YOUNG: She did not, Your Honor.

THE COURT: Yes, she did. She did, and I'll attach it.

MR. YOUNG: Yes, Your Honor.

THE COURT: You make things up out of whole cloth. You call people liars. You claim -- remember we had the Snuffleupagus chat? Do you remember that chat?

MR. YOUNG: I do not recall, Your Honor.

THE COURT: Well, I'll remind you of it.

Kim Askew tendered a tenure box in full to you. The only thing you could ever identify as missing ever, potentially, was some kind of dividers. You got it.

Now, when you couldn't reopen discovery, you claimed you didn't get it. And you made a whole big show about it. And you called her a liar, and you said that she didn't provide it. This Court made findings of bad faith back then that you lied about that. I still believe you

did. I believe you maligned counsel so that you could try to win your case improperly.

And I just want to read one thing into the record. This is from Case Number 5:15-CV-00324-C. In addition to looking into you violating the civil rights of Black attorneys who are against you, or before you, or don't need your help, Chad, in addition to that, I think you have a disturbing, perhaps, behavior, misbehavior in front of female federal judges, let's say.

Memorandum Opinion and Order. This is in the [redacted] case. Two pages.

After the jury found in favor of Plaintiff on her claim, the Court entered judgment in her favor. Defendants then appealed, and Plaintiff cross-appealed.

While the appeal was pending, Plaintiff parted ways with two of the lawyers who represented her at trial: Ezra Young and Brittany Novotny. Hereinafter: Young and Novotny. Plaintiff continues to be represented by attorney Jillian Weiss.

Collectively, these attorneys have filed several motions primarily consisting -- this sounds familiar -- of ad hominem attacks on each other. Now Young and Novotny have filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 against opposing counsel.

This is not your first rodeo, is it?

In support of their motion, Young and Novotny argued that Weiss has misrepresented facts -- stomp your feet now -- engaged in perjury -- oh, you're mad -- and encouraged her client to engage in perjury. Which you don't like.

The majority of the complaints raised by Young and Novotny center on issues related to the dispute between the parties about who is entitled to receive attorney's fees for work in this case.

By separate order, dated December 28th, 2021; docketed at Number 391: The Court held that any attorney's fees awarded to Plaintiff from Defendants are to be awarded to Plaintiff. The Court noted, however, that Young and Novotny may be entitled to collect their attorney's fees directly from Plaintiff.

Young and Novotny argue that Weiss has misrepresented facts and/or law, and must be sanctioned for the misconduct. The Court has considered the instances referenced, and finds no sanctionable conduct. Each of the alleged misrepresentations raised by Young and Novotny, at most, reveal Weiss advocating for a position -- crazy that a lawyer might do that -- by relying on an extension of existing law. What?

Such advocacy, says Judge Cauthron, is not sanctionable under Rule 11. See Federal Rule of Civil

Procedure 11(b)(2).

Listen to this, Mr. Young.

As for the other allegations raised by Young and Novotny, they raised nothing more than a different view of the applicable facts. Consequently, there is no sanctionable wrongdoing.

This next paragraph's important.

While the Court has found no sanctionable conduct, that ruling does not mean the conduct of either Weiss or Novotny and Young has been proper. Rather, it is evident that personal animosity amongst counsel is so strong -- and this is a federal judge saying this, a chief judge -- it is evident that personal animosity among counsel is so strong that these attorneys are more interested in exacting some penalty against the other than in representing Plaintiff.

That sounds familiar.

Further similar actions will result in sanctions up to and including disqualification to proceed further in this matter.

And you got that on March 29th of 2022.

So in light of everything the Court has said today, I'm going to give you an opportunity to speak and tell me anything you'd like to tell me.

MR. YOUNG: I think starting with the last points and working backwards, there's ongoing litigation still in

the Western District of Oklahoma about attorney's fees due. The Judge now presiding over that matter -- I believe Judge Cauthron was originally assigned it and recused. Because she's senior status, so she can recuse -- is Judge Jodi Dishman.

Incidentally, there are some recent orders on my website that speak to -- [redacted] misnamed my co-counsel. Her actual name is Brittany Stewart. We tried -- we fixed that later, but just for the sake of the record -- speak to the viability of our claims against [redacted] Ms. Weiss, as well as subdivisions of the State of Oklahoma.

I'd rather keep that to the Western District, because I believe that's their responsibility. But I'm just bringing that to the Court's attention that there's ongoing litigation about that. And I believe the denials -- partial denials and motions to dismiss of our claims against [redacted] and the Oklahoma subdivisions, I believe those were issued on April 6th, 2026. And I believe one, if not both, are on my website.

THE COURT: Let me ask you a question about [redacted]

MR. YOUNG: Yes, Your Honor.

THE COURT: Did she file a complaint against you?

MR. YOUNG: Yes, Your Honor. And I disclosed it in my application for pro hac vice admission to this Court.

THE COURT: You disclosed that you believed that it was addressed on the merits, correct?

MR. YOUNG: I believe I said it was addressed and dismissed by the New York Bar. I think technically the Oklahoma Bar dismissed it, too. I'm not -- there was some sort of like agency sharing, because of multiple licenses, with lots of people involved.

THE COURT: Would it surprise you to know that you in no way disclosed that the Oklahoma Bar was investigating you based on [redacted] complaint?

MR. YOUNG: Your Honor, I disclosed in the pro hac vice admission that there was a complaint. I can't recall if I gave the complaint number. And I noted it was dismissed. I can't remember if I gave the date.

THE COURT: You didn't give the date. And you said it was in New York.

MR. YOUNG: Yes, Your Honor. Because that's the -- when I said I thought that there was an agency sharing, I believe [redacted] initially filed a bunch of grievances in a bunch of jurisdictions. I think Texas might have been one of them.

And my understanding -- though I was represented by counsel in those proceedings -- was that Oklahoma investigated Ms. Stewart and New York investigated me. I'm not -- because they use -- they have different rules for

adjudication in both jurisdictions. But I disclosed that was the grievance. And those documents are also on the Western District's docket.

THE COURT: What did she accuse you of?

MR. YOUNG: I believe there were like 40 numbered paragraphs.

THE COURT: What was the biggest accusation?

MR. YOUNG: The one that I found most particularly alarming was she accused me of beating her in front of the judge and jury, and that being why the jury denied her reinstatement.

THE COURT: What else did she accuse you of?

MR. YOUNG: I believe she -- I can't remember if it was me or if it was just Ms. Stewart. She accused one of us of stealing money, when there was no money award.

She accused my wife, who is a lawyer at another firm --

THE COURT: I know.

MR. YOUNG: -- Quinn Emmanuel -- of something nefarious that was in that complaint, Your Honor.

THE COURT: What were you accused of by [redacted]

MR. YOUNG: That was one of the things -- I was blamed for my wife's conduct. That was part of the grievance.

THE COURT: Was your wife blamed for sexual

assault?

MR. YOUNG: No, she wasn't, Your Honor.

THE COURT: You were accused of it, weren't you?

MR. YOUNG: I don't recall a particular --

THE COURT: I think -- I think [redacted] made pretty clear in a complaint that she thinks it wasn't resolved on the merits, and she has accused you of sexual assault. My question to you is, why did you not disclose that to this Court?

MR. YOUNG: I disclosed the grievance, Your Honor. That was the grievance.

THE COURT: To New York.

MR. YOUNG: Yes, Your Honor. And that's where [redacted] filed the grievance.

THE COURT: She also -- there's also a filing that says she filed one in another state.

MR. YOUNG: So she -- she filed -- I want to say it was five grievances against Ms. Stewart. I believe all of those were in Oklahoma.

THE COURT: She said she filed one against you in another state.

MR. YOUNG: So I'm not sure which filing. The only Ethics Bar that I ever heard from about this -- though, the investigator in New York did tell me that there was like a coordinated investigation across grievances. And there

was also an investigation of Ms. Weiss for -- I wasn't privy to what it was.

THE COURT: I want to talk about the investigation of you.

MR. YOUNG: Yes. And I'm telling you, Your Honor.

THE COURT: Well, and let me ask a more specific question. When you disclosed on your pro hac vice that there was a prior grievance, you said that there was a grievance. Looked like a small matter. Had been resolved, and it was no big deal.

[redacted] is currently, right now, accusing you of sexual misconduct, true or false?

MR. YOUNG: She is not in the current case that we're in.

THE COURT: In current times, she is accusing you of sexual misconduct --

MR. YOUNG: Your Honor --

THE COURT: -- right?

MR. YOUNG: -- not to my recollection. I think there might be a Tenth Circuit filing made by -- I think it's Mr. Jerry Colclazier.

THE COURT: Let me ask you one more question and we'll wrap this up.

MR. YOUNG: Yes, Your Honor.

THE COURT: Is this a true or false statement: If

I were to go on your website, would I find private mental health records about [redacted] [redacted] that you've uploaded to punish her because of a fee dispute?

MR. YOUNG: No, Your Honor. I'm not aware of any -- my only recollection of mental health records were in the merits case. And that was a discovery dispute with the Oklahoma subdivisions. But those were under seal, I think.

THE COURT: You disclosed nothing about Oklahoma when you asked this Court for pro hac vice.

MR. YOUNG: Your Honor, I disclosed --

THE COURT: New York.

MR. YOUNG: -- yes, that's where the grievance was filed, Your Honor.

THE COURT: Your -- [redacted] [redacted] says that she filed a grievance in another state.

MR. YOUNG: Well, so let me clarify, Your Honor. I believe I applied for admission pro hac vice, I want to say it was like January 6th or 7th of 2022. It was early January 2022. The grievance against me that I think you're referring to, Your Honor, I think was opened in 2020 in New York, and it was closed September of 2021.

THE COURT: I'm not talking about anything in New York, sir.

MR. YOUNG: So, Your Honor, I am only aware of what I got from Ethics authorities in New York.

THE COURT: What about the lawsuit you've got going right now in Oklahoma District Court?

MR. YOUNG: So I think what you're referring to, Your Honor, is the -- it's like a -- it's a fees dispute about the merits case, Your Honor.

THE COURT: Uh-huh.

MR. YOUNG: There's no claim against me or Ms. Stewart. It's -- [redacted] brought an interpleader claim. She doesn't, to my recollection in her complaint -- it's a super-short complaint. I want to say it's like 3 or 4 pages -- make any of those allegations.

I believe Ms. Weiss filed and took back a claim against me in the Western District, and also in state court. She also -- I think that was dismissed for failure to prosecute, Your Honor.

So that's not [redacted] that's Ms. Weiss.

THE COURT: Uh-huh.

MR. YOUNG: And I believe -- I'd have to look at the dates, Your Honor. I think those events occurred after -- I want to say that stuff was 2023, and later in 2023. I believe Ms. Weiss file the claim on the Oklahoma docket, I want to say, in February or March of 2023. Which was after this Court put in a final judgment order, and after notice of appeal was filed to the Fifth Circuit.

And then, you know, she pulled that. She

dismissed it. And then she filed, I want to say, in like the Oklahoma City District Court. And then that was dismissed for failure to prosecute, I want to say, in 2025.

So at the time I applied for admission pro hac vice, I was not aware -- those things had not occurred. The only thing that had occurred, to my knowledge, was the grievance.

I did not -- in the process of being in the Western District of Oklahoma, I do recall that [redacted] latest counsel, Mr. Colclazier, I think he affirmatively disclosed that [redacted] filed more grievances against Ms. Stewart. And I think Ms. Stewart filed something showing that those had been dismissed.

And I -- I don't recall what those grievance were about. But I think it was she was upset that Ms. Stewart had filed a claim against her, was my recollection. And she grieved it with the Oklahoma Bar authorities. And the Bar authorities said that they had dismissed it. I'm not aware of any other grievance proceeding.

I can also say, Your Honor, just one thing -- because New York's quirky, I learned. I didn't know this all -- New York does not always tell the attorney against whom a grievance is filed that there is a grievance. There's some sort of filter mechanism, where they decide whether it's going to go to like the next level of scrutiny.

So it's possible that there's any number of grievances filed by [redacted] or someone else, but I would never know that unless it's disclosed to me by the authority. Or if someone who filed it, separate and apart from the official proceeding, handed me a copy of it.

And I learned in the process -- apparently it's very different in Oklahoma -- lawyers learn about everything that's filed against them. And I don't know what it is in Texas state court.

THE COURT: So it's your position that you didn't have to disclose this claim of sexual assault made by your client against you, from this Court's read, during the relevant time frame this case was before the Court? You don't think this Judge would have wanted to know that before I let you in my courtroom?

MR. YOUNG: Your Honor, I -- at the time that I sought admission pro hac vice, the only grievance that was brought against me had been dismissed by Ethics authorities in New York. And I disclosed that.

THE COURT: What about the Oklahoma complaint?

MR. YOUNG: The Oklahoma complaint, to my understanding, was like -- I never got a copy of it. The only person who ever got anything directly from the Oklahoma Bar was Ms. Stewart.

THE COURT: Oh. Would it surprise you to know

that [redacted] made filings where she very much disputes whether that was decided on the merits, and very much claims that there is a pending grievance in another state?

MR. YOUNG: [redacted] through her counsel, has made many representations to the Western District, as well as to the Tenth Circuit. It would not necessarily surprise me anything about said representations.

What I'm telling you, Your Honor, is to my knowledge, the only Ethics authority I've ever heard from was New York. And the New York authority told me -- or told my counsel. So I heard from my counsel -- a game of Telephone -- that there was some sort of cooperation. And some of the questions being officially asked of me of New York were about something in Oklahoma. And I think it was involving Ms. Stewart.

And then there was part of my process, my recollection is, the New York Bar authorities thought that [redacted] was not pro se in the grievances, and had asked me a series of questions about Ms. Weiss. And I answered those and I said, you know, I don't know. I'm not talking to either one of them.

And I -- I'd also note my -- my Ethics counsel at the time. So I'm allowed to disclose, Your Honor, things that [redacted] has herself disclosed or put into issue, because of the way -- New York Ethics grievances are

usually -- I guess, whatever's -- like it's not sealed. It's private unless the complainant does a set of things.

Again, I was represented by counsel, my malpractice insurer. I depended upon the advice of counsel.

I can say that hundreds and hundreds of pages of exhibits were considered in New York. I know that there was like an official investigation. It was about a year. And it went up to whatever appellate division covers me in Brooklyn, because that's where I was admitted at the time I had graduated from law school --

THE COURT: I think it's the Second District, right?

MR. YOUNG: It's -- so I want to say -- Brooklyn is the Second District, Your Honor. You're correct about that. But for some reason I don't know, the Ethics grievance is like multiple districts for Brooklyn. It's like the Second, Third, and something. It'll say it, whatever's on the grievance stuff.

But it went to, I want to say, some sort of like panel that the investigator presents all of the evidence and all of the stuff to. And it's that panel. I don't think I've ever been privy to who are the members of the panel or what they do.

All I got was they met on "X" date. Considered whatever file. They found no evidence of misconduct, under

whatever the very specific New York rules were.

THE COURT: Have you notified any Bars of any sanctions this Court has imposed so far?

MR. YOUNG: So I am -- so, to my knowledge, the January 2023 show cause, Your Honor, I believe -- I don't want to mischaracterize it -- sanctionable, but will not sanction at this time, correct?

My understanding -- and I believe I talked with Ethics counsel about that -- was that didn't trigger a reporting requirement. But I did seek counsel, because I wasn't sure.

The -- I want to say -- I don't want to get the date wrong here, Your Honor. I want to say like the November 26th summary order. And then I want to say it was like a December -- maybe it was like 6th or 8th, the caption on ECF says it's a response to the mandamus petition. But I believe the substance of the document may say order.

I'm still working with Ethics counsel to figure out whether if that is still subject to appeal. That requires mandatory reporting, and I'm trying to get it under -- because all of the different jurisdictions have different standards for what is reporting, Your Honor.

THE COURT: I can throw you a Hail Mary on that, and give you a too long, don't read: It is reportable. I can tell you that because I'm going to report it. And

ethics require me to, this disturbing pattern of misbehavior. But also when you failed to appeal the sanctionable conduct, that merged into the final judgment. It was appealable. You chose not to.

And so I would talk to your counsel about -- you're a member of the Supreme Court of the United States Bar, right?

MR. YOUNG: Yes, I am, Your Honor.

THE COURT: Are they aware that you've been kicked out of federal court?

MR. YOUNG: So I was admitted to the U.S. Supreme Court, I want to say, whatever the first Monday in October was this year.

THE COURT: Uh-huh.

MR. YOUNG: At that time, there was sanctionable, but not sanctioned. I am in the process of figuring out how to report that.

And I'll point back to my response to the order to show cause. My understanding, based upon research and consulting with counsel, is the -- the January 2023 thing was not appealable. But this now today, for weird collateral order doctrine reasons, is directly appealable.

What I plan on doing -- and I think I noted this in my response to the order to show cause -- because the immediate hurdle for me as a practitioner, is I have to

apply for admission pro hac vice again before the Kansas Court of Appeals. So I've been working with my Kansas counsel, including a former judge, to figure out how we accurately disclose that.

And I think I also flagged for Your Honor the concern that if these proceedings are sealed --

THE COURT: I'm not sealing them.

MR. YOUNG: Oh, okay. So -- but --

THE COURT: The last thing I want to do is have a star chamber, sir.

MR. YOUNG: So, Your Honor, thank you for that clarification.

THE COURT: You're so welcome.

MR. YOUNG: So I'm -- we're trying to figure out what the appropriate requirements and disclosures are for the Kansas Court of Appeals right now.

THE COURT: I'm going to help you with that.

By Tuesday, close of business, Mr. Young, I need you to provide me with a list of all of the courts you appeared in of record. And I want to know a couple things.

If you appeared. And I don't care about like filing an amicus brief. I mean real lawyering. If you showed up and represented anybody in a state court, in a city court -- I want to know if you were in a traffic ticket court at this point. I want to know who was opposing

counsel, who was your judge; were you sanctioned; were you threatened with sanctions; and did you accuse opposing counsel of misconduct.

MR. YOUNG: Okay. I'll get that information for Your Honor. And let me just clarify, I don't think I've been in front of a traffic court since I was 16 and dumb.

But the only courts that I appear in are federal trial and appellate courts. And then a handful of state trial and appellate courts.

And I'm just seeking clarification, Your Honor. Article I and pseudo Article I --

THE COURT: I want to know it all.

MR. YOUNG: Okay.

THE COURT: All of it. Any time you've made an appearance. I know whenever I was up for this job, I had to, you know, give a list of every opinion I'd ever -- and that's fair.

MR. YOUNG: I'm aware, Your Honor.

THE COURT: And so the last time you were in front of me, I suggested and decided it would be too much at that point to have you notify this Court of other courts where you may have had trouble. And I didn't have you do it at that time. It is appropriate now, in light of your current misbehavior and current circumstances to ask for a full list.

And I ask for that to be -- I mean, I need you to like sign that under oath. There can't be any mistake on that.

MR. YOUNG: Well, so, Your Honor, if I may? So my understanding of this, from my research, is if this Court sanctions me, I believe, under one of the specific local rules, I can be directed by some other part of this Court to report it to certain jurisdictions. Is Your Honor asking me to preemptively share before a sanctions order issues?

THE COURT: I am saying that as part of what this Court is considering, in a concerning pattern of behavior; that I believe I have given enough Hansel and Gretel -- you know, I've left enough rocks to give hopefully a flavor for all of your shenanigans --

MR. YOUNG: You --

THE COURT: -- let me finish -- your shenanigans, at this point, I'm requiring you to give me more information so that I can make a complete ruling. Because what I know is that you have engaged in similar misconduct in front of a woman judge in Oklahoma.

MR. YOUNG: So, Your Honor, Judge Cauthron never --

THE COURT: I'm not done -- listen, I'm not --

MR. YOUNG: -- found me to have committed misconduct, Your Honor.

THE COURT: -- I'm not done yet. Don't talk over me.

Well, let me tell you, I've read that whole transcript, and I -- I disagree. You didn't show up on time for, was it, closings, openings, where they just started without you --

MR. YOUNG: No, Your Honor.

THE COURT: -- at the beginning of the trial? No, I want to talk to you about your behavior in that trial.

You were called out by that Judge for calling women by their first names. Everything that happened in this Court happened in that Court.

So this Court needs to look at that record. This Court needs to look at that. If not this Court, the New York Bar. But I can tell you that at this point, this Court has a larger duty.

Let me ask you this question and we'll wrap. And I'll let you have your ten seconds to say whatever you want to say.

Will you agree with me that if you went to a doctor who would upload your medical records because they're ticked off at you because of some billing, to embarrass you or harass you, should that person be a doctor?

MR. YOUNG: So, Your Honor, again, I can't speak to a situation that's not before me.

THE COURT: You can't speak to a -- really?

MR. YOUNG: Your Honor, I'm here on a very specific order to show cause. And much of the substance of what we're discussing is not within the four corners of that show cause order. And I'm owed a right to have meaningful opportunity to be apprised ahead of time.

THE COURT: I've apprised you of every- -- I've apprised you of the three websites -- of several websites. You are an amnesiac, who cannot face the truth, even when confronted with direct evidence.

MR. YOUNG: So, Your Honor --

THE COURT: Just stop. Let me talk and I'll let you finish.

So I'm going to make this finding. You -- you -- you never -- no matter how squarely I confront you with something, you're an amnesiac. Nothing is your fault. You're always an exception to rules. And so I don't expect you to take any accountability about anything.

But I do just want to disabuse you of this notion that somehow you don't have to provide me information about potential misconduct in other courts. It's absolutely within my purview, as a sitting Article III judge, looking at disciplining you for a long line of racist behavior --

MR. YOUNG: So --

THE COURT: -- to do that. And so I'm asking it,

and you can appeal me on it. But I'm asking for a list of every place where, as a lawyer, you have stepped foot. Because I think -- I think you're a racial bully, and we need to look into it.

MR. YOUNG: Well --

THE COURT: And I'm going to let you have the mic now, and you finish saying anything you'd like to say.

MR. YOUNG: I believe every federal court in which I've appeared as a lawyer, though it'll be over and conclusive of amici counsel, that's all on PACER. That's public information.

THE COURT: Actually, give me amici, too. Give it all to me.

MR. YOUNG: Okay. And would Your Honor like that to include amici briefs I've signed, but I was not counsel?

THE COURT: Everything. Everywhere you may have appeared, because you don't tell me the truth about things.

MR. YOUNG: Well, again, Your Honor, I'll point out, all of the federal courts in which I've appeared, that's all on PACER.

THE COURT: I'm not going to go look it up.

MR. YOUNG: No, I'm just letting the Court know that's all public-facing. I'll go through and pull it.

THE COURT: Great. That will get the federal. Now I want to know every court you've appeared in as a

lawyer. All of them. Every judge. This misconduct is disturbing.

MR. YOUNG: Well, Your Honor, if I may --

THE COURT: Your abuse of lawyers is disturbing.

MR. YOUNG: -- if I may make a record now for appeal, Your Honor.

THE COURT: Go ahead.

MR. YOUNG: Thank you, Your Honor, for that opportunity.

I'll just point out for the record, much of what was presented to me today, including, it looked like, at least 15 exhibits provided to me today for the first time -- many of which are e-mails between Your Honor and someone else with partial screen caps -- these were presented to me for the first time. They're not included in the order to show cause. The order to show cause is specifically about alleged violation of the Court's November 2025 order. That's what I prepared for. That's what I responded to.

With respect to the other stuff, Your Honor, I respectfully disagree. This seems unusual and odd to me that a federal judge is asking me and accusing me of committing misconduct in other federal courts that did not sanction me; that did not make such findings, Your Honor, when, among other things, one of my concerns about Judge Cauthron is, for reasons that have nothing to do with

me, and everything to do with the State of Texas being pissed off at the federal government at the time.

[redacted] merits case was swallowed up by the Northern District of Texas for a bit. And it had to go up to the Fifth Circuit. There was a lot of --

THE COURT: I know.

MR. YOUNG: -- angst and upset about that, Your Honor.

THE COURT: I've got a map of it.

MR. YOUNG: Yes, Your Honor.

In addition to that, Your Honor, I realize -- Your Honor represented on the record today that none of this is coming from my disclosure that I participated in an investigation involving this Court. And I -- I appreciate you're allowed to have your representation and I'm allowed to have my representation. However, I'm not aware of any other lawyer that has appeared in front of Your Honor, at least on the federal bench -- I'll admit I'm not so good at sorting through the Texas stuff. I -- I don't quite understand how the dockets work. There's that.

I'll point out that I'm disgusted and mortified by the suggestion by Your Honor that I have anti-Black animus. I'll point out that Mr. Green, who is still appearing as a counsel here, is a Black man. We have a good working relationship. He's a great guy. He's a great lawyer. He's

mostly -- I think he's an expert in like bankruptcy and tax stuff. Which, that's cool. Someone has to do that. Great working relationship.

My co-counsel in front of the Texas Supreme Court, Professor Bowman, is a Black woman.

THE COURT: I saw that.

MR. YOUNG: I will also point out that repeatedly during this hearing, Your Honor, it appeared that the Court was using vicious stereotypes about White people, when I've repeatedly disclosed to this Court I am Latino. I -- I'm also not Black. There are some Black Latinos. I am not Black Latino, to my knowledge. God only knows family stuff, right? But --

THE COURT: So am I discriminating against you because you're Latino; is what you're saying?

MR. YOUNG: Your Honor, what I am saying is that it appears that this Court is trying to tar and feather me for anti-Black animus, that has never been raised by anyone but this Court.

THE COURT: This Black woman?

MR. YOUNG: No, Your Honor. This Court.

THE COURT: This Black judge?

MR. YOUNG: Your Honor, this Court.

THE COURT: Black.

MR. YOUNG: Yes, Your Honor. I'm aware of your

background. You're --

THE COURT: First Black woman.

MR. YOUNG: Yeah, my understanding -- I wasn't sure if it was first Black woman or if it was first -- I thought -- I knew about the first as a Native American, Your Honor. And I believe that's what the federal --

THE COURT: Also first Black woman.

MR. YOUNG: Okay. And the --

THE COURT: So I just want to throw out there, I know -- it is not unusual when White-presenting people, such as yourself, are accused of racism, and faced with a record of it, to be stunned and outraged, and talk about their Black friends, and say, no way --

MR. YOUNG: Your Honor, I didn't --

THE COURT: -- let me finish. Let me finish.

And so I know that you're shocked and outraged that somebody is holding you accountable for your misbehavior. And I know that you're stunned that I appear to be an angry Black woman. But I just want to tell you, some of the things that Black judges have to do is things like this.

And so I'm telling you, this record is disturbing. And I'm trying to give you an opportunity to air it out. But if what you want to do is say that you're being discriminated against --

MR. YOUNG: That's not what I said, Your Honor.

THE COURT: -- that's what I'm hearing from you, is that you're being tarred and feathered --

MR. YOUNG: Well, Your Honor, if I may just simply make a record for appeal, which I believe is my right, to be able to make sure that there's an appropriate record. Because if I am sanctioned by this Court, I'll challenge it on appeal. So I would like to be able to make that record, Your Honor.

I am concerned by this Court's conduct. I am concerned by how far afield today's proceedings were from the four corners of the order to show cause. I am concerned that this Court has made light of my actual work as a civil rights lawyer. Of my actual work.

THE COURT: What have you done? Let's pause for just a moment. Name one thing you have done.

MR. YOUNG: In what respect, Your Honor?

THE COURT: I know you use hashtags and I know you -- you know, I know that you are an ally to Black people. But my question is, everything that I have seen since your entry in this case to the Black people -- to the Black lives that matter in this case, is abuse.

MR. YOUNG: Well, Your Honor, among other things -- and I disclosed this in a letter to the Court, I want to say, like two days ago. Among other things, the

mentor who I am caring for in my home, and I have been --

THE COURT: Let me guess, is Black?

MR. YOUNG: Yes.

THE COURT: I'm surprised. You -- I love when people bring up all their Black friends when they're --

MR. YOUNG: Your Honor, that wasn't --

THE COURT: -- listen to me. Listen to me. You talk over me. You disrespect me. You have a problem with Black excellence. It just -- it's a thing, and I'm just saying it. And so --

MR. YOUNG: I would like to make --

THE COURT: -- that you're uncomfortable with it, and it injures you, I get that.

MR. YOUNG: -- Your Honor, I would like to make a record for appeal, if I may.

THE COURT: Well, here's what you don't get to do: Just talk.

MR. YOUNG: Thank you.

THE COURT: So I'm going to give you like -- well, I mean, there's no question on the floor. What you want to do is argue with me about --

MR. YOUNG: No, Your Honor --

THE COURT: -- hey, don't talk over me. Don't talk -- there's one hearing -- listen, you don't -- I promise you, Mr. Young, I promise you, if I pull this

transcript in front of a White man judge -- I'll pull one, promise. We'll see -- I could count in one hearing you -- you spoke over this Court 30 times. And that is no exaggeration. You also did it to Black opposing counsel. You talked over her like she did not exist.

And you called men by Mister. You called her by her first name. Judge Cauthron got on to you for the same thing. And so there's a disturbing pattern. And that you are really upset that someone has detected it does not make me somehow doing something terrible. It makes me doing my job and holding you accountable on a record.

And you're welcome to appeal it. I get that you're unhappy with me calling you out as a racist. It's really uncomfortable since you're all wrapped up in your ally-ship.

But as far as this Court can see, it's performative. I haven't seen anything that you have done other than give hashtags to Black people. The Black people that I have seen, you have -- I mean, everybody in this case was just trying to do their job. But you have to be the main character. You do. It's all about you.

Just like Judge Cauthron said. You are more interested in fighting with opposing counsel, and coming in and doing your -- whatever it is you do; kicking the chess pieces up, to show your perceived-to-be, I'm not sure what

you are, White privilege, whatever. White-presenting.

But I know that you abuse Black people and Black lawyers, and you get away with it. Because nobody has made a record. And so I'm telling you that I'm making one. I'll let you know what the sanctions are. You're welcome to respond to it. But I'm not going to argue with you about how many Black friends you have, because that just shows why we're here.

So is there anything other than how many Black people you like hanging around with, and how you -- I don't know, you're an ally, that you want to put for appeal?

MR. YOUNG: Yes. For the purposes of appeal -- and I'll disclose that I got the permission ahead of time, just in case this was relevant -- the reason why I am taking care of Luke Charles Harris right now is because his partner, Kimberlé Williams Crenshaw, has a memoir being released. This is the capstone of her amazing career.

One of the reasons why I am taking care of someone with dementia -- which is quite difficult -- right now, is to allow another cherished mentor to take her victory lap. One of the main reasons why I want her to be able to take that victory lap, is she -- I'm not going to disclose her age, but that's public; but she'd be upset if I said it on the record -- very few people of her cohort -- she's an elder to us both, Your Honor -- ever achieved anything like

this. Even her White mentors.

This was a major, major achievement for her. It's coming out on her birthday, May 5th. So, very soon. It's called Backtalker: An American Memoir.

THE COURT: What does that have to do with anything?

MR. YOUNG: Because Your Honor is accusing me of at no point in my life taking care of and supporting Black people. And specifically, with respect to Professor Crenshaw, Black excellence.

THE COURT: Well --

MR. YOUNG: I go out of my way to support the work of Professor Crenshaw, Professor Harris, and other people. I've written and been published on Critical Race Theory. And -- something that she coined, and something that she is the main conceptualizer of; that for reasons other people disagree, they attribute it to Derek Bell. But they're sexist. It was Kimberlé Crenshaw who coined Critical Race Theory and who built up much of the infrastructure of it.

Much of the work I do on the African American Policy Forum is making sure that our predominately Black staff are supported both while they work with us and for the rest of their careers. Much of the work that we do is working with other racial justice groups to properly conceptualize ways to push back against the Supreme Court's

recent retrenchment about affirmative action.

THE COURT: Oh.

MR. YOUNG: That is work that I have long been committed to, that is reflected on my CV. I don't think that that should be relevant to a proceeding in the Northern District of Texas. But I think this Court may have cherry-picked some things to try to paint me as being someone who I am not. And that that itself reflects, among other things, reasons why Professor Butler sought your recusal, Your Honor. Why I reported Your Honor.

THE COURT: Oh, I didn't know you reported me.

MR. YOUNG: Your Honor, I disclosed it in filings that --

THE COURT: I assumed you made that up, really.

MR. YOUNG: Well, Your Honor, if you go on my website and pull the appendices -- not the documents that were given to me, but the actual appendices -- they include redacted conversations with the various people to whom I was reporting to. That's public --

THE COURT: Okay.

MR. YOUNG: -- Your Honor.

THE COURT: I can promise you this -- listen, one -- just one last thing and I'll give you the record. Because you're in your feelings about this motion to recuse. I over share things. So I promise you if there's any

potential conflict, someone knows about it who was a lawyer before you. Promise you that.

Second of all, literally, I had a grievance from a murderer who was mad at me because I dared write an appellate opinion agreeing with the jury and the homicide detective. It doesn't bother me. It's just business.

If you feel I have wronged you, complain. If you feel I've wronged you today, complain again. I don't want to quell your right to whatever it is you think you should do. I feel like I'm doing my job today. I get that you don't like it. I think I'm still doing my job today.

Is there anything else you'd like to say?

(Brief pause.)

THE COURT: Hearing nothing --

MR. YOUNG: Your Honor, one moment.

THE COURT: No, let's rest and close.

Rest and close.

MR. YOUNG: Your Honor?

THE COURT: I'm going to give you 60 seconds.

So you're just going to pout now? Now you're looking at me like --

MR. YOUNG: Your Honor, the reason why I came into this case originally was because tenure discrimination in law schools, particularly against Black women, is heinous. It's under litigated. It is extremely difficult to find

representation.

The only reason why I took Professor Butler's case was because of what I have learned from Professor Crenshaw. What I've learned from Professor MacKinnon, who went through her own sorted and very public tenure denial --

THE COURT: Yes. Can I pause and just tell you, I appreciate, on behalf of Black people, your White saviordom. What else do you have?

MR. YOUNG: Your Honor, again, I'm not White.

THE COURT: Okay. White-appearing.

MR. YOUNG: Okay. But again, Your Honor, the Court appears to be injecting my race, supposed race --

THE COURT: Oh, is it reverse racism now? I'm --

MR. YOUNG: No, Your Honor --

THE COURT: -- listen --

MR. YOUNG: -- I think this Court is inappropriately searching for reasons to punish me because I have tried to zealously advocate for my clients. Because I have not agreed with this Court's characterizations of my behavior. Which is my right. I have a right to disagree with this Court.

THE COURT: You have a right to appeal. I'm not going to argue with you again. You've said you're not a racist. You've told me about your Black friends. You tell me how much you do for us. On behalf of Black people, thank

you so much.

Do you have anything else?

(No response.)

THE COURT: Then rest and close.

All right. I will let you know when I have reached a decision.

MR. YOUNG: I do have one additional thing, Your Honor.

THE COURT: I've rested and closed. I'll let you know when I've reached a decision, and I hope you have safe travels. I find it tragic -- and I do want to tell you this. I hoped to the end, Mr. Young -- I know you think I have an animus towards you. I hoped to the end you would take the alternate ending. Had I had it out for you, I would not have warned you the first time, and then pro hac'd you the second time.

I have had incremental sanctions in the hopes that your heart for civil rights would actually follow through to actually behaving honorably toward real living, breathing Black people. And it has not done so.

And so your performative civil rights hero thing...

(Clapping.)

THE COURT: I do want to note for the record, I did file a civil rights case in this courthouse, and won it.

And so I know about performance. And I think that's what you're doing.

And so with that said, Court's off the record and I'll let you know my decision.

Court's in recess.

(End of proceedings.)

I, BROOKE N. BARR, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Dallas Division, hereby certify that the above and foregoing contains a true and correct transcription of all proceedings in the above-styled and -numbered cause.

WITNESS MY OFFICIAL HAND this the 1st day of May, 2026.

/S/ BROOKE N. BARR
BROOKE N. BARR, CSR NO. 6521
CSR Expiration Date: 7/31/26
United States Court Reporter
1100 Commerce Street
Room 1376
Dallas, Texas 75252
(214) 753-2661